# EXHIBIT 13

AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO FREEPORT-MCMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY THIS ACTION

CENTURY INDEM. CO. V. FREEPORT-MCMORAN COPPER & GOLD INC.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.: 08 CV 02012 (PKL)

# HellerEhrman LLP

April 16, 2008

*Via Hand Delivery*

Mark J. Plumer<br>
Shareholder<br>
Mark.Plumer@hellerehrman.com<br>
Direct +1 (202) 912-2021<br>
Direct Fax +1 (202) 912-2202<br>
Main +1 (202) 912-2000<br>
Fax +1 (202) 912-2020

41196.0003

The Honorable Peter K. Leisure
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1910
New York, New York  10007

> Re:   *Century Indemnity Company, et al. v. Freeport-McMoRan Copper & Gold Inc., et al.,* Case No. 08 CV 02012 (PKL) (S.D.N.Y.)

Dear Judge Leisure:

We represent defendants Freeport-McMoRan Copper & Gold Inc., Phelps Dodge Corporation and Cyprus Amax Minerals Company (collectively, "Cyprus Amax").[1] This letter serves as a request, pursuant to Federal Rule of Civil Procedure 6(b)(1) and Rule 1.E. of this Court's individual practices, for a 45 day extension of the current deadline of April 23, 2008 to answer, move or otherwise respond to the Complaint or, in the alternative, for a 45 day stay of the litigation. Should the Court grant Cyprus Amax additional time to answer, we respectfully request, in addition, that the preliminary pre-trial conference, currently scheduled for May 22, 2008, be adjourned 45 days as well, until June 6, 2008 or the next available date on the Court's calendar. Consistent with Rule 1.E of this Court's individual practices, we have enclosed a proposed order rescheduling the date of the preliminary pre-trial conference, a copy of which has been electronically mailed to the Orders and Judgment Clerk pursuant to the Guidelines for Electronic Case Filing in the Southern District of New York.

Cyprus Amax previously requested and plaintiffs consented to a 30-day extension, and this Court "so ordered" the parties' stipulation on March 20, 2008. On Monday, April 14, 2008, Cyprus Amax requested consent for an additional 45 day extension from plaintiffs' counsel. *See* Exhibit A. Counsel for Century Indemnity Company ("Century") replied that it

---

[1] This dispute involves Cyprus Amax Minerals Company and its predecessors and subsidiaries. Accordingly, Cyprus Amax has met and conferred with plaintiff-insurers and requested that they agree to dismiss Freeport McMoRan Copper & Gold Inc., which is not necessary to a resolution of insurers' claims and is not properly named as a defendant. Insurers have refused, and Cyprus Amax intends to file, at the appropriate time, a motion to dismiss Freeport McMoRan Copper & Gold Inc. from this lawsuit.

Heller Ehrman LLP   1717 Rhode Island Avenue, NW,  Washington, D.C.  20036-3001  www.hellerehrman.com

Beijing   Hong Kong   London   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle/Anchorage   Shanghai   Silicon Valley   Singapore   Washington, D.C.

# HellerEhrmanᴸᴸᴾ

would agree to the extension but only if Cyprus Amax stipulated that it would not seek to transfer the action to another jurisdiction or court. *See* Exhibit B. Continental has not yet provided its final position. Cyprus Amax has informed Century that it cannot agree to Century's demand; such a stipulation would not "secure the just, speedy, and inexpensive determination of this action." Fed. R. Civ. P. 1. Therefore, Cyprus Amax is compelled to seek relief directly from the Court.

## Factual Background

A brief review of the facts will assist the Court in understanding the basis for Cyprus Amax's request.

The current dispute is over an alleged $7.8 million to be spent by Cyprus Amax segregating, indexing and privilege reviewing some 18,000 boxes of documents in defense of multiple lawsuits now pending in various jurisdictions against Cyprus Amax. Prior to a 1993 merger that created Cyprus Amax, there were two separate companies: (1) AMAX Inc. and (2) Cyprus Minerals Company. Prior to the merger, each of these companies had separate identities (and subsidiaries) and separately maintained their records in separate locations. After the merger, the records of these two companies were transferred to a single location and combined. Later-filed asbestos, silica, talc and clay lawsuits against these entities and their subsidiaries have necessitated the current review and segregation of the commingled records, which unfortunately were not reliably indexed. Until recently, Cyprus Amax believed that many of these documents had long-ago been destroyed. Upon learning some had not and that the existing indices were not reliable, Cyprus Amax commenced the disputed review.

The insurer-plaintiffs in this lawsuit issued primary insurance to AMAX Inc. and its subsidiaries. The current case seeks a declaratory judgment (only) that Century and Continental have no obligation to pay the costs of reviewing the newly discovered and commingled documents in defense of their insured, despite that outstanding discovery requests in the pending litigations may call for production of certain of the documents.

Thus, what plaintiffs' Complaint refers to as the "Corporate Records Assimilation Project" of Phelps Dodge Corporation is, rather, a project undertaken by Cyprus Amax in order to defend itself in lawsuits pending against certain of its predecessors. Plaintiffs have acknowledged that they have a duty and obligation to pay the defense costs for these actions and, in fact, both Century and Continental are defending several lawsuits pending against Amax Metals Recovery, Inc. ("AMRI"), a current Cyprus Amax subsidiary (and former AMAX Inc. subsidiary), with asbestos claims against it. However, both Century and Continental have reneged on their duty to defend and refused to pay for the litigation driven document review at the center of this case. In December 2007 and January 2008, Cyprus Amax met face-to-face with Continental and Century to discuss the project and related costs

# HellerEhrman LLP

and to answer its insurers' questions.  At these meetings, Cyprus Amax requested the insurers to provide their commitment to provide coverage for these costs.  In lieu of providing such a commitment, Century and Continental filed this lawsuit terminating the ongoing claims discussion.[2]

Although it is not reflected in the Complaint, the present defense costs dispute is not properly limited to AMAX Inc.'s primary insurers (plaintiffs Century and Continental ("AMAX insurers")).  The dispute also involves Cyprus Minerals Company's primary insurers (Truck Insurance Exchange, Fireman's Fund Insurance Company, Old Republic Insurance Company and Continental Insurance Company ("Cyprus insurers")).  Like the AMAX insurers, the historic Cyprus insurers have refused to pay the requested defense costs related to the review of commingled AMAX Inc. and Cyprus Minerals Company documents. However, there is a requirement that Cyprus Amax engage in non-binding mediation with the Cyprus insurers before commencing any lawsuit against them.  Co-plaintiff in this lawsuit, Continental, is well aware of this requirement, because it insured both AMAX Inc. and Cyprus Minerals Company.  Cyprus Amax last week sent a letter to the Cyprus insurers demanding mediation within 30 days.

Importantly, the Complaint filed by Century and Continental in this Court does not name AMRI as a party, despite that all of the underlying lawsuits for which the AMAX insurers owe defense costs have been filed against AMRI.  AMRI, a wholly owned subsidiary of Cyprus Amax, is incorporated in Delaware and has its principal place of business in Louisiana.  AMRI is not authorized to do business in New York and is not subject to this Court's jurisdiction.

Finally, since the Complaint was filed, Cyprus Amax and Continental have met to discuss the potential settlement of this dispute.  While the outcome of these discussions remains uncertain, there is at least a chance that a settlement may be accomplished between these parties.  It is Cyprus Amax's hope that a similar meeting will be held with Century within the next few weeks.

---

[2] This is not the first time that Continental has filed a lawsuit during ongoing claims negotiations with AMAX Inc. and its subsidiaries.  For example, in 1993, Continental filed a lawsuit against AMAX Inc., which was dismissed in favor of a later lawsuit filed in Colorado by AMAX Inc. and its relevant subsidiaries.  New York's Appellate Division, First Department recognized on an appeal taken by Continental and Century – the same plaintiffs here – that "[s]ince [Continental] commenced this action at a time when negotiations for settlement of these claims were taking place, we afford plaintiff no benefit from having commenced this action before defendant Amax commenced its similar Colorado action." *Cont'l Ins. Co. v. Amax Inc.*, 192 A.D.2d 391, 391, 596 N.Y.S.2d 370, 370-71 (1st Dept. 1993).

HellerEhrman LLP

## Reasons for Defendants' Request

Upon this factual backdrop, defendants respectfully request that there is good cause for the Court to order a 45-day extension, or stay, for the following reasons:

This is a lawsuit that never should have been filed in this forum and insurers' decision to seek a coverage determination in this Court is exactly the kind of forum shopping that they engaged in against AMAX Inc. previously and for which their conduct previously was condemned by the New York courts. *See* note 1. Based on information currently available to Cyprus Amax, the basis for filing the current lawsuit in New York is far weaker than the last time, as none of the parties are currently based in New York, there is no dispute about the existence or wording of the relevant policies and none of the key witnesses or documents are located in New York.

Moreover, this entire dispute over the scope of its insurers' duty to defend should be adjudicated, if necessary, in a single lawsuit that includes both the AMAX insurers and the Cyprus insurers. It is possible that mediation with the Cyprus insurers will resolve part of the dispute, although these insurers have identified numerous reasons why they believe the disputed defense costs are not covered. The requested extension will provide the time necessary for Cyprus Amax to complete the required mediation process. Thus, within 45 days, Cyprus Amax will know which parties are or are not necessary to resolve this entire dispute and can answer, move or otherwise respond to the Complaint without further delay. It is within this Court's inherent power to extend the time to answer or to issue a stay on these facts. *See, e.g., Don King Prod., Inc. v. Hopkins,* No. 04 Civ. 9705, 2004 U.S. Dist. LEXIS 25917, *8 (S.D.N.Y. Dec. 23, 2004) ("Rule 6 of the Federal Rules of Civil Procedure provides a district court with wide discretion to grant a request for an extension of time made prior to the expiration of the period prescribed. Indeed, courts will normally grant such applications in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party.") (internal citations omitted); *Kernisant v. City of New York,* 225 F.R.D. 422, 431 (E.D.N.Y. 2005) (explaining that an application for the enlargement of time under Rule 6(b)(1) normally will be granted in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1360 (3d ed. 2008) (recognizing that federal courts "rely[] on their inherent power . . . in an effort to maximize the effective utilization of judicial resources and to minimize the possibility of conflicts between different courts").

If Cyprus Amax's efforts to resolve this entire dispute outside of litigation should prove unsuccessful, Cyprus Amax intends to move this Court to dismiss the current lawsuit in favor of a more comprehensive action to be filed in a more appropriate forum where all of the necessary parties may be sued. The alternative action will include additional necessary claims and parties. Importantly, neither AMRI nor the Cyprus insurers may be sued in this

HellerEhrman LLP

Court.  Under such circumstances, the Court has ample discretion to dismiss or stay this diversity action seeking a declaratory judgment in favor of a more appropriate forum pursuant to the United States Supreme Court's decision in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) and, also, pursuant to Federal Rule of Civil Procedure 12(b)(7) in view of the fact that AMRI, a necessary and indispensable party to this action, cannot be joined in this proceeding.

Finally, an extension or stay will allow Cyprus Amax and Continental to continue ongoing settlement discussions and, we hope, will enable Cyprus Amax and Century to begin such discussions.  Of course, it would be preferable if this dispute could be settled (in whole or in part), averting further litigation in this Court.[3]

\* \* \* \* \*

Cyprus Amax has and intends to continue to act with urgency to resolve this entire dispute in the most efficient manner, with a view toward including all of the correct parties in the correct forum should litigation be necessary.  A 45-day extension or stay would promote efficiency by averting premature and potentially unnecessary motion practice.  The requested relief will not in any way prejudice plaintiffs' rights.  Indeed, plaintiff insurers' goal is to avoid payment of monies due and owing to Cyprus Amax and no harm can be worked upon them by delaying their payment obligation for an additional 45 days.  There is good cause to grant the requested relief, and the requested extension or stay is well within the Court's discretion and is necessary to ensure the "just, speedy, and inexpensive determination of this action."  Fed. R. Civ. P. 1.

Respectfully submitted,

*Mark J. Plumer*

Mark J. Plumer

Enclosures
cc:    Shane R. Heskin, Esq. (via facsimile and overnight mail)
       Alan P. Jacobus, Esq. (via facsimile and overnight mail)

---

[3] Cyprus Amax is cognizant of the Court's individual practices which require a pre-motion letter for motions other than discovery motions and motions to dismiss in lieu of an answer (Rule 2.A), and Cyprus Amax will file any such letter at an appropriate time.

# EXHIBIT 14

**AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO FREEPORT-McMoRan COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY THIS ACTION**

*CENTURY INDEM. CO. v. FREEPORT-McMoRan COPPER & GOLD INC.*

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.: 08 CV 02012 (PKL)**

# White and Williams LLP



1800 One Liberty Place
Philadelphia, PA 19103-7395
Phone: 215.864.7000
Fax: 215.864.7123

*Shane R. Heskin*
*Direct Dial: 215.864.6329*
*Direct Fax: 215.399.9603*
*heskins@whiteandwilliams.com*

April 17, 2008

**VIA HAND DELIVERY**

The Honorable Peter K. Leisure
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1910
New York, New York 10007

> Re: **Century Indemnity Company et al. v. Freeport McMoran Copper and Gold, Inc. et al., Case No. 08 CV 0210 (PKL) (S.D.N.Y.)**

Dear Judge Leisure:

Plaintiff Century Indemnity Company ("Century"), respectfully, writes in response to defendant Freeport-McMoRan Copper & Gold, Inc.'s ("Freeport") April 16, 2008 letter, which effectively seeks a stay of this litigation so that defendant may file a duplicative action in another jurisdiction and embroil this Court in an unnecessary forum battle. Century, respectfully, opposes defendant's open attempt to forum shop and to delay the swift resolution of this dispute.

Century filed its Complaint on February 28, 2008 seeking a declaration that defendant's $7.8 million document-review project (assimilating into its own corporate records 18,000 boxes of documents acquired in a hostile takeover) is not a "covered" defense cost. Among other things, Century contends that these costs are not related, reasonable or necessary costs of defending the underlying action and were incurred without prior notice or consent. Having already received a 30-day extension, defendant now asks this Court to extend its time to respond by 45 more days until June 7, 2008, thus allowing a total of 95 days, *i.e.*, over a quarter of a year to ultimately respond.

Notably, defendant Freeport does not seek this extension because it needs additional time to investigate or otherwise substantively respond. Nor does defendant need the additional time for its claimed purpose of furthering settlement discussions. Indeed, if that were the true basis, Century has already assented to the requested extension. *See* E-mail from Mark Plumer, dated April 14, 2008, annexed hereto as Exh. A. Tellingly, defendant declined Century's offer of an extension, which was conditioned only on defendant's representation that it would not use the extension to facilitate forum shopping. *See id.* Instead, defendant now moves this Court for an emergency stay by letter without providing the Court or the parties with the benefit and protections of motion practice.

The Honorable Peter K. Leisure
April 17, 2008
Page 2

In doing so, defendant Freeport casts a host of unsubstantiated assertions about the merits of the underlying claim, as well as, the factual and legal basis of its nascent motion to dismiss in favor of a yet to be identified forum. Significantly, defendant makes numerous blanket statements without any factual or legal support. For instance, defendant asserts that American Metals Recovery, Inc. ("AMRI"), the subject of the underlying litigation and a subsidiary of defendant Freeport, is not a party to the lawsuit and is not subject to the jurisdiction of New York. These newfound claims are wholly at odds with defendant's recent representations that plaintiffs have in fact named all relevant and necessary parties to this dispute. Indeed, just less than two weeks ago, Amax represented, in seeking dismissal of Freeport as the parent company of the named insured, that

> Plaintiffs' claim is based solely on policies issued Amax Inc. or its predecessors and historic records generated by Amax, Inc. and/or Cyprus Minerals Company or its predecessors. It is undisputed that Amax, Inc. merged into Cyprus Minerals Company and immediately changed its name to Cyprus Amax Minerals Company. It is also undisputed that Cyprus Amax Minerals Company thereafter merged with a subsidiary of Phelps Dodge, but kept the name Cyprus Amax Minerals Company. Thus, Cyprus Amax Minerals Company, a currently existing corporation, is the corporate successor to the Amax, Inc and predecessor coverage and is therefore entitled to any coverage available under the Amax policies. **Moreover, any documents implicated by plaintiffs' claims arise out of the operations of Cyprus Amax Minerals Company or its corporate predecessors. No other members of the Freeport McMoRan corporate family are necessary for plaintiffs to obtain complete relief regarding the declaratory judgment sought in this action regarding the Amax policies.**

E-mail from Mark Plumer, dated April 4, 2008, annexed hereto as Exh. B (emphasis added).

Setting aside these obvious inconsistencies, even if AMRI were a necessary party, defendant's personal jurisdiction claims also have no merit. The insurance policies at issue were issued by Century to American Metals Climax, Inc., a New York insured with its principle place of business located in New York. To the extent that AMRI claims coverage under these policies, which were issued to a New York insured, jurisdiction clearly exists. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, 319 F. Supp. 2d 352, 358-367 (S.D.N.Y. 2004) (confirming where an entity subject to personal jurisdiction in New York procures insurance for another entity, the second entity is subject to personal jurisdiction in New York).

For the same reasons, defendant Freeport's claim that New York does not have a substantial relationship to this dispute similarly has no merit. As the New York Court of Appeals has recently affirmed, the singular most controlling factor in deciding which state has

The Honorable Peter K. Leisure
April 17, 2008
Page 3

the most significant interest under an insurance policy is the named insured's domicile at the time of issuance. *See Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 26-27, 822 N.Y.S.2d 30, 37 (1st Dep't 2006) ("[W]e regard the state of the insured's domicile to be a proxy for the principal location of the insured risk, which, under New York law . . ., is the controlling factor in determining the law applicable to a liability insurance policy . . . ."), *aff'd*, 9 N.Y.3d 928, 876 N.E.2d 500, 844 N.Y.S.2d 773 (2007). The policies at issue here were issued to a New York insured with its principal place of business located in New York. New York therefore unquestionably has the most substantial interest to this dispute.

New York's substantial interest also defeats defendant Freeport's allegations that Century is the one engaged in forum shopping by filing this declaratory judgment action. Contrary to defendant's assertions, this Court has recognized that "forum shopping" only occurs "when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice; a party who appropriately files a declaratory judgment action in the forum most convenient to him to resolve a ripe legal dispute is not engaged in forum shopping." *Schnabel v. Ramsey Quantitative Systems, Inc.*, 322 F.Supp.2d 505 (S.D.N.Y. 2004). Far from defendant's accusations, Century's choice of a New York forum to litigate a dispute under policies issued to a New York insured is far more akin to a right than any claimed strategic maneuver.

Finally, defendant Freeport's claim that the insurers of a wholly separate insured, which have no relationship to the insurance policies or insured at issue, are necessary parties to this dispute is also baseless. The Second Circuit has long established that "a joint obligor is not an indispensable party to an action against one of the other obligors." *Giaguara S.p.A. v. Amiglio*, 257 F.Supp.2d 529, 541 (E.D.N.Y. 2003) (citing *Greenleaf v. Safeway Trails*, 140 F.2d 889, 890-91 (2d Cir. 1944)). Moreover, defendants have offered no identifiable reason why its other insurers cannot be joined in this New York action.

For all of the foregoing reasons, Century, respectfully, requests that the Court deny defendant Freeport's instant request to delay a prompt resolution of this matter.

Century thanks the Court for its consideration.

Respectfully submitted,

/s/ Shane R. Heskin (RV)

Shane R. Heskin

cc:    Alan Jacobus, Esq.
       Mark Plumer, Esq.

# EXHIBIT A

# EXHIBIT A

**Vergara, Rafael**

| | |
|---|---|
| From: | Plumer, Mark J. [Mark.Plumer@hellerehrman.com] |
| Sent: | Monday, April 14, 2008 5:45 PM |
| To: | Heskin, Shane |
| Cc: | Cirando, Lisa M.; Cellucci, Guy; ajacobus@cbmlaw.com |
| Subject: | RE: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc., No. 08-CV-0212 (PKL) (SDNY) |

Shane,

Thanks for your prompt response.  I don't think we can provide you the assurance
you require.  Accordingly, unless we hear otherwise from you, I am going to
assume that Century objects to our request.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW |
Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email: mark.plumer@hellerehrman.com
| web: www.hellerehrman.com

-----Original Message-----
From: Heskin, Shane [mailto:heskins@whiteandwilliams.com]
Sent: Monday, April 14, 2008 4:25 PM
To: Plumer, Mark J.
Cc: Cirando, Lisa M.; Cellucci, Guy; ajacobus@cbmlaw.com
Subject: RE: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold
Inc., No. 08-CV-0212 (PKL) (SDNY)

Mark:

Century will agree to the 45 day-extension of time to answer the complaint on the
condition that Freeport/Amax stipulate that it will not seek to remove the NY
action in favor of another jurisdiction or court.
If Freeport/Amax needs in good-faith additional time to answer for reasons other
than resolving its Cyprus obligations, we are happy to consider a reasonable
extension of time not to exceed 14 days.  We also do not feel an adjournment of
the Rule 16 conference is appropriate at this time.

Regards,
-Shane

-----Original Message-----
From: Plumer, Mark J. [mailto:Mark.Plumer@hellerehrman.com]
Sent: Monday, April 14, 2008 4:04 PM
To: Heskin, Shane; ajacobus@cbmlaw.com
Cc: Cirando, Lisa M.
Subject: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc.,
No. 08-CV-0212 (PKL) (SDNY)

Counsel:

On behalf of defendants Freeport-McMoRan Copper & Gold, Inc., Phelps Dodge
Corporation and Cyprus Amax Minerals Company ("Cyprus Amax"), we write to request
an additional extension of 45 days from the current deadline of April 23 to
answer, move or otherwise respond to the Complaint and, in addition, your
agreement to extend by the same time the court-ordered conference currently
scheduled fo <<793306_1.DOC>> r May 22.  With your approval, we will file the

1

attached stipulation with the court on Wednesday April 16. We recognize that the parties cannot extend a Court ordered deadline but the parties can at least consent to adjourn it. If plaintiffs are unwilling to agree to a further extension, defendants plan to seek either a 45-day extension of all deadlines or a 45-day stay of this litigation.

This brief extension or stay is necessary. First, it will allow certain of the parties to the current lawsuit to continue ongoing settlement discussions and, we hope, will enable the remaining parties to begin such discussions. It obviously would be ideal if the current dispute could be settled (in whole or in part) and further litigation could be averted or streamlined. Second, the requested extension will begin a process designed to resolve this entire dispute efficiently by including all of the correct parties and resolving the entire dispute in the correct forum. What plaintiffs' Complaint refers to as the "Corporate Records Assimilation Project" was undertaken by Cyprus Amax Minerals Company ("Cyprus Amax") to defend certain lawsuits pending against certain of its predecessors. Prior to the merger that created Cyprus Amax in 1993, there were two separate companies, AMAX Inc and Cyprus Minerals Company, each with separate identities and records. After the merger, the records of these two companies were combined. The current defense of later-filed claims now pending against an AMAX Inc and Cyprus Minerals Company predecessors or subsidiaries has necessitated the review and segregation of commingled and un-indexed records. Indeed, the plaintiffs were advised before this litigation commenced that the $7.8 million estimate identified in the Complaint was the cost of segregating, indexing and privilege reviewing the commingled documents of these two former entities. What is in part at issue therefore is defense costs assignable to AMAX Inc's primary insurers in this lawsuit (Century and Continental) and Cyprus Minerals Company's primary insurers (Truck Insurance Exchange, Fireman's Fund Insurance Company, Old Republic Insurance Company and Continental Insurance Company). The historic Cyprus Minerals Company insurers likewise have been tendered this claim and, like Century and Continental in this case, have thus far refused to pay the requested defense costs. This entire dispute should be adjudicated, if necessary, in one lawsuit. Because Cyprus Amax is required to mediate with the Cyprus Minerals Company insurers before filing any lawsuit, it has sent a letter to them demanding mediation within 30 days.

Within 45 days, Cyprus Amax should know whether the Cyprus Minerals Company insurers are or are not necessary to resolve this dispute and can so answer or otherwise plead. If one or both of the current plaintiffs are unwilling to provide the requested 45-day extension, we request that each of you let us know promptly, as we plan to request an extension or stay from Judge Leisure by the close of business on Wednesday April 16, 2008.

Thank you for your assistance. Please contact me if you have any questions or concerns. Thank you.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW | Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email:
mark.plumer@hellerehrman.com | web: www.hellerehrman.com

====================================================

This email is sent by a law firm and contains information that may be privileged

and confidential. If you are not the intended recipient, please delete the email and notify us immediately.

===================================================

===================================================

This email is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the email and notify us immediately.

===================================================

# EXHIBIT B

# EXHIBIT B

**Vergara, Rafael**

| | |
|---|---|
| **From:** | Plumer, Mark J. [Mark.Plumer@hellerehrman.com] |
| **Sent:** | Friday, April 04, 2008 9:28 AM |
| **To:** | ajacobus@cbmlaw.com; Heskin, Shane |
| **Cc:** | Cirando, Lisa M. |
| **Subject:** | Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc., No. 08-CV-0212 (PKL) (SDNY) |

**Attachments:** 791570_1.DOC



791570_1.DOC (34
KB)

       Ian and Shane,

We appreciate Century and Continental's ("plaintiffs'") willingness to consider
stipulating to the dismissal of Freeport-McMoRan Copper & Gold Inc. without
prejudice from the lawsuit in an effort to avoid unnecessary motion practice.
This email responds to your request that we explain the reason for the dismissal
and that we provide adequate assurances that a complete resolution of this disput
<<791570_1.DOC>> e may be had as against the remaining parties alone.

Plaintiffs' claim is based solely on policies issued Amax Inc. or its
predecessors and historic records generated by Amax, Inc. and/or Cyprus Minerals
Company or its predecessors. It is undisputed that Amax, Inc. merged into Cyprus
Minerals Company and immediately changed its name to Cyprus Amax Minerals
Company. It is also undisputed that Cyprus Amax Minerals Company thereafter
merged with a subsidiary of Phelps Dodge, but kept the name Cyprus Amax Minerals
Company. Thus, Cyprus Amax Minerals Company, a currently existing corporation,
is the corporate successor to the Amax, Inc and predecessor coverage and is
therefore entitled to any coverage available under the Amax policies. Moreover,
any documents implicated by plaintiffs' claims arise out of the operations of
Cyprus Amax Minerals Company or its corporate predecessors. No other members of
the Freeport McMoRan corporate family are necessary for plaintiffs to obtain
complete relief regarding the declaratory judgment sought in this action
regarding the Amax policies. This said, we do not propose to dismiss Phelps
Dodge Corporation, whom we have determined played an active role in the facts and
circumstances underlying plaintiffs' Complaint as Cyprus Amax Minerals Company's
immediate parent. Freeport McMoRan Copper & Gold Inc., as the ultimate parent of
Cyprus Amax Minerals Company and Phelps Dodge Corporation is too far removed from
the facts, is unnecessary and therefore should be dismissed from the case.

In return for the plaintiffs' agreement to dismiss Freeport-McMoRan Copper & Gold
Inc. without prejudice, Freeport-McMoRan Copper & Gold Inc will agree to provide
any discovery relevant to the litigation. A dismissal without prejudice also
will not bar Plaintiffs from seeking to re-name Freeport-McMoRan Copper & Gold
Inc. should the need arise.

Please confirm by reply email that you will stipulate to the Rule 41(a)(1)(A)(ii)
dismissal of Freeport-McMoRan without prejudice and the attached draft
stipulation is acceptable. Thank you.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW |
Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email: mark.plumer@hellerehrman.com
| web: www.hellerehrman.com

===============================================

This email is sent by a law firm and contains information that may be privileged
and confidential. If you are not the intended recipient, please delete the email
and notify us immediately.

===============================================

# EXHIBIT 15

AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM
OF LAW IN OPPOSITION TO FREEPORT-MCMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY
THIS ACTION

*CENTURY INDEM. CO. v. FREEPORT-MCMORAN COPPER & GOLD INC.*

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.:  08 CV 02012 (PKL)

# HellerEhrman LLP

April 18, 2008

Mark J. Plumer
Mark.Plumer@hellerehrman.com
Direct +1 (202) 912-2021
Direct Fax +1 (202) 912-2202
Main +1 (202) 912-2000
Fax +1 (202) 912-2020

41196.0003

*Via Hand Delivery*

The Honorable Peter K. Leisure
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 1910
New York, New York 10007

Re:  ***Century Indemnity Company, et al. v. Freeport-McMoRan Copper & Gold Inc., et al.,*** Case No. O8 CV 02012 (PKL) (S.D.N.Y.)

Dear Judge Leisure:

On behalf of Defendants Freeport-McMoRan Copper & Gold Inc., Phelps Dodge Corporation and Cyprus Amax Minerals Company (collectively, "Cyprus Amax"), we respectfully offer this brief reply to Plaintiff Century Indemnity Company's ("Century") April 17, 2008 letter.

The April 16, 2008 letter to which Century responds merely seeks a 45-day extension, or stay, of Cyprus Amax's time to answer, move or otherwise respond to the Complaint, pursuant to Federal Rule of Civil Procedure 6(b)(1) and Rule 1.E of this Court's individual practices. Given the breadth of the Court's discretion, Cyrpus Amax is not seeking any extraordinary relief, and Century has not articulated any legitimate reason why the request should not be granted. Although Century complains about Cyprus Amax providing the factual context for its request, Cyprus Amax has not moved for dismissal, only for a brief extension sufficient to enable it to continue settlement negotiations (at least with Continental), determine the proper parties to this dispute and to assure that this litigation – wherever it proceeds – is sufficiently comprehensive to allow complete relief in an efficient fashion.

Century's response on the merits misses the point and does not raise the kinds of facts that should persuade the Court to require Cyprus Amax to answer immediately. Despite its protestations, Century has not demonstrated bad faith on the part of Cyprus Amax that would justify denying the request for extension. *See Don King Prod., Inc. v. Hopkins,* No. 04 Civ. 9705 , 2004 U.S. Dist. LEXIS 25917, *8 (S.D.N.Y. Dec. 23, 2004). Moreover, neither Century nor Continental have claimed any prejudice whatsoever would result from the Court

# HellerEhrman LLP

Honorable Peter K. Leisure
April 18, 2008
Page 2

granting an additional 45-day extension, or stay; to reiterate, allowing the insurers to delay their payment obligation for another 45 days in no way harms their interests. *Id.*

As to the merits, Cyprus Amax continues to believe that insurers have forum shopped, that AMRI is a necessary party the insurers failed to join, that the Cyprus insurers also should be a part of this dispute, and this Court has the discretion to dismiss the pending suit in favor of a more comprehensive one filed elsewhere if the lawsuit more properly should proceed somewhere else. However, Cyprus Amax respectfully suggests that its request does not require the Court to reach the merits at this time, before Cyprus Amax has filed another lawsuit and a motion to dismiss. Accordingly, Cyprus Amax does not respond to Century's substantive arguments at this time.[1]

In sum, Cyprus Amax submits that nothing Century has said contravenes the fact that the best way to maximize judicial resources and ensure the "just, speedy, and inexpensive determination of this action" (Fed. R. Civ. P. 1) is for the Court to grant Cyprus Amax's request for a 45-day extension, or stay.

Respectfully submitted,

/s/ Mark J. Plumer
Mark J. Plumer

cc:    Shane R. Heskin, Esq. (via facsimile and overnight mail)
       Alan P. Jacobus, Esq. (via facsimile and overnight mail)

NY 794087 v2
(41196.0003)

---

[1]    Because Century devotes almost one-half a page in its brief to it, Cyprus Amax notes that it disputes that its counsel's email requesting Century to stipulate to the dismissal of Freeport McMoRan Copper & Gold Inc. (Exhibit B to Century's letter) is in any way "inconsistent" with the argument that AMRI is a necessary party. Cyprus Amax's request to clean up the Complaint by stipulation focused on whether Century really intended to name as a party a twice-removed parent company of Cyprus Amax with no relationship to the policies in dispute, not why an independent but wholly owned subsidiary of Cyprus Amax insured by the policies at issue was not named as a party.

# EXHIBIT 16

AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO FREEPORT-McMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY THIS ACTION

CENTURY INDEM. CO. V. FREEPORT-McMORAN COPPER & GOLD INC.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.:  08 CV 02012 (PKL)

 **CARROLL, BURDICK & McDONOUGH LLP**

April 21, 2008

Alan P. Jacobus
Direct Dial: 415.743.2245
ajacobus@cbmlaw.com

44 Montgomery Street
Suite 400
San Francisco, CA
94104-4606

415.989.5900
415.989.0932 Fax
www.cbmlaw.com

Los Angeles
Sacramento
Walnut Creek

**BY FEDERAL EXPRESS**

The Honorable Peter K. Leisure
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1910
New York, New York 10007

**Re:    *Century Indem. Co. v. Freeport-McMoRan Copper and Gold, Inc.*
Case No. 08 CV 02012 (PKL) (SDNY)**

Dear Judge Leisure:

I write on behalf of co-plaintiff The Continental Insurance Company. Continental joins the letter brief co-plaintiff Century Indemnity Company sent to the Court dated April 17, 2008, which, for convenience, is attached to this letter. Continental believes this Court is the proper forum for this dispute and opposes any delay that will facilitate Freeport's anticipated wasteful and unnecessary forum challenge.

Respectfully submitted,

CARROLL, BURDICK & McDONOUGH, LLP

Alan P. Jacobus

cc:    Counsel of Record (by Electronic Mail)

CBM-IPG\SF401500.1

# White and Williams LLP



*1800 One Liberty Place*
*Philadelphia, PA 19103-7395*
*Phone: 215.864.7000*
*Fax: 215.864.7123*

*Shane R. Heskin*
*Direct Dial: 215.864.6329*
*Direct Fax: 215.399.9603*
*heskins@whiteandwilliams.com*

April 17, 2008

**VIA HAND DELIVERY**

The Honorable Peter K. Leisure
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1910
New York, New York 10007

> Re:    **Century Indemnity Company et al. v. Freeport McMoran Copper and Gold,
> Inc. et al., Case No. 08 CV 0210 (PKL) (S.D.N.Y.)**

Dear Judge Leisure:

Plaintiff Century Indemnity Company ("Century"), respectfully, writes in response to defendant Freeport-McMoRan Copper & Gold, Inc.'s ("Freeport") April 16, 2008 letter, which effectively seeks a stay of this litigation so that defendant may file a duplicative action in another jurisdiction and embroil this Court in an unnecessary forum battle. Century, respectfully, opposes defendant's open attempt to forum shop and to delay the swift resolution of this dispute.

Century filed its Complaint on February 28, 2008 seeking a declaration that defendant's $7.8 million document-review project (assimilating into its own corporate records 18,000 boxes of documents acquired in a hostile takeover) is not a "covered" defense cost. Among other things, Century contends that these costs are not related, reasonable or necessary costs of defending the underlying action and were incurred without prior notice or consent. Having already received a 30-day extension, defendant now asks this Court to extend its time to respond by 45 more days until June 7, 2008, thus allowing a total of 95 days, *i.e.*, over a quarter of a year to ultimately respond.

Notably, defendant Freeport does not seek this extension because it needs additional time to investigate or otherwise substantively respond. Nor does defendant need the additional time for its claimed purpose of furthering settlement discussions. Indeed, if that were the true basis, Century has already assented to the requested extension. *See* E-mail from Mark Plumer, dated April 14, 2008, annexed hereto as Exh. A. Tellingly, defendant declined Century's offer of an extension, which was conditioned only on defendant's representation that it would not use the extension to facilitate forum shopping. *See id.* Instead, defendant now moves this Court for an emergency stay by letter without providing the Court or the parties with the benefit and protections of motion practice.

The Honorable Peter K. Leisure
April 17, 2008
Page 2

In doing so, defendant Freeport casts a host of unsubstantiated assertions about the merits of the underlying claim, as well as, the factual and legal basis of its nascent motion to dismiss in favor of a yet to be identified forum. Significantly, defendant makes numerous blanket statements without any factual or legal support. For instance, defendant asserts that American Metals Recovery, Inc. ("AMRI"), the subject of the underlying litigation and a subsidiary of defendant Freeport, is not a party to the lawsuit and is not subject to the jurisdiction of New York. These newfound claims are wholly at odds with defendant's recent representations that plaintiffs have in fact named all relevant and necessary parties to this dispute. Indeed, just less than two weeks ago, Amax represented, in seeking dismissal of Freeport as the parent company of the named insured, that

> Plaintiffs' claim is based solely on policies issued Amax Inc. or its predecessors and historic records generated by Amax, Inc. and/or Cyprus Minerals Company or its predecessors. It is undisputed that Amax, Inc. merged into Cyprus Minerals Company and immediately changed its name to Cyprus Amax Minerals Company. It is also undisputed that Cyprus Amax Minerals Company thereafter merged with a subsidiary of Phelps Dodge, but kept the name Cyprus Amax Minerals Company. Thus, Cyprus Amax Minerals Company, a currently existing corporation, is the corporate successor to the Amax, Inc and predecessor coverage and is therefore entitled to any coverage available under the Amax policies. **Moreover, any documents implicated by plaintiffs' claims arise out of the operations of Cyprus Amax Minerals Company or its corporate predecessors. No other members of the Freeport McMoRan corporate family are necessary for plaintiffs to obtain complete relief regarding the declaratory judgment sought in this action regarding the Amax policies.**

E-mail from Mark Plumer, dated April 4, 2008, annexed hereto as Exh. B (emphasis added).

Setting aside these obvious inconsistencies, even if AMRI were a necessary party, defendant's personal jurisdiction claims also have no merit. The insurance policies at issue were issued by Century to American Metals Climax, Inc., a New York insured with its principle place of business located in New York. To the extent that AMRI claims coverage under these policies, which were issued to a New York insured, jurisdiction clearly exists. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, 319 F. Supp. 2d 352, 358-367 (S.D.N.Y. 2004) (confirming where an entity subject to personal jurisdiction in New York procures insurance for another entity, the second entity is subject to personal jurisdiction in New York).

For the same reasons, defendant Freeport's claim that New York does not have a substantial relationship to this dispute similarly has no merit. As the New York Court of Appeals has recently affirmed, the singular most controlling factor in deciding which state has

The Honorable Peter K. Leisure
April 17, 2008
Page 3

the most significant interest under an insurance policy is the named insured's domicile at the time of issuance. *See Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 26-27, 822 N.Y.S.2d 30, 37 (1st Dep't 2006) ("[W]e regard the state of the insured's domicile to be a proxy for the principal location of the insured risk, which, under New York law . . ., is the controlling factor in determining the law applicable to a liability insurance policy . . . ."), *aff'd*, 9 N.Y.3d 928, 876 N.E.2d 500, 844 N.Y.S.2d 773 (2007). The policies at issue here were issued to a New York insured with its principal place of business located in New York. New York therefore unquestionably has the most substantial interest to this dispute.

New York's substantial interest also defeats defendant Freeport's allegations that Century is the one engaged in forum shopping by filing this declaratory judgment action. Contrary to defendant's assertions, this Court has recognized that "forum shopping" only occurs "when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice; a party who appropriately files a declaratory judgment action in the forum most convenient to him to resolve a ripe legal dispute is not engaged in forum shopping." *Schnabel v. Ramsey Quantitative Systems, Inc.*, 322 F.Supp.2d 505 (S.D.N.Y. 2004). Far from defendant's accusations, Century's choice of a New York forum to litigate a dispute under policies issued to a New York insured is far more akin to a right than any claimed strategic maneuver.

Finally, defendant Freeport's claim that the insurers of a wholly separate insured, which have no relationship to the insurance policies or insured at issue, are necessary parties to this dispute is also baseless. The Second Circuit has long established that "a joint obligor is not an indispensable party to an action against one of the other obligors." *Giaguara S.p.A. v. Amiglio*, 257 F.Supp.2d 529, 541 (E.D.N.Y. 2003) (citing *Greenleaf v. Safeway Trails*, 140 F.2d 889, 890-91 (2d Cir. 1944)). Moreover, defendants have offered no identifiable reason why its other insurers cannot be joined in this New York action.

For all of the foregoing reasons, Century, respectfully, requests that the Court deny defendant Freeport's instant request to delay a prompt resolution of this matter.

Century thanks the Court for its consideration.

Respectfully submitted,

/s/ Shane R. Heskin (RV)

Shane R. Heskin

cc:    Alan Jacobus, Esq.
       Mark Plumer, Esq.

# EXHIBIT A

# EXHIBIT A

**Vergara, Rafael**

| | |
|---|---|
| From: | Plumer, Mark J. [Mark.Plumer@hellerehrman.com] |
| Sent: | Monday, April 14, 2008 5:45 PM |
| To: | Heskin, Shane |
| Cc: | Cirando, Lisa M.; Cellucci, Guy; ajacobus@cbmlaw.com |
| Subject: | RE: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc., No. 08-CV-0212 (PKL) (SDNY) |

Shane,

Thanks for your prompt response.  I don't think we can provide you the assurance
you require.  Accordingly, unless we hear otherwise from you, I am going to
assume that Century objects to our request.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW |
Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email: mark.plumer@hellerehrman.com
| web: www.hellerehrman.com

-----Original Message-----
From: Heskin, Shane [mailto:heskins@whiteandwilliams.com]
Sent: Monday, April 14, 2008 4:25 PM
To: Plumer, Mark J.
Cc: Cirando, Lisa M.; Cellucci, Guy; ajacobus@cbmlaw.com
Subject: RE: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold
Inc., No. 08-CV-0212 (PKL) (SDNY)

Mark:

Century will agree to the 45 day-extension of time to answer the complaint on the
condition that Freeport/Amax stipulate that it will not seek to remove the NY
action in favor of another jurisdiction or court.
If Freeport/Amax needs in good-faith additional time to answer for reasons other
than resolving its Cyprus obligations, we are happy to consider a reasonable
extension of time not to exceed 14 days.  We also do not feel an adjournment of
the Rule 16 conference is appropriate at this time.

Regards,
-Shane

-----Original Message-----
From: Plumer, Mark J. [mailto:Mark.Plumer@hellerehrman.com]
Sent: Monday, April 14, 2008 4:04 PM
To: Heskin, Shane; ajacobus@cbmlaw.com
Cc: Cirando, Lisa M.
Subject: Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc.,
No. 08-CV-0212 (PKL) (SDNY)

Counsel:

On behalf of defendants Freeport-McMoRan Copper & Gold, Inc., Phelps Dodge
Corporation and Cyprus Amax Minerals Company ("Cyprus Amax"), we write to request
an additional extension of 45 days from the current deadline of April 23 to
answer, move or otherwise respond to the Complaint and, in addition, your
agreement to extend by the same time the court-ordered conference currently
scheduled fo <<793306_1.DOC>> r May 22.  With your approval, we will file the

1

attached stipulation with the court on Wednesday April 16. We recognize that the
parties cannot extend a Court ordered deadline but the parties can at least
consent to adjourn it. If plaintiffs are unwilling to agree to a further
extension, defendants plan to seek either a 45-day extension of all deadlines or
a 45-day stay of this litigation.

This brief extension or stay is necessary. First, it will allow certain of the
parties to the current lawsuit to continue ongoing settlement discussions and, we
hope, will enable the remaining parties to begin such discussions. It obviously
would be ideal if the current dispute could be settled (in whole or in part) and
further litigation could be averted or streamlined. Second, the requested
extension will begin a process designed to resolve this entire dispute
efficiently by including all of the correct parties and resolving the entire
dispute in the correct forum. What plaintiffs' Complaint refers to as the
"Corporate Records Assimilation Project" was undertaken by Cyprus Amax Minerals
Company ("Cyprus Amax") to defend certain lawsuits pending against certain of its
predecessors. Prior to the merger that created Cyprus Amax in 1993, there were
two separate companies, AMAX Inc and Cyprus Minerals Company, each with separate
identities and records. After the merger, the records of these two companies
were combined. The current defense of later-filed claims now pending against an
AMAX Inc and Cyprus Minerals Company predecessors or subsidiaries has
necessitated the review and segregation of commingled and un-indexed records.
Indeed, the plaintiffs were advised before this litigation commenced that the
$7.8 million estimate identified in the Complaint was the cost of segregating,
indexing and privilege reviewing the commingled documents of these two former
entities. What is in part at issue therefore is defense costs assignable to AMAX
Inc's primary insurers in this lawsuit (Century and Continental) and Cyprus
Minerals Company's primary insurers (Truck Insurance Exchange, Fireman's Fund
Insurance Company, Old Republic Insurance Company and Continental Insurance
Company). The historic Cyprus Minerals Company insurers likewise have been
tendered this claim and, like Century and Continental in this case, have thus far
refused to pay the requested defense costs. This entire dispute should be
adjudicated, if necessary, in one lawsuit. Because Cyprus Amax is required to
mediate with the Cyprus Minerals Company insurers before filing any lawsuit, it
has sent a letter to them demanding mediation within 30 days.

Within 45 days, Cyprus Amax should know whether the Cyprus Minerals Company
insurers are or are not necessary to resolve this dispute and can so answer or
otherwise plead. If one or both of the current plaintiffs are unwilling to
provide the requested 45-day extension, we request that each of you let us know
promptly, as we plan to request an extension or stay from Judge Leisure by the
close of business on Wednesday April 16, 2008.

Thank you for your assistance. Please contact me if you have any questions or
concerns. Thank you.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW |
Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email:
mark.plumer@hellerehrman.com | web: www.hellerehrman.com

=================================================================

This email is sent by a law firm and contains information that may be privileged

2

and confidential. If you are not the intended recipient, please delete the email
and notify us immediately.

=================================================

=================================================

This email is sent by a law firm and contains information that may be privileged
and confidential. If you are not the intended recipient, please delete the email
and notify us immediately.

=================================================

3

# EXHIBIT B

# EXHIBIT B

**Vergara, Rafael**

| | |
|---|---|
| From: | Plumer, Mark J. [Mark.Plumer@hellerehrman.com] |
| Sent: | Friday, April 04, 2008 9:28 AM |
| To: | ajacobus@cbmlaw.com; Heskin, Shane |
| Cc: | Cirando, Lisa M. |
| Subject: | Century Indemnity Co., et al. v. Freeport-McMoRan Copper & Gold Inc., No. 08-CV-0212 (PKL) (SDNY) |

| | |
|---|---|
| Attachments: | 791570_1.DOC |

791570_1.DOC (34 KB)

Ian and Shane,

We appreciate Century and Continental's ("plaintiffs'") willingness to consider stipulating to the dismissal of Freeport-McMoRan Copper & Gold Inc. without prejudice from the lawsuit in an effort to avoid unnecessary motion practice. This email responds to your request that we explain the reason for the dismissal and that we provide adequate assurances that a complete resolution of this disput <<791570_1.DOC>> e may be had as against the remaining parties alone.

Plaintiffs' claim is based solely on policies issued Amax Inc. or its predecessors and historic records generated by Amax, Inc. and/or Cyprus Minerals Company or its predecessors. It is undisputed that Amax, Inc. merged into Cyprus Minerals Company and immediately changed its name to Cyprus Amax Minerals Company. It is also undisputed that Cyprus Amax Minerals Company thereafter merged with a subsidiary of Phelps Dodge, but kept the name Cyprus Amax Minerals Company. Thus, Cyprus Amax Minerals Company, a currently existing corporation, is the corporate successor to the Amax, Inc and predecessor coverage and is therefore entitled to any coverage available under the Amax policies. Moreover, any documents implicated by plaintiffs' claims arise out of the operations of Cyprus Amax Minerals Company or its corporate predecessors. No other members of the Freeport McMoRan corporate family are necessary for plaintiffs to obtain complete relief regarding the declaratory judgment sought in this action regarding the Amax policies. This said, we do not propose to dismiss Phelps Dodge Corporation, whom we have determined played an active role in the facts and circumstances underlying plaintiffs' Complaint as Cyprus Amax Minerals Company's immediate parent. Freeport McMoRan Copper & Gold Inc., as the ultimate parent of Cyprus Amax Minerals Company and Phelps Dodge Corporation is too far removed from the facts, is unnecessary and therefore should be dismissed from the case.

In return for the plaintiffs' agreement to dismiss Freeport-McMoRan Copper & Gold Inc. without prejudice, Freeport-McMoRan Copper & Gold Inc will agree to provide any discovery relevant to the litigation. A dismissal without prejudice also will not bar Plaintiffs from seeking to re-name Freeport-McMoRan Copper & Gold Inc. should the need arise.

Please confirm by reply email that you will stipulate to the Rule 41(a)(1)(A)(ii) dismissal of Freeport-McMoRan without prejudice and the attached draft stipulation is acceptable. Thank you.

Mark J. Plumer | Attorney | HellerEhrmanLLP | 1717 Rhode Island Avenue, NW | Washington, DC 20036
tel: +1.202.912.2021 | fax: +1.202.912.2202 | email: mark.plumer@hellerehrman.com
| web: www.hellerehrman.com

===============================================================

This email is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the email and notify us immediately.

===============================================================

2

# EXHIBIT 17

AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO FREEPORT-MCMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY THIS ACTION

*CENTURY INDEM. CO. v. FREEPORT-MCMORAN COPPER & GOLD INC.*

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.:  08 CV 02012 (PKL)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  4 21 08
```

CENTURY INDEMNITY COMPANY, AS
SUCCESSOR TO CCI INSURANCE
COMPANY, AS SUCCESSOR TO
INSURANCE COMPANY OF NORTH
AMERICA and THE CONTINENTAL
INSURANCE COMPANY,

        Plaintiffs,

 - against -

FREEPORT-MCMORAN COPPER & GOLD
INC., AS THE CLAIMED SUCCESSOR
TO PHELPS DODGE CORPORATION, AS
THE CLAIMED SUCCESSOR TO CYPRUS
AMAX MINERALS COMPANY, AS THE
CLAIMED SUCCESSOR TO AMAX,
INC., AS SUCCESSOR TO AMERICAN
METAL CLIMAX, INC.,

        Defendants.

**ORDER**

08 Civ. 02012 (PKL)

**LEISURE, District Judge:**

The Court hereby ORDERS that defendants' time to answer, move, or otherwise respond to the Complaint is extended for 30 days.  The pre-trial conference scheduled for May 22, 2008 is hereby ADJOURNED to June 26, 2008 at 10:00 a.m.

**SO ORDERED.**
**New York, New York**
April **21**, 2008

_Peter K. Leisure_
U.S.D.J.

# EXHIBIT 18

AFFIDAVIT OF ALAN P. JACOBUS IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM
OF LAW IN OPPOSITION TO FREEPORT-MCMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY
THIS ACTION

*CENTURY INDEM. CO. V. FREEPORT-MCMORAN COPPER & GOLD INC.*

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO.: 08 CV 02012 (PKL)

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**
**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2007**
**OR**
**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to**
**Commission File Number: 1-9916**



# Freeport-McMoRan Copper & Gold Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **74-2480931** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **One North Central Avenue** **Phoenix, Arizona** | |
| (Address of principal executive offices) | **85004-4414** (Zip Code) |

**(602) 366-8100**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.10 per share | New York Stock Exchange |
| 7% Convertible Senior Notes due 2011 of the registrant | New York Stock Exchange |
| 6¾% Mandatory Convertible Preferred Stock, par value $0.10 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act ☑ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☑ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☑ Yes ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one): ☑ Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☑ No

The aggregate market value of common stock held by non-affiliates of the registrant was approximately $35.0 billion on February 15, 2008, and approximately $31.3 billion on June 30, 2007.

Common stock issued and outstanding was 382,767,582 shares on February 15, 2008, and 381,655,613 shares on June 30, 2007.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of our Proxy Statement for our 2008 Annual Meeting are incorporated by reference into Part III (Items 10, 11, 12, 13 and 14) of this report.

**PART I**

**Items 1. and 2. Business and Properties.**

*All of our periodic report filings with the Securities and Exchange Commission (SEC) pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available, free of charge, through our web site, www.fcx.com, including our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports. These reports and amendments are available through our web site as soon as reasonably practicable after we electronically file or furnish such material to the SEC.*

*References to "we," "us" and "our" refer to Freeport-McMoRan Copper & Gold Inc. (FCX) and its consolidated subsidiaries, including, except as otherwise stated, Phelps Dodge Corporation (Phelps Dodge) and its subsidiaries, which we acquired on March 19, 2007. References to "Notes" refer to the "Notes to Consolidated Financial Statements" included in our 2007 Annual Report included herein (see Item 8. Financial Statements and Supplementary Data).*

## GENERAL

We are one of the world's largest copper, gold and molybdenum mining companies in terms of reserves and production. Our principal asset is the Grasberg minerals district in Papua, Indonesia, which based on the latest available reserve data provided by third-party industry consultants, contains the largest single recoverable copper reserve and the largest single gold reserve of any mine in the world.

On March 19, 2007, we acquired Phelps Dodge, a fully integrated producer of copper and molybdenum, with mines in North and South America, processing capabilities for other by-product minerals and several development projects, including Tenke Fungurume in the Democratic Republic of Congo (DRC).

In North America we have six operating copper mines – Morenci, Bagdad, Sierrita and Safford in Arizona, and Chino and Tyrone in New Mexico, as well as one operating molybdenum mine – Henderson in Colorado. In addition, we have announced plans to restart the Miami copper mine in Arizona, and the Climax molybdenum mine in Colorado. All of these operations are wholly owned, except for Morenci, in which we have an 85 percent joint venture interest. The North American mining operations are operated in an integrated fashion and have long-lived reserves with additional development potential.

In South America we have four operating copper mines – Cerro Verde in Peru, and Candelaria, Ojos del Salado and El Abra in Chile. We own a 53.56 percent interest in Cerro Verde, 80 percent interests in Candelaria and Ojos del Salado, and a 51 percent interest in El Abra.

In Indonesia we own 90.64 percent of PT Freeport Indonesia, including 9.36 percent owned through our wholly owned subsidiary, PT Indocopper Investama. The Government of Indonesia owns the remaining 9.36 percent of PT Freeport Indonesia. PT Freeport Indonesia operates under an agreement called a Contract of Work with the Government of Indonesia. The Contract of Work permits us to conduct exploration, mining and production activities in a 24,700-acre area called Block A, which includes the Grasberg mineral district. Under the Contract of Work, PT Freeport Indonesia also conducts exploration activities (which had been suspended, but resumed in 2007) in an approximate 500,000-acre area called Block B.

In Africa, we have a 57.75 percent interest in the Tenke Fungurume project in the DRC. The Tenke Fungurume mine will produce copper and cobalt and is expected to commence mining operations in 2009.

Our mining revenue for 2007 (pro forma to include the operations of Phelps Dodge before the acquisition), includes sales of copper (approximately 79 percent), molybdenum (approximately 11 percent) and gold (approximately 6 percent). Our consolidated copper production (on a proforma basis to include the operations of Phelps Dodge before the acquisition) was primarily from three mines, the Grasberg minerals district in Indonesia (approximately 30 percent), the Morenci mine in Arizona (approximately 18 percent), and the Cerro Verde mine in Peru (approximately 15 percent).

For information about our segments and geographic areas see Note 18.

1

The locations of our operating mines, as well those in development are shown on the map below.

## FCX Mining Locations



As a mining company, our principal assets are our reserves. At December 31, 2007, consolidated recoverable proven and probable reserves totaled 93.2 billion pounds of copper, 41.0 million ounces of gold, 2.0 billion pounds of molybdenum, 230.9 million ounces of silver and 0.6 billion pounds of cobalt. Approximately 40 percent of our copper reserves were in Indonesia, approximately 28 percent were in South America, approximately 27 percent were in North America and approximately five percent were in Africa. Approximately 96 percent of our gold reserves were in Indonesia, with our remaining gold reserves located in South America. Our molybdenum reserves are primarily in North America (approximately 90 percent), with our remaining molybdenum reserves in South America. (See "Ore Reserves").

The diagram below shows our corporate structure.



the local villages and people and should help us to maintain good relations with the surrounding communities and avoid disruptions of mining operations. Nevertheless, social and political instability in the area may adversely impact our mining operations. See "Risk Factors."

Africa. We have committed to assist the communities surrounding our Tenke Fungurume concession in the Katanga Province of the DRC. Initiatives that have commenced over the past two years include the building of two schools and the remodeling of a third, development of ten community water wells, construction of roads, and agricultural support programs to local farmers. Additionally, we have committed to contribute a portion of net sales revenue from production to a trust fund for local development.

Security Matters in Indonesia. Consistent with our Contract of Work in Indonesia and the requirement to protect our employees and property, we have taken appropriate steps to provide a safe and secure working environment. As part of its security program, PT Freeport Indonesia maintains its own internal security department, which performs functions such as protecting company facilities, monitoring the shipment of company goods through the airport and terminal, assisting in traffic control and aiding rescue operations. PT Freeport Indonesia's civilian security employees (numbering approximately 680) are unarmed and perform duties consistent with their internal security role. PT Freeport Indonesia's share of costs for its internal civilian security department totaled approximately $17 million for 2007, $14 million for 2006 and $11 million for 2005. The security department has received human rights training and each member is required to certify his or her compliance with our human rights policy.

PT Freeport Indonesia, and all businesses and residents of Indonesia, rely on the Government of Indonesia for the maintenance of public order, upholding the rule of law and the protection of personnel and property. The Grasberg mine has been designated by the Government of Indonesia as one of Indonesia's vital national assets. This designation results in the military and police playing a significant role in protecting the area of our operations. The Government of Indonesia is responsible for employing police and military personnel and directing their operations.

From the outset of PT Freeport Indonesia's operations, the government has looked to PT Freeport Indonesia to provide logistical and infrastructure support and assistance for these necessary services because of the limited resources of the Indonesian government and the remote location of and lack of development in Papua. PT Freeport Indonesia's financial support for the Indonesian government security institutions assigned to the operations area represents a prudent response to its requirements to protect its workforce and property, better ensuring that personnel are properly fed and lodged, and have the logistical resources to patrol PT Freeport Indonesia's roads and secure its operating area. In addition, provision of such support and oversight is consistent with PT Freeport Indonesia's obligations under the Contract of Work, reflects our philosophy of responsible corporate citizenship, and is in keeping with our commitment to pursue practices that will promote human rights.

PT Freeport Indonesia's share of support costs for the government-provided security, involving approximately 2,100 Indonesian government security personnel currently located in the general area of our operations, was $9 million for 2007, $9 million for 2006 and $6 million for 2005. This supplemental support consists of various infrastructure and other costs, such as food, housing, fuel, travel, vehicle repairs, allowances to cover incidental and administrative costs, and community assistance programs conducted by the military and police. PT Freeport Indonesia's capital costs for associated infrastructure was less than $1 million for the three years ended December 31, 2007.

As reported in January 2006, we have received and responded to requests from governmental authorities related to PT Freeport Indonesia's support of Indonesian security institutions. We are cooperating fully with these requests.

## ENVIRONMENTAL AND RECLAMATION MATTERS

### Environmental

In the U.S. we are subject to stringent federal, state and local environmental laws and regulations that govern emissions of air pollutants; discharges of water pollutants; and generation, handling, storage and

disposal of hazardous substances, hazardous wastes and other toxic materials. We also are subject to potential liabilities arising under the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and similar state laws that impose responsibility on persons who arranged for the disposal of hazardous substances, and on current and previous owners and operators of a facility for the cleanup of hazardous substances released from the facility into the environment, including damages to natural resources.

Phelps Dodge and many of its affiliates and predecessor companies have been involved in mining, milling and manufacturing in the U.S. for more than a century. Activities that occurred in the late 19th century and the 20th century prior to the advent of modern environmental laws were not subject to environmental regulation and were conducted before American industrial companies understood the long-term effects of their operations on the surrounding environment. With the passage of CERCLA in 1980, companies like Phelps Dodge became legally responsible for environmental remediation on properties previously owned or operated by them, irrespective of when the damage to the environment occurred or who caused it. That liability often is shared on a joint and several basis with all other owners and operators, meaning that each owner or operator of the property is fully responsible for the clean-up, although in many cases some or all of the historical owners or operators no longer exist, do not have the financial ability to respond or cannot be found. As a result, because of our acquisition of Phelps Dodge in 2007, many of the subsidiary companies we now own are responsible for a wide variety of environmental remediation projects throughout the U.S., and we expect to spend substantial sums annually for many years to address those remediation issues. Various of our subsidiaries have previously been advised by the U.S. Environmental Protection Agency (EPA), the Department of the Interior, the Department of Agriculture and several state agencies that under CERCLA or similar state laws and regulations, they may be liable for costs of responding to environmental conditions at sites that have been or are being investigated by EPA, the Department of the Interior, the Department of Agriculture, or state agencies to determine whether releases of hazardous substances have occurred and, if so, to develop and implement remedial actions to address environmental concerns. As of December 31, 2007, we had more than 100 active remediation projects in the U.S. in more than 25 states. We are also subject to claims for natural resource damages where the release of hazardous substances is alleged to have injured natural resources. A number of our subsidiaries have also been advised by trustees for natural resources that they may be liable under CERCLA or similar state laws for damages to natural resources caused by releases of hazardous substances.

Under applicable purchase accounting rules, we are required to allocate the purchase price paid for Phelps Dodge in accordance with our estimate of the fair value of all the Phelps Dodge assets and liabilities, including contingencies such as environmental remediation obligations. That process must be completed by the first anniversary of the acquisition, or March 19, 2008. Our revised estimates resulted in a significant increase in our reserve for environmental obligations at December 31, 2007. At December 31, 2007, environmental reserves recorded in our consolidated balance sheets totaled $1.3 billion, which include the purchase accounting adjustments to reflect the estimated fair value of the Phelps Dodge obligations attributed to CERCLA or analogous state programs and for estimated future costs associated with environmental matters at closed facilities and closed portions of certain operating facilities.

In 2005, PT Freeport Indonesia agreed to participate in the Government of Indonesia's PROPER (Program for Pollution Control, Evaluation and Rating) program. In March 2006, the Indonesian Ministry of Environment announced the preliminary results of its PROPER environmental management audit, acknowledging the effectiveness of PT Freeport Indonesia's environmental management practices in some areas while making several suggestions for improvement in others. We are working with the Ministry of Environment to address the issues raised as we complete the audit process.

In connection with obtaining our environmental approvals from the Indonesian government, we committed to perform a one-time environmental risk assessment on the impacts of our tailings management plan. We completed this extensive environmental risk assessment with more than 90 scientific studies

conducted over four years and submitted it to the Indonesian government in December 2002. We developed the risk assessment study with input from an independent review panel, which included representatives from the Indonesian government, academia and non-governmental organizations. The risks that we identified during this process were in line with our impact projections of the tailings management program contained in our environmental approval documents.

The cost of complying with environmental laws is a fundamental cost of our business. In 2007, we incurred aggregate environmental capital expenditures and other environmental costs of $320 million (including $228 million incurred since March 20, 2007, related to the acquired Phelps Dodge operations) for programs to comply with applicable environmental laws and regulations that affect our operations. Aggregate environmental capital expenditures totaled $63 million in 2006 and $44 million in 2005. In 2008, we expect to incur approximately $520 million of aggregate environmental capital expenditures and other environmental costs, which are part of our overall 2008 operating budget.

Refer to Note 15 for additional information on significant environmental matters.

**Asset Retirement Obligations**
We recognize asset retirement obligations (AROs) as liabilities when incurred, with the initial measurement at fair value. These liabilities are accreted to full value over time through charges to income. Reclamation costs for future disturbances are recorded as an ARO in the period of disturbance. Our cost estimates are reflected on a third-party cost basis and comply with our legal obligation to retire tangible, long-lived assets as defined by SFAS No. 143. Refer to Note 1 for further discussion of our accounting policy for reclamation and closure costs.

At December 31, 2007, we had $728 million recorded for AROs in current and long-term liabilities on the consolidated balance sheet. ARO costs may increase or decrease significantly in the future as a result of changes in regulations, engineering designs and technology, permit modifications or updates, mine plans, cost of inflation or other factors and as actual reclamation spending occurs. ARO activities and expenditures generally are made over an extended period of time commencing near the end of the mine life; however, certain reclamation activities could be accelerated if we elect or are required to do so.

Legal requirements in New Mexico, Arizona and Colorado require financial assurance to be provided for estimated costs of reclamation and closure, including groundwater quality protection programs. We have satisfied financial assurance requirements by using a variety of mechanisms, such as third-party performance guarantees, financial capability demonstrations, trust funds, surety bonds, letters of credit and collateral. The applicable regulatory requirements provide financial strength tests to support third-party performance guarantees and financial capability demonstrations, which are designed to confirm a company's or third-party guarantor's financial capability to fund future estimated reclamation and closure costs. The amount of financial assurance we are required to provide will vary with changes in laws, regulations and reclamation and closure cost estimates. At December 31, 2007, we had trust assets totaling $544 million that are designated for funding global reclamation and remediation activities, of which $106 million is legally restricted to fund a portion of our asset retirement obligations for Chino, Tyrone and Cobre as required by New Mexico regulatory authorities.

Additionally, in 1996, PT Freeport Indonesia began contributing to a cash fund ($10 million balance at December 31, 2007) designed to accumulate at least $100 million by the end of our Indonesian mining activities. We plan to use this fund, including accrued interest, to pay mine closure and reclamation costs. Any costs in excess of the $100 million fund would be funded by operational cash flow or other sources.

Prior to its acquisition by FCX, Phelps Dodge had initiated a process of identifying and prioritizing opportunities to accelerate certain demolition, environmental reserve and asset retirement obligation projects. The projects were prioritized based on regulatory flexibility to remediate at a faster pace structures that could be readily demolished, reclamation of visibly impacted areas, and projects in Arizona and New Mexico where we have substantial long-term closure obligations. These costs are included in our aggregate environmental capital and other costs reported above.

**Items 7. and 7A.  Management's Discussion and Analysis of Financial Condition and Results of Operations and Quantitative and Qualitative Disclosures About Market Risk.**

**FREEPORT-McMoRan COPPER & GOLD INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

*In Management's Discussion and Analysis of Financial Condition and Results of Operations, "we," "us" and "our" refer to Freeport-McMoRan Copper & Gold Inc. (FCX) and its consolidated subsidiaries, including, except as otherwise stated, Phelps Dodge Corporation (Phelps Dodge) and its subsidiaries, which we acquired on March 19, 2007. The results of operations reported and summarized below are not necessarily indicative of future operating results. In particular, the financial results for 2007 include the operations of Phelps Dodge from March 20, 2007, through December 31, 2007, because of the accounting treatment for the acquisition. References to "Notes" refer to the "Notes to Consolidated Financial Statements." Throughout Management's Discussion and Analysis of Financial Condition and Results of Operations all dollar amounts included in tables are in millions (except per share amounts) and all references to earnings or losses per share are on a diluted basis, unless otherwise noted.*

Through our wholly owned subsidiary, Phelps Dodge, and our majority-owned subsidiary, PT Freeport Indonesia, we are one of the world's largest copper, gold and molybdenum mining companies in terms of reserves and production. The Grasberg minerals district contains the largest single recoverable copper reserve and the largest single gold reserve of any mine in the world based on the latest available reserve data provided by third-party industry consultants.

On March 19, 2007, we acquired Phelps Dodge, a fully integrated producer of copper and molybdenum, with mines in North and South America and processing capabilities for other by-product minerals, such as gold, silver and rhenium, and several development projects, including Tenke Fungurume in the Democratic Republic of Congo (DRC).

In North America, we have six operating copper mines – Morenci, Bagdad, Sierrita and Safford in Arizona and Chino and Tyrone in New Mexico, as well as one operating molybdenum mine – Henderson in Colorado. In addition, we have announced plans to restart the Miami copper mine in Arizona, and the Climax molybdenum mine in Colorado. All of these mining operations are wholly owned, except for Morenci. We record our 85 percent interest in Morenci, an unincorporated joint venture, using the proportionate consolidation method. The North American mining operations are operated in an integrated fashion and have long-lived reserves with additional development potential.

In South America, we have four operating copper mines – Cerro Verde in Peru, and Candelaria, Ojos del Salado and El Abra in Chile. We own a 53.56 percent interest in Cerro Verde, an 80 percent interest in both Candelaria and Ojos del Salado and a 51 percent interest in El Abra. We consolidate the results of these operations and report the minority interests.

We own 90.64 percent of PT Freeport Indonesia, including 9.36 percent owned through our wholly owned subsidiary, PT Indocopper Investama. The Government of Indonesia owns the remaining 9.36 percent of PT Freeport Indonesia. PT Freeport Indonesia operates under an agreement, called a Contract of Work, with the Government of Indonesia. The Contract of Work allows us to conduct exploration, mining and production activities in a 24,700-acre area called Block A located in Papua, Indonesia. Under the Contract of Work, PT Freeport Indonesia also conducts exploration activities (which had been suspended, but resumed in 2007) in an approximate 500,000-acre area called Block B in Papua. All of PT Freeport Indonesia's proven and probable mineral reserves and current mining operations are located in Block A.

We also operate Atlantic Copper S.A. (Atlantic Copper), a wholly owned subsidiary, located in Spain. Atlantic Copper's operations involve the smelting and refining of copper concentrates and the marketing of refined copper and precious metals in slimes. Additionally, PT Freeport Indonesia owns a 25 percent interest in PT Smelting, an Indonesian company, which operates a copper smelter and refinery in Gresik, Indonesia.

Phelps Dodge also had an international manufacturing division, Phelps Dodge International Corporation (PDIC), which manufactured engineered wire and cable products principally for the global energy sector. On October 31, 2007, FCX completed the sale of PDIC. As a result of the sale, the operating results of PDIC have been removed from continuing operations and reported as discontinued operations in the consolidated statements of income for the year ended December 31, 2007. Refer to Note 4 for further discussion of discontinued operations.

### ACQUISITION OF PHELPS DODGE

Phelps Dodge became our wholly owned subsidiary on March 19, 2007. In the acquisition, each share of Phelps Dodge common stock was exchanged for 0.67 of a share of FCX common stock and $88.00 in cash. As a result, we issued 136.9 million shares and paid $18.0 billion in cash to Phelps Dodge shareholders for total consideration of approximately $26 billion. The estimated fair value of assets acquired and liabilities assumed and the results of Phelps Dodge's operations are included in our consolidated financial statements beginning March 20, 2007.

At December 31, 2007, the carrying value of goodwill, which is associated with our acquisition of Phelps Dodge, totaled $6.1 billion. Goodwill represents the excess of the purchase price over the fair value of net tangible and identified intangible assets and is attributable to potential strategic and financial benefits that are expected to be realized. Refer to Note 2 for further discussion of these potential benefits.

Accounting for the Acquisition of Phelps Dodge. The acquisition of Phelps Dodge is being accounted for under the purchase method as required by Statement of Financial Accounting Standards (SFAS) No. 141, "Business Combinations," with FCX as the accounting acquirer. Refer to Note 2 for a summary of the approximate $26 billion purchase price, which was funded through a combination of common shares issued, borrowings under an $11.5 billion senior credit facility, proceeds from the offering of $6.0 billion of senior notes and available cash resources (including cash acquired from Phelps Dodge).

In accordance with the purchase method of accounting, the purchase price paid was determined at the date of the public announcement of the transaction and has been allocated to the assets acquired and liabilities assumed based upon their estimated fair values on the acquisition date of March 19, 2007. Adjustments to the estimated fair values, which were initially recorded based on preliminary estimates, may occur until such values are finalized in first-quarter 2008. In valuing acquired assets and assumed liabilities, fair values were based on, but were not limited to: quoted market prices, where available; our intent with respect to whether the assets purchased were to be held, sold or abandoned; expected future cash flows; current replacement cost for similar capacity for certain fixed assets; market rate assumptions for contractual obligations; and appropriate discount rates and growth rates. The excess of the purchase price over the estimated fair value of the net assets acquired has been recorded as goodwill. At the acquisition date, price projections used to value the assets acquired ranged from near-term prices of $2.98 per pound of copper and $26.20 per pound of molybdenum to long-term average prices of $1.20 per pound of copper and $8.00 per pound of molybdenum.

The following table summarizes the impacts of purchase accounting fair value adjustments in 2007 and the projected 2008 impacts on production and delivery costs and depreciation, depletion and amortization expense associated with the increases in the carrying values of Phelps Dodge's metal inventories (including mill and leach stockpiles) and property, plant and equipment, and also includes the impact associated with the amortization of intangible assets and liabilities resulting from the acquisition. These net charges do not affect cash flows and are subject to change as FCX finalizes the purchase price allocation in first-quarter 2008 (refer to Note 2 for a summary of the preliminary purchase price allocation). Additionally, inventories (including mill and leach stockpiles) are subject to lower of cost or market assessments, and declines in metals prices could result in future impairment charges.

|  | 2007 | (Projected) 2008 |
|---|---|---|
| Production and delivery costs | $ 737 | $ 60 |
| Depreciation, depletion and amortization | 595 | 940 |
| Amortization of intangibles and other | (76) | 75 |
| Reduction of operating income | $ 1,256 | $ 1,075 [a] |
| | | |
| Reduction of income from continuing operations | $ 785 | $ 670 |

a.  The estimated reduction in operating income for 2008 is expected to decline, compared with 2007, primarily because of a decreased impact on production and delivery costs from inventory valuations as the most significant increases in inventory values were realized in 2007, partly offset by increases in (i) depreciation, depletion and amortization reflecting a full year impact for 2008 and higher values for acquired property, plant and equipment resulting from revised valuations completed in fourth-quarter 2007 and (ii) amortization of net intangibles assets in 2008, compared with the amortization of net intangible liabilities in 2007, which included the amortization of unfavorable sales contracts (refer to Note 7).

**NOTE 15. CONTINGENCIES**
**Environmental.** FCX incurred aggregate environmental capital expenditures and other environmental costs, including joint venture partners' share, totaling $320 million in 2007, $63 million in 2006 and $44 million in 2005.

FCX subsidiaries that operate in the U.S. are subject to various federal, state and local environmental laws and regulations that govern emissions of air pollutants; discharges of water pollutants; and generation, handling, storage and disposal of hazardous substances, hazardous wastes and other toxic materials. FCX subsidiaries that operate in the U.S. also are subject to potential liabilities arising under CERCLA or similar state laws that impose responsibility on persons who arranged for the disposal of hazardous substances, and on current and previous owners and operators of a facility for the cleanup of hazardous substances released from the facility into the environment, including damages to natural resources. With the passage of CERCLA in 1980, companies like Phelps Dodge became legally responsible for environmental remediation on properties previously owned or operated by them, irrespective of when the damage to the environment occurred or who caused it. That liability often is shared on a joint and several basis with all other owners and operators, meaning that each owner or operator of the property is fully responsible for the clean-up, although in many cases some or all of the other historical owners or operators no longer exist, do not have the financial ability to respond or cannot be found. As a result, because of FCX's acquisition of Phelps Dodge in 2007, many of the subsidiary companies FCX now owns are responsible for a wide variety of environmental remediation projects throughout the U.S. FCX expects to spend substantial sums annually for many years to address those remediation issues. Certain FCX subsidiaries have been advised by the U.S. Environmental Protection Agency (EPA), the Department of the Interior, the Department of Agriculture and several state agencies that, under CERCLA or similar state laws and regulations, they may be liable for costs of responding to environmental conditions at a number of sites that have been or are being investigated to determine whether releases of hazardous substances have occurred and, if so, to develop and implement remedial actions to address environmental concerns. As of December 31, 2007, FCX had more than 100 active remediation projects in the U.S. in more than 25 states. FCX is also subject to claims for natural resource damages where the release of hazardous substances is alleged to have injured natural resources.

A summary of changes in environmental obligations for the year ended December 31, 2007, follows:

| | |
|---|---:|
| Balance at beginning of year | $ – |
| Liabilities assumed in the acquisition of Phelps Dodge | 1,334 |
| Additions | 6 |
| Reductions | (1) |
| Spending | (71) |
| Balance at end of year | 1,268 |
| Less current portion | (166) |
| Long-term portion | $ 1,102 |

As a result of the acquisition of Phelps Dodge, FCX was required to record Phelps Dodge's environmental obligations at fair value on the acquisition date in accordance with SFAS No. 141. At the acquisition date, Phelps Dodge's historical environmental obligations of $385 million, before purchase accounting adjustments to fair value, were based on accounting guidance provided by SFAS No. 5, "Accounting for Contingencies," and SOP 96-1, which require that an estimated loss be recorded for a loss contingency if, prior to the issuance of the financial statements, it is probable that a liability had been incurred and the loss can be reasonably estimated. Amounts recorded under this guidance are generally not considered fair value. FCX has an environmental and legal group dedicated to the ongoing review and monitoring of environmental remediation sites. At the acquisition date, the largest environmental remediation sites were undergoing studies to evaluate the extent of the environmental damage and the available remedies. Advancement of these studies and consideration of alternative remedies and cost sharing arrangements resulted in FCX's calculation of the estimated fair values being approximately $900 million greater than the historical Phelps Dodge estimates. As a result, the fair value of the environmental obligations was estimated to be $1.3 billion. After FCX finalizes the allocation of fair values associated with the acquisition of Phelps Dodge in the first quarter of 2008, future estimates of environmental obligations will be recorded in accordance with SFAS No. 5 and SOP 96-1. Significant adjustments to these reserves could occur in the future.

FCX believes that there may be other potential claims for recovery from other third parties, including the U.S. government and other PRPs. These potential recoveries are not recognized unless realization is considered probable.

At December 31, 2007, the most significant environmental obligations are associated with the Pinal Creek site, several historical smelter sites principally located in Arizona, Kansas and Oklahoma, and uranium mining sites in the western U.S. The recorded environmental reserves for these sites totaled $880 million at December 31, 2007. A discussion of these sites follows.

*Pinal Creek.* The Pinal Creek site located near Miami, Arizona, was listed under the Arizona Department of Environmental Quality (ADEQ) Water Quality Assurance Revolving Fund program in 1989 for contamination in the shallow alluvial aquifers within the Pinal Creek drainage near Miami, Arizona. Since that time, environmental remediation has been performed by the members of the Pinal Creek Group (PCG), consisting of Phelps Dodge Miami, Inc. (Miami), a wholly owned subsidiary of Phelps Dodge, and two other companies. In 1998, the District Court approved a Consent Decree between the PCG members and the state of Arizona resolving all matters related to an enforcement action contemplated by the state of Arizona against the PCG members with respect to groundwater. The Consent Decree committed the PCG members to complete the remediation work outlined in the Consent Decree. That work continues at this time pursuant to the Consent Decree and consistent with state law and the National Contingency Plan prepared by EPA under CERCLA.

The PCG members have been pursuing contribution litigation against three other parties involved with the site. Miami dismissed its contribution claims against one defendant when another PCG member agreed to be responsible for any share attributable to that defendant. Miami and the other PCG members settled their contribution claims against another defendant in April 2005. While the terms of the settlement are confidential, the proceeds of the settlement will be used to address remediation at the Pinal Creek site. There are significant disagreements among the members of the PCG regarding the allocation of the cost of remediation, and a trial on that issue is currently scheduled to begin in late 2008. The overall cost of the clean up is expected to be significant.

*Historical Smelter Sites.* Phelps Dodge and its predecessors at various times owned or operated historical copper and zinc smelters in several states, including Arizona, Kansas and Oklahoma. For some of these smelter sites, certain FCX subsidiaries have been advised by EPA or state agencies that they may be liable for costs of investigating and, if appropriate, remediating environmental conditions. At other sites, certain FCX subsidiaries have entered into state voluntary remediation programs to investigate and, if appropriate, remediate site conditions. The historical smelter sites are in various stages of assessment, with the current most significant individual site being the one located in Blackwell, Oklahoma.

From 1916 to 1974, Blackwell Zinc Company, Inc. (BZC), currently a subsidiary of FCX, owned and operated a zinc smelter in Blackwell, Oklahoma. In 1974, the smelter was demolished and the property deeded to the City of Blackwell. Pursuant to an administrative order with the State of Oklahoma (the State), BZC undertook remedial actions in Blackwell in 1996 and 1997, including sampling residential and commercial properties, and removing soils on properties that were found to have metal concentrations above state-established cleanup standards. From 1997 to 2003, BZC investigated the nature and extent of groundwater contamination potentially attributable to the former smelter and evaluated options for remedying such contamination. In 2003, the State adopted a cleanup plan requiring the installation of a groundwater extraction and treatment system and the closure of domestic groundwater wells within the groundwater plume area. BZC is prepared to install the groundwater extraction and treatment system as soon as access to necessary municipal property is secured.

In the fall of 2006, some Blackwell residents began to engage legal counsel to evaluate property damage and personal injury claims related to alleged exposure to contaminants potentially associated with former zinc smelter operations. While no suit has been filed, counsel for prospective plaintiffs has stated publicly that a suit will be filed in the near future.

In April 2007, FCX, on behalf of BZC, commenced a voluntary community outreach program inviting property owners in and around Blackwell to have their properties sampled for the presence of smelter-related contaminants, and agreed to remediate properties whose soils are found to have metal concentrations above state-established cleanup standards. Owners of about 2,200 properties requested sampling, representing approximately 50 percent of all eligible properties. In January 2008, FCX renewed its outreach program in an effort to obtain permission to sample a larger percentage of properties. All of these soil sampling and remediation activities are being coordinated with, and supervised by, the State.

*Uranium Mining Sites.* During a period between 1940 and the early 1970s, certain Phelps Dodge predecessor entities were involved in uranium exploration and mining in the western U.S. Similar exploration and mining activities by other companies have caused environmental impacts that have warranted remediation, and EPA and local authorities are currently evaluating the need for significant clean-up activities in the region. To date, Phelps Dodge has undertaken remediation at a limited number of sites associated with these predecessor entities. Phelps Dodge recognized the existence of a potential liability for these activities and had environmental reserves for six former uranium sites. An initiative to gather additional information about sites in the region is ongoing. FCX utilized the results of Phelps Dodge's remediation experience, in combination with historical and updated information gathered to date, to initially estimate its fair value of uranium-related liabilities at December 31, 2007.

**Asset Retirement Obligations (AROs).** FCX's ARO cost estimates are reflected on a third-party cost basis and comply with FCX's legal obligation to retire tangible, long-lived assets as defined by SFAS No. 143.

Information on FCX's AROs for the years ended December 31, 2007, 2006 and 2005, follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Balance at beginning of year | $    30 | $    27 | $    23 |
| Liabilities assumed in the acquisition of Phelps Dodge | 531[a] | – | – |
| Liabilities incurred | 1 | – | 2 |
| Revisions to cash flow estimates | 179 | – | (1) |
| Accretion expense | 27 | 3 | 3 |
| Spending | (40) | – | – |
| Balance at end of year | 728 | 30 | 27 |
| Less current portion | (97) | – | – |
| Long-term portion | $   631 | $    30 | $    27 |

a.    The fair value of AROs assumed in the acquisition of Phelps Dodge was estimated based on projected cash flows, an estimated long-term annual inflation rate of 2.4 percent, a discount rate based on FCX's estimated credit-adjusted, risk-free interest rate of 7.8 percent and a market risk premium of 10 percent to reflect what a third-party might require to assume these AROs.

ARO costs may increase or decrease significantly in the future as a result of changes in regulations, engineering designs and technology, permit modifications or updates, mine plans, cost of inflation or other factors and as actual reclamation spending occurs. ARO activities and expenditures generally are made over an extended period of time commencing near the end of the mine life; however, certain reclamation activities could be accelerated if required, or if they are determined to be economically beneficial.

The most significant revisions to cash flow estimates in 2007 were related to changes at Chino, Tyrone and PT Freeport Indonesia. During 2007, Chino and Tyrone each submitted updated third-party closure cost estimates to the state of New Mexico as part of the permit renewal process. As a result, FCX revised its cash flow estimates and increased its ARO by $95 million for Chino and $45 million for Tyrone. Additional adjustments may be required based upon the state's review of the updated closure plans and any permit conditions imposed by the state of New Mexico. Additionally, PT Freeport Indonesia updated its cost estimates primarily for changes to its plans for the treatment of acidic water, resulting in an increase of $33 million.

Legal requirements in New Mexico, Arizona and Colorado require financial assurance to be provided for the estimated costs of reclamation and closure, including groundwater quality protection programs. FCX has satisfied financial assurance requirements by using a variety of mechanisms, such as third-party performance guarantees, financial capability demonstrations, trust funds, surety bonds, letters of credit and collateral. The applicable regulatory requirements provide financial strength tests to support third-party performance

mentioned mine closure and reclamation costs. Any costs in excess of the $100 million fund would be funded by operational cash flow or other sources.

**Litigation.** FCX is subject to legal proceedings claims and liabilities that arise in the normal course of business. FCX believes the amount of the ultimate liability with respect to those matters will not have a material adverse effect, either individually or in the aggregate, upon its business, financial condition, liquidity, results of operations or cash flow.

Since approximately 1990, Phelps Dodge or its subsidiaries have been named as a defendant in product liability or premises lawsuits claiming injury from exposure to asbestos found in electrical wire products produced or marketed many years ago, or from asbestos at certain Phelps Dodge properties. FCX believes its liability, if any, in these matters will not have a material adverse effect, either individually or in the aggregate, upon its business, financial condition, liquidity, results of operations or cash flow. There can be no assurance, however, that future developments will not alter this conclusion.

**Letters of Credit and Surety Bonds.** Standby letters of credit totaled $74 million at December 31, 2007, primarily for reclamation, environmental obligations and workers' compensation insurance programs. In addition, FCX had surety bonds totaling $91 million at December 31, 2007, associated with reclamation and closure ($66 million – see discussion above), self-insurance bonds primarily for workers' compensation ($21 million) and miscellaneous bonds ($4 million).

**Insurance.** FCX purchases a variety of insurance products to mitigate potential losses. The various insurance products typically have specified deductible amounts, or self-insured retentions, and policy limits. In 2007, FCX renewed its property insurance coverage, which included the acquired Phelps Dodge mining operations. FCX generally is self-insured for U.S. workers' compensation, but purchases excess insurance up to statutory limits. An actuarial analysis is performed twice a year for various FCX casualty programs, including workers' compensation, to estimate required insurance reserves. Insurance reserves totaled $54 million at December 31, 2007, which consisted of a current portion of $10 million (included in accounts payable and accrued liabilities) and a long-term portion of $44 million (included in other liabilities).

## NOTE 16.  COMMITMENTS AND GUARANTEES
**Operating leases.**  FCX leases various types of properties, including offices and equipment. A summary of future minimum rentals under these non-cancelable leases at December 31, 2007, follows:

| | |
|---|---:|
| 2008 | $ 26 |
| 2009 | 25 |
| 2010 | 20 |
| 2011 | 16 |
| 2012 | 14 |
| After 2012 | 2 |
| Total payments | $ 103 |

Minimum payments under operating leases have not been reduced by aggregate minimum sublease rentals, which are minimal.

Certain of FCX's mineral leases require minimum annual royalty payments, and others provide for royalties based on production. At December 31, 2007, FCX's aggregate minimum future payments under these non-cancelable mineral leases totaled $2 million per year for 2008, 2009 and 2010, $1 million per year for 2011 and 2012, and $8 million after 2012.

172

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 29, 2008.

**Freeport-McMoRan Copper & Gold Inc.**

By: _____/s/ Richard C. Adkerson_____
Richard C. Adkerson
President, Chief Executive Officer
and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the registrant in the capacities indicated on February 29, 2008.

| | |
|---|---|
| *<br>James R. Moffett | Chairman of the Board |
| *<br>B. M. Rankin, Jr. | Vice Chairman of the Board |
| /s/ Richard C. Adkerson<br>Richard C. Adkerson | President, Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Kathleen L. Quirk<br>Kathleen L. Quirk | Executive Vice President, Chief Financial Officer and Treasurer<br>(Principal Financial Officer) |
| *<br>C. Donald Whitmire, Jr. | Vice President and Controller - Financial Reporting<br>(Principal Accounting Officer) |
| *<br>Robert J. Allison, Jr. | Director |
| *<br>Robert A. Day | Director |
| *<br>Gerald J. Ford | Director |
| *<br>H. Devon Graham, Jr. | Director |
| *<br>J. Bennett Johnston | Director |