# EXHIBIT 6

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

Page 1

**H**

National Union Fire Ins. Co. of Pittsburgh, PA. v.
BP Amoco P.L.C.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
NATIONAL UNION FIRE INSURANCE CO. OF
PITTSBURGH, PA, and Associated Electric & Gas
Insurance Services Ltd., Plaintiffs,
v.
BP AMOCO P.L.C., et al., Defendants.
**No. 03 Civ. 0200(GEL).**

Jan. 30, 2004.

**Background:** New York insurer sought declaratory
judgment in state court against group of companies
affiliated or partnered with insured, for finding that
certain insurance contracts were void ab initio be-
cause defendants misrepresented their eligibility for
coverage, or finding that claims made under them
were not covered. Companies removed action to
federal court. Particular defendants moved to dis-
miss for lack of personal or subject matter jurisdic-
tion.

**Holdings:** The District Court, Lynch, J., held that:
(1) Court had specific personal jurisdiction over
group of foreign companies affiliated or partnered
with foreign insured under transacting business pro-
vision of New York long arm statute;
(2) Court's exercise of personal jurisdiction over
companies was both fair and reasonable under due
process clause;
(3) commercial activity exception within Foreign
Sovereign Immunities Act (FSIA) applied to in-
surer's claim which related to coverage provided for
Vietnam petroleum company; and
(4) mere possibility in future, that contractor or oth-
er entity might acquire interest in oil and gas
projects and be included by insured under insurance
policy, did not suffice to give rise to actual case or
controversy.

Motions denied in part and granted in part.

West Headnotes

**[1] Federal Courts 170B ⊜82**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk77 Corporations, Actions by or
Against
           170Bk82 k. Agent Within District;
Parent and Subsidiary. Most Cited Cases

**Federal Courts 170B ⊜86**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk86 k. Aliens or Alien Corporations.
Most Cited Cases
New York federal district court had specific person-
al jurisdiction over group of foreign companies af-
filiated or partnered with foreign insured under
transacting business provision of New York long-
arm statute, in lawsuit under Declaratory Judgment
Act, although companies did not directly negotiate,
agree to, or execute contract with New York in-
surer, but only acquired interest subsequently in
certain projects or claims allegedly subject to cov-
erage under policy; insurance broker acted as agent
for insured, and, thus, for affiliated and partnered
companies, and broker's New York contacts suf-
ficed to permit New York court to exercise personal
jurisdiction over all of them on cause of action
arising out of its dealings with insurer. 28 U.S.C.A.
§ 2201 et seq; N.Y.McKinney's CPLR 302(a)(1).

**[2] Courts 106 ⊜12(2.15)**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction
in General
      106k10 Jurisdiction of the Person
         106k12 Domicile or Residence of Party

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352                                                                                                Page 2
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
        106k12(2.15) k. Transacting or Doing Business. Most Cited Cases
A defendant "transacts business" under the New York long-arm statute when it purposefully avails itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. N.Y.McKinney's CPLR 302(a)(1).

**[3] Courts 106 ⟊12(2.15)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.15) k. Transacting or Doing Business. Most Cited Cases
To determine whether a defendant has purposefully availed itself of the privilege of conducting activities in New York, as required to transact business under New York long-arm statute, courts examine several factors, no one of which is dispositive. N.Y.McKinney's CPLR 302(a)(1).

**[4] Courts 106 ⟊12(2.15)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.15) k. Transacting or Doing Business. Most Cited Cases
Proof of a single transaction may suffice to establish that non-resident defendant was transacting business under New York long-arm statute, provided it is purposeful. N.Y.McKinney's CPLR 302(a)(1).

**[5] Courts 106 ⟊12(2.20)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases
For purposes of personal jurisdiction under New York long-arm statute, an "agent" is a person or entity that acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control. N.Y.McKinney's CPLR 302(a)(1).

**[6] Courts 106 ⟊12(2.20)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases
As a matter of law, where there is joint control of a business enterprise, similar to that existing in a partnership or joint venture, enough control has been shown to establish prima facie this particular element of agency to satisfy long-arm jurisdiction under the New York long-arm statute. N.Y.McKinney's CPLR 302(a)(1).

**[7] Constitutional Law 92 ⟊3965(6)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3965 Particular Parties or Circumstances
                    92k3965(6) k. Insurers and Insur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

ance. Most Cited Cases
   (Formerly 92k305(6))

**Federal Courts 170B &#9901;82**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk77 Corporations, Actions by or Against
            170Bk82 k. Agent Within District; Parent and Subsidiary. Most Cited Cases

**Federal Courts 170B &#9901;86**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk86 k. Aliens or Alien Corporations. Most Cited Cases
   (Formerly 217k3558)
New York federal court's exercise of personal jurisdiction over group of foreign companies affiliated or partnered with foreign insured was both fair and reasonable under due process clause of Fifth Amendment, in lawsuit under Declaratory Judgment Act, since insurer's unified action was brought to address validity and interpretation of single insurance program negotiated, executed, and administered in New York, through deliberate choice of agents to whom companies not only delegated the responsibility to secure insurance, but whose decision to carry out that responsibility in New York was easily discoverable at time they acquired their respective interests in covered projects. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2201 et seq; N.Y.McKinney's CPLR 302(a)(1).

**[8] International Law 221 &#9901;10.34**

221 International Law
   221k10.29 Actions Against Sovereign or Instrumentality
      221k10.34 k. Corporations and Other Instrumentalities. Most Cited Cases
   (Formerly 221k10.33)

"Commercial activity exception" within Foreign Sovereign Immunities Act (FSIA) applied to New York insurer's claim under Declaratory Judgment Act which related to coverage provided for Vietnam petroleum company, since Vietnam deputized foreign corporation to acquire necessary insurance for its projects, and foreign corporation and its broker acted on behalf of Vietnam in securing insurance coverage for projects in which Vietnam maintained ownership interest. 28 U.S.C.A. §§ 1605(a)(2), § 2201 et seq.

**[9] Federal Courts 170B &#9901;29.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk29 Objections to Jurisdiction, Determination and Waiver
            170Bk29.1 k. In General. Most Cited Cases
On a motion to dismiss for lack of subject matter jurisdiction, the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both, and how the court should resolve the motion to dismiss depends upon whether the motion presents a factual challenge. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[10] Federal Courts 170B &#9901;34**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk29 Objections to Jurisdiction, Determination and Waiver
            170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
Where a defendant moving to dismiss for lack of subject matter jurisdiction challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352                                                          Page 4

319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

**[11] Federal Courts 170B ⬦33**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk29 Objections to Jurisdiction, Determination and Waiver
            170Bk33 k. Affidavits and Evidence in General. Most Cited Cases
Where a defendant moving to dismiss for lack of subject matter jurisdiction challenges jurisdictional facts, the court may inquire by affidavits or otherwise, into the facts as they exist. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[12] Declaratory Judgment 118A ⬦165**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
      118AII(G) Written Instruments and Contracts
         118AII(G)2 Insurance
            118Ak165 k. Liability or Indemnity Insurance in General. Most Cited Cases
Mere possibility in future that contractor or other entity might acquire interest in oil and gas projects and be included by insured under insurance policy, which allowed insured to "declare" certain projects and associated entities that it selected for coverage within specified period of time, did not suffice to give rise to actual case or controversy, and, consequently, federal district court did not have subject matter jurisdiction over insurer's claim against those contractors or entities under Declaratory Judgment Act. U.S.C.A. Const. Art. 3, § 2; 28 U.S.C.A. § 2201 et seq.

**[13] Federal Courts 170B ⬦12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
Federal court lacks subject matter jurisdiction to decide what the law would be upon a hypothetical state of facts.

**[14] Declaratory Judgment 118A ⬦165**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
      118AII(G) Written Instruments and Contracts
         118AII(G)2 Insurance
            118Ak165 k. Liability or Indemnity Insurance in General. Most Cited Cases
Federal district court had subject matter jurisdiction in declaratory judgment action over claim made by insurer that foreign corporation did not have interest in insurance policy, and, consequently, requisite controversy existed, since foreign corporation asserted that it did have interest in that policy. U.S.C.A. Const.Art. 3, § 2; 28 U.S.C.A. § 2201 et seq.

**\*355** Michael J. Carcich,Nicoletti Hornig Campise Sweeney & Paige, New York City (Robert A. Novak, on the brief), for Plaintiffs.

Heather M. Zona, Heller Ehrman White & McAuliffe LLP, New York City (Edward M. Joyce, David B. Goodwin, Esta L. Brand, on the brief), for Certain Foreign BP Defendants, Certain Non-BP Defendants, Wrongly Named Defendants, and Svenska Petroleum Exploration AS.

Esta L. Brand, Heller Ehrman White & McAuliffe LLP, San Francisco, CA (Edward M. Joyce, David B. Goodwin, Heather M. Zona, on the brief), for Defendants Vietnam Oil and Gas Corp. (Petrovietnam), Allseas USA, Inc., Allseas Subsea Contractors, S.A., and Allseas U.K., Ltd.

Edward M. Joyce, Heller Ehrman White & McAuliffe LLP, New York City (Heather M. Zona, on the brief), for Defendant Statoil Vietnam AS.

John A. Borek, Fried, Frank, Harris, Shriver & Jacobson, New York City (Elliot E. Polebaum, Daniel E. Loeb, Steven C. Parker, on the brief), for Defendants Total E & P Norge SA, Total E & P U.K. PLC, Elf Exploration U.K. PLC, and Fina Exploration Ltd.

Clifford Thau, Vinson & Elkins, LLP, New York City (Gregory Zimmer, on the brief), for Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ants Saipem S.p.A., Saipem Inc., Saipem U.K. Ltd., and European Marine Contractors Ltd.

Richard L. Lewis, Anderson Kill & Olick, P.C., New York City (John N. Ellison, on the brief), for Defendants ConocoPhillips Vietnam AS, Conoco-Phillips (U.K.) Ltd., and ConocoPhillips Ltd.

### OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and Associated Electric & Gas Insurance Services Ltd. ("AEGIS") seek a declaratory judgment either finding certain insurance contracts void *ab initio*, because defendants misrepresented their eligibility for coverage, or finding claims made under them not covered. Defendants removed this action from Supreme Court, New York County, pursuant to 28 U.S.C. § 1441(a), and the Court denied plaintiffs' motion to remand. *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, 03 Civ. 0200, 2003 WL 1618534 (S.D.N.Y. Mar. 27, 2003) (*"Nat'l Union I"*). Defendants then moved to dismiss based on *forum non conveniens*, which the Court also denied. *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, No. 03 Civ. 0200, 2003 WL 21180421 (S.D.N.Y. May 20, 2003)(*"Nat'l Union II"*). Various subcategories of defendants now bring a number of motions to dismiss for lack of personal or subject matter jurisdiction pursuant to Rules 12(b)(2) and 12(b)(1), respectively, of the Federal Rules of Civil Procedure. For the reasons that follow, the motion of the self-**356** styled "Wrongly Named Defendants" to dismiss for lack of subject matter jurisdiction will be granted and the other motions denied.

### BACKGROUND

*Nat'l Union II* sets forth most of the relevant facts, *see*2003 WL 21180421, at *1-3, and they will be recited here only to the extent necessary to the disposition of this motion. In 1998, BP [FN1] devised an "Open Cover" insurance policy for itself, its subsidiaries, affiliates, joint-venture partners, and associated entities involved in oil and gas projects worldwide. *Id.* at *1. (Carcich Aff., Ex. 2 at 2 ¶ 4.) The Open Cover allowed BP to "declare" certain projects that BP selected for coverage within a specified period of time.[FN2] *Id.* It covered, as "Principal Insureds," BP, its subsidiaries, affiliates, associates, and "interrelated companies of every tier," as well as, at BP's option but subject to the filing of the proper declaration, joint-venturers, project managers, and financiers. (Carcich Aff., Ex. 2 at 000116.) The Open Cover also gave BP the right to extend its coverage to contractors, architects, engineers, consultants, suppliers, agents, manufacturers, vendors, and licensors, again provided that BP named such entities in the underlying declarations at the time it made those declarations. (*Id.*) Under the Open Cover, BP declared about thirty projects worldwide. (Wrongly Named Ds. Br. 1.)

> FN1. Amoco Corporation developed the insurance policy that is the subject of this action and began to seek subscribers shortly before it merged with British Petroleum Company P.L.C. to form BP Amoco P.L.C., now known as BP P.L.C. (Foreign BP Ds. Br. 3 & n. 2.) For ease of reference, the Court will refer to this parent corporation as "BP."

> FN2. Specifically, the Open Cover allowed BP to declare projects that began after December 31, 1998, but before January 1, 2001, for onshore projects, and after December 31, 1998, but before July 1, 2000, for offshore projects. (Carcich Aff., Ex. 2 at 000117.)

BP enlisted "Aon Risk Services ('Aon'), an insurance broker with offices in London and the United States, to identify insurers willing to participate in the Open Cover and to coordinate project declaration and claims processing." *Nat'l Union II*, 2003 WL 21180421, at *1. BP gave Aon information about the projects BP wanted to declare, and employees of Aon then solicited insurers to participate

319 F.Supp.2d 352
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

in the Open Cover. According to plaintiffs, "Aon solicited National Union in New York, and all negotiations for the National Union policy were conducted with National Union in New York, either in person, via e-mail, telefax or over the phone with National Union's New York office"; and "National Union's underwriters executed and issued the policy in New York and delivered the policy to Aon either by hand in New York or by mail from National Union's New York office to Aon in Chicago." (Ps. Br. in Opp. to P.J. Mots. 4.) Moreover, BP's employee William Siebenaler, who bears responsibility for administering the Open Cover, met with National Union representatives in New York on at least one occasion. (Siebenaler Aff. ¶ 5.)

National Union and AEGIS, two of the fifteen insurers that comprise the international consortium that subscribed to the Open Cover (Foreign BP Ds. Br. 3), allege that certain projects declared by defendants-an assortment of BP subsidiaries, affiliates, joint-venturers, and entities unaffiliated with BP except through their alleged work on BP-affiliated oil and gas projects-do not qualify for coverage because of misrepresentations in certain declarations filed by BP. In the alternative, plaintiffs allege that certain claims, even if arising out of valid, covered projects, do not fall within the scope of the Open Cover *357 policy. *Nat'l Union II*, 2003 WL 21180421, at *2.

For purposes of the present motions, defendants fall into three principal categories: (1) BP subsidiaries and affiliates ("the Foreign BP Defendants"), (2) non-BP joint-venturers or co-owners of projects declared for coverage by BP ("the Non-BP Defendants"), and (3) present and former BP entities and other business entities allegedly related to BP, but which claim no interest, either as participant or owner, in any declared project and do not claim to be insured by the Open Cover ("the Wrongly Named Defendants").[FN3] The former two categories of defendants move to dismiss for lack of personal jurisdiction, arguing that New York's long-arm statute does not reach them, and in the alternat-

ive, that even if it does, to exercise personal jurisdiction over them under the circumstances would violate the Due Process Clause. The latter category of defendants move to dismiss for lack of subject matter jurisdiction, arguing that, as between them and plaintiffs, no case or controversy exists.

> FN3. Defendants denominate and categorize themselves by these labels, and the Court adopts them for the sake of convenience and consistency. None of them, however, should be understood to express or imply anything substantive about the nature of the various self-identified groups of defendants, and in particular, the Court's use of the label "Wrongly Named Defendants" does not express any prejudgment of the merits of those defendants' motion; it does not, that is, imply that the Court agrees that the "Wrongly Named Defendants" have been wrongly named by plaintiffs.

## DISCUSSION

### I. *The Motions to Dismiss for Lack of Personal Jurisdiction*

### A. *Standard on a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(2)*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden to establish jurisdiction. *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2d Cir.2003). Where no jurisdictional discovery has been conducted, allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff, *CutCo Indus.. Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986), and the motion must be denied if those allegations suffice as a matter of law. *In re Magnetic Audiotape,* 334 F.3d at 206; *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997) ("A plaintiff facing a Fed.R.Civ.P. 12(b)(2) motion to dismiss made before any discovery need only allege

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352                                                                                    Page 7
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

facts constituting a prima facie showing of personal jurisdiction[,]" and courts must "construe the pleadings and affidavits in plaintiff's favor at this early stage."); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996).

### B. *Requirements to Exercise Personal Jurisdiction*

A federal court sitting in diversity may exercise jurisdiction over a foreign defendant if, first, the defendant is amenable to process under the law of the forum state, *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 105, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Metro. Life Ins. Co.,* 84 F.3d at 567, and second, the exercise of personal jurisdiction comports with due process under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. *See Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (*en banc* ) ("[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, *358 with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee."); *see also Clarendon Nat'l Ins. Co. v. Lan,* 152 F.Supp.2d 506, 515 (S.D.N.Y.2001).

### C. *The Foreign BP Defendants' Motion*

[1] The motion to dismiss for lack of personal jurisdiction of the Foreign BP Defendants sets forth the basic argument of which the other motions are minor variations: Because defendants did not directly negotiate, agree to, or execute the Open Cover with National Union, but only acquired an interest subsequently in certain projects or claims (allegedly) subject to its coverage, plaintiffs' causes of action do not "aris[e] from" business transactions by defendants within New York. *See* N.Y. C.P.L.R. § 302(a)(1); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996). (Foreign BP Ds. Br. 13.) For similar

reasons, defendants argue, the absence of sufficient contacts between them and the State of New York would make any assertion of personal jurisdiction over them by a New York court inconsistent with the " 'traditional notions of fair play and substantial justice' " that circumscribe the constitutional limits of personal jurisdiction under the Due Process Clause. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154, quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). (Foreign BP Ds. Br. 23-25.) Neither argument withstands analysis.

### 1. *New York's Long-Arm Jurisdiction Statute*

New York law authorizes both general and specific exercises of personal jurisdiction over foreign defendants. N.Y. C.P.L.R. §§ 301-302; *see generally Metro. Life. Ins. Co.,* 84 F.3d at 567-68 (explaining distinction between general and specific jurisdiction) Plaintiffs do not argue that the Court may exercise general jurisdiction based on defendants' physical or legal presence in New York. They instead argue that specific personal jurisdiction exists under § 302(a), which authorizes New York courts to exercise jurisdiction over nondomiciliaries as to causes of action that arise from certain enumerated acts, whether performed personally or by agents. Those acts include transacting business in New York. *Id.* § 302(a)(1); *see McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981) ( "Essential to the maintenance of a suit against a nondomiciliary under [§ 302(a)(1) ] is the existence of some articulable nexus between the business transacted and the cause of action sued upon.").

[2][3][4] A defendant transacts business in New York within the meaning of § 302(a)(1) when it " 'purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.' " *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967), quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *see also CutCo*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

Page 8

*Indus.,* 806 F.2d at 365. To determine whether a defendant has purposefully availed itself of the privilege of conducting activities in New York, courts examine several factors, none of which is dispositive. *Agency Rent A Car Sys.,* 98 F.3d at 29 (canvassing factors relevant to the question whether a defendant has "transact[ed] business in New York" for purposes of § 302(a)(1)). Proof of a single transaction may suffice, provided it is purposeful. *George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 651, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977); *see also*\*359*Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988) (emphasizing that N.Y. C.P.L.R. § 302"is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted").

The Foreign BP Defendants describe themselves as "independently operated, indirect subsidiaries of the named insured and ultimate parent of all BP entitles, BP p.l.c." (Foreign BP Ds. Br. 1.) They assert that their "sole connection" to New York consists in, first, acquiring an interest in one or more of the projects allegedly insured by the Open Cover, and second, joining in certain claims submitted pursuant to that policy. (*Id.* 1-2.) National Union, a New York insurer, participates in the Open Cover and therefore received defendants' declarations and claims. This suit, in brief, is an effort by National Union and AEGIS to disavow them. The question, then, is whether defendants' contacts with New York State suffice to permit the Court to exercise personal jurisdiction over them pursuant to § 302(a)(1).

Aon's acts in New York included soliciting and negotiating National Union's agreement to participate in the Open Cover; executing an insurance contract with National Union; declaring eligible projects for coverage; meeting with representatives of National Union to discuss disputed declarations; and submitting claims to National Union under the Open Cover. Without question, were Aon itself the insured, these acts would suffice to subject it to the personal jurisdiction of a New York court as to a cause of action arising out of the Open Cover. Under *Agency Rent A Car Sys.,* the Court should consider:

(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [the defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

98 F.3d at 29 (internal citations omitted). While the Open Cover does not require, though it does (apparently)[FN4] permit, the application of New York law, in every other respect, Aon's negotiation, execution, and other acts in connection with the contract by which National Union subscribed to the Open Cover more than suffice under the above criteria to establish personal jurisdiction on a cause of action arising out of that contract. *See, e.g.,PDK Labs,* 103 F.3d at 1109; *Clarendon Nat'l Ins. Co.,* 152 F.Supp.2d at 516-17. Indeed, the negotiation and execution of the contract in New York may alone suffice to confer personal jurisdiction over Aon in an action arising out of that contract. *Seelroquois Gas Corp. v. Collins,* 42 Misc.2d 632, 248 N.Y.S.2d 494, 497 (1964), *aff'd,*23 A.D.2d 823, 258 N.Y.S.2d 376 (4th Dep't 1965); *seealsoKreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40. Because plaintiffs seek, *inter alia,* rescission, declaratory relief, and reimbursement for insurance\*360 claims paid by National Union based on defendants' alleged misrepresentations (P. Br. in Opp. to P.J. Mots. 21-22), their causes of action arise out of Aon's acts such that "there is a substan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tial relationship between the transaction and the claim asserted." *Id.; see also* *CutCo,* 806 F.2d at 365; *McGowan,* 52 N.Y.2d at 272, 437 N.Y.S.2d 643, 419 N.E.2d 321.

> FN4. The Open Cover permits the insureds "to select 'USA' or 'English' law" (Foreign BP Ds. Br. 13), though it is not clear whether the former reference would permit each insured to elect the law of whatever U.S. jurisdiction it desires.

[5] Of course, Aon is not the defendant. But § 302(a) authorizes personal jurisdiction as to causes of action arising out of the enumerated acts whether performed "in person or through an agent." The dispositive question is therefore whether Aon acted as the agent of the Foreign BP Defendants in its dealings with National Union. *See* *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 19, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970) ("The mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts."). To decide whether Aon acted as the agent of these defendants requires an analysis of "the realities of the relationship in question rather than the formalities of agency law." *CutCo,* 806 F.2d at 366; *see also* *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40. For purposes of personal jurisdiction, an agent is a person or entity that acts "for the benefit of, and with the knowledge and consent of, the non-resident principal," *CutCo,* 806 F.2d at 366 (internal quotation marks omitted), and over which that principal exercises "some control." *Id.; see also* *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981) (collecting cases).

Aon acted as the insurance broker for BP. (Siebenaler Aff. ¶¶ 6, 8.) BP acquired the Open Cover policy "for itself, certain subsidiary and/or associated companies, joint-venture partners, and other insureds as indicated in the policy wording for various potential onshore and offshore projects it expected to begin all over the world." (*Id.* ¶ 4.)

The Foreign BP Defendants argue that they did no more than passively "become" insured by the Open Cover by virtue of ownership interests they acquired in projects declared by BP subsequent to the execution of the contract with National Union, and then join in the submission of certain claims under that policy. (Foreign BP Ds. Br. 1-2) None of them, they argue, knew about or consented to Aon's activities in New York, still less exercised "some control" over Aon; indeed, none of them could have controlled Aon's activities in New York, for all of them became insured by virtue of declarations filed by BP after Aon had secured the subscribers to the Open Cover, including National Union. (*Id.* 4; Foreign BP Ds. Reply Br. 1-7.)

This argument disregards a crucial fact: Each Foreign BP Defendant knew and voluntarily authorized BP to acquire insurance for it in relation to the project in which it holds some stake, whether as participant, partial owner, or both. A company cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise to a legal dispute. The Foreign BP Defendants acquired ownership interests in the various projects insured by the Open Cover knowing that BP had performed the acts required to obtain insurance for those projects. They gave BP the information it needed to declare those projects for coverage. Had they wished, they could have learned the names and locations of the subscribers to the Open Cover. That they chose not to cannot immunize them from personal jurisdiction on a cause of action arising out of the very activities they delegated to BP, and through BP to Aon, to perform.

*361 Nor does it matter that the Foreign BP Defendants did not become insured by the Open Cover until after it had been negotiated and executed by Aon. Each defendant could have decided to acquire insurance for its respective project in whatever manner it deemed suitable. Rather than handle insurance for the projects themselves, the Foreign BP Defendants entered into contracts with BP by which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

they effectively "bought in" to the Open Cover, including its contacts to New York and a New York insurer, thereby purposefully availing themselves of the benefits of Aon's and BP's prior dealings in New York to acquire insurance for their projects.

In short, when Aon acquired insurance for the projects by locating subscribers to the Open Cover, it acted for the benefit of, not only BP, but the Foreign BP Defendants who, after all, now claim entitlement to coverage and, in some cases, insurance proceeds pursuant to that policy. *Cf.Elman v. Belson,* 32 A.D.2d 422, 302 N.Y.S.2d 961, 964 (2d Dep't 1969) (emphasizing that while "defendant did not physically visit New York or personally enter into the negotiations,""it is hardly disputable that all of these activities were conducted for his benefit, even though he now chooses not to recognize them"). Because the Foreign BP Defendants authorized BP to take the actions required to acquire insurance for their projects-or, more accurately, consented *ex post facto* to BP's prior acts to acquire insurance for prospective projects in which defendants purchased interests-for jurisdictional purposes, Aon, BP's agent, acted for their benefit, with their consent, and with their imputed, if not actual, knowledge. *SeeCutCo,* 806 F.2d at 366.

[6] While the Foreign BP Defendants object strenuously that they lacked "some control" over Aon, the objection is easily answered. Each *chose* to delegate to BP authority to acquire insurance for the projects rather than to seek it by other means, and BP controlled Aon. As a matter of law, "where there is joint control of a business enterprise-similar to that existing in a partnership or joint venture-enough control has been shown to establish *prima facie* this particular element of agency to satisfy long-arm jurisdiction." *Id.* Defendants seek to distinguish *CutCo* on the ground that they do not technically qualify as co-venturers or partners of BP. (Foreign BP Ds. Reply Br. 6-7.) But *CutCo* did not hold that the formal legal requirements of a partnership or joint-venture relationship must be established in order for the "some control" element of agency to be satisfied; it held that where arrangements among business entities are "similar to" or "sufficiently analogous to a joint venture or partnership," sufficient control exists to satisfy this element of agency for the purposes of assessing the propriety of long-arm jurisdiction under § 302(a)(1). *Seeid.*

The purpose of requiring "some control" is to ensure that a party will not be subjected to suit in a jurisdiction against its will, by virtue of the actions of a purported "agent" to which that party did not consent and as to which it had no choice. That purpose is clearly met here. By the time these defendants executed the transactions by which their respective projects became insured by the Open Cover, BP had already undertaken, through its own agents, to acquire insurance in, among other places, New York. Had defendants cared, had they wished not to be insured in New York such that they could be forced to litigate about the validity of their insurance coverage here, they could easily have learned of BP's arrangements, declined the invitation to avail themselves of the Open Cover, and thereby avoided that fate. They could have avoided amenability to *362 suit on such matters in New York by the simple expedient of asking about the insurance arrangements, and if they objected to them, seeking to negotiate the right to obtain other, more suitable coverage on their own, or if necessary, rejecting the business. Instead, defendants deliberately chose to delegate the matter of insurance for their respective projects to BP, thus taking the risk that they would find themselves uninsured (with recourse only against BP for breach of contract), as well as the lesser risk that BP would fulfill its duties in a way that subjected it and its co-insureds to suit in New York. Defendants had absolute control over whether this fate would befall them; it was their choice not to exercise that control.[FN5]

> FN5. This analysis also explains why it does not matter whether BP, as defendants' agent, transacted insurance business in New York on its own or through sub-

agents, for however BP acted, its contacts with New York were equally discoverable by defendants and the consequent connections to New York were equally under defendants' control, to adopt and ratify or to reject. Defendants exercised their control by shrugging it off, delegating insurance concerns to BP, and adopting BP's New York-based insurance without inquiry. Any complaint now that, as a result of these decisions, they wound up transacting business in New York against their will is unavailing, for it is false. Defendants were masters of their fate in regard to insurance jurisdiction; if they chose to navigate with their eyes closed, they cannot complain that they landed in New York.

The Foreign BP Defendants cite *Royal & Sunalliance Insurance Co. v. Resolve Towing & Salvage, Inc.,* No. 00 Civ. 2473, 2000 . WL 1801838 (S.D.N.Y. Dec. 7, 2000), in which several insurance underwriters sought to disavow liability for a claim submitted by a corporation engaged in providing towage and salvage services in the Caribbean. *Id.* at *1. The defendant had acquired insurance by enlisting Frankel & Co., a New York insurance broker, but otherwise lacked contacts with New York. *Id.* The court in *Royal* held that even if New York's long-arm statute authorized personal jurisdiction over the defendant under the circumstances, "such an assertion [would] not pass constitutional muster because the defendant's relationship with the forum does not satisfy the minimum contacts and reasonableness prongs of the due process inquiry." *Id.* at *2. By contrast, in *Security Insurance Co. v. ITA Textiles Corp.,* No. 99 Civ. 10942, 2000 WL 1576879 (S.D.N.Y. Oct. 23, 2000), which the Foreign BP Defendants disparage as an "unreported case" (Foreign BP Ds. Br. 18),[FN6] the court confronted a similar factual scenario but sustained jurisdiction. In *Security Insurance,* as in *Royal,* an insurer sought to disavow coverage on a claim submitted by the defendant, a Delaware corporation with its principal place of business in Cali-

fornia. *Security Insurance,* 2000 WL 1576879, at *1. The defendant ***363** had acquired insurance by contacting an insurance broker in New York, who in turn contacted a "a marine underwriter for [the] underwriting manager for [the plaintiff] Security." *Id.* The court found that this string of agency relationships sufficed to authorize personal jurisdiction over the defendant ITA on a cause of action arising out of the insurance policy, because the defendant ITA "purposefully engaged the services of Simon," the insurance broker, "asking him to locate an insurance policy," and Simon negotiated the policy on ITA's behalf. *Id.* at *3.

> FN6. *Security Insurance* is by no means an obscure or inaccessible authority. It is reported on the Westlaw and Lexis electronic databases, which are very likely the research tools used by every law firm involved in this case, as well as by the Court. Whether a district court decision is reported in the Federal Supplement is insignificant in the modern era of computerized legal research. District judges may decide to publish or not to publish a given decision in West's bound volumes for any number of reasons, but the fact of publication in hard copy does not make a district court decision any more or less precedential or persuasive than one that is only published electronically. Neither *Royal* nor *Security Insurance* binds the Court, and to the extent these decisions conflict, the Court must decide for itself which represents the more persuasive view. This Court sees no reason to encourage district judges to kill trees in order to ensure that their opinions will be taken seriously by other judges. It would surely be arbitrary to defer more to the personal-jurisdiction reasoning in *Royal* because someone decided to publish that decision in the *American Maritime Cases* series.

Here, of course, Aon did not act directly on behalf

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the Foreign BP Defendants; it acted for BP, which in turn acted on behalf of various BP subsidiaries and others that it projected would acquire interests in nascent oil and gas projects worldwide. That additional link, however, does not modify the analysis: If $X$ transacts business in New York, then $X$ will be subject to personal jurisdiction on a cause of action arising out of that transaction. If $X$ instead hires $Y$ to transact the same business in New York, and $Y'$ s contacts with New York relative to that transaction would suffice to confer on a New York court personal jurisdiction over $Y$, then $X$ will also be subject to personal jurisdiction on a cause of action arising out of that transaction. *SeeCutCo,* 806 F.2d at 366. If $X$ decides that rather than *either* transact the same business itself *or* hire an agent to do so, it would prefer not to be bothered, and for that reason delegates authority to $Y$ to transact the same business; and $Y$, in turn, exercises that authority by hiring $Z$ as its agent; and $Z'$ s contacts with New York would suffice to give rise to specific long-arm jurisdiction over $Z$; then, again, $X$ will be subject to jurisdiction on a cause of action arising out of $Z'$ s, the agent's, transaction.

That is the situation here. Rather than independently secure insurance for various oil and gas projects in which they acquired interests, the Foreign BP Defendants decided, for whatever reason, to have BP take care of that particular transaction and therefore submitted the information necessary for BP to declare their projects under the Open Cover.[FN7] BP enlisted Aon as its agent to acquire insurance for these projects under the Open Cover, which was developed precisely to permit BP's subsidiaries and business partners to accept insurance coverage in relation to those projects. And Aon's New York contacts would suffice to permit a New York court to exercise personal jurisdiction over Aon on a cause of action arising out of its dealings with National Union. Neither the number of intermediate agency relationships nor defendants' protestations that they lacked actual knowledge or control over Aon can obscure the simple fact that, at bottom, these defendants transacted certain business essential to their activities-the negotiation, execution, and subsequent administration of a major insurance contract-in New York, and this action arises out of that transaction. That defendants made use of others to carry out this business on their behalf does not deprive New York of jurisdiction to resolve disputes that arise directly out of that New York transaction.

> FN7. This is not a case, like *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385 (S.D.N.Y.1978), upon which defendants rely, in which the activities of the relevant agents-here BP and Aon-simply inured to the benefit of defendants without their conscious choice to receive that benefit. *Seeid.* at 390-91. By their decision to acquire insurance for their projects through the Open Cover rather than to seek it independently, the Foreign BP Defendants purposefully availed themselves of BP's and Aon's acts in New York.

To the extent *Royal* implies that New York's long-arm statute does not reach the **\*364** Foreign BP Defendants, the Court respectfully disagrees. Plaintiffs correctly note, however, that the *Royal* court declined to sustain jurisdiction on constitutional grounds, *see*2000 WL 1801838, at \*2, and its implications, if any, for the reach of N.Y. C.P.L.R. § 302(a)(1) are unclear. The Foreign BP Defendants also cite *Ambassador Insurance Co. v. Truly Nolan of America, Inc.,* 514 F.Supp. 985 (S.D.N.Y.1981), where the court found that a single act by an insurance agent in New York did not suffice to subject the principal to personal jurisdiction. *Id.* at 988-89. (Foreign BP Ds. Br. 17.) Here, by contrast, Aon played a continuing role in negotiating the Open Cover with National Union, submitting declarations from BP based on information supplied by defendants, and making claims on their behalf. And in any event, to the extent *Ambassador Insurance Co.* suggests that a single purposeful act does not suffice to confer on a New York court personal jurisdiction over an out-of-state defendant, that proposition

must be rejected as inconsistent with the holding of the New York Court of Appeals in *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40.FN8

> FN8. The Foreign BP Defendants cite several other decisions in support of their position. Some of these decisions address personal jurisdiction under § 302(a)(1) in connection with motions to transfer venue. *SeeSeneca Ins. Co. v. Henrietta Oil Co.,* No. 02 Civ. 3535, 2003 WL 255317 (S.D.N.Y. Feb. 4, 2003); *Am. Motorists Ins. Co. v. Roller Bearing Co.,* No. 99 Civ. 9133, 2001 WL 170658 (S.D.N.Y. Feb. 21, 2001). *Seneca* does not discuss § 302(a)(1), and the circumstances in that case strongly favored litigation in Texas despite the existence of a New York forum-selection clause, which the court held unenforceable. *See* 2003 WL 255317, at *3-4. In *American Motorists,* the court declined to find personal jurisdiction under the totality of the circumstances, where three of the four claims sued upon arose out of contracts negotiated and executed outside New York. *See*2001 WL 170658, at *4. In *State Street Bank and Trust Co. v. Arganese,* No. 95 Civ. 0440, 1996 WL 97186 (S.D.N.Y. Mar. 5, 1996), the court said that "activities of an agent that take place in New York by mere fortuity, and without the knowledge of the principal, do not subject the principal to New York's long-arm jurisdiction,"*id.* at *2, and on that basis disclaimed personal jurisdiction over defendants on a cause of action arising out of indenture and deferred purchase certificates executed by defendants' agents in New York. The Court respectfully disagrees with *State Street Bank* insofar as it suggests that a principal may avoid the jurisdiction of New York courts by professing ignorance that its agent transacted the very business assigned to that agent in New York. But Aon's acts in New York can hardly be described as fortuitous; it purposefully solicited National Union's participation in the Open Cover. In *National Union Fire Insurance Co. v. Mason, Perrin & Kanovsky,* 689 F.Supp. 303 (S.D.N.Y.1988), the court held that plaintiff's cause of action did not arise out of defendants' alleged misrepresentations in an insurance contract because "all the events relating to the application for and the execution of the policy took place in Washington, D.C."*Id.* at 307. Here, the misrepresentations allegedly made by BP (through Aon) took place in New York; Aon negotiated and executed the Open Cover on behalf of BP in New York; and Aon submitted claims made by the defendants to, among other insurers, National Union in New York.

## 2. Constitutional Requirements

[7] The Foreign BP Defendants also argue that even if New York law authorizes personal jurisdiction over them, the exercise of that jurisdiction would contravene the "traditional notions of fair play and substantial justice" imposed by the Due Process Clause, *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted), which "protects a person without meaningful ties to the. forum state from being subjected to its jurisdiction." *Metro. Life Ins. Co.,* 84 F.3d at 567. A foreign defendant may be subjected to the personal jurisdiction of a forum state's courts if that defendant "'purposefully avail[ed] itself*365 of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Because the "purposeful availment" requirement of N.Y. C.P.L.R. § 302(a)(1) derives directly from *Hanson,see*McKee *Elec. Co.,* 20 N.Y.2d at 382, 283

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

N.Y.S.2d 34, 229 N.E.2d 604,"satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements." *Kelly v. MD Buyline, Inc.,* 2 F.Supp.2d 420, 431 (S.D.N.Y.1998). A defendant that purposefully directs acts toward New York can and should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The Foreign BP Defendants nonetheless maintain that it would be unfair for a New York court to exercise personal jurisdiction over them because they allegedly could not foresee a New York forum, did not perform purposeful acts in New York, and could not anticipate that by merely purchasing interests in the projects covered by BP's Open Cover policy, they would be haled into court here. (Foreign BP Ds. Br. 24.) They liken their situation to that of petitioner in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a Japanese company that sold products to a Taiwanese manufacturer of tire tubes, one of which was used in the construction of the allegedly defective motorcycle that caused the California plaintiff's injuries. *Id.* at 106, 107 S.Ct. 1026. (Foreign BP Ds. Reply Br. 11-12.) The Supreme Court held that petitioner's act of placing its "product into the stream of commerce, without more, [wa]s not an act of the [petitioner] purposefully directed toward the forum State," because petitioner's mere "awareness that the stream of commerce may or will sweep the product into the forum State" could not be deemed purposeful. *Id.* at 112, 107 S.Ct. 1026.

Here, the Foreign BP Defendants purchased interests in various oil and gas projects for which they knew or should have known that BP had acquired insurance and intended to "declare" their projects pursuant to the Open Cover. *See Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 613 n. 4 (8th Cir.1994) (observing that in applying the criteria of *International Shoe,* "it is a matter of common sense that there should be no

distinction between 'know' and 'should have known' "). Again, had they wished, defendants could have discovered the identity and locations of the insurers participating in the Open Cover. It is neither unfair nor unreasonable to expect them to defend an action based on business transactions taken by Aon in New York in order to secure an insurance contract expressly intended to covers their projects.[FN9] After *366 all, the Foreign BP Defendants continue to claim to be insured by the Open Cover. They do not contend, for example, that Aon acted *ultra vires* its authority or that, for any other reason, Aon's New York acts do not suffice to bind them under the Open Cover, such that they now claim no rights against National Union. To the contrary, because of Aon's New York acts, by which it secured National Union's subscription to the Open Cover and declared various BP-affiliated projects under that policy, the Foreign BP Defendants claim entitlement to insurance coverage and, in some cases, to payments from National Union. It is simply untenable for these defendants simultaneously to insist that for National Union to pursue its claim that the Open Cover does not extend to certain of their projects or claims because of misrepresentations by their agents, it should be required to sue each of them, individually, in fora scattered throughout the globe.

> FN9. That the Foreign BP Defendants acquired interests in various covered projects after the conclusion of the Open Cover does not absolve them of responsibility for the New York acts taken by Aon and BP in order to secure coverage for those projects. Not only did defendants submit information to BP to enable it, through Aon, to declare their projects to National Union for coverage pursuant to the Open Cover and subsequently, in some cases, to submit claims; by effectively buying into the Open Cover, they also, as principals, ratified Aon's prior acts as agent on their behalf. *Cf. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 60

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

(1st Cir.2002). Indeed, while in some circumstances subjecting defendants to jurisdiction based on the unknown, perhaps unforeseeable, and fortuitous *subsequent* actions of agents might be deemed unreasonable under the Due Process Clause, where, as here, the agents already have performed the actions in question, defendants enjoy the opportunity to discover precisely what those agents did and where they did it, thus enabling them to make a fully informed decision about whether to ratify those agents' acts.

Finally, analysis of the factors enumerated by the Supreme Court in *Asahi* confirms that the exercise of personal jurisdiction over the Foreign BP Defendants is both fair and reasonable under the Due Process Clause:

The Supreme Court has held that the court must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining the most efficient resolution of the controversy; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies.

*Metro. Life. Ins. Co.,* 84 F.3d at 568 (citing *Asahi,* 480 U.S. at 113-14, 107 S.Ct. 1026). These factors decisively establish the fairness and reasonableness of exercising personal jurisdiction over these defendants.

Defendants will not be unduly burdened by this litigation. Plaintiffs allege certain common misrepresentations by BP, which can ably defend this action on behalf of all defendants. As a practical matter, BP has a strong incentive to litigate this case vigorously, not only because of its own interests in the projects at issue, but because of its contractual responsibility to the other defendants if it failed, by reason of its own wrongful or negligent acts, to secure insurance for the projects. Indeed, if plaintiffs succeed in this action, the other defendants may well have recourse against BP, presumably in fora of their own choosing. Despite defendants' diverse nationalities, this case will not require the production of witnesses and evidence located worldwide. Except for defendants' provision of the information needed for BP to declare their various projects pursuant to the Open Cover, most of the relevant negotiations and other conduct took place in the United States or Great Britain. By contrast, the burden on plaintiffs, were they required to bring separate actions against each defendant in fora throughout the world, would be colossal. Both plaintiffs' and the judicial system's interests in obtaining an efficient resolution of these claims in a single, consolidated action are therefore overwhelming. Finally, New York State has an undoubted interest in regulating an insurance contract negotiated, executed, and administered in New York by a New York company.

In short, for jurisdictional purposes, Aon's and BP's actions in New York to *367 negotiate and execute an insurance contract with National Union, to declare projects eligible for coverage, and to submit claims on behalf of, and as agent for, the Foreign BP Defendants more than suffice to constitute transacting business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1), this action arises out of that transaction; and the Court's exercise of personal jurisdiction under the circumstances fully comports with those "traditional notions of fair play and substantial justice" that circumscribe the exercise of personal jurisdiction under the Due Process Clause. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted). Put simply, notwithstanding the number and diversity of defendants, this is in essence a unified action to address the validity and interpretation of a single insurance program negotiated, executed, and administered in New York, through the deliberate choice of agents to whom defendants not only delegated the responsibility to secure insurance, but whose decision to carry out that responsibility in New York was eas-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ily discoverable by defendants at the time they acquired their respective interests in the covered projects. Requiring defendants to litigate this action in New York can therefore hardly be deemed unfair. Accordingly, the motion to dismiss for lack of personal jurisdiction of the Foreign BP Defendants is denied.

### D. *The Non-BP Defendants' Motion*

The Non-BP Defendants bring a separate motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2). For purposes of personal jurisdiction, the sole difference between their status and that of the Foreign BP Defendants is that the former are not BP subsidiaries. The Non-BP Defendants describe themselves as unaffiliated foreign corporations that have ownership interests in projects declared for coverage under the Open Cover.[FN10] But nothing about the preceding analysis of the Foreign BP Defendants' motion turns on their status as BP subsidiaries. The dispositive question under N.Y. C.P.L.R. § 302(a)(1), as under the Due Process Clause, is whether defendants took certain acts, whether personally or through agents, which were purposefully directed toward New York. The Non-BP Defendants, no less than the Foreign BP Defendants, understood that BP had acquired insurance to cover their respective projects. (Non-BP Ds. Br. 2) The gravamen of their objection to personal jurisdiction is that they did not know that BP had acquired that insurance by acts within, among other places, New York. But these defendants, too, had they desired, could have arranged to insure their projects by other means. They instead chose to entrust this task to BP. Had they troubled to inquire, the Non-BP Defendants could have discovered the identities and locations of the insurers for their projects. That they did not cannot immunize them from personal jurisdiction based on acts taken by their agents in New York and out of which plaintiffs' causes of action arise. The Non-BP Defendants' motion is therefore denied for substantially the same reasons*368 set forth above in section I(C) of this Opinion.[FN11]

FN10. The sole exception is Stolt Offshore Ltd., a contractor for one of the Foreign BP Defendants, BP Exploration Operating Co., on a project subject to the Open Cover. The contract between Stolt and that BP subsidiary obliged the subsidiary to acquire insurance for Stolt, which the subsidiary did by availing itself of the Open Cover. (P. Br. in Opp. to P.J. Mots. 6; Carcich Aff., Exs. 8-9.) Stolt's status as an insured contractor on one of the covered BP projects rather than an insured co-owner or co-venturer with BP does not make Stolt's decision to buy into the Open Cover, and thereby avail itself of BP's actions in New York, any less purposeful for purposes of N.Y. C.P.L.R. § 302(a)(1) and the Due Process Clause.

FN11. Non-BP Defendant ONGC Videsh also moves to dismiss for lack of proper service of process, *see* Fed.R.Civ.P. 12(b)(5), because plaintiffs initially failed to serve ONGC Videsh in the manner prescribed by Indian law. *See* Fed.R.Civ.P. 4(f)(2)(a). (Non-BP Ds. Br. 14.) Plaintiffs requested in their opposition papers, however, that they be permitted to cure this alleged defect in service by re-serving ONGC Videsh within sixty days (Carcich Aff. ¶ 4.), which they have done. (Carcich Supp. Aff. ¶ 5, Ex. 1.) Plaintiffs' request is granted, and proper service having now been effected, ONGC Videsh's Rule 12(b)(5) motion is denied.

### E. *The Remaining 12(b)(2) Motions*

#### 1. *ConocoPhillips, Svenska, and the Total Foreign Defendants*

ConocoPhillips Vietnam AS, ConocoPhillips (U.K.) Ltd., and ConocoPhillips Ltd. (collectively, "the ConocoPhillips Defendants") join in the motions of the Foreign BP and Non-BP Defendants, as does Svenska Petroleum Exploration AS. For purposes

319 F.Supp.2d 352                                                    Page 17
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

of jurisdiction, these defendants do not differ in any relevant respect from the Non-BP Defendants. Each purchased an ownership interest in or participates as a co-venturer on BP-affiliated oil and gas projects insured by the Open Cover, and National Union brings this action to obtain a declaratory judgment finding such projects not insured by the Open Cover. Total E & P Norge SA, Total E & P U.K. PLC, Elf Exploration U.K. PLC, and Fina Exploration Ltd. (collectively, "the Total Foreign Defendants") bring a separate motion to dismiss for lack of personal jurisdiction. They describe themselves as "passive partners or co-venturers with BP Amoco on one or more of the exploration projects which BP Amoco declared covered under the [Open Cover]," and they, too, concede that they were "offered and accepted the opportunity by BP Amoco affiliates to insure their interests in a given project under BP Amoco's Open Cover Policy." (Total Foreign Ds. Br. 3.) Again, for purposes of personal jurisdiction, the Total Foreign Defendants do not differ in any relevant respect from the Non-BP Defendants. By availing themselves of the opportunity to insure themselves by means of the Open Cover, they availed themselves of BP's actions, both its own and those of its agent Aon, within New York. Accordingly, the motions of the ConocoPhillips Defendants, Svenska Petroleum Exploration AS, and the Total Foreign Defendants are denied for the reasons already stated.

## 2. The Saipem Defendants

Saipem S.p.A., Saipem Inc., Saipem U.K. Ltd., and European Marine Contractors Ltd. (collectively, "the Saipem Defendants") also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(2).[FN12] Saipem S.p.A. and Saipem U.K. Ltd. argue that they lack any connection to the Open Cover, that they neither "entered into any contractual relationship [n]or performed any work in connection with the projects identified in the Amended Complaint." (Saipem Ds. Reply Br. 3, 6-7.) Plaintiffs allege, on information and belief, that Saipem S.p.A. and Saipem U.K. Ltd. acted as contractors on projects declared by BP

under the Open Cover. (P. Br. in Opp. to P.J. Mots., Ex. D at 2.) Absent jurisdictional discovery, the Court must credit plaintiffs' jurisdictional allegations and "construe the pleadings and affidavits in [their] favor." *369PDK Labs, Inc., 103 F.3d at 1108. This does not, of course, preclude Saipem S.p.A. and Saipem U.K. Ltd. from challenging personal jurisdiction at a later stage. The other two Saipem Defendants, Saipem Inc. and European Marine Contractors Ltd., concede that they "acted as contractors on two of the projects" identified in the Amended Complaint. (Saipem Ds. Reply Br. 1.) At least for purposes of this motion, the Court must assume that the Saipem Defendants fall within the category of "contractor[s] for whom BP was required to obtain insurance pursuant to the terms of the relevant contract." (Ps. Br. in Opp. to P.J. Mots. 6-7.)

> FN12. Even though the same law firm represents all four of these defendants, and their arguments are virtually identical, Saipem U.K. and European Marine Contractors filed one motion to dismiss, while Saipem S.p.A. and Saipem Inc. filed a separate motion to dismiss. The Court will consider them together.

Status as a contractor on a project covered by the Open Cover, as opposed to a co-owner or joint-venturer on such a project, does not modify the personal jurisdiction analysis. Assuming, as plaintiffs allege, that these defendant contractors entered into contracts with BP subsidiaries or co-venturers requiring BP to obtain the necessary insurance for the projects on which they agreed to work, the contractors purposefully availed themselves of BP's and Aon's activities to negotiate and execute an insurance contract with National Union in New York and subsequently to declare their projects pursuant to the Open Cover. BP's and Aon's activities suffice to subject them, and those for whom they acted as agents, to the personal jurisdiction of a New York court on a cause of action that arises out of those activities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352

Page 18

319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

The Saipem Defendants, like the Foreign BP and Non-BP Defendants, object that they lacked knowledge or control over BP or Aon. (Saipem Ds. Reply Br. 7-8.) Again, this objection misconceives the issue and the nature of their nexus to New York. By choosing to be contractors on projects that they knew or should have known were insured by the Open Cover, the Saipem Defendants purposefully availed themselves of BP's and Aon's New York activities, effectively ratifying those activities after the fact. They cannot now object that they did not know about or consent to those activities. Had they wished, they could have inquired into the identities and locations of the Open Cover insurers. Had they, upon learning of National Union's identity and location, wished to avoid being haled into a New York court on a cause of action arising out of the Open Cover, they could have sought insurance elsewhere. And were their refusal to consent to be insured by the Open Cover a deal-breaker for the owners or managers of their respective projects, they could have declined the work. The Saipem Defendants' motions are therefore also denied.

### 3. *Petrovietnam and the Allseas Defendants*

[8]    Vietnam   Oil   and   Gas   Corporation (Petrovietnam), Allseas USA, Inc., Allseas Subsea Contractors, S.A., and Allseas UK, Ltd. join in the Non-BP Defendants' motion to dismiss. The three Allseas entities describe themselves as contractors on projects subject to the Open Cover, and for purposes of personal jurisdiction, their status does not differ in any relevant respect from that of the Non-BP Defendants or the Saipem Defendants discussed in the preceding section. (*See* Petrovietnam, *et al.* Notice of Mot., Exs., 2-4.) Accordingly, as to the Allseas entities, the motion to dismiss is denied for the reasons already stated.

Petrovietnam, a corporation wholly owned by the Socialist Republic of Vietnam (*id.*, Ex. 1 ¶ 2), moves to dismiss on the additional ground that it qualifies as a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act **\*370**

("FSIA"), 28 U.S.C. § 1602, *et seq.*,[FN13] which confers immunity on foreign states, subject to enumerated exceptions. A "foreign state" includes an "agency or instrumentality of a foreign state ... a majority of whose share or other ownership interest is owned by a foreign state." *Id.* § 1603(b)(2). Petrovietnam qualifies as a foreign state under this definition, as plaintiffs concede (P. Supp. Br. in Opp. to Petrovietnam Mot. 4), and it therefore enjoys immunity from suit unless one of the Act's exceptions apply. *See Robinson v. Gov't of Malaysia,* 269 F.3d 133, 138-39 (2d Cir.2001).

> FN13. Petrovietnam admits that it bought interests in two projects insured by the Open Cover pursuant to declarations filed by BP. (Petrovietnam, *et al.* Notice of Mot., Ex. 1 ¶¶ 4-5.) Like the Foreign BP and Non-BP Defendants, it objects that it had only a general awareness that the project operators "arranged the insurance programs for those projects," but "did not know the details of the insurance, such as the names and locations of the insurance companies." (*Id.* ¶ 6.) The Court has already rejected that argument, and the basis for specific jurisdiction explained in sections 1(C) and (D) of this Opinion applies equally to Petrovietnam.

Plaintiffs argue that the commercial activity exception, 28 U.S.C. § 1605(a)(2), applies because their cause of action against Petrovietnam, as against the other defendants, arises out of "a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." *Id.* The Court agrees. The same activities that permit the Court to exercise personal jurisdiction over Petrovietnam under N.Y. C.P.L.R. § 302(a)(1)-the negotiation of National Union's participation in the Open Cover, execution of an insurance contract, and submission of declarations under that policy-constitute a commercial transaction within the United States. Alternatively,

319 F.Supp.2d 352

Page 19

319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

those activities at a minimum constitute acts in the United States in connection with the underlying commercial oil-project activities that Petrovietnam and BP engaged in "elsewhere." Petrovietnam, through BP and Aon, acquired insurance for two projects in which it maintains ownership interests. Had its corporate officers traveled to New York personally to secure National Union's participation in the insurance policy covering its projects, Petrovietnam would clearly have performed a commercial activity within the meaning of § 1605(a)(2), and it would be subject to suit on a cause of action arising out of that activity. *SeeReiss v. Societe Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) (commercial activity exception requires "significant nexus" between alleged commercial act or acts and plaintiff's cause of action). That Petrovietnam instead deputized BP to acquire the necessary insurance for its projects does not modify the analysis. At bottom, BP and Aon acted on behalf of, among others, Petrovietnam in securing National Union's subscription to the Open Cover, which insures, among other projects, those in which Petrovietnam maintains an ownership interest. The FSIA therefore authorizes the exercise of jurisdiction over Petrovietnam as to causes of action that arise out of the Open Cover. Accordingly, Petrovietnam's motion to dismiss based on its alleged sovereign immunity is denied.

**4. *Aker Stord AS***

On October 24, 2003, Aker Stord AS, a Norwegian company that entered into a contract with a BP subsidiary whereby that subsidiary arranged for Aker Stord to be insured by the Open Cover, moved to dismiss for lack of personal jurisdiction. (Aker Stord Br. 1.) Aker Stord's brief **\*371** repeats all the arguments made by the Foreign BP and Non-BP Defendants, and the Court rejects them again for the reasons already stated. Aker Stord, too, availed itself of BP's and Aon's activities in New York to secure National Union's subscription to the Open Cover, to execute an insurance contract, and to declare projects pursuant to the Open Cover. BP and

Aon acted as the agent of Aker Stord in connection with the Open Cover, and Aker Stord is therefore subject to personal jurisdiction on causes of action that arise out of the Open Cover. Aker Stord's motion is accordingly denied.

**II. *The Motions to Dismiss for Lack of Subject Matter Jurisdiction***

**A. *Standard on a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)***

[9][10][11] On a motion to dismiss for lack of subject matter jurisdiction, the defendant "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both," and how the Court should "resolve the motion to dismiss depends upon whether the motion presents a factual challenge." *Robinson,* 269 F.3d at 140 (citations and internal quotation marks omitted). Where "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Id.* (citations and internal quotation marks omitted). But where, as here, the defendant challenges jurisdictional facts, "the court may inquire by affidavits or otherwise, into the facts as they exist." *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *see alsoRobinson,* 269 F.3d at 140; *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir.1986); *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976).

**B. *The Wrongly Named Defendants' Motion***

[12] The Wrongly Named Defendants move to dismiss for lack of subject matter jurisdiction, arguing that, as between them and plaintiffs, no case or controversy within the meaning of Article III, § 2 of the Constitution exists. By contrast to the Foreign BP and Non-BP Defendants, these defendants assert that they "have no ownership interests in any projects [insured by the Open Cover] and are not

making claims to recover insurance proceeds for property damage at those projects." (Wrongly Named Ds. Br. 1.) Specifically,

None of these defendants: (a) claims or has a present interest as an owner, partner, contractor, subcontractor or otherwise in any of the 30 projects "declared" under the Open Cover; (b) presently claims to be an insured under the Open Cover or any declaration under the policy; or (c) is presently making a claim for payment or indemnity under the Open Cover or any declaration under the policy.

(*Id.* 2.) FN14

FN14. By order dated December 15, 2003, the Court denied plaintiffs' motions to strike various portions of the Affidavits of William Siebenaler. Plaintiffs object that Siebenaler cannot competently testify that the Wrongly Named Defendants have no present interest in any of the projects insured by the Open Cover because he does not work for them. (Ps. Br. in Opp. to S.M.J. Mot. 12.) Siebenaler bears principal responsibility for administering the Open Cover on behalf of BP, submits information to Aon to permit it to "declare" projects, and therefore would know which companies falls within the Open Cover's scope. (Siebenaler Supp. Aff. 2-3.) To require each of the more than seventy Wrongly Named Defendants to submit an affidavit stating that it does not claim to be insured by the Open Cover would be superfluous. Plaintiffs have not submitted any evidence to call into question Siebenaler's basis of knowledge.

Because the Wrongly Named Defendants agree with plaintiffs that the Open *372 Cover does not insure them, it seems clear that no case or controversy exists for the Court to adjudicate. (*Id.* 4-5.) *See* *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch., Inc.,* 24 F.3d 427, 431 (2d Cir.1994) ( "Article III of the United States Constitution limits

the judicial authority of the federal courts to 'Cases' and 'Controversies.' U.S. Const. art. III, § 2. Because Article III is a limit on judicial power, a court will not have subject matter jurisdiction over an action absent the requisite case or controversy."). Plaintiffs argue, however, that the Wrongly Named Defendants disclaim only a *present* interest in the Open Cover, which "is far different from having no interest" (P. Br. in Opp. to S.M.J. Mot. 7), and they cite cases for the proposition that the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* permits courts in some circumstances to adjudicate controversies based on future contingencies. *E.g.,Assoc. Indem. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir.1992); *Am. Mach. & Metals, Inc. v. De Bothezat Impeller Co.,* 166 F.2d 535, 536 (2d Cir.1948); *accord,Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.,* 670 F.Supp. 424, 429-30 (D.D.C.1987). This general principle, however, simply begs the question whether the facts present such circumstances, because " '[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree.... Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *see also*Charles Alan Wright, *et al., Federal Practice & Procedure* § 2757, at 477 (3d ed. 1998) ("[T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists."); *Nat'l R.R. Passenger Corp.,* 670 F.Supp. at 430 (same; collecting cases).

Here, the future contingency at issue is that the Wrongly Named Defendants might some day acquire interests in projects insured by the Open Cover. But that future contingency could apply to virtu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352                                                                 Page 21
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

ally any business entity. Countless companies might one day purchase an ownership interest in or agree to perform work on one of the oil and gas projects insured by the Open Cover. Except for the superficial fact that some Wrongly Named Defendants appear nominally related to BP, no evidence suggests that any of these entities are any more likely than any other to purchase an interest in or become a contractor on a project allegedly insured by the Open Cover. The mere possibility that one of these defendants might acquire an interest in a project insured by the Open Cover in the future does not suffice to give rise to an actual case or controversy. Cf. *Atlanta Gas Light Co. v. Aetna Cas. and Sur. Co.*, 68 F.3d 409, 414-15 (11th Cir.1995) (no justiciable case or controversy where plaintiff insured filed a declaratory judgment action based on the fact that "defendant insurers denied coverage to similar utilities under similar circumstances in the past").

**\*373** [13] Plaintiffs place principal, but misplaced, reliance on *Hanover Ins. Co. v. Dialuck Corp.*, No. 01 Civ. 7484, 2002 WL 1453834 (S.D.N.Y.2002). While the Court has no quarrel with the general principle that "litigation over insurance coverage has become the paradigm for asserting jurisdiction [in declaratory judgment actions] despite future contingencies that will determine whether a controversy ever actually becomes real," *id.* at \*2 (internal quotation marks omitted), the *Hanover* court applied that principle to sustain subject matter jurisdiction in circumstances far different from those presented by this case. In *Hanover*, plaintiffs sought a declaratory judgment as to an actual controversy, and the Court rejected defendants' argument that "any action taken by the court would likely be rendered moot by the reinstatement" of certain involuntary bankruptcy petitions, which would stay the underlying action. *Id.* Here, plaintiffs urge the Court to sustain jurisdiction in the opposite scenario: No actual controversy exists, and plaintiffs argue only that defendants *might* one day acquire an interest in the Open Cover that *could* create a controversy. The Court lacks subject matter

jurisdiction to decide "what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The Wrongly Named Defendants' motion to dismiss for lack of subject matter jurisdiction is therefore granted.

### C. The Remaining 12(b)(1) Motions

#### 1. ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd.

[14] ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. seek to join in the Wrongly Named Defendants motion. As plaintiffs correctly observe, however, the Conoco defendants, unlike the other Wrongly Named Defendants, *presently* claim an interest in the Open Cover policy. (Ps. Br. in Opp. to S.M.J. Mot. 4-5); they concede that they participate in a project insured by the Open Cover. (ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. Reply Br. 2.) That makes all the difference, for it means that a present, actual controversy exists: The Conoco defendants insist that the Open Cover insures them because of their participation on a project declared pursuant to it; plaintiffs deny that. The Court can constitutionally determine whether, as plaintiffs claim, this project, like those in which the Foreign BP and Non-BP Defendants hold interests, does not fall within the ambit of the Open Cover because of alleged misrepresentations made to plaintiffs. See *Morris v. Progressive Cas. Ins. Co.*, 662 F.Supp. 1489, 1491 (S.D.N.Y.1987) ("Disputes over coverage afforded by an insurance policy present an actual case or controversy, so that declaratory judgment is appropriate."), citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *cf. Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F.Supp.2d 293, 295-96 (S.D.N.Y.2003) (sustaining jurisdiction over insured's causes of action seeking declaratory relief while dismissing related insurance claims for breach of contract on ripeness grounds). The motion to dismiss for lack of subject matter jurisdiction of ConocoPhillips Ltd. and Conoco-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

Phillips (U.K.) Ltd. is therefore denied.

### 2. *Statoil Vietnam AS*

Statoil Vietnam AS likewise seeks to join in the Wrongly Named Defendants motion to dismiss, but on an entirely distinct basis: that it has been acquired by another entity and changed its name. Statoil Vietnam AS, a former subsidiary of Statoil ASA, once "held a 16.33% interest in the Nam Con Son Pipeline project in *374 Vietnam," one of the projects declared pursuant to the Open Cover, but it has since sold its assets to a company now known as ConocoPhillips Vietnam AS. (Statoil Vietnam AS Notice of Joinder, Ex. 1 ¶ 2.) Plaintiffs do not dispute this. (Ps. Opp. to Statoil Vietnam AS Mot. 4) ConocoPhillips Vietnam AS, not Statoil Vietnam AS, now owns the relevant interest in the pipeline project insured by the Open Cover, and in section I(E)(1) of this Opinion, the Court denied Conoco-Phillips Vietnam AS's motion to dismiss for lack of personal jurisdiction. This ostensible motion to dismiss for lack of subject matter jurisdiction thus amounts to no more than a dispute over the proper name under which this particular entity should be sued. ConocoPhillips Vietnam AS remains a party to this action, and plaintiffs do not seek relief from Statoil Vietnam AS but rather from its successor-in-interest, that is, ConocoPhillips Vietnam AS. Accordingly, the Court will deem ConocoPhillips Vietnam AS substituted for Statoil Vietnam AS, and the latter's motion to dismiss for lack of subject matter jurisdiction is denied as moot.

### CONCLUSION

For the reasons set forth above, the motions to dismiss for lack of personal jurisdiction of (1) Certain Foreign BP Defendants, (2) Certain Non-BP Defendants, (3) ConocoPhillips Vietnam AS, Conoco-Phillips (U.K.) Ltd., and ConocoPhillips Ltd., (4) Svenska Petroleum Exploration AS, (5) Total E & P Norge SA, Total E & P U.K. PLC, Elf Exploration U.K. PLC, and Fina Exploration Ltd., (6)

Saipem U.K. Ltd. and European Marine Contractors, (7) Saipem S.p.A. and Saipem Inc., (8) Vietnam Oil and Gas Corporation (Petrovietnam), Allseas USA, Inc., Allseas UK Ltd., and Allseas Subsea Contractors, S.A., and (9) Aker Stord AS are denied. The motion to dismiss for lack of subject matter jurisdiction of the Wrongly Named Defendants is granted. The motion to dismiss for lack of subject matter jurisdiction of ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. is denied, and the motion to dismiss for lack of subject matter jurisdiction of Statoil Vietnam AS is denied as moot.

SO ORDERED.

S.D.N.Y.,2004.
National Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.
319 F.Supp.2d 352

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

108 S.Ct. 404                                                                                Page 1
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

▷
Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.
U.S.La.,1987.

Supreme Court of the United States
OMNI CAPITAL INTERNATIONAL, LTD., et al.,
Petitioners
v.
RUDOLF WOLFF & CO., LTD., et al.
**No. 86-740.**

Argued Oct. 6, 1987.
Decided Dec. 8, 1987.

Commodities futures investors brought an action against marketers of a trading program on grounds that they fraudulently induced plaintiffs to participate in violation of various securities laws. Defendants impleaded a British corporation which they employed to handle trades on a British metals exchange and the British representative who solicited their business. The District Court for the Eastern District of Louisiana granted the defendants' motion to dismiss the securities law claims as having been preempted by the Commodity Exchange Act, but concluded that it could exercise personal jurisdiction over them. Upon reconsideration, the court concluded that it lacked personal jurisdiction and dismissed the claims against the British defendant on grounds that requirements of the Louisiana long-arm statute were not met. On appeal, the Court of Appeals for the Fifth Circuit, sitting en banc, 795 F.2d 415, affirmed in a per curiam opinion. On petition for certiorari, the Supreme Court, Justice Blackmun, held that the district court lacked personal jurisdiction over the nonresident defendants as there was no implied authorization for nationwide service of process under the Commodity Exchange Act provision authorizing private cause of action and requirements of Louisiana long-arm statute were not met.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟲4**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk3 Jurisdiction in General; Nature and Source
            170Bk4 k. Constitutional and Statutory Provisions. Most Cited Cases
The jurisdictional limits that Article III of the Constitution places on the federal courts relate only to subject matter jurisdiction, rather than personal jurisdiction. U.S.C.A. Const. Art. 3, § 1 et seq.

**[2] Federal Civil Procedure 170A ⟲411**

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)1 In General
                170Ak411 k. In General. Most Cited Cases
Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied by notice to the defendant, a constitutionally sufficient relationship between the defendant and the forum, and a basis for the defendant's amenability to service of summons. U.S.C.A. Const. Art. 3, § 1 et seq.; Amends. 5, 14.

**[3] Federal Courts 170B ⟲76.1**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.1 k. In General. Most Cited Cases
    (Formerly 170Bk76, 106k12(2))
Absent consent, there must be authorization for service of summons on a nonresident defendant in or-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                          Page 2
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

der for a defendant to be amenable to service of summons as required in order for a federal court to exercise personal jurisdiction over the defendant.

**[4] Commodity Futures Trading Regulation 83H** ☞75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
The Commodity Exchange Act did not contain an implied provision for nationwide service of process in a private cause of action. Commodity Exchange Act, § 1 et seq., as amended, 7 U.S.C.A. § 1 et seq.

**[5] Commodity Futures Trading Regulation 83H** ☞75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
Congress' failure to include a provision for nationwide service of process in a private cause of action when it enacted the Futures Trading Act of 1982 forcefully argued that Congress did not intend to authorize nationwide service of process in light of the express provision for nationwide service of process in other enforcement provisions of the Commodity Exchange Act. Commodity Exchange Act, §§ 6c, 6d(4), 14(d), as amended, 7 U.S.C.A. §§ 13a-1, 13a-2(4), 18(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[6] Commodity Futures Trading Regulation 83H** ☞75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
The fact that Congress enacted broader service provisions for Commodity Futures Trading Commission actions than for private actions did not imply that Congress intended to provide nationwide ser-

vice of process for private actions under the Commodity Exchange Act in light of legislative history stating that the availability of private right of action supplemented but did not substitute for the regulatory and enforcement program of the CFTC. Commodity Exchange Act, §§ 22, 22(d), as amended, 7 U.S.C.A. §§ 25, 25(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[7] Commodity Futures Trading Regulation 83H** ☞75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
Nationwide service of process was not authorized under the implied cause of action recognized in *Curran* for private actions under the Commodity Exchange Act which accrued prior to the effective date of the section explicitly authorizing private right of action for violation of the Act. Commodity Exchange Act, §§ 22, 22(d), as amended, 7 U.S.C.A. §§ 25, 25(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[8] Federal Courts 170B** ☞417

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk417 k. Federal Jurisdiction. Most Cited Cases
In order to determine whether a federal court had jurisdiction over a private cause of action for violations of the Commodity Exchange Act, which did not implicitly authorize service of summons on nonconsenting defendants, the court had to look to the long-arm statute of the state in which the district court sat to determine whether nonresident defendants were amenable to service of process. U.S.C.A. Const. Art. 3, § 1 et seq.; Fed.Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.; LSA-R.S. 13:3201(d) (1977).

**[9] Commodity Futures Trading Regulation 83H**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

Page 3

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

⟲⟶75

83H Commodity Futures Trading Regulation
   83HIII Civil Remedies in General
      83Hk75 k. Parties and Process. Most Cited Cases
Federal court lacked jurisdiction over plaintiff's private cause of action under the Commodity Exchange Act, in light of Act's failure to implicitly authorize service of summons on nonconsenting nonresident defendant and the plaintiffs' failure to comply with requirements of Louisiana long-arm statute. Securities Exchange Act of 1934, § 27, 15 U.S.C.A. § 78aa; Securities Act of 1933, § 22, 15 U.S.C.A. § 77v; LSA-R.S. 13:3201(d) (1977); Fed.Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.

**[10]  Commodity Futures Trading Regulation 83H ⟲⟶75**

83H Commodity Futures Trading Regulation
   83HIII Civil Remedies in General
      83Hk75 k. Parties and Process. Most Cited Cases
The Supreme Court would not act to fill the "interstices in the law inadvertently left by legislative enactment" by creating a rule authorizing service of process on nonresident defendants by plaintiffs bringing a private cause of action for violations of the Commodity Exchange Act. Commodity Exchange Act, § 1 et seq., as amended, 7 U.S.C.A. § 1 et seq.

**[11]  Federal Courts 170B ⟲⟶76.1**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
            170Bk76.1 k. In General. Most Cited Cases
   (Formerly 170Bk76)
Even if it had the power, it would be unwise for a court to make its own rule authorizing service of summons on nonresident defendants in light of Congress' likely assumption that federal courts cannot add to the scope of service of summons Congress has authorized and the United States Supreme Court's repeated past statements that a legislative grant of authority is necessary.

**\*\*405 Syllabus** FN\*

   FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*97** Omni Capital International, Ltd., and Omni Capital Corporation (hereafter petitioners), New York corporations, marketed an investment program involving commodity-futures trades on the London Metals Exchange. Certain investors filed suits (later consolidated) against petitioners in the Federal District Court for the Eastern District of Louisiana, charging that petitioners fraudulently induced them to participate in petitioners' program, in violation of various federal securities laws. Petitioners impleaded respondent Rudolf Wolff & Co., a British corporation with offices in London \*\*406 that was employed by petitioners to handle trades on the London Exchange, and respondent Gourlay (hereafter respondents), a United Kingdom citizen and resident who was Wolff's representative in soliciting petitioners' business. Petitioners contended that their liability, if any, was caused by respondents' improper trading activities. While the action was pending, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182, was decided, recognizing an implied private cause of action under the Commodity Exchange Act (CEA), and the plaintiffs in this litigation amended their complaints to allege violations of that Act. The District Court dismissed the other securities law claims as pre-empted by the CEA, and held that it lacked personal jurisdiction over respondents because (1) the CEA was silent about service of process for private causes of action, (2) thus, application of Louisiana's long-arm

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
(Cite as: 484 U.S. 97, 108 S.Ct. 404)

statute was required, and (3) that statute's requirements were not met. The Court of Appeals affirmed.

*Held:* The District Court lacked personal jurisdiction over respondents in this federal-question litigation under the CEA. Pp. 408-413.

(a) The requirement that a federal court have personal jurisdiction flows from the Due Process Clause of the Fifth Amendment. However, before a federal court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons. Absent consent, there must be authorization for service of summons on the defendant. Pp. 409-410.

**\*98** (b) Under Federal Rule of Civil Procedure 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether an out-of-state defendant is amenable to service. After the *Curran* decision, and while the present litigation was still pending in the District Court, Congress added § 22 to the CEA, explicitly authorizing a private cause of action for CEA violations but not referring to service of process, in contrast to Congress' explicit authorization of nationwide service of process in other CEA provisions for other civil actions under the Act. This contrast, as well as the legislative history, supports the conclusion that Congress did not intend to provide nationwide service of process for private actions under the CEA. Nor was nationwide service implicitly authorized for any implied private cause of action under the CEA, such as petitioners', that accrued prior to § 22's effective date. Moreover, the District Court held, and petitioners concede, that the requirements of Louisiana's long-arm statute were not met here. Pp. 409-412.

(c) Even were it within this Court's power, judicial creation of a common-law rule authorizing service of process in this litigation would be unwise. The

strength of the longstanding assumption that federal courts cannot add to the scope of service of summons Congress has authorized, and the network of statutory enactments and judicial decisions tied to that assumption, argue strongly against devising common-law service of process provisions. The responsibility for creating service of process provisions rests with those who propose the Federal Rules of Civil Procedure and with Congress. Pp. 411-413.

795 F.2d 415, affirmed.

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Robert A. Kutcher* argued the cause for petitioners. With him on the brief was *John D. Fricke. Anita M. Warner* filed a brief for Point Landing, Inc., et al., respondents under this Court's Rule 19.6, in support of petitioners.
*Elliot Paskoff* argued the cause for respondents and filed a brief for respondent Rudolf Wolff & Co., Ltd. *Sheldon H. Elsen, Clement J. Colucci, Jerome Lipper,* and *Michael S. Fawer* filed a brief for respondent Gourlay.
Justice BLACKMUN delivered the opinion of the Court.
This case presents questions concerning the prerequisites to a federal court's exercise of *in personam* jurisdiction.

### \*99 \*\*407 I

Petitioners Omni Capital International, Ltd., and Omni Capital Corporation (collectively Omni),[FN1] New York corporations, marketed an investment program involving commodity-futures trades on the London Metals Exchange. Omni employed respondent Rudolf Wolff & Co., Ltd., a British corporation with its offices in London, as a broker to handle trades on that Exchange. Respondent James Gourlay, a citizen and resident of the United Kingdom, served as Wolff's representative in soliciting this business from Omni.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                    Page 5
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

FN1. The other petitioners are Richard Friedberg and Michael Stern, officers of Omni, and/Northglen Capital Corporation which was named as a defendant with Omni in three of the four consolidated cases now before this Court. Petitioners have filed a single brief.

The United States Internal Revenue Service disallowed income tax deductions, claimed by the participants in Omni's investment program, and did so on the ground that the program's commodities trades on the London Metals Exchange were not bona fide arm's-length transactions. A number of corporate and individual investors who participated in Omni's program then sued Omni in four separate actions in the United States District Court for the Eastern District of Louisiana.[FN2] The plaintiffs in each action charged that, by misrepresenting its tax benefits and future profits, Omni fraudulently induced them to participate in the investment program. Omni, in turn, impleaded Wolff and Gourlay,[FN3] **100** contending that its liability, if any, was caused by their improper trading activities.

FN2. The plaintiffs were two Louisiana corporations, Point Landing, Inc., and Point Landing Fuel Corporation, and six individuals, William S. and Ruby M. Smith, Frank J. and Brenda A. George, and Dennis M. and Joan Rosenberg. Although all these plaintiffs technically are respondents here, see this Court's Rule 19.6, all of them except the Georges have filed a skeletal brief adopting Omni's brief "as if copied *in extenso*." Brief for Respondents in Support of Petitioners 1.

FN3. In the Point Landing suit, Wolff was named as a defendant. In that suit, Omni cross-claimed against Wolff and filed a third-party complaint against Gourlay. In the Smith and George suits, Omni filed a third-party complaint against both Wolff and Gourlay. In the Rosenberg suit, no

move was made against either Wolff or Gourlay.

The procedural history is complex. The original complaints, filed in 1980 and 1981, charged violations of the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, as amended, 15 U.S.C. § 78a*et seq.* (1982 ed. and Supp. IV); SEC Rule 10b-5, 17 CFR § 240.10b-5 (1987); and the Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. § 77a*et seq.* (1982 ed. and Supp. IV), and included pendent state-law claims. The four cases were consolidated in the District Court. While they were pending, this Court decided *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In *Curran,* we recognized an implied private cause of action under the Commodity Exchange Act (CEA), 42 Stat. 998, as amended, 7 U.S.C. § 1*et seq.* (1982 ed. and Supp. IV). The plaintiffs accordingly amended their complaints to allege violations of §§ 4b and 9(b) of the CEA, as amended, 7 U.S.C. §§ 6b and 13(b).

Wolff and Gourlay moved to dismiss the claims against them for lack of personal jurisdiction and, as an additional ground, argued that the securities law claims failed to state causes of action. In its initial opinion dated May 13, 1983, the District Court dismissed the securities law claims as having been pre-empted by the CEA but concluded that it could exercise personal jurisdiction over Wolff and Gourlay. App. 6. The court reasoned that, in actions under the CEA, "Congress intended for U.S. courts to exercise personal jurisdiction over foreign defendants not present in the United States to the limits of the due process clause of the Fifth Amendment." *Id.,* at 9. Therefore, the court determined, if "the quality and nature of a foreign defendant's activities ... in the United States" support a "finding of fair play and substantial justice,"**408** personal jurisdiction would be proper. *Id.,* at 9-10. After examining the extent of Wolff's and Gourlay's contacts with the United States, the District Court concluded it had personal jurisdiction.

**101** After this initial decision of the District Court,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                                                                              Page 6
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

the Fifth Circuit decided *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260 (1983). In *DeMelo*, the Court of Appeals concluded that "when a federal question case is based upon a federal statute that is silent as to service of process, and a state long-arm statute is therefore utilized to serve an out-of-state defendant, [Federal Rule of Civil Procedure] 4(e) requires that the state's standard of amenability to jurisdiction apply." *Id.*, at 1266. Following that decision by its controlling court, the District Court granted Wolff's and Gourlay's motions for reconsideration, noting that the CEA is silent about service of process for private causes of action. App. 19. Upon its reconsideration, the District Court concluded that, in accord with *DeMelo*,"unless jurisdiction can be asserted under the Louisiana long-arm statute, there is no personal jurisdiction over Wolff or Gourlay." App. 22. Because, in its view, the requirements of the Louisiana long-arm statute [FN4] were not met, the District Court concluded that it lacked personal jurisdiction over Wolff and Gourlay, and it directed the entry **\*102** of a final judgment dismissing all claims against them. *Id.*, at 23.

> FN4. Louisiana's long-arm statute, then in effect, provided in relevant part:
>
> "A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's
>
> "(a) transacting any business in this state;
>
> "(b) contracting to supply services or things in this state;
>
> "(c) causing injury or damage by an offense or quasi offense committed through an act or omission in this state;
>
> "(d) causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or

solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state...." La.Rev.Stat.Ann. § 13:3201 (West 1968).

> Louisiana has amended this statute, see 1980 La.Acts, No. 764, § 2, and 1984 La.Acts, No. 398, § 1, codified at La.Rev.Stat.Ann. § 13:3201 (West Supp.1987), but no party has argued that the amendments affect the outcome of this litigation. We therefore do not consider them.

The Fifth Circuit decided the ensuing appeals en banc in the first instance and, by a 9-to-6 vote, affirmed. *Point Landing, Inc. v. Omni Capital Int'l, Ltd.*, 795 F.2d 415 (1986). The majority started from "the unmalleable principle of law ... that federal courts ... must ground their personal jurisdiction on a federal statute or rule." *Id.*, at 423. In the majority's view, neither the CEA nor the Federal Rules of Civil Procedure authorized service of process upon Wolff or Gourlay, and therefore personal jurisdiction over them was lacking. The dissent conceded that neither the CEA nor Civil Rule 4 provided for service of process on Wolff and Gourlay but would have remedied this "bizarre hiatus in the Rules," 795 F.2d, at 428, with an ad hoc authorization of service of process on them based on their contacts with the United States as a whole.

Because of a possible conflict with views of the Sixth Circuit expressed in *Handley v. Indiana & Michigan Electric Co.*, 732 F.2d 1265, 1272 (1984), we granted certiorari to decide whether, in this federal-question litigation arising under the CEA, the District Court may exercise personal jurisdiction over Wolff and Gourlay.

II

Omni's primary and fundamental contention is that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                    Page 7
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

in a suit under the CEA, the only limits on a district court's power to exercise personal jurisdiction derive from the Due Process Clause of the Fifth Amendment. The objection of the Court of Appeals, and of Wolff and Gourlay before this Court, is that, even if an exercise of personal jurisdiction would comport with **409 that Due Process Clause,[FN5] the District Court cannot*103 exercise personal jurisdiction over Wolff and Gourlay because they are not amenable to service of summons in the absence of a statute or rule authorizing such service.[FN6]

> FN5. Under Omni's theory, a federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits. As was the case in *Asahi Metal Industry Co. v. Superior Court of Cal.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), "[w]e have no occasion" to consider the constitutional issues raised by this theory. *Id.,* at 113, n. *, 107 S.Ct., at 1032, n. *.

> FN6. There is no objection to the method of service in this litigation; the objection is only to amenability to service. See *Point Landing, Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415, 424 (CA5 1986).

Omni attempts to meet this objection in a variety of ways. First, Omni argues that the District Court may exercise personal jurisdiction because Wolff and Gourlay have constitutionally sufficient contacts with the forum and, as well, have notice of the suits. Second, Omni contends that even if a rule authorizing service is a prerequisite to effective service and thus to the exercise of personal jurisdiction, Congress implicitly authorized nationwide service for private causes of action under the CEA. Third, Omni presses upon us the view of the Fifth Circuit dissenters that, even if authorization for service of process is required and cannot be found in a

statute or rule, such authorization should be created by fashioning a remedy to fill a gap in the Federal Rules of Civil Procedure. We examine these contentions in turn.

### III

#### A

Omni argues that the jurisdictional limits that Art. III of the Constitution places on the federal courts relate to subject-matter jurisdiction only. In this view, although Art. III, § 1, leaves it to Congress to "ordain and establish" inferior federal courts, the only limits on those courts, once established, in their exercise of personal jurisdiction, relate to due process. Thus, Omni contends, the District Court may exercise personal jurisdiction over Wolff and Gourlay if the Due Process Clause of the Fifth Amendment does not forbid it.

*104 [1] Omni's argument that Art. III does not itself limit a court's personal jurisdiction is correct. "The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause.... It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). Omni's argument fails, however, because there are other prerequisites to a federal court's exercise of personal jurisdiction.

[2][3] Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied. "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-445, 66 S.Ct. 242, 245-246, 90 L.Ed. 185 (1946). Thus, before a court may exercise personal jurisdiction over a de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

(Cite as: 484 U.S. 97, 108 S.Ct. 404)

fendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

### B

The next question, then, is whether there is authorization to serve summons in this litigation. Today, service of process in a federal action is covered generally by Rule 4 of the Federal Rules of Civil Procedure. **410 Rule 4(f) describes where process "may be served." [FN7] It authorizes service in the State *105 in which the action is brought, or anywhere else authorized by a federal statute or by the Rules.

> FN7. Rule 4(f) provides:

> "All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state."

The "most obvious reference" of this last provision is to Rule 4(e). [FN8] See D. Currie, Federal Courts 373 (3d ed. 1982). The first sentence of the Rule speaks to the ability to serve summons on an out-of-state defendant when a federal statute authorizes such service. The second sentence, as an additional method, authorizes service of summons "under the circumstances" prescribed in a state statute or rule. Thus, under Rule 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction. [FN9]

> FN8. Rule 4(e) provides:

> "Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides ... for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule."

> FN9. This assumes, of course, that the defendant is not "an inhabitant of or found within the state," Fed.Rule Civ.Proc. 4(e), and has not consented to service.

Omni argues that Wolff and Gourlay are amenable to service under Rule 4(e) because the CEA implicitly "provides for service ... upon a party not an inhabitant of or found within the state." Omni points out that, prior to this Court's recognition in *Curran* of an implied private cause of action, all other civil actions under the CEA explicitly authorized nationwide service of process. See § 6c (in a Commodity Futures Trading Commission (CFTC) action, service authorized "wherever the defendant may be found"), § 6d(4) (in an action *106 by a state attorney general, service authorized "wherever the defendant may be found"), and § 14(d) (in enforcement action by a beneficiary of a CFTC order, service authorized "anywhere in the United States") of the CEA, as amended, 7 U.S.C. §§ 13a-1, 13a-2(4), and 18(d). Omni contends that this broad avenue for service is mandated by the importance of futures trading to the Nation as a whole. Since this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                                        Page 9
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
(Cite as: 484 U.S. 97, 108 S.Ct. 404)

Court concluded that a private right of action was intended as a "tool for enforcement," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S., at 393, 102 S.Ct., at 1847, it must be given the same "dignity" as other enforcement provisions. Accordingly, Omni contends, nationwide service of process is also authorized for the implied private cause of action under the CEA.

[4][5] Neither the majority nor the dissent in the Court of Appeals found that the CEA contained an implied provision for nationwide service of process in a private cause of action. We, too, decline to draw that inference. After the *Curran* decision, while the present litigation was still pending in the District Court, Congress enacted the Futures Trading Act of 1982, 96 Stat. 2294. That Act amended the CEA by adding § 22, 96 Stat. 2322, 7 U.S.C. § 25, which authorizes explicitly a private right of action for a violation of the CEA. Section 22, however, is silent as to service of process. This contrasts sharply with the other enforcement provisions of the CEA, on which Omni asks us to rely. We find it significant that Congress expressly provided for nationwide service of process in those sections but did not do so in the new**411 § 22. See *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). It would appear that Congress knows how to authorize nationwide service of process when it wants to provide for it. That Congress failed to do so here argues forcefully that such authorization was not its intention. Cf. *INS v. Hector,* 479 U.S. 85, 88-91, 107 S.Ct. 379, 381-383, 93 L.Ed.2d 326 (1986).

[6] The legislative history also supports the conclusion that Congress did not intend to provide nationwide service of process for private actions under the CEA. The House Report*107 on the Futures Trading Act of 1982 noted: "The availability of-... private rights of action-supplements, but does not substitute, for the regulatory and enforcement program of the CFTC.... The Committee fully expects [it will] not become necessary to rely on private litigants as a policeman of the Commodity Exchange

Act." H.R.Rep. No. 97-565, pt. 1, p. 57 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3871, 3906. Thus, it is unremarkable that Congress enacted broader service provisions for CFTC actions than for private actions.

[7] That the new § 22 of the CEA does not provide nationwide service of process does not end our inquiry, however, because Omni's cause of action accrued prior to the effective date of that section. See § 22(d), 7 U.S.C. § 25(d). Strictly speaking, Omni's argument may be that nationwide service is authorized under the implied cause of action recognized in *Curran.* This argument, however, is equally without force. See *Gravois v. Fairchild,* [1977-1980 Transfer Binder] CCH Comm.Fut.L.Rep. ¶ 20,706, p. 22,875 (ED La.1978) (no nationwide service of process for implied private cause of action under CEA). The decision in *Curran* gave no consideration to service of process. Inasmuch as Congress carefully provided for service section by section in the CEA, we would not automatically graft nationwide service onto the implied private right of action. Indeed, the CEA's authorization for nationwide service section by section contrasts sharply with the service provisions of the securities laws. Each of those Acts uses a single section to provide for service "wherever the defendant may be found" for any action under the entire chapter. See § 22 of the Securities Act of 1933, 48 Stat. 86, as amended, 15 U.S.C. § 77v, and § 27 of the Securities Exchange Act of 1934, 48 Stat. 902, as amended, 15 U.S.C. § 78aa. In any event, now that Congress has enacted a private cause of action without nationwide service, we have a better perspective on Congress' view of the role of a private action within the statute as a whole. We see no reason to take a different position. Accordingly,*108 we conclude that a nationwide service provision for a private action was not implicit in the CEA.

[8][9] Since the CEA does not authorize service of summons on Wolff and Gourlay, we look to the second sentence of Rule 4(e), which points to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

Page 10

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

long-arm statute of the State in which the District Court sits-here, Louisiana. The District Court held that the requirements of the Louisiana long-arm statute, see n. 4, *supra,* were not met in this litigation. It noted that even the provision allowing a court to rely on the effects that the defendant causes within the State was "clearly not applicable" because it "applies only to a defendant who 'regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.' " App. 22-23 (quoting La.Rev.Stat.Ann. § 13:3201(d) (West 1968)). Because the terms of the Louisiana statute were not met, the District Court considered a due process analysis unnecessary. Before us, Omni has not contended that Wolff and Gourlay may be reached under the Louisiana long-arm statute. Indeed, Omni has conceded that they may not. See Tr. of Oral Arg. 4. Thus, neither part of Rule 4(e) authorizes the service of summons on Wolff and Gourlay.

**\*\*412 C**

[10] The dissenters in the Court of Appeals argued that even if authorization to serve process is necessary and cannot be found in Rule 4(e), the federal courts should act to fill the "interstices in the law inadvertently left by legislative enactment" by creating their own rule authorizing service of process in this litigation. See 795 F.2d, at 431-432. We decline to embark on that adventure.

As an initial matter, it is unclear at this time whether it is open to us to fashion a rule authorizing service of process. At common law, a court lacked authority to issue process outside its district, and Congress made this same restriction the general rule when it enacted the Judiciary Act of Sept. 24, 1789, § 11, 1 Stat. 79. See **\*109***Robertson v. Railroad Labor Board,* 268 U.S. 619, 622-623, 45 S.Ct. 621, 622-623, 69 L.Ed. 1119 (1925). Thus, specific legislative authorization of extraterritorial service of summons was required for a court to exercise personal jurisdiction over a person outside the district.

Even were we to conclude that the bases for the rule in *Robertson* are no longer valid,[FN10] we would not necessarily have the power to create service-of-process rules. We would have to decide that the provisions of Rules 4(e) and 4(f), in authorizing service in certain circumstances, were not intended to prohibit service in all other circumstances. We would also have to find adequate authority for common-law rulemaking.[FN11] We need not decide these questions, however, since we would not fashion a rule for service in this litigation even if we had the power to do so.

> FN10. The successor to the provision of the first Judiciary Act relating to a district court's ability to serve process was revised in 1948, 62 Stat. 869, at which time the express territorial limitation on serving process was dropped. See 28 U.S.C. §§ 1391, 1401, 1693, 1695. See also note following 28 U.S.C. § 112 (1940 ed.) (tracing history of provision prior to 1948 revision). To the extent that the cases cited in *Robertson* rely on principles of territoriality, their force may have been undercut by the decision in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), where the Court held that "presence [of the defendant] within the territorial jurisdiction of a court" was no longer necessary "to subject a defendant to a judgment *in personam." Id.,* at 316, 66 S.Ct., at 158. We express no view as to continuing validity of *Robertson* 's rationales.

> FN11. See *Petrol Shipping Corp. v. Kingdom of Greece Ministry of Commerce, Purchase Directorate,* 360 F.2d 103, 107-109 (CA2) (discussing court's authority to fashion an ad hoc rule to govern method of service), cert. denied, 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213 (1966).

[11] We would consider it unwise for a court to make its own rule authorizing service of summons.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

It seems likely that Congress has been acting on the assumption that federal courts cannot add to the scope of service of summons Congress has authorized. This Court in the past repeatedly has stated that a legislative grant of authority is necessary. See, *e.g., Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 467-468, 65 S.Ct. 716, 731, 89 L.Ed. 1051 (1945). Indeed, as the dissent in the Court of Appeals conceded, "the weight of authority, both in the cases and in the commentary,"795 F.2d, at 433, considers statutory*110 authorization necessary to a federal court's service of summons. See, *e.g., Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 297 (CA3),cert. denied, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 414-416 (CA9 1977); 2 J. Moore, J. Lucas, H. Fink, & C. Thompson, Moore's Federal Practice ¶ 4.02[3], p. 4-67 (1987); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1075, p. 302 (1969).

The strength of this longstanding assumption, and the network of statutory enactments and judicial decisions tied to it,[FN12] argue strongly against devising common-law**413 service of process provisions at this late date for at least two reasons. First, since Congress concededly has the power to limit service of process, circumspection is called for in going beyond what Congress has authorized. Second, as statutes and rules have always provided the measures for service, courts are inappropriate forums for deciding whether to extend them. Legislative rulemaking better ensures proper consideration of a service rule's ramifications within the pre-existing structure and is more likely to lead to consistent application.[FN13]

> FN12. Presumably acting on this widespread understanding that federal courts may serve process nationwide only when a federal statute authorizes such service, Congress has carefully provided for that kind of service of process when it so desired. See 2 J. Moore, J. Lucas, H. Fink & C. Thompson, Moore's Federal Practice ¶

4.42[2.-1], pp. 4-386 to 4-391 (1987) (listing over 15 statutes).

> FN13. The legislative history of the Futures Trading Act of 1986, 100 Stat. 3556, provides an example why courts should not construct service of process rules ad hoc, even if they have the power to do so. Section 103 of that Act, 100 Stat. 3557, 7 U.S.C. § 15 (1982 ed., Supp. IV), amended the CEA to allow the CFTC to serve subpoenas outside the United States in the manner prescribed by the Federal Rules of Civil Procedure. The Conference Committee, however, expressed concern about the possibility of disrupting the Nation's foreign policy objectives and stated a preference that the new power be exercised with circumspection. See H.Conf.Rep. No. 99-995. pp. 21-22 (1986), U.S.Code Cong. & Admin.News 1986, p. 6005. We also note that with this amendment of the CEA, Congress declined still another opportunity to authorize nationwide service of process for a private action under the CEA.

*111 Nothing about this case impels us to a different conclusion. If we do not create a rule here, the only harm to federal interests is the inability of a private litigant to bring a CEA action in the United States against an alien defendant who is not within the reach of the state long-arm statute. Since the CEA authorizes broader service of process in other enforcement actions, aliens cannot consider themselves immune from the Act's provisions. Also, a British court may be willing to enforce the CEA itself, if Omni brings suit against Wolff and Gourlay there.

We are not blind to the consequences of the inability to serve process on Wolff and Gourlay. A narrowly tailored service of process provision, authorizing service on an alien in a federal-question case when the alien is not amenable to service under the applicable state long-arm statute, might well serve the ends of the CEA and other federal statutes. It is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

not for the federal courts, however, to create such a rule as a matter of common law. That responsibility, in our view, better rests with those who propose the Federal Rules of Civil Procedure and with Congress.

## IV

In summary, the District Court may not exercise jurisdiction over Wolff and Gourlay without authorization to serve process. That authorization is not found in either the CEA or the Louisiana long-arm statute to which we look under Rule 4(e). We reject the suggestion that we should create a common-law rule authorizing service of process, since we would consider that action unwise, even were it within our power.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

U.S.La.,1987.
Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

Mckinney's Consolidated Laws of New York Annotated Currentness
    Civil Practice Law and Rules (Refs & Annos)
        Chapter Eight. Of the Consolidated Laws
            Article 3. Jurisdiction and Service, Appearance and Choice of Court (Refs & Annos)
            → **§ 302. Personal jurisdiction by acts of non-domiciliaries**

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

    1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

    2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

    3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

        (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

        (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

    4. owns, uses or possesses any real property situated within the state.

(b) Personal jurisdiction over non-resident defendant in matrimonial actions or family court proceedings. A court in any matrimonial action or family court proceeding involving a demand for support, alimony, maintenance, distributive awards or special relief in matrimonial actions may exercise personal jurisdiction over the respondent or defendant notwithstanding the fact that he or she no longer is a resident or domiciliary of this state, or over his or her executor or administrator, if the party seeking support is a resident of or domiciled in this state at the time such demand is made, provided that this state was the matrimonial domicile of the parties before their separation, or the defendant abandoned the plaintiff in this state, or the claim for support, alimony, maintenance, distributive awards or special relief in matrimonial actions accrued under the laws of this state or under an agreement executed in this state. The family court may exercise personal jurisdiction over a non-resident respondent to the extent provided in sections one hundred fifty-four and one thousand thirty-six and article five-B of the family court act and article five-A of the domestic relations law.

(c) **Effect of appearance.** Where personal jurisdiction is based solely upon this section, an appearance does not confer such jurisdiction with respect to causes of action not arising from an act enumerated in this section.

(d) Foreign defamation judgment. The courts of this state shall have personal jurisdiction over any person who obtains a judgment in a defamation proceeding outside the United States against any person who is a resident of New York or is a person or entity amenable to jurisdiction in New York who has assets in New York or may have to take actions in New York to comply with the judgment, for the purposes of rendering declaratory relief with respect to that person's liability for the judgment, and/or for the purpose of determining whether said judgment should be deemed non-recognizable pursuant to section fifty-three hundred four of this chapter, to the fullest extent permitted

Westlaw.

by the United States constitution, provided:

1. the publication at issue was published in New York, and

2. that resident or person amenable to jurisdiction in New York (i) has assets in New York which might be used to satisfy the foreign defamation judgment, or (ii) may have to take actions in New York to comply with the foreign defamation judgment. The provisions of this subdivision shall apply to persons who obtained judgments in defamation proceedings outside the United States prior to and/or after the effective date of this subdivision.

CREDIT(S)

(L.1962, c. 308; amended L.1966, c. 590, § 1; L.1974, c. 859, § 1; L.1979, c. 252, §§ 1, 2; L.1980, c. 281, § 22; L.1982, c. 505, § 1; L.1991, c. 69, § 7; L.1995, c. 441, § 2; L.2006, c. 184, § 5, eff. July 26, 2006; L.2008, c. 66, § 3, eff. April 28, 2008.)

# EXHIBIT 6

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

319 F.Supp.2d 352                                                                                                      Page 1
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

**H**

National Union Fire Ins. Co. of Pittsburgh, PA. v.
BP Amoco P.L.C.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
NATIONAL UNION FIRE INSURANCE CO. OF
PITTSBURGH, PA, and Associated Electric & Gas
Insurance Services Ltd., Plaintiffs,
v.
BP AMOCO P.L.C., et al., Defendants.
**No. 03 Civ. 0200(GEL).**

Jan. 30, 2004.

**Background:** New York insurer sought declaratory
judgment in state court against group of companies
affiliated or partnered with insured, for finding that
certain insurance contracts were void ab initio be-
cause defendants misrepresented their eligibility for
coverage, or finding that claims made under them
were not covered. Companies removed action to
federal court. Particular defendants moved to dis-
miss for lack of personal or subject matter jurisdic-
tion.

**Holdings:** The District Court, Lynch, J., held that:
(1) Court had specific personal jurisdiction over
group of foreign companies affiliated or partnered
with foreign insured under transacting business pro-
vision of New York long arm statute;
(2) Court's exercise of personal jurisdiction over
companies was both fair and reasonable under due
process clause;
(3) commercial activity exception within Foreign
Sovereign Immunities Act (FSIA) applied to in-
surer's claim which related to coverage provided for
Vietnam petroleum company; and
(4) mere possibility in future, that contractor or oth-
er entity might acquire interest in oil and gas
projects and be included by insured under insurance
policy, did not suffice to give rise to actual case or
controversy.

Motions denied in part and granted in part.

West Headnotes

**[1] Federal Courts 170B ⟶82**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk77 Corporations, Actions by or
Against
                170Bk82 k. Agent Within District;
Parent and Subsidiary. Most Cited Cases

**Federal Courts 170B ⟶86**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk86 k. Aliens or Alien Corporations.
Most Cited Cases
New York federal district court had specific person-
al jurisdiction over group of foreign companies af-
filiated or partnered with foreign insured under
transacting business provision of New York long-
arm statute, in lawsuit under Declaratory Judgment
Act, although companies did not directly negotiate,
agree to, or execute contract with New York in-
surer, but only acquired interest subsequently in
certain projects or claims allegedly subject to cov-
erage under policy; insurance broker acted as agent
for insured, and, thus, for affiliated and partnered
companies, and broker's New York contacts suf-
ficed to permit New York court to exercise personal
jurisdiction over all of them on cause of action
arising out of its dealings with insurer. 28 U.S.C.A.
§ 2201 et seq; N.Y.McKinney's CPLR 302(a)(1).

**[2] Courts 106 ⟶12(2.15)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction
in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
    106k12(2.15) k. Transacting or Doing Business. Most Cited Cases

A defendant "transacts business" under the New York long-arm statute when it purposefully avails itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. N.Y.McKinney's CPLR 302(a)(1).

**[3] Courts 106 ☞12(2.15)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.15) k. Transacting or Doing Business. Most Cited Cases

To determine whether a defendant has purposefully availed itself of the privilege of conducting activities in New York, as required to transact business under New York long-arm statute, courts examine several factors, no one of which is dispositive. N.Y.McKinney's CPLR 302(a)(1).

**[4] Courts 106 ☞12(2.15)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.15) k. Transacting or Doing Business. Most Cited Cases

Proof of a single transaction may suffice to establish that non-resident defendant was transacting business under New York long-arm statute, provided it is purposeful. N.Y.McKinney's CPLR 302(a)(1).

**[5] Courts 106 ☞12(2.20)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases

For purposes of personal jurisdiction under New York long-arm statute, an "agent" is a person or entity that acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control. N.Y.McKinney's CPLR 302(a)(1).

**[6] Courts 106 ☞12(2.20)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k10 Jurisdiction of the Person
            106k12 Domicile or Residence of Party
                106k12(2) Actions by or Against Non-residents; "Long-Arm" Jurisdiction in General
                    106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases

As a matter of law, where there is joint control of a business enterprise, similar to that existing in a partnership or joint venture, enough control has been shown to establish prima facie this particular element of agency to satisfy long-arm jurisdiction under the New York long-arm statute. N.Y.McKinney's CPLR 302(a)(1).

**[7] Constitutional Law 92 ☞3965(6)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3965 Particular Parties or Circumstances
                    92k3965(6) k. Insurers and Insur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

ance. Most Cited Cases
(Formerly 92k305(6))

**Federal Courts 170B ☞82**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk77 Corporations, Actions by or Against
170Bk82 k. Agent Within District; Parent and Subsidiary. Most Cited Cases

**Federal Courts 170B ☞86**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk86 k. Aliens or Alien Corporations. Most Cited Cases
(Formerly 217k3558)
New York federal court's exercise of personal jurisdiction over group of foreign companies affiliated or partnered with foreign insured was both fair and reasonable under due process clause of Fifth Amendment, in lawsuit under Declaratory Judgment Act, since insurer's unified action was brought to address validity and interpretation of single insurance program negotiated, executed, and administered in New York, through deliberate choice of agents to whom companies not only delegated the responsibility to secure insurance, but whose decision to carry out that responsibility in New York was easily discoverable at time they acquired their respective interests in covered projects. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2201 et seq; N.Y.McKinney's CPLR 302(a)(1).

**[8] International Law 221 ☞10.34**

221 International Law
221k10.29 Actions Against Sovereign or Instrumentality
221k10.34 k. Corporations and Other Instrumentalities. Most Cited Cases
(Formerly 221k10.33)

"Commercial activity exception" within Foreign Sovereign Immunities Act (FSIA) applied to New York insurer's claim under Declaratory Judgment Act which related to coverage provided for Vietnam petroleum company, since Vietnam deputized foreign corporation to acquire necessary insurance for its projects, and foreign corporation and its broker acted on behalf of Vietnam in securing insurance coverage for projects in which Vietnam maintained ownership interest. 28 U.S.C.A. §§ 1605(a)(2), § 2201 et seq.

**[9] Federal Courts 170B ☞29.1**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk29.1 k. In General. Most Cited Cases
On a motion to dismiss for lack of subject matter jurisdiction, the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both, and how the court should resolve the motion to dismiss depends upon whether the motion presents a factual challenge. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[10] Federal Courts 170B ☞34**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
Where a defendant moving to dismiss for lack of subject matter jurisdiction challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[11] Federal Courts 170B ☙33**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, De-
termination and Waiver
                170Bk33 k. Affidavits and Evidence in
General. Most Cited Cases
Where a defendant moving to dismiss for lack of
subject matter jurisdiction challenges jurisdictional
facts, the court may inquire by affidavits or other-
wise, into the facts as they exist. Fed.Rules
Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[12] Declaratory Judgment 118A ☙165**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(G) Written Instruments and Contracts
            118AII(G)2 Insurance
            118Ak165 k. Liability or Indemnity In-
surance in General. Most Cited Cases
Mere possibility in future that contractor or other
entity might acquire interest in oil and gas projects
and be included by insured under insurance policy,
which allowed insured to "declare" certain projects
and associated entities that it selected for coverage
within specified period of time, did not suffice to
give rise to actual case or controversy, and, con-
sequently, federal district court did not have subject
matter jurisdiction over insurer's claim against
those contractors or entities under Declaratory
Judgment Act. U.S.C.A. Const. Art. 3, § 2; 28
U.S.C.A. § 2201 et seq.

**[13] Federal Courts 170B ☙12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Require-
ment
                170Bk12.1 k. In General. Most Cited
Cases
Federal court lacks subject matter jurisdiction to

decide what the law would be upon a hypothetical
state of facts.

**[14] Declaratory Judgment 118A ☙165**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(G) Written Instruments and Contracts
            118AII(G)2 Insurance
            118Ak165 k. Liability or Indemnity In-
surance in General. Most Cited Cases
Federal district court had subject matter jurisdiction
in declaratory judgment action over claim made by
insurer that foreign corporation did not have in-
terest in insurance policy, and, consequently, re-
quisite controversy existed, since foreign corpora-
tion asserted that it did have interest in that policy.
U.S.C.A. Const.Art. 3, § 2; 28 U.S.C.A. § 2201 et
seq.

**\*355** Michael J. Carcich,Nicoletti Hornig Campise
Sweeney & Paige, New York City (Robert A.
Novak, on the brief), for Plaintiffs.

Heather M. Zona, Heller Ehrman White & McAul-
iffe LLP, New York City (Edward M. Joyce, David
B. Goodwin, Esta L. Brand, on the brief), for Cer-
tain Foreign BP Defendants, Certain Non-BP De-
fendants, Wrongly Named Defendants, and Svenska
Petroleum Exploration AS.

Esta L. Brand, Heller Ehrman White & McAuliffe
LLP, San Francisco, CA (Edward M. Joyce, David
B. Goodwin, Heather M. Zona, on the brief), for
Defendants   Vietnam   Oil   and   Gas   Corp.
(Petrovietnam), Allseas USA, Inc., Allseas Subsea
Contractors, S.A., and Allseas U.K., Ltd.

Edward M. Joyce, Heller Ehrman White & McAul-
iffe LLP, New York City (Heather M. Zona, on the
brief), for Defendant Statoil Vietnam AS.

John A. Borek, Fried, Frank, Harris, Shriver & Jac-
obson, New York City (Elliot E. Polebaum, Daniel
E. Loeb, Steven C. Parker, on the brief), for De-
fendants Total E & P Norge SA, Total E & P U.K.
PLC, Elf Exploration U.K. PLC, and Fina Explora-
tion Ltd.

Clifford Thau, Vinson & Elkins, LLP, New York
City (Gregory Zimmer, on the brief), for Defend-

319 F.Supp.2d 352                                                                                    Page 5
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

ants Saipem S.p.A., Saipem Inc., Saipem U.K. Ltd., and European Marine Contractors Ltd.

Richard L. Lewis, Anderson Kill & Olick, P.C., New York City (John N. Ellison, on the brief), for Defendants ConocoPhillips Vietnam AS, Conoco-Phillips (U.K.) Ltd., and ConocoPhillips Ltd.

### OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and Associated Electric & Gas Insurance Services Ltd. ("AEGIS") seek a declaratory judgment either finding certain insurance contracts void *ab initio*, because defendants misrepresented their eligibility for coverage, or finding claims made under them not covered. Defendants removed this action from Supreme Court, New York County, pursuant to 28 U.S.C. § 1441(a), and the Court denied plaintiffs' motion to remand. *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.,* 03 Civ. 0200, 2003 WL 1618534 (S.D.N.Y. Mar. 27, 2003) (*"Nat'l Union I"* ). Defendants then moved to dismiss based on *forum non conveniens,* which the Court also denied. *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.,* No. 03 Civ. 0200, 2003 WL 21180421 (S.D.N.Y. May 20, 2003)(*"Nat'l Union II"* ). Various subcategories of defendants now bring a number of motions to dismiss for lack of personal or subject matter jurisdiction pursuant to Rules 12(b)(2) and 12(b)(1), respectively, of the Federal Rules of Civil Procedure. For the reasons that follow, the motion of the self-*356 styled "Wrongly Named Defendants" to dismiss for lack of subject matter jurisdiction will be granted and the other motions denied.

### BACKGROUND

*Nat'l Union II* sets forth most of the relevant facts, *see* 2003 WL 21180421, at *1-3, and they will be recited here only to the extent necessary to the disposition of this motion. In 1998, BP [FN1] devised an "Open Cover" insurance policy for itself, its subsidiaries, affiliates, joint-venture partners, and associated entities involved in oil and gas projects worldwide. *Id.* at *1. (Carcich Aff., Ex. 2 at 2 ¶ 4.) The Open Cover allowed BP to "declare" certain projects that BP selected for coverage within a specified period of time. [FN2] *Id.* It covered, as "Principal Insureds," BP, its subsidiaries, affiliates, associates, and "interrelated companies of every tier," as well as, at BP's option but subject to the filing of the proper declaration, joint-venturers, project managers, and financiers. (Carcich Aff., Ex. 2 at 000116.) The Open Cover also gave BP the right to extend its coverage to contractors, architects, engineers, consultants, suppliers, agents, manufacturers, vendors, and licensors, again provided that BP named such entities in the underlying declarations at the time it made those declarations. (*Id.*) Under the Open Cover, BP declared about thirty projects worldwide. (Wrongly Named Ds. Br. 1.)

> FN1. Amoco Corporation developed the insurance policy that is the subject of this action and began to seek subscribers shortly before it merged with British Petroleum Company P.L.C. to form BP Amoco P.L.C., now known as BP P.L.C. (Foreign BP Ds. 3 & n. 2.) For ease of reference, the Court will refer to this parent corporation as "BP."

> FN2. Specifically, the Open Cover allowed BP to declare projects that began after December 31, 1998, but before January 1, 2001, for onshore projects, and after December 31, 1998, but before July 1, 2000, for offshore projects. (Carcich Aff., Ex. 2 at 000117.)

BP enlisted "Aon Risk Services ('Aon'), an insurance broker with offices in London and the United States, to identify insurers willing to participate in the Open Cover and to coordinate project declaration and claims processing." *Nat'l Union II,* 2003 WL 21180421, at *1. BP gave Aon information about the projects BP wanted to declare, and employees of Aon then solicited insurers to participate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the Open Cover. According to plaintiffs, "Aon solicited National Union in New York, and all negotiations for the National Union policy were conducted with National Union in New York, either in person, via e-mail, telefax or over the phone with National Union's New York office"; and "National Union's underwriters executed and issued the policy in New York and delivered the policy to Aon either by hand in New York or by mail from National Union's New York office to Aon in Chicago." (Ps. Br. in Opp. to P.J. Mots. 4.) Moreover, BP's employee William Siebenaler, who bears responsibility for administering the Open Cover, met with National Union representatives in New York on at least one occasion. (Siebenaler Aff. ¶ 5.)

National Union and AEGIS, two of the fifteen insurers that comprise the international consortium that subscribed to the Open Cover (Foreign BP Ds. Br. 3), allege that certain projects declared by defendants-an assortment of BP subsidiaries, affiliates, joint-venturers, and entities unaffiliated with BP except through their alleged work on BP-affiliated oil and gas projects-do not qualify for coverage because of misrepresentations in certain declarations filed by BP. In the alternative, plaintiffs allege that certain claims, even if arising out of valid, covered projects, do not fall within the scope of the Open Cover *357 policy. *Nat'l Union II,* 2003 WL 21180421, at *2.

For purposes of the present motions, defendants fall into three principal categories: (1) BP subsidiaries and affiliates ("the Foreign BP Defendants"), (2) non-BP joint-venturers or co-owners of projects declared for coverage by BP ("the Non-BP Defendants"), and (3) present and former BP entities and other business entities allegedly related to BP, but which claim no interest, either as participant or owner, in any declared project and do not claim to be insured by the Open Cover ("the Wrongly Named Defendants").[FN3] The former two categories of defendants move to dismiss for lack of personal jurisdiction, arguing that New York's long-arm statute does not reach them, and in the alternat-

ive, that even if it does, to exercise personal jurisdiction over them under the circumstances would violate the Due Process Clause. The latter category of defendants move to dismiss for lack of subject matter jurisdiction, arguing that, as between them and plaintiffs, no case or controversy exists.

> FN3. Defendants denominate and categorize themselves by these labels, and the Court adopts them for the sake of convenience and consistency. None of them, however, should be understood to express or imply anything substantive about the nature of the various self-identified groups of defendants, and in particular, the Court's use of the label "Wrongly Named Defendants" does not express any prejudgment of the merits of those defendants' motion; it does not, that is, imply that the Court agrees that the "Wrongly Named Defendants" have been wrongly named by plaintiffs.

*DISCUSSION*

I. *The Motions to Dismiss for Lack of Personal Jurisdiction*

A. *Standard on a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(2)*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden to establish jurisdiction. *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2d Cir.2003). Where no jurisdictional discovery has been conducted, allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff, *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986), and the motion must be denied if those allegations suffice as a matter of law. *In re Magnetic Audiotape,* 334 F.3d at 206; *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997) ("A plaintiff facing a Fed.R.Civ.P. 12(b)(2) motion to dismiss made before any discovery need only allege

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts constituting a prima facie showing of personal jurisdiction[,]" and courts must "construe the pleadings and affidavits in plaintiff's favor at this early stage."); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996).

### B. Requirements to Exercise Personal Jurisdiction

A federal court sitting in diversity may exercise jurisdiction over a foreign defendant if, first, the defendant is amenable to process under the law of the forum state, *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 105, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Metro. Life Ins. Co.,* 84 F.3d at 567, and second, the exercise of personal jurisdiction comports with due process under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. *See Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (*en banc*) ("[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, *\*358* with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee."); *see also Clarendon Nat'l Ins. Co. v. Lan,* 152 F.Supp.2d 506, 515 (S.D.N.Y.2001).

### C. The Foreign BP Defendants' Motion

[1] The motion to dismiss for lack of personal jurisdiction of the Foreign BP Defendants sets forth the basic argument of which the other motions are minor variations: Because defendants did not directly negotiate, agree to, or execute the Open Cover with National Union, but only acquired an interest subsequently in certain projects or claims (allegedly) subject to its coverage, plaintiffs' causes of action do not "aris[e] from" business transactions by defendants within New York. *See* N.Y. C.P.L.R. § 302(a)(1); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996). (Foreign BP Ds. Br. 13.) For similar

reasons, defendants argue, the absence of sufficient contacts between them and the State of New York would make any assertion of personal jurisdiction over them by a New York court inconsistent with the " 'traditional notions of fair play and substantial justice' " that circumscribe the constitutional limits of personal jurisdiction under the Due Process Clause. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154, quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). (Foreign BP Ds. Br. 23-25.) Neither argument withstands analysis.

### 1. New York's Long-Arm Jurisdiction Statute

New York law authorizes both general and specific exercises of personal jurisdiction over foreign defendants. N.Y. C.P.L.R. §§ 301-302; *see generally Metro. Life. Ins. Co.,* 84 F.3d at 567-68 (explaining distinction between general and specific jurisdiction) Plaintiffs do not argue that the Court may exercise general jurisdiction based on defendants' physical or legal presence in New York. They instead argue that specific personal jurisdiction exists under § 302(a), which authorizes New York courts to exercise jurisdiction over nondomiciliaries as to causes of action that arise from certain enumerated acts, whether performed personally or by agents. Those acts include transacting business in New York. *Id.* § 302(a)(1); *see McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981) ( "Essential to the maintenance of a suit against a nondomiciliary under [§ 302(a)(1) ] is the existence of some articulable nexus between the business transacted and the cause of action sued upon.").

[2][3][4] A defendant transacts business in New York within the meaning of § 302(a)(1) when it " 'purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.' " *McKee Elec. Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967), quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *see also CutCo*

319 F.Supp.2d 352                                                                           Page 8
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

*Indus.,* 806 F.2d at 365. To determine whether a defendant has purposefully availed itself of the privilege of conducting activities in New York, courts examine several factors, no one of which is dispositive. *Agency Rent A Car Sys.,* 98 F.3d at 29 (canvassing factors relevant to the question whether a defendant has "transact[ed] business in New York" for purposes of § 302(a)(1)). Proof of a single transaction may suffice, provided it is purposeful. *George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 651, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977); *see also\*359Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988) (emphasizing that N.Y. C.P.L.R. § 302"is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted").

The Foreign BP Defendants describe themselves as "independently operated, indirect subsidiaries of the named insured and ultimate parent of all BP entitles, BP p.l.c." (Foreign BP Ds. Br. 1.) They assert that their "sole connection" to New York consists in, first, acquiring an interest in one or more of the projects allegedly insured by the Open Cover, and second, joining in certain claims submitted pursuant to that policy. (*Id.* 1-2.) National Union, a New York insurer, participates in the Open Cover and therefore received defendants' declarations and claims. This suit, in brief, is an effort by National Union and AEGIS to disavow them. The question, then, is whether defendants' contacts with New York State suffice to permit the Court to exercise personal jurisdiction over them pursuant to § 302(a)(1).

Aon's acts in New York included soliciting and negotiating National Union's agreement to participate in the Open Cover; executing an insurance contract with National Union; declaring eligible projects for coverage; meeting with representatives of National

Union to discuss disputed declarations; and submitting claims to National Union under the Open Cover. Without question, were Aon itself the insured, these acts would suffice to subject it to the personal jurisdiction of a New York court as to a cause of action arising out of the Open Cover. Under *Agency Rent A Car Sys.,* the Court should consider:

(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [the defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

98 F.3d at 29 (internal citations omitted). While the Open Cover does not require, though it does (apparently) permit, the application of New York law, [FN4] in every other respect, Aon's negotiation, execution, and other acts in connection with the contract by which National Union subscribed to the Open Cover more than suffice under the above criteria to establish personal jurisdiction on a cause of action arising out of that contract. *See, e.g.,PDK Labs,* 103 F.3d at 1109; *Clarendon Nat'l Ins. Co.,* 152 F.Supp.2d at 516-17. Indeed, the negotiation and execution of the contract in New York may alone suffice to confer personal jurisdiction over Aon in an action arising out of that contract. *SeeIroquois Gas Corp. v. Collins,* 42 Misc.2d 632, 248 N.Y.S.2d 494, 497 (1964), *aff'd,*23 A.D.2d 823, 258 N.Y.S.2d 376 (4th Dep't 1965); *seealsoKreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40. Because plaintiffs seek, *inter alia,* rescission, declaratory relief, and reimbursement for insurance\*360 claims paid by National Union based on defendants' alleged misrepresentations (P. Br. in Opp. to P.J. Mots. 21-22), their causes of action arise out of Aon's acts such that "there is a substan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tial relationship between the transaction and the claim asserted." *Id.; see also* *CutCo,* 806 F.2d at 365; *McGowan,* 52 N.Y.2d at 272, 437 N.Y.S.2d 643, 419 N.E.2d 321.

> FN4. The Open Cover permits the insureds "to select 'USA' or 'English' law" (Foreign BP Ds. Br. 13), though it is not clear whether the former reference would permit each insured to elect the law of whatever U.S. jurisdiction it desires.

[5] Of course, Aon is not the defendant. But § 302(a) authorizes personal jurisdiction as to causes of action arising out of the enumerated acts whether performed "in person or through an agent." The dispositive question is therefore whether Aon acted as the agent of the Foreign BP Defendants in its dealings with National Union. *See* *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 19, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970) ("The mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts."). To decide whether Aon acted as the agent of these defendants requires an analysis of "the realities of the relationship in question rather than the formalities of agency law." *CutCo,* 806 F.2d at 366; *see also* *Kreutter,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40. For purposes of personal jurisdiction, an agent is a person or entity that acts "for the benefit of, and with the knowledge and consent of, the non-resident principal," *CutCo,* 806 F.2d at 366 (internal quotation marks omitted), and over which that principal exercises "some control." *Id.; see also* *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981) (collecting cases).

Aon acted as the insurance broker for BP. (Siebenaler Aff. ¶¶ 6, 8.) BP acquired the Open Cover policy "for itself, certain subsidiary and/or associated companies, joint-venture partners, and other insureds as indicated in the policy wording for various potential onshore and offshore projects it expected to begin all over the world." (*Id.* ¶ 4.)

The Foreign BP Defendants argue that they did no more than passively "become" insured by the Open Cover by virtue of ownership interests they acquired in projects declared by BP subsequent to the execution of the contract with National Union, and then join in the submission of certain claims under that policy. (Foreign BP Ds. Br. 1-2) None of them, they argue, knew about or consented to Aon's activities in New York, still less exercised "some control" over Aon; indeed, none of them could have controlled Aon's activities in New York, for all of them became insured by virtue of declarations filed by BP after Aon had secured the subscribers to the Open Cover, including National Union. (*Id.* 4; Foreign BP Ds. Reply Br. 1-7.)

This argument disregards a crucial fact: Each Foreign BP Defendant knew and voluntarily authorized BP to acquire insurance for it in relation to the project in which it holds some stake, whether as participant, partial owner, or both. A company cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise to a legal dispute. The Foreign BP Defendants acquired ownership interests in the various projects insured by the Open Cover knowing that BP had performed the acts required to obtain insurance for those projects. They gave BP the information it needed to declare those projects for coverage. Had they wished, they could have learned the names and locations of the subscribers to the Open Cover. That they chose not to cannot immunize them from personal jurisdiction on a cause of action arising out of the very activities they delegated to BP, and through BP to Aon, to perform.

**\*361** Nor does it matter that the Foreign BP Defendants did not become insured by the Open Cover until after it had been negotiated and executed by Aon. Each defendant could have decided to acquire insurance for its respective project in whatever manner it deemed suitable. Rather than handle insurance for the projects themselves, the Foreign BP Defendants entered into contracts with BP by which

they effectively "bought in" to the Open Cover, including its contacts to New York and a New York insurer, thereby purposefully availing themselves of the benefits of Aon's and BP's prior dealings in New York to acquire insurance for their projects.

In short, when Aon acquired insurance for the projects by locating subscribers to the Open Cover, it acted for the benefit of, not only BP, but the Foreign BP Defendants who, after all, now claim entitlement to coverage and, in some cases, insurance proceeds pursuant to that policy. *Cf.Elman v. Belson,* 32 A.D.2d 422, 302 N.Y.S.2d 961, 964 (2d Dep't 1969) (emphasizing that while "defendant did not physically visit New York or personally enter into the negotiations,""it is hardly disputable that all of these activities were conducted for his benefit, even though he now chooses not to recognize them"). Because the Foreign BP Defendants authorized BP to take the actions required to acquire insurance for their projects-or, more accurately, consented *ex post facto* to BP's prior acts to acquire insurance for prospective projects in which defendants purchased interests-for jurisdictional purposes, Aon, BP's agent, acted for their benefit, with their consent, and with their imputed, if not actual, knowledge. *SeeCutCo,* 806 F.2d at 366.

[6] While the Foreign BP Defendants object strenuously that they lacked "some control" over Aon, the objection is easily answered. Each *chose* to delegate to BP authority to acquire insurance for the projects rather than to seek it by other means, and BP controlled Aon. As a matter of law, "where there is joint control of a business enterprise-similar to that existing in a partnership or joint venture-enough control has been shown to establish *prima facie* this particular element of agency to satisfy long-arm jurisdiction." *Id.* Defendants seek to distinguish *CutCo* on the ground that they do not technically qualify as co-venturers or partners of BP. (Foreign BP Ds. Reply Br. 6-7.) But *CutCo* did not hold that the formal legal requirements of a partnership or joint-venture relationship must be established in order for the "some control" element of

agency to be satisfied; it held that where arrangements among business entities are "similar to" or "sufficiently analogous to a joint venture or partnership," sufficient control exists to satisfy this element of agency for the purposes of assessing the propriety of long-arm jurisdiction under § 302(a)(1). *Seeid.*

The purpose of requiring "some control" is to ensure that a party will not be subjected to suit in a jurisdiction against its will, by virtue of the actions of a purported "agent" to which that party did not consent and as to which it had no choice. That purpose is clearly met here. By the time these defendants executed the transactions by which their respective projects became insured by the Open Cover, BP had already undertaken, through its own agents, to acquire insurance in, among other places, New York. Had defendants cared, had they wished not to be insured in New York such that they could be forced to litigate about the validity of their insurance coverage here, they could easily have learned of BP's arrangements, declined the invitation to avail themselves of the Open Cover, and thereby avoided that fate. They could have avoided amenability to **\*362** suit on such matters in New York by the simple expedient of asking about the insurance arrangements, and if they objected to them, seeking to negotiate the right to obtain other, more suitable coverage on their own, or if necessary, rejecting the business. Instead, defendants deliberately chose to delegate the matter of insurance for their respective projects to BP, thus taking the risk that they would find themselves uninsured (with recourse only against BP for breach of contract), as well as the lesser risk that BP would fulfill its duties in a way that subjected it and its co-insureds to suit in New York. Defendants had absolute control over whether this fate would befall them; it was their choice not to exercise that control.[FN5]

> FN5. This analysis also explains why it does not matter whether BP, as defendants' agent, transacted insurance business in New York on its own or through sub-

agents, for however BP acted, its contacts with New York were equally discoverable by defendants and the consequent connections to New York were equally under defendants' control, to adopt and ratify or to reject. Defendants exercised their control by shrugging it off, delegating insurance concerns to BP, and adopting BP's New York-based insurance without inquiry. Any complaint now that, as a result of these decisions, they wound up transacting business in New York against their will is unavailing, for it is false. Defendants were masters of their fate in regard to insurance jurisdiction; if they chose to navigate with their eyes closed, they cannot complain that they landed in New York.

The Foreign BP Defendants cite *Royal & Sunalliance Insurance Co. v. Resolve Towing & Salvage, Inc.,* No. 00 Civ. 2473, 2000 WL 1801838 (S.D.N.Y. Dec. 7, 2000), in which several insurance underwriters sought to disavow liability for a claim submitted by a corporation engaged in providing towage and salvage services in the Caribbean. *Id.* at *1. The defendant had acquired insurance by enlisting Frankel & Co., a New York insurance broker, but otherwise lacked contacts with New York. *Id.* The court in *Royal* held that even if New York's long-arm statute authorized personal jurisdiction over the defendant under the circumstances, "such an assertion [would] not pass constitutional muster because the defendant's relationship with the forum does not satisfy the minimum contacts and reasonableness prongs of the due process inquiry." *Id.* at *2. By contrast, in *Security Insurance Co. v. ITA Textiles Corp.,* No. 99 Civ. 10942, 2000 WL 1576879 (S.D.N.Y. Oct. 23, 2000), which the Foreign BP Defendants disparage as an "unreported case" (Foreign BP Ds. Br. 18),[FN6] the court confronted a similar factual scenario but sustained jurisdiction. In *Security Insurance,* as in *Royal,* an insurer sought to disavow coverage on a claim submitted by the defendant, a Delaware corporation with its principal place of business in Cali-

fornia. *Security Insurance,* 2000 WL 1576879, at *1. The defendant ***363** had acquired insurance by contacting an insurance broker in New York, who in turn contacted a "a marine underwriter for [the] underwriting manager for [the plaintiff] Security." *Id.* The court found that this string of agency relationships sufficed to authorize personal jurisdiction over the defendant ITA on a cause of action arising out of the insurance policy, because the defendant ITA "purposefully engaged the services of Simon," the insurance broker, "asking him to locate an insurance policy," and Simon negotiated the policy on ITA's behalf. *Id.* at *3.

FN6. *Security Insurance* is by no means an obscure or inaccessible authority. It is reported on the Westlaw and Lexis electronic databases, which are very likely the research tools used by every law firm involved in this case, as well as by the Court. Whether a district court decision is reported in the Federal Supplement is insignificant in the modern era of computerized legal research. District judges may decide to publish or not to publish a given decision in West's bound volumes for any number of reasons, but the fact of publication in hard copy does not make a district court decision any more or less precedential or persuasive than one that is only published electronically. Neither *Royal* nor *Security Insurance* binds the Court, and to the extent these decisions conflict, the Court must decide for itself which represents the more persuasive view. This Court sees no reason to encourage district judges to kill trees in order to ensure that their opinions will be taken seriously by other judges. It would surely be arbitrary to defer more to the personal-jurisdiction reasoning in *Royal* because someone decided to publish that decision in the *American Maritime Cases* series.

Here, of course, Aon did not act directly on behalf

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

of the Foreign BP Defendants; it acted for BP, which in turn acted on behalf of various BP subsidiaries and others that it projected would acquire interests in nascent oil and gas projects worldwide. That additional link, however, does not modify the analysis: If *X* transacts business in New York, then *X* will be subject to personal jurisdiction on a cause of action arising out of that transaction. If *X* instead hires *Y* to transact the same business in New York, and *Y*'s contacts with New York relative to that transaction would suffice to confer on a New York court personal jurisdiction over *Y*, then *X* will also be subject to personal jurisdiction on a cause of action arising out of that transaction. See *CutCo*, 806 F.2d at 366. If *X* decides that rather than *either* transact the same business itself *or* hire an agent to do so, it would prefer not to be bothered, and for that reason delegates authority to *Y* to transact the same business; and *Y*, in turn, exercises that authority by hiring *Z* as its agent; and *Z*'s contacts with New York would suffice to give rise to specific long-arm jurisdiction over *Z*; then, again, *X* will be subject to jurisdiction on a cause of action arising out of *Z*'s, the agent's, transaction.

That is the situation here. Rather than independently secure insurance for various oil and gas projects in which they acquired interests, the Foreign BP Defendants decided, for whatever reason, to have BP take care of that particular transaction and therefore submitted the information necessary for BP to declare their projects under the Open Cover.[FN7] BP enlisted Aon as its agent to acquire insurance for these projects under the Open Cover, which was developed precisely to permit BP's subsidiaries and business partners to accept insurance coverage in relation to those projects. And Aon's New York contacts would suffice to permit a New York court to exercise personal jurisdiction over Aon on a cause of action arising out of its dealings with National Union. Neither the number of intermediate agency relationships nor defendants' protestations that they lacked actual knowledge or control over Aon can obscure the simple fact that, at bottom, these defendants transacted certain busi-

ness essential to their activities-the negotiation, execution, and subsequent administration of a major insurance contract-in New York, and this action arises out of that transaction. That defendants made use of others to carry out this business on their behalf does not deprive New York of jurisdiction to resolve disputes that arise directly out of that New York transaction.

> FN7. This is not a case, like *Louis Marx & Co. v. Fuji Seiko Co.*, 453 F.Supp. 385 (S.D.N.Y.1978), upon which defendants rely, in which the activities of the relevant agents-here BP and Aon-simply inured to the benefit of defendants without their conscious choice to receive that benefit. *See id.* at 390-91. By their decision to acquire insurance for their projects through the Open Cover rather than to seek it independently, the Foreign BP Defendants purposefully availed themselves of BP's and Aon's acts in New York.

To the extent *Royal* implies that New York's long-arm statute does not reach the **\*364** Foreign BP Defendants, the Court respectfully disagrees. Plaintiffs correctly note, however, that the *Royal* court declined to sustain jurisdiction on constitutional grounds, see 2000 WL 1801838, at *2, and its implications, if any, for the reach of N.Y. C.P.L.R. § 302(a)(1) are unclear. The Foreign BP Defendants also cite *Ambassador Insurance Co. v. Truly Nolan of America, Inc.*, 514 F.Supp. 985 (S.D.N.Y.1981), where the court found that a single act by an insurance agent in New York did not suffice to subject the principal to personal jurisdiction. *Id.* at 988-89. (Foreign BP Ds. Br. 17.) Here, by contrast, Aon played a continuing role in negotiating the Open Cover with National Union, submitting declarations from BP based on information supplied by defendants, and making claims on their behalf. And in any event, to the extent *Ambassador Insurance Co.* suggests that a single purposeful act does not suffice to confer on a New York court personal jurisdiction over an out-of-state defendant, that proposition

must be rejected as inconsistent with the holding of the New York Court of Appeals in *Kreutter*, 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40.FN8

> FN8. The Foreign BP Defendants cite several other decisions in support of their position. Some of these decisions address personal jurisdiction under § 302(a)(1) in connection with motions to transfer venue. *SeeSeneca Ins. Co. v. Henrietta Oil Co.*, No. 02 Civ. 3535, 2003 WL 255317 (S.D.N.Y. Feb. 4, 2003); *Am. Motorists Ins. Co. v. Roller Bearing Co.*, No. 99 Civ. 9133, 2001 WL 170658 (S.D.N.Y. Feb. 21, 2001). *Seneca* does not discuss § 302(a)(1), and the circumstances in that case strongly favored litigation in Texas despite the existence of a New York forum-selection clause, which the court held unenforceable. *See* 2003 WL 255317, at *3-4. In *American Motorists*, the court declined to find personal jurisdiction under the totality of the circumstances, where three of the four claims sued upon arose out of contracts negotiated and executed outside New York. *See*2001 WL 170658, at *4. In *State Street Bank and Trust Co. v. Arganese*, No. 95 Civ. 0440, 1996 WL 97186 (S.D.N.Y. Mar. 5, 1996), the court said that "activities of an agent that take place in New York by mere fortuity, and without the knowledge of the principal, do not subject the principal to New York's long-arm jurisdiction,"*id.* at *2, and on that basis disclaimed personal jurisdiction over defendants on a cause of action arising out of indenture and deferred purchase certificates executed by defendants' agents in New York. The Court respectfully disagrees with *State Street Bank* insofar as it suggests that a principal may avoid the jurisdiction of New York courts by professing ignorance that its agent transacted the very business assigned to that agent in New

York. But Aon's acts in New York can hardly be described as fortuitous; it purposefully solicited National Union's participation in the Open Cover. In *National Union Fire Insurance Co. v. Mason, Perrin & Kanovsky*, 689 F.Supp. 303 (S.D.N.Y.1988), the court held that plaintiff's cause of action did not arise out of defendants' alleged misrepresentations in an insurance contract because "all the events relating to the application for and the execution of the policy took place in Washington, D.C."*Id.* at 307. Here, the misrepresentations allegedly made by BP (through Aon) took place in New York; Aon negotiated and executed the Open Cover on behalf of BP in New York; and Aon submitted claims made by the defendants to, among other insurers, National Union in New York.

## 2. Constitutional Requirements

[7] The Foreign BP Defendants also argue that even if New York law authorizes personal jurisdiction over them, the exercise of that jurisdiction would contravene the "traditional notions of fair play and substantial justice" imposed by the Due Process Clause, *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted), which "protects a person without meaningful ties to the. forum state from being subjected to its jurisdiction." *Metro. Life Ins. Co.*, 84 F.3d at 567. A foreign defendant may be subjected to the personal jurisdiction of a forum state's courts if that defendant " 'purposefully avail[ed] itself*365 of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Because the "purposeful availment" requirement of N.Y. C.P.L.R. § 302(a)(1) derives directly from *Hanson,see*McKee Elec. Co., 20 N.Y.2d at 382, 283

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

Page 14

N.Y.S.2d 34, 229 N.E.2d 604,"satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements." *Kelly v. MD Buyline, Inc.,* 2 F.Supp.2d 420, 431 (S.D.N.Y.1998). A defendant that purposefully directs acts toward New York can and should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The Foreign BP Defendants nonetheless maintain that it would be unfair for a New York court to exercise personal jurisdiction over them because they allegedly could not foresee a New York forum, did not perform purposeful acts in New York, and could not anticipate that by merely purchasing interests in the projects covered by BP's Open Cover policy, they would be haled into court here. (Foreign BP Ds. Br. 24.) They liken their situation to that of petitioner in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a Japanese company that sold products to a Taiwanese manufacturer of tire tubes, one of which was used in the construction of the allegedly defective motorcycle that caused the California plaintiff's injuries. *Id.* at 106, 107 S.Ct. 1026. (Foreign BP Ds. Reply Br. 11-12.) The Supreme Court held that petitioner's act of placing its "product into the stream of commerce, without more, [wa]s not an act of the [petitioner] purposefully directed toward the forum State," because petitioner's mere "awareness that the stream of commerce may or will sweep the product into the forum State" could not be deemed purposeful. *Id.* at 112, 107 S.Ct. 1026.

Here, the Foreign BP Defendants purchased interests in various oil and gas projects for which they knew or should have known that BP had acquired insurance and intended to "declare" their projects pursuant to the Open Cover. See *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 613 n. 4 (8th Cir.1994) (observing that in applying the criteria of *International Shoe,* "it is a matter of common sense that there should be no

distinction between 'know' and 'should have known' "). Again, had they wished, defendants could have discovered the identity and locations of the insurers participating in the Open Cover. It is neither unfair nor unreasonable to expect them to defend an action based on business transactions taken by Aon in New York in order to secure an insurance contract expressly intended to covers their projects.[FN9] After *366 all, the Foreign BP Defendants continue to claim to be insured by the Open Cover. They do not contend, for example, that Aon acted *ultra vires* its authority or that, for any other reason, Aon's New York acts do not suffice to bind them under the Open Cover, such that they now claim no rights against National Union. To the contrary, because of Aon's New York acts, by which it secured National Union's subscription to the Open Cover and declared various BP-affiliated projects under that policy, the Foreign BP Defendants claim entitlement to insurance coverage and, in some cases, to payments from National Union. It is simply untenable for these defendants simultaneously to insist that for National Union to pursue its claim that the Open Cover does not extend to certain of their projects or claims because of misrepresentations by their agents, it should be required to sue each of them, individually, in fora scattered throughout the globe.

FN9. That the Foreign BP Defendants acquired interests in various covered projects after the conclusion of the Open Cover does not absolve them of responsibility for the New York acts taken by Aon and BP in order to secure coverage for those projects. Not only did defendants submit information to BP to enable it, through Aon, to declare their projects to National Union for coverage pursuant to the Open Cover and subsequently, in some cases, to submit claims; by effectively buying into the Open Cover, they also, as principals, ratified Aon's prior acts as agent on their behalf. *Cf.Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 60

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
(Cite as: 319 F.Supp.2d 352)

(1st Cir.2002). Indeed, while in some circumstances subjecting defendants to jurisdiction based on the unknown, perhaps unforeseeable, and fortuitous *subsequent* actions of agents might be deemed unreasonable under the Due Process Clause, where, as here, the agents already have performed the actions in question, defendants enjoy the opportunity to discover precisely what those agents did and where they did it, thus enabling them to make a fully informed decision about whether to ratify those agents' acts.

Finally, analysis of the factors enumerated by the Supreme Court in *Asahi* confirms that the exercise of personal jurisdiction over the Foreign BP Defendants is both fair and reasonable under the Due Process Clause:

The Supreme Court has held that the court must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining the most efficient resolution of the controversy; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies.

*Metro. Life. Ins. Co.*, 84 F.3d at 568 (citing *Asahi,* 480 U.S. at 113-14, 107 S.Ct. 1026). These factors decisively establish the fairness and reasonableness of exercising personal jurisdiction over these defendants.

Defendants will not be unduly burdened by this litigation. Plaintiffs allege certain common misrepresentations by BP, which can ably defend this action on behalf of all defendants. As a practical matter, BP has a strong incentive to litigate this case vigorously, not only because of its own interests in the projects at issue, but because of its contractual responsibility to the other defendants if it failed, by reason of its own wrongful or negligent acts, to secure insurance for the projects. Indeed, if plaintiffs succeed in this action, the other defendants may well have recourse against BP, presumably in fora of their own choosing. Despite defendants' diverse nationalities, this case will not require the production of witnesses and evidence located worldwide. Except for defendants' provision of the information needed for BP to declare their various projects pursuant to the Open Cover, most of the relevant negotiations and other conduct took place in the United States or Great Britain. By contrast, the burden on plaintiffs, were they required to bring separate actions against each defendant in fora throughout the world, would be colossal. Both plaintiffs' and the judicial system's interests in obtaining an efficient resolution of these claims in a single, consolidated action are therefore overwhelming. Finally, New York State has an undoubted interest in regulating an insurance contract negotiated, executed, and administered in New York by a New York company.

In short, for jurisdictional purposes, Aon's and BP's actions in New York to **\*367** negotiate and execute an insurance contract with National Union, to declare projects eligible for coverage, and to submit claims on behalf of, and as agent for, the Foreign BP Defendants more than suffice to constitute transacting business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1), this action arises out of that transaction; and the Court's exercise of personal jurisdiction under the circumstances fully comports with those "traditional notions of fair play and substantial justice" that circumscribe the exercise of personal jurisdiction under the Due Process Clause. *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted). Put simply, notwithstanding the number and diversity of defendants, this is in essence a unified action to address the validity and interpretation of a single insurance program negotiated, executed, and administered in New York, through the deliberate choice of agents to whom defendants not only delegated the responsibility to secure insurance, but whose decision to carry out that responsibility in New York was eas-

319 F.Supp.2d 352

319 F.Supp.2d 352

(Cite as: 319 F.Supp.2d 352)

ily discoverable by defendants at the time they acquired their respective interests in the covered projects. Requiring defendants to litigate this action in New York can therefore hardly be deemed unfair. Accordingly, the motion to dismiss for lack of personal jurisdiction of the Foreign BP Defendants is denied.

### D. *The Non-BP Defendants' Motion*

The Non-BP Defendants bring a separate motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2). For purposes of personal jurisdiction, the sole difference between their status and that of the Foreign BP Defendants is that the former are not BP subsidiaries. The Non-BP Defendants describe themselves as unaffiliated foreign corporations that have ownership interests in projects declared for coverage under the Open Cover.[FN10] But nothing about the preceding analysis of the Foreign BP Defendants' motion turns on their status as BP subsidiaries. The dispositive question under N.Y. C.P.L.R. § 302(a)(1), as under the Due Process Clause, is whether defendants took certain acts, whether personally or through agents, which were purposefully directed toward New York. The Non-BP Defendants, no less than the Foreign BP Defendants, understood that BP had acquired insurance to cover their respective projects. (Non-BP Ds. Br. 2) The gravamen of their objection to personal jurisdiction is that they did not know that BP had acquired that insurance by acts within, among other places, New York. But these defendants, too, had they desired, could have arranged to insure their projects by other means. They instead chose to entrust this task to BP. Had they troubled to inquire, the Non-BP Defendants could have discovered the identities and locations of the insurers for their projects. That they did not cannot immunize them from personal jurisdiction based on acts taken by their agents in New York and out of which plaintiffs' causes of action arise. The Non-BP Defendants' motion is therefore denied for substantially the same reasons *368 set forth above in section I(C) of this Opinion.[FN11]

FN10. The sole exception is Stolt Offshore Ltd., a contractor for one of the Foreign BP Defendants, BP Exploration Operating Co., on a project subject to the Open Cover. The contract between Stolt and that BP subsidiary obliged the subsidiary to acquire insurance for Stolt, which the subsidiary did by availing itself of the Open Cover. (P. Br. in Opp. to P.J. Mots. 6; Carcich Aff., Exs. 8-9.) Stolt's status as an insured contractor on one of the covered BP projects rather than an insured co-owner or co-venturer with BP does not make Stolt's decision to buy into the Open Cover, and thereby avail itself of BP's actions in New York, any less purposeful for purposes of N.Y. C.P.L.R. § 302(a)(1) and the Due Process Clause.

FN11. Non-BP Defendant ONGC Videsh also moves to dismiss for lack of proper service of process, *see* Fed.R.Civ.P. 12(b)(5), because plaintiffs initially failed to serve ONGC Videsh in the manner prescribed by Indian law. *See* Fed.R.Civ.P. 4(f)(2)(a). (Non-BP Ds. Br. 14.) Plaintiffs requested in their opposition papers, however, that they be permitted to cure this alleged defect in service by re-serving ONGC Videsh within sixty days (Carcich Aff. ¶ 4.), which they have done. (Carcich Supp. Aff. ¶ 5, Ex. 1.) Plaintiffs' request is granted, and proper service having now been effected, ONGC Videsh's Rule 12(b)(5) motion is denied.

### E. *The Remaining 12(b)(2) Motions*

#### 1. *ConocoPhillips, Svenska, and the Total Foreign Defendants*

ConocoPhillips Vietnam AS, ConocoPhillips (U.K.) Ltd., and ConocoPhillips Ltd. (collectively, "the ConocoPhillips Defendants") join in the motions of the Foreign BP and Non-BP Defendants, as does Svenska Petroleum Exploration AS. For purposes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of jurisdiction, these defendants do not differ in any relevant respect from the Non-BP Defendants. Each purchased an ownership interest in or participates as a co-venturer on BP-affiliated oil and gas projects insured by the Open Cover, and National Union brings this action to obtain a declaratory judgment finding such projects not insured by the Open Cover. Total E & P Norge SA, Total E & P U.K. PLC, Elf Exploration U.K. PLC, and Fina Exploration Ltd. (collectively, "the Total Foreign Defendants") bring a separate motion to dismiss for lack of personal jurisdiction. They describe themselves as "passive partners or co-venturers with BP Amoco on one or more of the exploration projects which BP Amoco declared covered under the [Open Cover]," and they, too, concede that they were "offered and accepted the opportunity by BP Amoco affiliates to insure their interests in a given project under BP Amoco's Open Cover Policy." (Total Foreign Ds. Br. 3.) Again, for purposes of personal jurisdiction, the Total Foreign Defendants do not differ in any relevant respect from the Non-BP Defendants. By availing themselves of the opportunity to insure themselves by means of the Open Cover, they availed themselves of BP's actions, both its own and those of its agent Aon, within New York. Accordingly, the motions of the ConocoPhillips Defendants, Svenska Petroleum Exploration AS, and the Total Foreign Defendants are denied for the reasons already stated.

### 2. The Saipem Defendants

Saipem S.p.A., Saipem Inc., Saipem U.K. Ltd., and European Marine Contractors Ltd. (collectively, "the Saipem Defendants") also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(2).[FN12] Saipem S.p.A. and Saipem U.K. Ltd. argue that they lack any connection to the Open Cover, that they neither "entered into any contractual relationship [n]or performed any work in connection with the projects identified in the Amended Complaint." (Saipem Ds. Reply Br. 3, 6-7.) Plaintiffs allege, on information and belief, that Saipem S.p.A. and Saipem U.K. Ltd. acted as contractors on projects declared by BP

under the Open Cover. (P. Br. in Opp. to P.J. Mots., Ex. D at 2.) Absent jurisdictional discovery, the Court must credit plaintiffs' jurisdictional allegations and "construe the pleadings and affidavits in [their] favor." *369 PDK Labs, Inc., 103 F.3d at 1108. This does not, of course, preclude Saipem S.p.A. and Saipem U.K. Ltd. from challenging personal jurisdiction at a later stage. The other two Saipem Defendants, Saipem Inc. and European Marine Contractors Ltd., concede that they "acted as contractors on two of the projects" identified in the Amended Complaint. (Saipem Ds. Reply Br. 1.) At least for purposes of this motion, the Court must assume that the Saipem Defendants fall within the category of "contractor[s] for whom BP was required to obtain insurance pursuant to the terms of the relevant contract." (Ps. Br. in Opp. to P.J. Mots. 6-7.)

> FN12. Even though the same law firm represents all four of these defendants, and their arguments are virtually identical, Saipem U.K. and European Marine Contractors filed one motion to dismiss, while Saipem S.p.A. and Saipem Inc. filed a separate motion to dismiss. The Court will consider them together.

Status as a contractor on a project covered by the Open Cover, as opposed to a co-owner or joint-venturer on such a project, does not modify the personal jurisdiction analysis. Assuming, as plaintiffs allege, that these defendant contractors entered into contracts with BP subsidiaries or co-venturers requiring BP to obtain the necessary insurance for the projects on which they agreed to work, the contractors purposefully availed themselves of BP's and Aon's activities to negotiate and execute an insurance contract with National Union in New York and subsequently to declare their projects pursuant to the Open Cover. BP's and Aon's activities suffice to subject them, and those for whom they acted as agents, to the personal jurisdiction of a New York court on a cause of action that arises out of those activities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Saipem Defendants, like the Foreign BP and Non-BP Defendants, object that they lacked knowledge or control over BP or Aon. (Saipem Ds. Reply Br. 7-8.) Again, this objection misconceives the issue and the nature of their nexus to New York. By choosing to be contractors on projects that they knew or should have known were insured by the Open Cover, the Saipem Defendants purposefully availed themselves of BP's and Aon's New York activities, effectively ratifying those activities after the fact. They cannot now object that they did not know about or consent to those activities. Had they wished, they could have inquired into the identities and locations of the Open Cover insurers. Had they, upon learning of National Union's identity and location, wished to avoid being haled into a New York court on a cause of action arising out of the Open Cover, they could have sought insurance elsewhere. And were their refusal to consent to be insured by the Open Cover a deal-breaker for the owners or managers of their respective projects, they could have declined the work. The Saipem Defendants' motions are therefore also denied.

### 3. *Petrovietnam and the Allseas Defendants*

[8]    Vietnam    Oil    and    Gas    Corporation (Petrovietnam), Allseas USA, Inc., Allseas Subsea Contractors, S.A., and Allseas UK, Ltd. join in the Non-BP Defendants' motion to dismiss. The three Allseas entities describe themselves as contractors on projects subject to the Open Cover, and for purposes of personal jurisdiction, their status does not differ in any relevant respect from that of the Non-BP Defendants or the Saipem Defendants discussed in the preceding section. (*See Petrovietnam, et al.* Notice of Mot., Exs., 2-4.) Accordingly, as to the Allseas entities, the motion to dismiss is denied for the reasons already stated.

Petrovietnam, a corporation wholly owned by the Socialist Republic of Vietnam (*id.,* Ex. 1 ¶ 2), moves to dismiss on the additional ground that it qualifies as a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act *370

("FSIA"), 28 U.S.C. § 1602, *et seq.,*[FN13] which confers immunity on foreign states, subject to enumerated exceptions. A "foreign state" includes an "agency or instrumentality of a foreign state ... a majority of whose share or other ownership interest is owned by a foreign state." *Id.* § 1603(b)(2). Petrovietnam qualifies as a foreign state under this definition, as plaintiffs concede (P. Supp. Br. in Opp. to Petrovietnam Mot. 4), and it therefore enjoys immunity from suit unless one of the Act's exceptions apply. *See Robinson v. Gov't of Malaysia,* 269 F.3d 133, 138-39 (2d Cir.2001).

> FN13. Petrovietnam admits that it bought interests in two projects insured by the Open Cover pursuant to declarations filed by BP. (Petrovietnam, *et al.* Notice of Mot., Ex. 1 ¶¶ 4-5.) Like the Foreign BP and Non-BP Defendants, it objects that it had only a general awareness that the project operators "arranged the insurance programs for those projects," but "did not know the details of the insurance, such as the names and locations of the insurance companies." (*Id.* ¶ 6.) The Court has already rejected that argument, and the basis for specific jurisdiction explained in sections 1(C) and (D) of this Opinion applies equally to Petrovietnam.

Plaintiffs argue that the commercial activity exception, 28 U.S.C. § 1605(a)(2), applies because their cause of action against Petrovietnam, as against the other defendants, arises out of "a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." *Id.* The Court agrees. The same activities that permit the Court to exercise personal jurisdiction over Petrovietnam under N.Y. C.P.L.R. § 302(a)(1)-the negotiation of National Union's participation in the Open Cover, execution of an insurance contract, and submission of declarations under that policy-constitute a commercial transaction within the United States. Alternatively,

319 F.Supp.2d 352                                                                    Page 19
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

those activities at a minimum constitute acts in the United States in connection with the underlying commercial oil-project activities that Petrovietnam and BP engaged in "elsewhere." Petrovietnam, through BP and Aon, acquired insurance for two projects in which it maintains ownership interests. Had its corporate officers traveled to New York personally to secure National Union's participation in the insurance policy covering its projects, Petrovietnam would clearly have performed a commercial activity within the meaning of § 1605(a)(2), and it would be subject to suit on a cause of action arising out of that activity. *SeeReiss v. Societe Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) (commercial activity exception requires "significant nexus" between alleged commercial act or acts and plaintiff's cause of action). That Petrovietnam instead deputized BP to acquire the necessary insurance for its projects does not modify the analysis. At bottom, BP and Aon acted on behalf of, among others, Petrovietnam in securing National Union's subscription to the Open Cover, which insures, among other projects, those in which Petrovietnam maintains an ownership interest. The FSIA therefore authorizes the exercise of jurisdiction over Petrovietnam as to causes of action that arise out of the Open Cover. Accordingly, Petrovietnam's motion to dismiss based on its alleged sovereign immunity is denied.

**4. Aker Stord AS**

On October 24, 2003, Aker Stord AS, a Norwegian company that entered into a contract with a BP subsidiary whereby that subsidiary arranged for Aker Stord to be insured by the Open Cover, moved to dismiss for lack of personal jurisdiction. (Aker Stord Br. 1.) Aker Stord's brief **\*371** repeats all the arguments made by the Foreign BP and Non-BP Defendants, and the Court rejects them again for the reasons already stated. Aker Stord, too, availed itself of BP's and Aon's activities in New York to secure National Union's subscription to the Open Cover, to execute an insurance contract, and to declare projects pursuant to the Open Cover. BP and

Aon acted as the agent of Aker Stord in connection with the Open Cover, and Aker Stord is therefore subject to personal jurisdiction on causes of action that arise out of the Open Cover. Aker Stord's motion is accordingly denied.

**II. *The Motions to Dismiss for Lack of Subject Matter Jurisdiction***

**A. *Standard on a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)***

[9][10][11] On a motion to dismiss for lack of subject matter jurisdiction, the defendant "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both," and how the Court should "resolve the motion to dismiss depends upon whether the motion presents a factual challenge." *Robinson,* 269 F.3d at 140 (citations and internal quotation marks omitted). Where "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Id.* (citations and internal quotation marks omitted). But where, as here, the defendant challenges jurisdictional facts, "the court may inquire by affidavits or otherwise, into the facts as they exist." *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *see alsoRobinson,* 269 F.3d at 140; *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir.1986); *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976).

**B. *The Wrongly Named Defendants' Motion***

[12] The Wrongly Named Defendants move to dismiss for lack of subject matter jurisdiction, arguing that, as between them and plaintiffs, no case or controversy within the meaning of Article III, § 2 of the Constitution exists. By contrast to the Foreign BP and Non-BP Defendants, these defendants assert that they "have no ownership interests in any projects [insured by the Open Cover] and are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 352
319 F.Supp.2d 352
**(Cite as: 319 F.Supp.2d 352)**

Page 20

making claims to recover insurance proceeds for property damage at those projects." (Wrongly Named Ds. Br. 1.) Specifically,

None of these defendants: (a) claims or has a present interest as an owner, partner, contractor, subcontractor or otherwise in any of the 30 projects "declared" under the Open Cover; (b) presently claims to be an insured under the Open Cover or any declaration under the policy; or (c) is presently making a claim for payment or indemnity under the Open Cover or any declaration under the policy.

(Id. 2.) FN14

> FN14. By order dated December 15, 2003, the Court denied plaintiffs' motions to strike various portions of the Affidavits of William Siebenaler. Plaintiffs object that Siebenaler cannot competently testify that the Wrongly Named Defendants have no present interest in any of the projects insured by the Open Cover because he does not work for them. (Ps. Br. in Opp. to S.M.J. Mot. 12.) Siebenaler bears principal responsibility for administering the Open Cover on behalf of BP, submits information to Aon to permit it to "declare" projects, and therefore would know which companies falls within the Open Cover's scope. (Siebenaler Supp. Aff. 2-3.) To require each of the more than seventy Wrongly Named Defendants to submit an affidavit stating that it does not claim to be insured by the Open Cover would be superfluous. Plaintiffs have not submitted any evidence to call into question Siebenaler's basis of knowledge.

Because the Wrongly Named Defendants agree with plaintiffs that the Open *372 Cover does not insure them, it seems clear that no case or controversy exists for the Court to adjudicate. (Id. 4-5.) See S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch., Inc., 24 F.3d 427, 431 (2d Cir.1994) ( "Article III of the United States Constitution limits

the judicial authority of the federal courts to 'Cases' and 'Controversies.' U.S. Const. art. III, § 2. Because Article III is a limit on judicial power, a court will not have subject matter jurisdiction over an action absent the requisite case or controversy."). Plaintiffs argue, however, that the Wrongly Named Defendants disclaim only a present interest in the Open Cover, which "is far different from having no interest" (P. Br. in Opp. to S.M.J. Mot. 7), and they cite cases for the proposition that the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., permits courts in some circumstances to adjudicate controversies based on future contingencies. E.g.,Assoc. Indem. Corp. v. Fairchild Indus., Inc., 961 F.2d 32, 35 (2d Cir.1992); Am. Mach. & Metals, Inc. v. De Bothezat Impeller Co., 166 F.2d 535, 536 (2d Cir.1948); accord,Nat'l R.R. Passenger Corp. v. Consol. Rail Corp., 670 F.Supp. 424, 429-30 (D.D.C.1987). This general principle, however, simply begs the question whether the facts present such circumstances, because " '[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree.... Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); see also Charles Alan Wright, et al., Federal Practice & Procedure § 2757, at 477 (3d ed. 1998) ("[T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists."); Nat'l R.R. Passenger Corp., 670 F.Supp. at 430 (same; collecting cases).

Here, the future contingency at issue is that the Wrongly Named Defendants might some day acquire interests in projects insured by the Open Cover. But that future contingency could apply to virtu-

ally any business entity. Countless companies might one day purchase an ownership interest in or agree to perform work on one of the oil and gas projects insured by the Open Cover. Except for the superficial fact that some Wrongly Named Defendants appear nominally related to BP, no evidence suggests that any of these entities are any more likely than any other to purchase an interest in or become a contractor on a project allegedly insured by the Open Cover. The mere possibility that one of these defendants might acquire an interest in a project insured by the Open Cover in the future does not suffice to give rise to an actual case or controversy. Cf. *Atlanta Gas Light Co. v. Aetna Cas. and Sur. Co.,* 68 F.3d 409, 414-15 (11th Cir.1995) (no justiciable case or controversy where plaintiff insured filed a declaratory judgment action based on the fact that "defendant insurers denied coverage to similar utilities under similar circumstances in the past").

**\*373** [13] Plaintiffs place principal, but misplaced, reliance on *Hanover Ins. Co. v. Dialuck Corp.,* No. 01 Civ. 7484, 2002 WL 1453834 (S.D.N.Y.2002). While the Court has no quarrel with the general principle that "litigation over insurance coverage has become the paradigm for asserting jurisdiction [in declaratory judgment actions] despite future contingencies that will determine whether a controversy ever actually becomes real," *id.* at \*2 (internal quotation marks omitted), the *Hanover* court applied that principle to sustain subject matter jurisdiction in circumstances far different from those presented by this case. In *Hanover,* plaintiffs sought a declaratory judgment as to an actual controversy, and the Court rejected defendants' argument that "any action taken by the court would likely be rendered moot by the reinstatement" of certain involuntary bankruptcy petitions, which would stay the underlying action. *Id.* Here, plaintiffs urge the Court to sustain jurisdiction in the opposite scenario: No actual controversy exists, and plaintiffs argue only that defendants *might* one day acquire an interest in the Open Cover that *could* create a controversy. The Court lacks subject matter

jurisdiction to decide "what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The Wrongly Named Defendants' motion to dismiss for lack of subject matter jurisdiction is therefore granted.

### C. The Remaining 12(b)(1) Motions

#### 1. ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd.

[14] ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. seek to join in the Wrongly Named Defendants motion. As plaintiffs correctly observe, however, the Conoco defendants, unlike the other Wrongly Named Defendants, *presently* claim an interest in the Open Cover policy. (Ps. Br. in Opp. to S.M.J. Mot. 4-5); they concede that they participate in a project insured by the Open Cover. (ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. Reply Br. 2.) That makes all the difference, for it means that a present, actual controversy exists: The Conoco defendants insist that the Open Cover insures them because of their participation on a project declared pursuant to it; plaintiffs deny that. The Court can constitutionally determine whether, as plaintiffs claim, this project, like those in which the Foreign BP and Non-BP Defendants hold interests, does not fall within the ambit of the Open Cover because of alleged misrepresentations made to plaintiffs. See*Morris v. Progressive Cas. Ins. Co.,* 662 F.Supp. 1489, 1491 (S.D.N.Y.1987) ("Disputes over coverage afforded by an insurance policy present an actual case or controversy, so that declaratory judgment is appropriate."), citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *cf. Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 261 F.Supp.2d 293, 295-96 (S.D.N.Y.2003) (sustaining jurisdiction over insured's causes of action seeking declaratory relief while dismissing related insurance claims for breach of contract on ripeness grounds). The motion to dismiss for lack of subject matter jurisdiction of ConocoPhillips Ltd. and Conoco-

Phillips (U.K.) Ltd. is therefore denied.

### 2. *Statoil Vietnam AS*

Statoil Vietnam AS likewise seeks to join in the Wrongly Named Defendants motion to dismiss, but on an entirely distinct basis: that it has been acquired by another entity and changed its name. Statoil Vietnam AS, a former subsidiary of Statoil ASA, once "held a 16.33% interest in the Nam Con Son Pipeline project in *374 Vietnam," one of the projects declared pursuant to the Open Cover, but it has since sold its assets to a company now known as ConocoPhillips Vietnam AS. (Statoil Vietnam AS Notice of Joinder, Ex. 1 ¶ 2.) Plaintiffs do not dispute this. (Ps. Opp. to Statoil Vietnam AS Mot. 4) ConocoPhillips Vietnam AS, not Statoil Vietnam AS, now owns the relevant interest in the pipeline project insured by the Open Cover, and in section I(E)(1) of this Opinion, the Court denied Conoco-Phillips Vietnam AS's motion to dismiss for lack of personal jurisdiction. This ostensible motion to dismiss for lack of subject matter jurisdiction thus amounts to no more than a dispute over the proper name under which this particular entity should be sued. ConocoPhillips Vietnam AS remains a party to this action, and plaintiffs do not seek relief from Statoil Vietnam AS but rather from its successor-in-interest, that is, ConocoPhillips Vietnam AS. Accordingly, the Court will deem ConocoPhillips Vietnam AS substituted for Statoil Vietnam AS, and the latter's motion to dismiss for lack of subject matter jurisdiction is denied as moot.

### CONCLUSION

For the reasons set forth above, the motions to dismiss for lack of personal jurisdiction of (1) Certain Foreign BP Defendants, (2) Certain Non-BP Defendants, (3) ConocoPhillips Vietnam AS, Conoco-Phillips (U.K.) Ltd., and ConocoPhillips Ltd., (4) Svenska Petroleum Exploration AS, (5) Total E & P Norge SA, Total E & P U.K. PLC, Elf Exploration U.K. PLC, and Fina Exploration Ltd., (6)

Saipem U.K. Ltd. and European Marine Contractors, (7) Saipem S.p.A. and Saipem Inc., (8) Vietnam Oil and Gas Corporation (Petrovietnam), Allseas USA, Inc., Allseas UK Ltd., and Allseas Subsea Contractors, S.A., and (9) Aker Stord AS are denied. The motion to dismiss for lack of subject matter jurisdiction of the Wrongly Named Defendants is granted. The motion to dismiss for lack of subject matter jurisdiction of ConocoPhillips Ltd. and ConocoPhillips (U.K.) Ltd. is denied, and the motion to dismiss for lack of subject matter jurisdiction of Statoil Vietnam AS is denied as moot.

SO ORDERED.

S.D.N.Y.,2004.
National Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.
319 F.Supp.2d 352

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

108 S.Ct. 404                                                          Page 1
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

▷

Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.
U.S.La.,1987.

Supreme Court of the United States
OMNI CAPITAL INTERNATIONAL, LTD., et al.,
Petitioners
v.
RUDOLF WOLFF & CO., LTD., et al.
No. 86-740.

Argued Oct. 6, 1987.
Decided Dec. 8, 1987.

Commodities futures investors brought an action against marketers of a trading program on grounds that they fraudulently induced plaintiffs to participate in violation of various securities laws. Defendants impleaded a British corporation which they employed to handle trades on a British metals exchange and the British representative who solicited their business. The District Court for the Eastern District of Louisiana granted the defendants' motion to dismiss the securities law claims as having been preempted by the Commodity Exchange Act, but concluded that it could exercise personal jurisdiction over them. Upon reconsideration, the court concluded that it lacked personal jurisdiction and dismissed the claims against the British defendant on grounds that requirements of the Louisiana long-arm statute were not met. On appeal, the Court of Appeals for the Fifth Circuit, sitting en banc, 795 F.2d 415, affirmed in a per curiam opinion. On petition for certiorari, the Supreme Court, Justice Blackmun, held that the district court lacked personal jurisdiction over the nonresident defendants as there was no implied authorization for nationwide service of process under the Commodity Exchange Act provision authorizing private cause of action and requirements of Louisiana long-arm statute were not met.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⬤4**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk3 Jurisdiction in General; Nature and Source
            170Bk4 k. Constitutional and Statutory Provisions. Most Cited Cases
The jurisdictional limits that Article III of the Constitution places on the federal courts relate only to subject matter jurisdiction, rather than personal jurisdiction. U.S.C.A. Const. Art. 3, § 1 et seq.

**[2] Federal Civil Procedure 170A ⬤411**

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)1 In General
                170Ak411 k. In General. Most Cited Cases
Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied by notice to the defendant, a constitutionally sufficient relationship between the defendant and the forum, and a basis for the defendant's amenability to service of summons. U.S.C.A. Const. Art. 3, § 1 et seq.; Amends. 5, 14.

**[3] Federal Courts 170B ⬤76.1**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.1 k. In General. Most Cited Cases
    (Formerly 170Bk76, 106k12(2))
Absent consent, there must be authorization for service of summons on a nonresident defendant in or-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                Page 2
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

der for a defendant to be amenable to service of summons as required in order for a federal court to exercise personal jurisdiction over the defendant.

**[4] Commodity Futures Trading Regulation 83H**
🔑75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
The Commodity Exchange Act did not contain an implied provision for nationwide service of process in a private cause of action. Commodity Exchange Act, § 1 et seq., as amended, 7 U.S.C.A. § 1 et seq.

**[5] Commodity Futures Trading Regulation 83H**
🔑75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
Congress' failure to include a provision for nationwide service of process in a private cause of action when it enacted the Futures Trading Act of 1982 forcefully argued that Congress did not intend to authorize nationwide service of process in light of the express provision for nationwide service of process in other enforcement provisions of the Commodity Exchange Act. Commodity Exchange Act, §§ 6c, 6d(4), 14(d), as amended, 7 U.S.C.A. §§ 13a-1, 13a-2(4), 18(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[6] Commodity Futures Trading Regulation 83H**
🔑75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
The fact that Congress enacted broader service provisions for Commodity Futures Trading Commission actions than for private actions did not imply that Congress intended to provide nationwide ser-

vice of process for private actions under the Commodity Exchange Act in light of legislative history stating that the availability of private right of action supplemented but did not substitute for the regulatory and enforcement program of the CFTC. Commodity Exchange Act, §§ 22, 22(d), as amended, 7 U.S.C.A. §§ 25, 25(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[7] Commodity Futures Trading Regulation 83H**
🔑75

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited Cases
Nationwide service of process was not authorized under the implied cause of action recognized in *Curran* for private actions under the Commodity Exchange Act which accrued prior to the effective date of the section explicitly authorizing private right of action for violation of the Act. Commodity Exchange Act, §§ 22, 22(d), as amended, 7 U.S.C.A. §§ 25, 25(d); Futures Trading Act of 1982, § 101 et seq., 96 Stat. 2294.

**[8] Federal Courts 170B** 🔑417

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk417 k. Federal Jurisdiction. Most Cited Cases
In order to determine whether a federal court had jurisdiction over a private cause of action for violations of the Commodity Exchange Act, which did not implicitly authorize service of summons on nonconsenting defendants, the court had to look to the long-arm statute of the state in which the district court sat to determine whether nonresident defendants were amenable to service of process. U.S.C.A. Const. Art. 3, § 1 et seq.; Fed.Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.; LSA-R.S. 13:3201(d) (1977).

**[9] Commodity Futures Trading Regulation 83H**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                      Page 3

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

$\Longleftarrow$**75**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited
Cases
Federal court lacked jurisdiction over plaintiff's
private cause of action under the Commodity Ex-
change Act, in light of Act's failure to implicitly au-
thorize service of summons on nonconsenting non-
resident defendant and the plaintiffs' failure to com-
ply with requirements of Louisiana long-arm stat-
ute. Securities Exchange Act of 1934, § 27, 15
U.S.C.A. § 78aa; Securities Act of 1933, § 22, 15
U.S.C.A. § 77v; LSA-R.S. 13:3201(d) (1977);
Fed.Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.

**[10] Commodity Futures Trading Regulation
83H** $\Longleftarrow$**75**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk75 k. Parties and Process. Most Cited
Cases
The Supreme Court would not act to fill the
"interstices in the law inadvertently left by legislat-
ive enactment" by creating a rule authorizing ser-
vice of process on nonresident defendants by
plaintiffs bringing a private cause of action for viol-
ations of the Commodity Exchange Act. Commod-
ity Exchange Act, § 1 et seq., as amended, 7
U.S.C.A. § 1 et seq.

**[11] Federal Courts 170B** $\Longleftarrow$**76.1**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents;
"Long-Arm" Jurisdiction in General
                170Bk76.1 k. In General. Most Cited
Cases
    (Formerly 170Bk76)
Even if it had the power, it would be unwise for a
court to make its own rule authorizing service of
summons on nonresident defendants in light of

Congress' likely assumption that federal courts can-
not add to the scope of service of summons Con-
gress has authorized and the United States Supreme
Court's repeated past statements that a legislative
grant of authority is necessary.

**\*\*405 Syllabus** [FN*]

> [FN*] The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the con-
> venience of the reader. See *United States v.*
> *Detroit Lumber Co.*, 200 U.S. 321, 337, 26
> S.Ct. 282, 287, 50 L.Ed. 499.

**\*97** Omni Capital International, Ltd., and Omni
Capital Corporation (hereafter petitioners), New
York corporations, marketed an investment pro-
gram involving commodity-futures trades on the
London Metals Exchange. Certain investors filed
suits (later consolidated) against petitioners in the
Federal District Court for the Eastern District of
Louisiana, charging that petitioners fraudulently in-
duced them to participate in petitioners' program, in
violation of various federal securities laws. Peti-
tioners impleaded respondent Rudolf Wolff & Co.,
a British corporation with offices in London **\*\*406**
that was employed by petitioners to handle trades
on the London Exchange, and respondent Gourlay
(hereafter respondents), a United Kingdom citizen
and resident who was Wolff's representative in soli-
citing petitioners' business. Petitioners contended
that their liability, if any, was caused by respond-
ents' improper trading activities. While the action
was pending, *Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct.
1825, 72 L.Ed.2d 182, was decided, recognizing an
implied private cause of action under the Commod-
ity Exchange Act (CEA), and the plaintiffs in this
litigation amended their complaints to allege viola-
tions of that Act. The District Court dismissed the
other securities law claims as pre-empted by the
CEA, and held that it lacked personal jurisdiction
over respondents because (1) the CEA was silent
about service of process for private causes of ac-
tion, (2) thus, application of Louisiana's long-arm

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                                           Page 4
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
(Cite as: 484 U.S. 97, 108 S.Ct. 404)

statute was required, and (3) that statute's require-
ments were not met. The Court of Appeals af-
firmed.

*Held:* The District Court lacked personal jurisdic-
tion over respondents in this federal-question litiga-
tion under the CEA. Pp. 408-413.

(a) The requirement that a federal court have per-
sonal jurisdiction flows from the Due Process
Clause of the Fifth Amendment. However, before a
federal court may exercise personal jurisdiction
over a defendant, there must be more than notice to
the defendant and a constitutionally sufficient rela-
tionship between the defendant and the forum.
There also must be a basis for the defendant's
amenability to service of summons. Absent consent,
there must be authorization for service of summons
on the defendant. Pp. 409-410.

**\*98** (b) Under Federal Rule of Civil Procedure 4(e),
a federal court normally looks either to a federal
statute or to the long-arm statute of the State in
which it sits to determine whether an out-of-state
defendant is amenable to service. After the *Curran*
decision, and while the present litigation was still
pending in the District Court, Congress added § 22
to the CEA, explicitly authorizing a private cause
of action for CEA violations but not referring to
service of process, in contrast to Congress' explicit
authorization of nationwide service of process in
other CEA provisions for other civil actions under
the Act. This contrast, as well as the legislative his-
tory, supports the conclusion that Congress did not
intend to provide nationwide service of process for
private actions under the CEA. Nor was nationwide
service implicitly authorized for any implied
private cause of action under the CEA, such as peti-
tioners', that accrued prior to § 22's effective date.
Moreover, the District Court held, and petitioners
concede, that the requirements of Louisiana's long-
arm statute were not met here. Pp. 409-412.

(c) Even were it within this Court's power, judicial
creation of a common-law rule authorizing service
of process in this litigation would be unwise. The

strength of the longstanding assumption that federal
courts cannot add to the scope of service of sum-
mons Congress has authorized, and the network of
statutory enactments and judicial decisions tied to
that assumption, argue strongly against devising
common-law service of process provisions. The re-
sponsibility for creating service of process provi-
sions rests with those who propose the Federal
Rules of Civil Procedure and with Congress. Pp.
411-413.

795 F.2d 415, affirmed.

BLACKMUN, J., delivered the opinion for a unan-
imous Court.

*Robert A. Kutcher* argued the cause for petitioners.
With him on the brief was *John D. Fricke. Anita M.
Warner* filed a brief for Point Landing, Inc., et al.,
respondents under this Court's Rule 19.6, in support
of petitioners.
*Elliot Paskoff* argued the cause for respondents and
filed a brief for respondent Rudolf Wolff & Co.,
Ltd. *Sheldon H. Elsen, Clement J. Colucci, Jerome
Lipper,* and *Michael S. Fawer* filed a brief for re-
spondent Gourlay.
Justice BLACKMUN delivered the opinion of the
Court.
This case presents questions concerning the pre-
requisites to a federal court's exercise of *in perso-
nam* jurisdiction.

**\*99 \*\*407** I

Petitioners Omni Capital International, Ltd., and
Omni Capital Corporation (collectively Omni),[FN1]
New York corporations, marketed an investment
program involving commodity-futures trades on the
London Metals Exchange. Omni employed re-
spondent Rudolf Wolff & Co., Ltd., a British cor-
poration with its offices in London, as a broker to
handle trades on that Exchange. Respondent James
Gourlay, a citizen and resident of the United King-
dom, served as Wolff's representative in soliciting
this business from Omni.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                    Page 5

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

FN1. The other petitioners are Richard Friedberg and Michael Stern, officers of Omni, and/Northglen Capital Corporation which was named as a defendant with Omni in three of the four consolidated cases now before this Court. Petitioners have filed a single brief.

The United States Internal Revenue Service disallowed income tax deductions, claimed by the participants in Omni's investment program, and did so on the ground that the program's commodities trades on the London Metals Exchange were not bona fide arm's-length transactions. A number of corporate and individual investors who participated in Omni's program then sued Omni in four separate actions in the United States District Court for the Eastern District of Louisiana.[FN2] The plaintiffs in each action charged that, by misrepresenting its tax benefits and future profits, Omni fraudulently induced them to participate in the investment program. Omni, in turn, impleaded Wolff and Gourlay,[FN3] **\*100** contending that its liability, if any, was caused by their improper trading activities.

FN2. The plaintiffs were two Louisiana corporations, Point Landing, Inc., and Point Landing Fuel Corporation, and six individuals, William S. and Ruby M. Smith, Frank J. and Brenda A. George, and Dennis M. and Joan Rosenberg. Although all these plaintiffs technically are respondents here, see this Court's Rule 19.6, all of them except the Georges have filed a skeletal brief adopting Omni's brief "as if copied *in extenso.*" Brief for Respondents in Support of Petitioners 1.

FN3. In the Point Landing suit, Wolff was named as a defendant. In that suit, Omni cross-claimed against Wolff and filed a third-party complaint against Gourlay. In the Smith and George suits, Omni filed a third-party complaint against both Wolff and Gourlay. In the Rosenberg suit, no

move was made against either Wolff or Gourlay.

The procedural history is complex. The original complaints, filed in 1980 and 1981, charged violations of the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, as amended, 15 U.S.C. § 78a*et seq.* (1982 ed. and Supp. IV); SEC Rule 10b-5, 17 CFR § 240.10b-5 (1987); and the Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. § 77a*et seq.* (1982 ed. and Supp. IV), and included pendent state-law claims. The four cases were consolidated in the District Court. While they were pending, this Court decided *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In *Curran,* we recognized an implied private cause of action under the Commodity Exchange Act (CEA), 42 Stat. 998, as amended, 7 U.S.C. § 1*et seq.* (1982 ed. and Supp. IV). The plaintiffs accordingly amended their complaints to allege violations of §§ 4b and 9(b) of the CEA, as amended, 7 U.S.C. §§ 6b and 13(b).

Wolff and Gourlay moved to dismiss the claims against them for lack of personal jurisdiction and, as an additional ground, argued that the securities law claims failed to state causes of action. In its initial opinion dated May 13, 1983, the District Court dismissed the securities law claims as having been pre-empted by the CEA but concluded that it could exercise personal jurisdiction over Wolff and Gourlay. App. 6. The court reasoned that, in actions under the CEA, "Congress intended for U.S. courts to exercise personal jurisdiction over foreign defendants not present in the United States to the limits of the due process clause of the Fifth Amendment." *Id.,* at 9. Therefore, the court determined, if "the quality and nature of a foreign defendant's activities ... in the United States" support a "finding of fair play and substantial justice,"**\*\*408** personal jurisdiction would be proper. *Id.,* at 9-10. After examining the extent of Wolff's and Gourlay's contacts with the United States, the District Court concluded it had personal jurisdiction.

**\*101** After this initial decision of the District Court,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                        Page 6
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

the Fifth Circuit decided *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260 (1983). In *DeMelo*, the Court of Appeals concluded that "when a federal question case is based upon a federal statute that is silent as to service of process, and a state long-arm statute is therefore utilized to serve an out-of-state defendant, [Federal Rule of Civil Procedure] 4(e) requires that the state's standard of amenability to jurisdiction apply." *Id.,* at 1266. Following that decision by its controlling court, the District Court granted Wolff's and Gourlay's motions for reconsideration, noting that the CEA is silent about service of process for private causes of action. App. 19. Upon its reconsideration, the District Court concluded that, in accord with *DeMelo,* "unless jurisdiction can be asserted under the Louisiana long-arm statute, there is no personal jurisdiction over Wolff or Gourlay." App. 22. Because, in its view, the requirements of the Louisiana long-arm statute [FN4] were not met, the District Court concluded that it lacked personal jurisdiction over Wolff and Gourlay, and it directed the entry **\*102** of a final judgment dismissing all claims against them. *Id.,* at 23.

FN4. Louisiana's long-arm statute, then in effect, provided in relevant part:

"A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's

"(a) transacting any business in this state;

"(b) contracting to supply services or things in this state;

"(c) causing injury or damage by an offense or quasi offense committed through an act or omission in this state;

"(d) causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or

solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state...." La.Rev.Stat.Ann. § 13:3201 (West 1968).

Louisiana has amended this statute, see 1980 La.Acts, No. 764, § 2, and 1984 La.Acts, No. 398, § 1, codified at La.Rev.Stat.Ann. § 13:3201 (West Supp.1987), but no party has argued that the amendments affect the outcome of this litigation. We therefore do not consider them.

The Fifth Circuit decided the ensuing appeals en banc in the first instance and, by a 9-to-6 vote, affirmed. *Point Landing, Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415 (1986). The majority started from "the unmalleable principle of law ... that federal courts ... must ground their personal jurisdiction on a federal statute or rule." *Id.,* at 423. In the majority's view, neither the CEA nor the Federal Rules of Civil Procedure authorized service of process upon Wolff or Gourlay, and therefore personal jurisdiction over them was lacking. The dissent conceded that neither the CEA nor Civil Rule 4 provided for service of process on Wolff and Gourlay but would have remedied this "bizarre hiatus in the Rules," 795 F.2d, at 428, with an ad hoc authorization of service of process on them based on their contacts with the United States as a whole.

Because of a possible conflict with views of the Sixth Circuit expressed in *Handley v. Indiana & Michigan Electric Co.,* 732 F.2d 1265, 1272 (1984), we granted certiorari to decide whether, in this federal-question litigation arising under the CEA, the District Court may exercise personal jurisdiction over Wolff and Gourlay.

II

Omni's primary and fundamental contention is that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                          Page 7
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

in a suit under the CEA, the only limits on a district court's power to exercise personal jurisdiction derive from the Due Process Clause of the Fifth Amendment. The objection of the Court of Appeals, and of Wolff and Gourlay before this Court, is that, even if an exercise of personal jurisdiction would comport with **409 that Due Process Clause,[FN5] the District Court cannot*103 exercise personal jurisdiction over Wolff and Gourlay because they are not amenable to service of summons in the absence of a statute or rule authorizing such service.[FN6]

> FN5. Under Omni's theory, a federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits. As was the case in *Asahi Metal Industry Co. v. Superior Court of Cal.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), "[w]e have no occasion" to consider the constitutional issues raised by this theory. *Id.,* at 113, n. *, 107 S.Ct., at 1032, n. *.

> FN6. There is no objection to the method of service in this litigation; the objection is only to amenability to service. See *Point Landing, Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415, 424 (CA5 1986).

Omni attempts to meet this objection in a variety of ways. First, Omni argues that the District Court may exercise personal jurisdiction because Wolff and Gourlay have constitutionally sufficient contacts with the forum and, as well, have notice of the suits. Second, Omni contends that even if a rule authorizing service is a prerequisite to effective service and thus to the exercise of personal jurisdiction, Congress implicitly authorized nationwide service for private causes of action under the CEA. Third, Omni presses upon us the view of the Fifth Circuit dissenters that, even if authorization for service of process is required and cannot be found in a

statute or rule, such authorization should be created by fashioning a remedy to fill a gap in the Federal Rules of Civil Procedure. We examine these contentions in turn.

### III

### A

Omni argues that the jurisdictional limits that Art. III of the Constitution places on the federal courts relate to subject-matter jurisdiction only. In this view, although Art. III, § 1, leaves it to Congress to "ordain and establish" inferior federal courts, the only limits on those courts, once established, in their exercise of personal jurisdiction, relate to due process. Thus, Omni contends, the District Court may exercise personal jurisdiction over Wolff and Gourlay if the Due Process Clause of the Fifth Amendment does not forbid it.

*104 [1] Omni's argument that Art. III does not itself limit a court's personal jurisdiction is correct. "The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause.... It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). Omni's argument fails, however, because there are other prerequisites to a federal court's exercise of personal jurisdiction.

[2][3] Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied. "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-445, 66 S.Ct. 242, 245-246, 90 L.Ed. 185 (1946). Thus, before a court may exercise personal jurisdiction over a de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

Page 8

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

fendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

B

The next question, then, is whether there is authorization to serve summons in this litigation. Today, service of process in a federal action is covered generally by Rule 4 of the Federal Rules of Civil Procedure. **410 Rule 4(f) describes where process "may be served." [FN7] It authorizes service in the State *105 in which the action is brought, or anywhere else authorized by a federal statute or by the Rules.

> FN7. Rule 4(f) provides:
>
> "All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state."

The "most obvious reference" of this last provision is to Rule 4(e). [FN8] See D. Currie, Federal Courts 373 (3d ed. 1982). The first sentence of the Rule speaks to the ability to serve summons on an out-of-state defendant when a federal statute authorizes such service. The second sentence, as an additional method, authorizes service of summons "under the circumstances" prescribed in a state statute or rule. Thus, under Rule 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction. [FN9]

> FN8. Rule 4(e) provides:

> "Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides ... for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule."

> FN9. This assumes, of course, that the defendant is not "an inhabitant of or found within the state,"Fed.Rule Civ.Proc. 4(e), and has not consented to service.

Omni argues that Wolff and Gourlay are amenable to service under Rule 4(e) because the CEA implicitly "provides for service ... upon a party not an inhabitant of or found within the state." Omni points out that, prior to this Court's recognition in *Curran* of an implied private cause of action, all other civil actions under the CEA explicitly authorized nationwide service of process. See § 6c (in a Commodity Futures Trading Commission (CFTC) action, service authorized "wherever the defendant may be found"), § 6d(4) (in an action *106 by a state attorney general, service authorized "wherever the defendant may be found"), and § 14(d) (in enforcement action by a beneficiary of a CFTC order, service authorized "anywhere in the United States") of the CEA, as amended, 7 U.S.C. §§ 13a-1, 13a-2(4), and 18(d). Omni contends that this broad avenue for service is mandated by the importance of futures trading to the Nation as a whole. Since this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404                                                                                    Page 9

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

Court concluded that a private right of action was intended as a "tool for enforcement," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S., at 393, 102 S.Ct., at 1847, it must be given the same "dignity" as other enforcement provisions. Accordingly, Omni contends, nationwide service of process is also authorized for the implied private cause of action under the CEA.

[4][5] Neither the majority nor the dissent in the Court of Appeals found that the CEA contained an implied provision for nationwide service of process in a private cause of action. We, too, decline to draw that inference. After the *Curran* decision, while the present litigation was still pending in the District Court, Congress enacted the Futures Trading Act of 1982, 96 Stat. 2294. That Act amended the CEA by adding § 22, 96 Stat. 2322, 7 U.S.C. § 25, which authorizes explicitly a private right of action for a violation of the CEA. Section 22, however, is silent as to service of process. This contrasts sharply with the other enforcement provisions of the CEA, on which Omni asks us to rely. We find it significant that Congress expressly provided for nationwide service of process in those sections but did not do so in the new**411 § 22. See *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). It would appear that Congress knows how to authorize nationwide service of process when it wants to provide for it. That Congress failed to do so here argues forcefully that such authorization was not its intention. Cf. *INS v. Hector,* 479 U.S. 85, 88-91, 107 S.Ct. 379, 381-383, 93 L.Ed.2d 326 (1986).

[6] The legislative history also supports the conclusion that Congress did not intend to provide nationwide service of process for private actions under the CEA. The House Report*107 on the Futures Trading Act of 1982 noted: "The availability of-... private rights of action-supplements, but does not substitute, for the regulatory and enforcement program of the CFTC.... The Committee fully expects [it will] not become necessary to rely on private litigants as a policeman of the Commodity Exchange

Act." H.R.Rep. No. 97-565, pt. 1, p. 57 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3871, 3906. Thus, it is unremarkable that Congress enacted broader service provisions for CFTC actions than for private actions.

[7] That the new § 22 of the CEA does not provide nationwide service of process does not end our inquiry, however, because Omni's cause of action accrued prior to the effective date of that section. See § 22(d), 7 U.S.C. § 25(d). Strictly speaking, Omni's argument may be that nationwide service is authorized under the implied cause of action recognized in *Curran.* This argument, however, is equally without force. See *Gravois v. Fairchild,* [1977-1980 Transfer Binder] CCH Comm.Fut.L.Rep. ¶ 20,706, p. 22,875 (ED La.1978) (no nationwide service of process for implied private cause of action under CEA). The decision in *Curran* gave no consideration to service of process. Inasmuch as Congress carefully provided for service section by section in the CEA, we would not automatically graft nationwide service onto the implied private right of action. Indeed, the CEA's authorization for nationwide service section by section contrasts sharply with the service provisions of the securities laws. Each of those Acts uses a single section to provide for service "wherever the defendant may be found" for any action under the entire chapter. See § 22 of the Securities Act of 1933, 48 Stat. 86, as amended, 15 U.S.C. § 77v, and § 27 of the Securities Exchange Act of 1934, 48 Stat. 902, as amended, 15 U.S.C. § 78aa. In any event, now that Congress has enacted a private cause of action without nationwide service, we have a better perspective on Congress' view of the role of a private action within the statute as a whole. We see no reason to take a different position. Accordingly,*108 we conclude that a nationwide service provision for a private action was not implicit in the CEA.

[8][9] Since the CEA does not authorize service of summons on Wolff and Gourlay, we look to the second sentence of Rule 4(e), which points to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691
**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

long-arm statute of the State in which the District Court sits-here, Louisiana. The District Court held that the requirements of the Louisiana long-arm statute, see n. 4, *supra,* were not met in this litigation. It noted that even the provision allowing a court to rely on the effects that the defendant causes within the State was "clearly not applicable" because it "applies only to a defendant who 'regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.' " App. 22-23 (quoting La.Rev.Stat.Ann. § 13:3201(d) (West 1968)). Because the terms of the Louisiana statute were not met, the District Court considered a due process analysis unnecessary. Before us, Omni has not contended that Wolff and Gourlay may be reached under the Louisiana long-arm statute. Indeed, Omni has conceded that they may not. See Tr. of Oral Arg. 4. Thus, neither part of Rule 4(e) authorizes the service of summons on Wolff and Gourlay.

**\*\*412 C**

[10] The dissenters in the Court of Appeals argued that even if authorization to serve process is necessary and cannot be found in Rule 4(e), the federal courts should act to fill the "interstices in the law inadvertently left by legislative enactment" by creating their own rule authorizing service of process in this litigation. See 795 F.2d, at 431-432. We decline to embark on that adventure.

As an initial matter, it is unclear at this time whether it is open to us to fashion a rule authorizing service of process. At common law, a court lacked authority to issue process outside its district, and Congress made this same restriction the general rule when it enacted the Judiciary Act of Sept. 24, 1789, § 11, 1 Stat. 79. See \*109*Robertson v. Railroad Labor Board,* 268 U.S. 619, 622-623, 45 S.Ct. 621, 622-623, 69 L.Ed. 1119 (1925). Thus, specific legislative authorization of extraterritorial service of summons was required for a court to exercise personal jurisdiction over a person outside the district.

Even were we to conclude that the bases for the rule in *Robertson* are no longer valid,[FN10] we would not necessarily have the power to create service-of-process rules. We would have to decide that the provisions of Rules 4(e) and 4(f), in authorizing service in certain circumstances, were not intended to prohibit service in all other circumstances. We would also have to find adequate authority for common-law rulemaking.[FN11] We need not decide these questions, however, since we would not fashion a rule for service in this litigation even if we had the power to do so.

> FN10. The successor to the provision of the first Judiciary Act relating to a district court's ability to serve process was revised in 1948, 62 Stat. 869, at which time the express territorial limitation on serving process was dropped. See 28 U.S.C. §§ 1391, 1401, 1693, 1695. See also note following 28 U.S.C. § 112 (1940 ed.) (tracing history of provision prior to 1948 revision). To the extent that the cases cited in *Robertson* rely on principles of territoriality, their force may have been undercut by the decision in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), where the Court held that "presence [of the defendant] within the territorial jurisdiction of a court" was no longer necessary "to subject a defendant to a judgment *in personam.*" *Id.,* at 316, 66 S.Ct., at 158. We express no view as to continuing validity of *Robertson* 's rationales.

> FN11. See *Petrol Shipping Corp. v. Kingdom of Greece Ministry of Commerce, Purchase Directorate,* 360 F.2d 103, 107-109 (CA2) (discussing court's authority to fashion an ad hoc rule to govern method of service), cert. denied, 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213 (1966).

[11] We would consider it unwise for a court to make its own rule authorizing service of summons.

108 S.Ct. 404                                                                      Page 11

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

It seems likely that Congress has been acting on the assumption that federal courts cannot add to the scope of service of summons Congress has authorized. This Court in the past repeatedly has stated that a legislative grant of authority is necessary. See, *e.g., Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 467-468, 65 S.Ct. 716, 731, 89 L.Ed. 1051 (1945). Indeed, as the dissent in the Court of Appeals conceded, "the weight of authority, both in the cases and in the commentary,"795 F.2d, at 433, considers statutory*110 authorization necessary to a federal court's service of summons. See, *e.g., Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 297 (CA3),cert. denied, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 414-416 (CA9 1977); 2 J. Moore, J. Lucas, H. Fink, & C. Thompson, Moore's Federal Practice ¶ 4.02[3], p. 4-67 (1987); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1075, p. 302 (1969).

The strength of this longstanding assumption, and the network of statutory enactments and judicial decisions tied to it,[FN12] argue strongly against devising common-law**413 service of process provisions at this late date for at least two reasons. First, since Congress concededly has the power to limit service of process, circumspection is called for in going beyond what Congress has authorized. Second, as statutes and rules have always provided the measures for service, courts are inappropriate forums for deciding whether to extend them. Legislative rulemaking better ensures proper consideration of a service rule's ramifications within the pre-existing structure and is more likely to lead to consistent application.[FN13]

> FN12. Presumably acting on this widespread understanding that federal courts may serve process nationwide only when a federal statute authorizes such service, Congress has carefully provided for that kind of service of process when it so desired. See 2 J. Moore, J. Lucas, H. Fink & C. Thompson, Moore's Federal Practice ¶

4.42[2.-1], pp. 4-386 to 4-391 (1987) (listing over 15 statutes).

> FN13. The legislative history of the Futures Trading Act of 1986, 100 Stat. 3556, provides an example why courts should not construct service of process rules ad hoc, even if they have the power to do so. Section 103 of that Act, 100 Stat. 3557, 7 U.S.C. § 15 (1982 ed., Supp. IV), amended the CEA to allow the CFTC to serve subpoenas outside the United States in the manner prescribed by the Federal Rules of Civil Procedure. The Conference Committee, however, expressed concern about the possibility of disrupting the Nation's foreign policy objectives and stated a preference that the new power be exercised with circumspection. See H.Conf.Rep. No. 99-995. pp. 21-22 (1986), U.S.Code Cong. & Admin.News 1986, p. 6005. We also note that with this amendment of the CEA, Congress declined still another opportunity to authorize nationwide service of process for a private action under the CEA.

*111 Nothing about this case impels us to a different conclusion. If we do not create a rule here, the only harm to federal interests is the inability of a private litigant to bring a CEA action in the United States against an alien defendant who is not within the reach of the state long-arm statute. Since the CEA authorizes broader service of process in other enforcement actions, aliens cannot consider themselves immune from the Act's provisions. Also, a British court may be willing to enforce the CEA itself, if Omni brings suit against Wolff and Gourlay there.

We are not blind to the consequences of the inability to serve process on Wolff and Gourlay. A narrowly tailored service of process provision, authorizing service on an alien in a federal-question case when the alien is not amenable to service under the applicable state long-arm statute, might well serve the ends of the CEA and other federal statutes. It is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 S.Ct. 404

484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

**(Cite as: 484 U.S. 97, 108 S.Ct. 404)**

not for the federal courts, however, to create such a rule as a matter of common law. That responsibility, in our view, better rests with those who propose the Federal Rules of Civil Procedure and with Congress.

### IV

In summary, the District Court may not exercise jurisdiction over Wolff and Gourlay without authorization to serve process. That authorization is not found in either the CEA or the Louisiana long-arm statute to which we look under Rule 4(e). We reject the suggestion that we should create a common-law rule authorizing service of process, since we would consider that action unwise, even were it within our power.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

U.S.La.,1987.
Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.
484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415, 56 USLW 4031, 9 Fed.R.Serv.3d 691

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

Mckinney's Consolidated Laws of New York Annotated Currentness
    Civil Practice Law and Rules (Refs & Annos)
        Chapter Eight. Of the Consolidated Laws
            Article 3. Jurisdiction and Service, Appearance and Choice of Court (Refs & Annos)
            → **§ 302. Personal jurisdiction by acts of non-domiciliaries**

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

    1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

    2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

    3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

        (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

        (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

    4. owns, uses or possesses any real property situated within the state.

(b) Personal jurisdiction over non-resident defendant in matrimonial actions or family court proceedings. A court in any matrimonial action or family court proceeding involving a demand for support, alimony, maintenance, distributive awards or special relief in matrimonial actions may exercise personal jurisdiction over the respondent or defendant notwithstanding the fact that he or she no longer is a resident or domiciliary of this state, or over his or her executor or administrator, if the party seeking support is a resident of or domiciled in this state at the time such demand is made, provided that this state was the matrimonial domicile of the parties before their separation, or the defendant abandoned the plaintiff in this state, or the claim for support, alimony, maintenance, distributive awards or special relief in matrimonial actions accrued under the laws of this state or under an agreement executed in this state. The family court may exercise personal jurisdiction over a non-resident respondent to the extent provided in sections one hundred fifty-four and one thousand thirty-six and article five-B of the family court act and article five-A of the domestic relations law.

(c) **Effect of appearance.** Where personal jurisdiction is based solely upon this section, an appearance does not confer such jurisdiction with respect to causes of action not arising from an act enumerated in this section.

(d) Foreign defamation judgment. The courts of this state shall have personal jurisdiction over any person who obtains a judgment in a defamation proceeding outside the United States against any person who is a resident of New York or is a person or entity amenable to jurisdiction in New York who has assets in New York or may have to take actions in New York to comply with the judgment, for the purposes of rendering declaratory relief with respect to that person's liability for the judgment, and/or for the purpose of determining whether said judgment should be deemed non-recognizable pursuant to section fifty-three hundred four of this chapter, to the fullest extent permitted

Westlaw.

by the United States constitution, provided:

1. the publication at issue was published in New York, and

2. that resident or person amenable to jurisdiction in New York (i) has assets in New York which might be used to satisfy the foreign defamation judgment, or (ii) may have to take actions in New York to comply with the foreign defamation judgment. The provisions of this subdivision shall apply to persons who obtained judgments in defamation proceedings outside the United States prior to and/or after the effective date of this subdivision.

CREDIT(S)

(L.1962, c. 308; amended L.1966, c. 590, § 1; L.1974, c. 859, § 1; L.1979, c. 252, §§ 1, 2; L.1980, c. 281, § 22; L.1982, c. 505, § 1; L.1991, c. 69, § 7; L.1995, c. 441, § 2; L.2006, c. 184, § 5, eff. July 26, 2006; L.2008, c. 66, § 3, eff. April 28, 2008.)

1  Alison V. Lippa, No. 160807
   Alan P. Jacobus, No. 206954
2  Vance A. Woodward, No. 231730
   **CARROLL, BURDICK & McDONOUGH** LLP
3  Attorneys at Law
   44 Montgomery Street, Suite 400
4  San Francisco, CA  94104
   Telephone:    415.989.5900
5  Facsimile:    415.989.0932
   Email:    alippa@cbmlaw.com
6            ajacobus@cbmlaw.com
             vwoodward@cbmlaw.com
7  Attorneys for Defendant The Continental Insurance Company

8  Deborah A. Aiwasian, No. 125490
   **BERMAN  AIWASIAN**
9  725 South Figueroa Street, Suite 1050
   Los Angeles, CA  90017
10 Telephone:    213.833.3200
   Facsimile:    213.833.3230
11 Email:    deborah.aiwasian@mclolaw.com
   Attorneys for Defendant Century Indemnity Company

12
               SUPERIOR COURT OF THE STATE OF CALIFORNIA
13
                        COUNTY OF LOS ANGELES
14

15
16 CYPRUS AMAX MINERALS            No. BC 391068
   COMPANY, et al.,
17                                 **NON-CALIFORNIA AUTHORITIES**
              Plaintiffs,          **SUPPORTING THE CONTINENTAL**
18                                 **INSURANCE COMPANY'S AND CENTURY**
         versus                    **INDEMNITY COMPANY'S JOINT MOTION**
19                                 **TO DISMISS OR STAY THE ACTION BASED**
   CONTINENTAL CASUALTY            **ON *FORUM NON CONVENIENS***
20 COMPANY, et al.,
                                   Hearing Date:   August 27, 2008
21            Defendants.          Hearing Time:   8:30 a.m.
                                   Dept.:          68
22                                 Room:           617
                                   Judge:          Hon. Judge Mooney
23
                                   Complaint Filed: May 20, 2008
24

25         Attached hereto are the non-California authorities cited in the Memorandum of

26 Points and Authorities in Support The Continental Insurance Company's and Century

27 Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non*

28 *Conveniens*:

CBM-IPG\SF408425.1

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 19 2008

John A. Clarke, Executive Officer/Clerk

By_____, Deputy
A.E. LaFLEUR-CLAYTON

COPY

| Authority | Exhibit |
|-----------|---------|
| *Amax, Inc. v. Sohio Indus. Prods. Co.*, 121 Misc. 2d 814, 469 N.Y.S.2d 282 (Supreme Ct., New York County 1983) | 1 |
| *Certain Underwriters at Lloyd's London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 26-27, 822 N.Y.S.2d 30, 37 (2006), *aff'd* 9 N.Y.3d 928, 876 N.E.2d 500, 844 N.Y.S.2d 773 (2007) | 2 |
| *Cyprus Amax Minerals Co. v. Asarco Inc.*, 2003 WL 22118989 (S.D.N.Y. Sept. 11, 2003) | 3 |
| *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 301 (S.D.N.Y. 2006) | 4 |
| *In re Phelps Dodge Indus., Inc.*, 131 A.D.2d 675, 516 N.Y.S.2d 754 (2 Dep't 1987) | 5 |
| *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, 319 F. Supp. 2d 352, 358-367 (S.D.N.Y. 2004) | 6 |
| *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105, 108 S. Ct. 404, 410, 98 L. Ed. 2d 415 (1987) | 7 |
| N.Y. C.P.L.R. § 302 (a) (1) | 8 |

Dated:  June 19, 2008

CARROLL, BURDICK & McDONOUGH LLP          BERMAN  AIWASIAN

By _____            By _____
    Alison V. Lippa                          Deborah A. Aiwasian
    Alan P. Jacobus                         Attorneys for Defendant
    Vance A. Woodward                      Century Indemnity Company
  Attorneys for Defendant
  The Continental Insurance Company

# EXHIBIT 1

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

CBM-IPG\SF408521.1

Westlaw.

121 Misc.2d 814, 469 N.Y.S.2d 282
**(Cite as: 121 Misc.2d 814, 469 N.Y.S.2d 282)**

▷

Amax, Inc. v. Sohio Indus. Products Co.
N.Y.Sup.,1983.

Supreme Court, New York County, New York,
Special Term, Part I.
AMAX, INC., Plaintiff,
v.
SOHIO INDUSTRIAL PRODUCTS COMPANY,
Defendant.
Oct. 4, 1983.

Purchaser of property brought action against previous owner to recover damages for radioactive contamination resulting from previous owner's manufacturing operation. On defendant's motion to dismiss, the Supreme Court, Special Term, New York County, Part I, Richard W. Wallach, J., held that the nuisance was continuous in sense that it gave rise to successive causes of action that continuously accrued throughout period that the property remained contaminated and, thus, the suit was not untimely.

Motion denied.

West Headnotes

**[1] Limitation of Actions 241 🗝55(6)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k55 Torts
            241k55(6) k. Continuing Injury in General. Most Cited Cases
For purposes of statute of limitations governing nuisance actions, injuries to property need not be intermittent or episodic in order for there to be successive causes of action continuously accruing throughout the period that harm is suffered and damages sustained, that is, period during which the wrongful act has consequences adverse to use and enjoyment of the property.

**[2] Limitation of Actions 241 🗝55(6)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k55 Torts
            241k55(6) k. Continuing Injury in General. Most Cited Cases
A structure encroaching upon easements of light, air and access, though not actively maintained by defendant during period that damages are sustained, is regarded as a continuing trespass giving rise to successive causes of action barred only by expiration of such time as would create an easement by prescription or change of title by operation of law.

**[3] Trespass 386 🗝51**

386 Trespass
   386II Actions
      386II(D) Damages
         386k51 k. Continuing Trespass to Real Property. Most Cited Cases
Damages recoverable for a continuing trespass are for past injury to the freehold and possession, that is, pecuniary loss sustained by plaintiff in use and enjoyment of his property up to time suit was commenced.

**[4] Nuisance 279 🗝50(5)**

279 Nuisance
   279I Private Nuisances
      279I(D) Actions for Damages
         279k50 Damages
            279k50(5) k. Mitigation and Reduction of Loss. Most Cited Cases
Abatement of a continuous nuisance does not affect right to recover damages for its past existence, although damages are limited to those sustained during three years prior to commencement of suit.

**[5] Nuisance 279 🗝50(1)**

121 Misc.2d 814                                                                                                    Page 2
121 Misc.2d 814, 469 N.Y.S.2d 282
**(Cite as: 121 Misc.2d 814, 469 N.Y.S.2d 282)**

279 Nuisance
   279I Private Nuisances
      279I(D) Actions for Damages
         279k50 Damages
            279k50(1) k. Elements and Measure of
Damages in General. Most Cited Cases
Owner of real property affected by a nuisance cannot recover damages based upon assumption that an injury to his property will be permanent or unabatable, i.e., he cannot obtain a single recovery including prospective as well as past damages unless the injury is incapable of actual, physical repair.

**[6] Trespass 386 &#x21A4;47**

386 Trespass
   386II Actions
      386II(D) Damages
         386k47 k. Grounds and Elements of Compensatory Damages in General. Most Cited Cases
Injuries to land are held to be incapable of repair and thus permanent in nature for which prospective damages can be recovered when things attached to the land, such as timber, trees, soil and buildings, are removed or destroyed.

**[7] Limitation of Actions 241 &#x21A4;55(5)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k55 Torts
            241k55(5) k. Injuries to Property in General. Most Cited Cases
Permanent injuries incapable of repair arising when things attached to the land are removed or destroyed are actionable at time of initial encroachment and give rise to but a single cause of action.

**[8] Limitation of Actions 241 &#x21A4;55(6)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense

         241k55 Torts
            241k55(6) k. Continuing Injury in General. Most Cited Cases
Injury to property caused by radioactive contamination which resulted from prior owner's manufacturing operations gave rise to successive causes of action that continuously accrued throughout period that the property remained contaminated and, thus, nuisance action brought 18 years after the property was sold but within one year after prior owner completed cleanup and eliminated the nuisance was not untimely.

**\*\*283 \*814** Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff.
Squire, Sanders & Dempsey, Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant.
RICHARD W. WALLACH, Justice:
This is a motion by defendant for an order dismissing that portion of the action as time-barred which seeks money damages for nuisance. The basic issue here involves application of the statute of limitations to a claim arising from radioactive contamination of land and improvements.

For determination of this motion plaintiff may be considered as the owner of real property and defendant as the immediate prior owner. An ore processing plant for **\*\*284** the production of nuclear grade zirconium metals was operated on the property during defendant's ownership. Defendant stored the radioactive residues resulting from the operation in drums, or buried the waste in a waste dump located on the property. These storage and disposal techniques caused the property to become contaminated with radiation. Thereafter plaintiff became legally obligated to decontaminate or clean up the property. The action seeks to recover the clean-up costs incurred, plaintiff contending that the storage and disposal techniques used by defendant violated a legal duty owed not only to plaintiff but also to the public, either absolute or measured by a standard of **\*815** reasonable care, not to cause the property to become contaminated with radi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 Misc.2d 814                                                                                                              Page 3
121 Misc.2d 814, 469 N.Y.S.2d 282
**(Cite as: 121 Misc.2d 814, 469 N.Y.S.2d 282)**

ation.

The storage and disposal techniques complained of
were in effect from 1961 to 1964; defendant sold
the property in 1965; the contamination was dis-
covered in 1978; plaintiff acknowledged legal re-
sponsibility for cleaning up the property some time
prior to 1980; "radioactive contamination stabiliza-
tion" was completed in late 1982; and suit was
commenced in 1983.

Defendant urges dismissal of the action because it
was not commenced within three years from the
date in 1965 when defendant sold the property and
thereafter could not possibly have had any connec-
tion with whatever activity it was that caused the
contamination. In opposition, plaintiff argues that
the three-year period should be measured from
1982, when the clean-up was completed and the
"nuisance" eliminated.

At issue is whether the injury sustained, the radio-
active contamination, should be regarded as per-
manent, in the sense that it gave rise to but a single
cause of action that accrued when defendant under-
took to store and dispose of the radioactive
residues, or continuous, in the sense that it gave rise
to successive causes of action that continuously ac-
crued throughout the period that the property re-
mained contaminated (see, *509 Sixth Avenue Corp.
v. New York City Transit Authority*, 15 N.Y.2d 48,
255 N.Y.S.2d 89, 203 N.E.2d 486).

[1][2][3][4] Injuries to property need not be inter-
mittent or episodic (e.g., *Meruk v. The City of New
York*, 223 N.Y. 271, 119 N.E. 571; *Reed v. The
State of New York*, 108 N.Y. 407, 15 N.E. 735) in
order for there to be successive causes of action
continuously accruing throughout the period that
harm is suffered and damages sustained-that is, the
period during which the wrongful act has con-
sequences adverse to the use and enjoyment of the
property. Injuries can also be fluid and constant
through time, recurring not from time to time, but,
in theory, second-by-second, as, for example, when
a structure such as an elevated street railroad en-

croaches upon easements of light, air and access
(e.g., *Galway v. M.E.R. Co.*, 128 N.Y. 132, 28 N.E.
479; *Pappenheim v. M.E.R. Co.*, 128 N.Y. 436, 28
N.E. 518). A structure so encroaching, though not
actively maintained by the defendant during the
period that damages *816 are sustained, is regarded
as a continuous trespass giving rise to successive
causes of action barred only by the expiration of
such time as would create an easement by prescrip-
tion or change of title by operation of law (*509
Sixth Ave. Corp.*, supra). The damages recoverable
are for the past injury to the freehold and posses-
sion; that is, the pecuniary loss sustained by the
plaintiff in the use and enjoyment of his property
up to the time suit was commenced (*Uline v. N.Y.C.
& H.R.R.R. Co.*, 101 N.Y. 98, 116,4 N.E. 536). In
such a case, it may not be to the injured party's ad-
vantage to bring successive actions often and
promptly; he may prefer to delay the action until
his damages are large and immediate (*Galway*,
supra, 128 N.Y. at 147, 28 N.E. 479). The abate-
ment of the nuisance does not affect the right to re-
cover damages for its past existence (42 NY Jur.,
Nuisances, § 58), although damages are limited to
such as were sustained within three years prior to
the commencement of suit (36 NY Jur., Limitations
and Laches, § 88).

[5][6][7] Defendant would not analogize the con-
tamination to an encroaching structure;**285 no
doubt, if analogy there must be, it would urge that
the contamination is like the disease contracted as a
result of an act of medical malpractice which mani-
fests itself only after a long interval of time (e.g.,
*Schmidt v. The Merchants Despatch Transportation
Company*, 270 N.Y. 287, 200 N.E. 824; *Schwartz v.
Heyden Newport Chemical Corporation*, 12 N.Y.2d
212, 237 N.Y.S.2d 714, 188 N.E.2d 142; *Thornton
v. Roosevelt Hospital*, 47 N.Y.2d 780, 417
N.Y.S.2d 920, 391 N.E.2d 1002), the act of mal-
practice being analogous to the storage and disposal
techniques used by defendant in producing the nuc-
lear materials. Such an argument, however, over-
looks that the owner of real property cannot recover
damages based upon the assumption that an injury

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to his property will be permanent or "unabatable", i.e., he cannot obtain a single recovery including prospective as well as past damages (see, *Boomer v. Atlantic Cement Co., Inc.,* 26 N.Y.2d 219, 226, 309 N.Y.S.2d 312, 257 N.E.2d 870), unless the injury is incapable of actual, physical repair (*Dietzel v. City of New York,* 218 N.Y. 270, 112 N.E. 720). Injuries to land are held to be incapable of repair and thus permanent in nature when things attached to the land, such as timber, trees, soil and buildings, are removed or destroyed (see, *Dietzel,*supra, at 272, 112 N.E. 720; **\*817***Hartshorn v. Chaddock,* 135 N.Y. 116, 31 N.E. 997; 13 NY Jur., Damages, §§ 87-88). Such injuries, like the one here, are actionable at the time of the initial encroachment, but unlike the one here, give rise to but a single cause of action (*509 Sixth Avenue Corp.,* supra, 15 N.Y.2d at 52, 255 N.Y.S.2d 89, 203 N.E.2d 486).

Thus, in *509 Sixth Avenue Corp., supra,* excavation work undertaken by plaintiff in 1960 for the purpose of constructing a building was hindered by an underground "encroachment" allegedly belonging to defendant and erected in 1939. Rejecting an argument by plaintiff that its lack of knowledge prevented the cause of action from accruing in 1939, the court nevertheless held the action timely on the ground that the encroachment in question should be classified as a continuous trespass. The court stated: "In New York, we have consistently characterized an unlawful encroachment as a continuous trespass giving rise to successive causes of action".

[8] Accordingly, the motion is denied. Within ten days after service of a copy of this order with notice of entry, plaintiff shall serve an amended complaint repleading its second cause of action for "negligence", its third cause of action for "strict liability" and its fourth cause of action for "nuisance" as a second cause of action for a nuisance based on negligence and a third cause of action for a nuisance based on liability for abnormally dangerous conditions or activities (see, *Copart Industries, Inc. v. Consolidated Edison Co. of New York,* 41 N.Y.2d 564, 569, 394 N.Y.S.2d 169, 362

N.E.2d 968; *Schmidt v. Merchants Despatch Trans. Co.,* supra, 270 N.Y. at 299, 200 N.E. 824).

N.Y.Sup.,1983.
Amax, Inc. v. Sohio Indus. Products Co.
121 Misc.2d 814, 469 N.Y.S.2d 282

END OF DOCUMENT

# EXHIBIT 2

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

Westlaw.

36 A.D.3d 17                                                    Page 1
36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

**H**

**\*\*1** Certain Underwriters at Lloyd's, London, et al.,
Plaintiffs

v

Foster Wheeler Corporation, Appellant, and Affili-
ated FM Insurance Company et
al., Respondents, et al., Defendants, et al., Nominal
Defendants.

Supreme Court, Appellate Division, First Depart-
ment, New York

September 28, 2006

CITE TITLE AS: Certain Underwriters at Lloyd's,
London v Foster Wheeler Corp.

## SUMMARY

Appeal from an order of the Supreme Court, New
York County (Barbara R. Kapnick, J.), entered
January 10, 2005. The order denied defendant-ap-
pellant's motion for partial summary judgment de-
claring that New Jersey substantive law governed
all disputed issues in this action, and granted the
motions by defendants-respondents for partial sum-
mary judgment declaring that New York substant-
ive law governed all disputed issues in this action.

## HEADNOTE

Conflict of Laws
Law Governing Contract Actions
    Liability Insurance--Law Governing Policies
Covering Multistate Risks

In a declaratory judgment action by insurers seek-
ing an apportionment of responsibility for the de-
fense and indemnity costs of nationwide asbestos-re-
lated personal injury claims against defendant man-
ufacturer under policies issued to defendant
between 1970 to 1981 while defendant's principal
place of business was in New Jersey, New Jersey
substantive law, rather than New York law, was ap-
plicable, under a grouping of contacts analysis, to
determine the coverage obligation of each nonset-
tling insurer in the absence of any choice-of-law

provisions in the relevant policies. Application of
New Jersey law was warranted under the circum-
stances even if New York constituted the place of
contracting, negotiation, and the insured's perform-
ance. In determining the law governing liability in-
surance policies covering multistate risks, the state
of the insured's principal place of business, the in-
sured's domicile, is the primary factor and should
be regarded as a proxy for the principal location of
the insured risk, which is ordinarily the controlling
factor in determining the law applicable to a liabil-
ity insurance policy. The state of the insured's prin-
cipal place of business has a greater concern with
issues of policy construction and application bear-
ing on the amount of coverage than do states where
contracting, negotiation, or payment of the premi-
um happened to occur. Furthermore, the law gov-
erning the settled policies was irrelevant to the
choice-of-law determination regarding the nonset-
tling insurers' liability.

### RESEARCH REFERENCES

Am Jur 2d, Conflict of Laws §§ 84, 86-88, 94, 106,
107; Am Jur 2d, Declaratory Judgments §§ 14, 15;
Am Jur 2d, Insurance §§ 1761, 1764.

**\*18** Couch on Insurance (3d ed) §§ 24:17, 217:3,
220:32, 220:39.

NY Jur 2d, Conflict of Laws §§ 32, 37-39; NY Jur
2d, Declaratory Judgments and Agreed Case § 81;
NY Jur 2d, Insurance §§ 804, 811-813, 2160, 2162.

### ANNOTATION REFERENCE

See ALR Index under Conflict of Laws; Declarat-
ory Judgments or Relief; Insurance and Insurance
Companies.

### FIND SIMILAR CASES ON WESTLAW

Database: NY-ORCS

Query: conflict-of-law /p allocat! /s insurance

### APPEARANCES OF COUNSEL

*Covington & Burling*, Washington, DC (*Robert A.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17

Page 2

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

*Long, Jr.*, of the District of Columbia bar, admitted pro hac vice, and *William P. Skinner* and *Keith A. Noreika* of counsel), and *Covington & Burling*, New York City (*Michael C. Nicholson* of counsel), for appellant.

*Crowell & Moring LLP*, Washington, DC (*Clifton S. Elgarten, Kathryn A. Underhill, Jonathan H. Pittman* and *Amy B. Newman* of counsel), and *Levin & Glasser, P.C.*, New York City (*Paul G. Burns* of counsel), for Century Indemnity Company, respondent.

*Cozen O'Connor*, New York City (*James B. Dolan, Jr., Thomas G. Wilkinson, Jr.*, and *Melissa F. Brill* of counsel), for AIU Insurance Company, and others, respondents.

*Riker, Danzig, Scherer, Hyland & Perretti LLP*, New York City (*David A. Niles* and *Brian E. O'Donnell* of counsel), for Mitsui Sumitomo Insurance Company, Ltd., and others, respondents.

*Bates & Carey LLP*, Chicago, Illinois (*Krista C. Sorvino* and *Maria G. Enriquez* of counsel), for American Re-Insurance Company and another, respondents.

*Coughlin Duffy, LLP*, Morristown, New Jersey (*Adam M. Smith* of counsel), for Zurich American Insurance Company, respondent.

OPINION OF THE COURT

Friedman, J.P.

The question presented is whether New York law or New York Jersey law governs a large number of excess liability insurance *19 policies, under which the insured seeks coverage for a portion of the costs of defending and paying asbestos-related personal injury claims that have been asserted against it since the 1970s. For the reasons discussed below, we conclude that New Jersey law applies.

This declaratory judgment action seeks an apportionment of responsibility for the defense and indemnity costs of hundreds of thousands of asbestos-

related personal injury claims (the asbestos claims) among defendant Foster Wheeler Corporation (FW Corp.), its subsidiary, Foster **2 Wheeler Energy Corp. (FW Energy), and their liability insurers. The asbestos claims, which have been asserted in jurisdictions throughout the United States since the 1970s, are based on allegations that the claimants or their decedents were exposed to asbestos contained in boilers and other steam-generating equipment designed and built for industrial customers by FW Corp. (from the early twentieth century until 1973) or by FW Energy (since 1973, when FW Energy took over FW Corp.'s commercial operations). FW Corp. was incorporated under New York law from 1900 until 2001, when it was merged into another entity in a corporate restructuring. FW Energy, which is now a subsidiary of FW Corp.'s successor-by-merger, has been incorporated under Delaware law at all times since its formation in 1973. We use the term "Foster Wheeler" to refer to FW Corp. and FW Energy collectively.

From its founding in 1900 until 1962, Foster Wheeler's principal place of business was located in New York City. From 1962 to the present, Foster Wheeler's principal place of business has been in New Jersey. After the 1962 move to New Jersey, Foster Wheeler continued to maintain a small office in New York City, where only one employee was assigned on a full-time basis. It is undisputed that, at all relevant times, Foster Wheeler's operations relating to the design and building of asbestos-containing products were conducted throughout the United States, and that its customers purchasing such products were similarly widespread.

Before the order appealed from was rendered, Foster Wheeler reached settlements with all of its insurers except for defendants-respondents (the nonsettling insurers). From 1970 to 1981, the nonsettling insurers sold Foster Wheeler certain excess liability policies (the unsettled policies) that covered various periods between February 1, 1970 and October 1, 1982. Thus, all of the unsettled policies were issued while Foster Wheeler's prin-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17                                                                    Page 3
36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

cipal place of business was in New Jersey. The **20** nonsettling insurers (of which there are about 30) had their principal places of business in various states at the times their policies were issued; five were domiciled in New York, three in New Jersey. It is undisputed that almost all of the nonsettling insurers are licensed to do business in both New York and New Jersey.

The parties agree that the underlying asbestos claims are based on injuries that are deemed, for purposes of insurance coverage, to have been suffered continuously over extended periods of time. This makes it necessary to allocate each injury "horizontally" over the period of its occurrence in order to determine the coverage obligation of each nonsettling insurer. The conflict-of-laws issue in this case arises from the circumstance (on which the parties agree, as more fully discussed below) that New York and New Jersey prescribe different mathematical methods of performing such an allocation. The matter is further complicated by the need, once an allocation is made to each year (whichever method is used), to allocate the loss for that particular year "vertically" among the various layers of insurance purchased for that year, with primary policies paying first within each year. Thus, as the nonsettling insurers point out, "the way in which liabilities are allocated to policies in the primary layers will determine when those primary policies are exhausted, and thus when excess layer policies [such as the unsettled policies] are reached, if at all."

Since there is no suggestion that methods of allocating a loss "horizontally" over time can be derived from the terms of the relevant policies, such an allocation method must be supplied by **3** the applicable state law. As the relevant policies do not contain choice-of-law provisions, we are required to make that determination in accordance with our state's established choice-of-law principles.

As previously indicated, the parties agree (and we accept for purposes of this appeal) that New York and New Jersey (the only states suggested as the

source of applicable law on the allocation issue) each uses a different mathematical method of effecting a pro rata allocation of an insured loss over the period of its occurrence. The " 'time-on-the-risk' method" that was approved by the New York Court of Appeals in *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.* (98 NY2d 208, 225 [2002]) derives the portion of the total loss allocable to the term of a given policy "by multiplying the [total loss] by a fraction that has as its denominator the entire number of years of the **21** claimant's injury, and as its numerator the number of years within that period when the policy was in effect" (*Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.*, 73 F3d 1178, 1202 [2d Cir 1995]). [FN1] The New Jersey Supreme Court, on the other hand, has adopted the method of "proration on the basis of policy limits, multiplied by years of coverage" (*Owens-Illinois, Inc. v United Ins. Co.*, 138 NJ 437, 475, 650 A2d 974, 993 [1994]). Under the New Jersey method (which has been referred to as "time-plus-limits"), the proportion of the total loss allocable to the term of a given policy is the ratio of the total coverage purchased (or risk retained) during the term of that policy to the total coverage purchased (or risk retained) during the entire period of the injury's occurrence (excluding any time during which insurance for the risk was unavailable) (see *Carter-Wallace, Inc. v Admiral Ins. Co.*, 154 NJ 312, 322- 323, 712 A2d 1116, 1122 [1998] [illustrating how the method operates]). It is undisputed that the time-plus-limits method, by "intentionally assign[ing] a greater portion of indemnity costs to years in which greater amounts of insurance were purchased" (154 NJ at 326, 712 A2d at 1123 [internal quotation marks and citation omitted]), would make tens of millions of dollars more coverage available to Foster Wheeler than would the time-on-the-risk method.

In the proceedings before the motion court, Foster Wheeler moved for partial summary judgment declaring all disputed issues to be governed by New Jersey law, while the nonsettling insurers moved for partial summary judgment declaring New York law to govern. In the order appealed from, the mo-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

tion court ruled that New York law applies. We now reverse and hold that New Jersey law applies.

Under New York's "center of gravity" or "grouping of contacts" approach to choice-of-law questions in contract cases, we are required to apply the law of the state with the "most significant relationship to the transaction and the parties" (*Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 317 [1994], quoting Restatement [Second] of Conflict of Laws [hereinafter, Restatement] § 188 [1]). This approach generally dictates that a contract of liability **4 insurance be governed by the law of "the *22 state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties" (*id.* at 318, quoting Restatement § 193). However, the location-of-the-risk rule obviously cannot be applied without modification in the event the insurance policies in question cover risks that are spread though multiple states. Such is the case here, where the risks covered by the unsettled policies are nationwide or global in scope, and, given Foster Wheeler's widely dispersed operations and customers, there is no contention that, at the time the unsettled policies were issued, the parties would have understood any one state to have constituted, in a literal sense, "the principal location of the insured risk." Accordingly, we turn to broader choice-of-law principles for guidance.

In adopting the "grouping of contacts" theory to resolve choice-of-law issues in contract cases, the Court of Appeals noted that the merit of this approach "is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation" (*Auten v Auten*, 308 NY 155, 161 [1954] [internal quotation marks, brackets and citation omitted]). Thus, although contract cases do not call for use of the pure "interest analysis" employed in tort cases (*see Zurich*, 84

NY2d at 319), the respective "governmental interests" of the competing jurisdictions nonetheless "should be considered" (*Zurich*, 84 NY2d at 319, quoting *Matter of Allstate Ins. Co. [Stolarz--New Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 226 [1993]).

The governmental interests implicated by an insured's claim against an insurer of risks located in multiple states are those in: (1) regulating conduct with respect to insured risks within the state's borders; (2) assuring that the state's domiciliaries are fairly treated by their insurers; (3) assuring that insurance is available to the state's domiciliaries from companies located both within and without the state; and (4) regulating the conduct of insurance companies doing business within the state's borders (*see Fireman's Fund Ins. Co., Inc. v Schuster Films, Inc.*, 811 F Supp 978, 984 [SD NY 1993] [applying New York choice-of-law principles]). In the case of a corporate insured seeking coverage under a policy covering risks in multiple states, the foregoing interests, in aggregate, weigh in favor of applying *23 the law of the insured's domicile, notwithstanding that certain other states (e.g., the states of the insurer's domicile, and where negotiation and contracting occurred) may share, to a lesser extent, in the fourth interest enumerated above (*see id.* at 984-985). [FN2]**5

Additional goals of choice-of-law analysis are "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied" (Restatement § 6 [2] [f], [g]; *see Zurich*, 84 NY2d at 318 n 5 ["Section 6 of (the) Restatement . . . embodies the general choice of law principles"]). These goals, too, will be furthered by applying the law of the insured's domicile to liability insurance policies covering multistate risks. The state of the insured's domicile is a fact known to the parties at the time of contracting, and (in the absence of a contractual choice-of-law provision) application of the law of that state is most likely to conform to their expectations. As a Rhode Island federal court addressing a similar choice-of-law issue has observed, "common sense suggests that,

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

knowing of the potential for claims in any number of states and even in foreign countries, the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together" (*CPC Intl., Inc. v Northbrook Excess & Surplus Ins. Co.*, 739 F Supp 710, 715 [D RI 1990], *reconsideration granted on other grounds* 839 F Supp 124 [D RI 1993], *affd* 46 F3d 1211 [1st Cir 1995]; *accord Liggett Group Inc. v Affiliated FM Ins. Co.*, 788 A2d 134, 138 [Del Super 2001]). Moreover, the state of the insured's domicile can be ascertained in any subsequent litigation without fact-intensive inquiry or unguided weighing of different contacts, and making the insured's domicile the primary factor in selecting applicable law minimizes the likelihood that contemporaneous policies will be deemed governed by the laws of different states. Thus, in addition to rendering the resolution of choice-of-law issues less difficult, adoption of a rule to apply the law of the insured's domicile *24 makes it more likely that consistent and uniform results will be reached in different cases.

What emerges from the foregoing is that, where it is necessary to determine the law governing a liability insurance policy covering risks in multiple states, the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk. As such, the state of domicile is the source of applicable law. This conclusion accords with prior decisions of this Court and of the Third Department. Most recently, in *Steadfast Ins. Co. v Sentinel Real Estate Corp.* (283 AD2d 44 [2001]), this Court held that, where the policy in question covered the risks arising from "the nationwide scope of [the insured's] operations, the principal location of the insured risk should be deemed to be the state where [the insured] is incorporated and has its principal place of business" (*id.* at 50), i.e, the insured's domicile. [FN3] Similarly, in **6*Munzer v St. Paul Fire & Mar. Ins. Co.* (203 AD2d 770 [1994]), the Third Department held that the "primary factor" in ascertaining the law governing a liability policy covering risks in multiple states was that the insured was "a Vermont based business"

. at 772), notwithstanding that, among other things, the policy had been procured by a New York broker from the insurer's New York office (*id.* at 771). [FN4] Finally, in *Regional Import & Export Trucking Co. v North Riv. Ins. Co.* (149 AD2d 361 [1989]), this Court held that "a policy delivered to a New Jersey corporation to insure against a loss occurring 'anywhere' should be subject to the law of that State" (*id.* at 362).

The foregoing establishes that, "where the insured risk is scattered throughout multiple states, courts still deem the risk to be located principally in one state" (*Maryland Cas. Co. v Continental Cas. Co.*, 332 F3d 145, 153 [2d Cir 2003] [following *Steadfast*]), namely, in the state of the insured's domicile at the time the policy was issued. It remains for us to discuss whether *25 a corporate insured's domicile is the state of its principal place of business or the state of its incorporation, where, as here, these are not the same state. [FN5] In the case of such a divergence, the state of the principal place of business takes precedence over the state of incorporation, a point that the nonsettling insurers apparently do not dispute (*see Munzer*, 203 AD2d at 771, 772 [applying the law of Vermont, the state of the insured's principal place of business, rather than the law of New York, the state of incorporation]). Treating the state of the principal place of business as the corporate domicile for these purposes, rather than the state of incorporation, is consistent with the view expressed in the Restatement that, "[a]t least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation" (Restatement § 188, Comment *e*, at 581). We look to the state of incorporation for the law governing the corporation's internal corporate governance and its relations with shareholders, not for the law governing the corporation's contractual relationships in general.

Significantly, our conclusion that New Jersey law applies to the unsettled policies finds **7 further support in the fact that Foster Wheeler, as an in-

36 A.D.3d 17                                                                 Page 6
36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

sured with a New Jersey principal place of business, will look to the New Jersey insurance guaranty fund for payment of its claims against insolvent insurers (see NJ Stat Ann § 17:30A-5; see also *American Employers' Ins. Co. v Elf Atochem N. Am., Inc.*, 157 NJ 580, 591, 725 A2d 1093, 1099 [1999]; *Eastern Seaboard Pile Driving Corp. v New Jersey Prop.-Liab. Ins. Guar. Assn.*, 175 NJ Super 589, 594, 421 A2d 597, 600 [App Div 1980]). New Jersey's provision of such protection to Foster Wheeler, based on Foster Wheeler's maintenance of its principal place of business in that state, confirms that New Jersey now has, and had at the time the unsettled policies were issued, the greatest interest in the determination of the amount of coverage available to Foster Wheeler.

We recognize that, in contract cases generally, the resolution of a choice-of-law issue involves consideration of five factors enumerated in section 188 of the Restatement (the Restatement factors), viz., the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and *26 the contracting parties' domiciles (see *Zurich*, 84 NY2d at 317, citing Restatement § 188 [2]). In arguing for the application of New York law, the nonsettling insurers rely heavily on the first three of these factors, emphasizing the role New York City insurance brokerage firms (specifically, Marsh & McLennan and Johnson & Higgins) played in procuring the unsettled policies. In this regard, the nonsettling insurers point to evidence that, among other things: (1) the unsettled policies were generally negotiated and "bound" by these brokers in New York City; (2) many of the unsettled policies were countersigned by the insurers' agents in New York; (3) the insurers generally delivered the policies to the brokers' New York offices; (4) premium invoices were sent by the insurers to, and premium checks remitted to the insurers from, the brokers' offices; and (5) most of Foster Wheeler's premium checks were drawn on a bank account it maintained in New York City. Based on this evidence, the nonsettling insurers argue that New York was the place where the un-

settled policies were contracted, negotiated and performed. [FN6]

Foster Wheeler, for its part, argues that New Jersey was the place of contracting, negotiation and performance for each of the unsettled policies. To this end, Foster Wheeler highlights evidence that, among other things: (1) each of the unsettled policies was either mailed or hand-delivered to Foster Wheeler in New Jersey; (2) Foster Wheeler's internal activities related to obtaining the policies (e.g., setting specifications, preparing applications, giving brokers authority to act, writing premium checks) were performed in New Jersey; (3) the brokers frequently met with Foster Wheeler in New Jersey; and (4) Foster Wheeler received premium **8 invoices in New Jersey. [FN7]

As previously discussed, in cases involving liability insurance covering multistate risks, we regard the state of the insured's *27 domicile to be a proxy for the principal location of the insured risk, which, under New York law and Restatement § 193, is the controlling factor in determining the law applicable to a liability insurance policy, thereby obviating the need to consider all five Restatement factors. Even if consideration of all five Restatement factors were required, however, we still would conclude that New Jersey law should be applied. Further, we would reach the same conclusion even if, as the nonsettling insurers argue, New York constituted the place of contracting, negotiation, and the insured's performance. This is because the Restatement factors "are to be evaluated according to their relative importance with respect to the particular issue" (Restatement § 188 [2]). Stated otherwise, the choice-of-law analysis is not "a mindless scavenger hunt to see which state can be found to have more contacts, but rather . . . an effort to detect and analyze what interest the competing states have in enforcing their respective rules" (*Fireman's Fund*, 811 F Supp at 984). In the case of a liability insurance policy covering risks in multiple states, the state of the insured's principal place of business has a greater concern with issues of policy construction

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

and application bearing on the amount of available coverage than do the states where contracting, negotiation, or payment of the premium happened to occur.

In this case, the nonsettling insurers' argument that the first three Restatement factors point to New York (which the motion court essentially adopted) is based largely on the fact that the unsettled policies were procured by New York-based insurance brokers. As a result of the brokers' involvement, certain of the relevant activities (negotiations, policy delivery, premium collection) occurred in New York. We agree with Foster Wheeler that the nonsettling insurers' approach places too much weight on the location of the broker, who, after all, is not a party to the insurance contract (*see Munzer*, 203 AD2d at 771 [applying the law of Vermont, the state of the policyholder's principal place of business, although the "policies were procured through a New York insurance broker from (the insurer's) New York office"]; *Regional Import & Export*, 149 AD2d at 362 ["(t)he mere fact that the policy was placed through a New York insurance broker which negotiated its terms is not a sufficient contact" to warrant application of New York law, given the insured's New Jersey domicile]; *see also CPC Intl.*, 739 F Supp at 712 ["the locations **\*\*9** of the brokers present mere distractions because the brokers acted only as intermediaries"];\***28** *Liggett Group*, 788 A2d at 141 [in choice-of-law analysis, roles of brokers "pale in comparison and significance to the role of the insured" (internal quotation marks, brackets, ellipsis and citation omitted)]). [FN8] Thus, when the Restatement factors are "evaluated according to their relative importance with respect to the particular issue [presented in this case]" (Restatement § 188 [2]), the conclusion is that the insured's principal place of business should be considered the "primary factor" (*Munzer*, 203 AD2d at 772) in the choice-of-law analysis.

In the alternative, the nonsettling insurers argue that, even assuming that the insured's primary place

of business is the primary factor in resolving the choice-of-law issue presented here (as we now hold), the law governing the unsettled policies cannot be chosen without also considering the settled policies, as well as still earlier lost policies that the nonsettling insurers also consider relevant. [FN9] Many of the settled policies, and all of the lost policies, were issued before 1962, when Foster Wheeler's principal place of business was still in New York. Since these pre-1962 settled and lost policies presumably would have been deemed governed by New York law, the nonsettling insurers contend, considering each policy separately for choice-of-law purposes would result in "applying differing allocation approaches to the same sequence of policies." This, they maintain, "would add insurmountable complexity if not impossibility to the process, undermining the basic principles underlying allocation," which they describe as "divid[ing] responsibility for a continuing liability in a consistent and coordinated way." Accordingly, the nonsettling insurers reason, there should be a blanket choice-of-law determination for all policies covering the asbestos claims, whether issued before or after Foster Wheeler's 1962 move to New Jersey, and whether settled, unsettled, or lost. In their view, the law chosen to govern all implicated policies should be that of New York, on the ground that, even if the insured's principal place of business is the primary factor in choosing the governing law, Foster Wheeler had its principal \***29** place of business in New York for the majority of the years the nonsettling insurers regard as relevant (1940 to 1982). [FN10]**\*\*10**

The crux of the nonsettling insurers' concern is that, in determining when their excess layers of coverage are reached, the losses will be allocated to the now-settled primary policies (and lower-level excess policies) in force during the same years (1970 to 1982) in accordance with a state law different from that applicable to the unsettled policies themselves. Specifically, the nonsettling insurers are concerned that the losses will be allocated in accordance with New York law to the policies issued by settled de-

36 A.D.3d 17                                                                                                    Page 8
36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

fendant Liberty Mutual Insurance Company (Liberty), which provided underlying primary coverage for all but three years (1972-1975) of the decades of the injuries' occurrence, at the same time that New Jersey law is applied to the unsettled policies. [FN11] As previously noted, the nonsettling insurers contend that Foster Wheeler was based in New York for most of what they view as the relevant period, and contend, on that basis, that New York law is applicable to the Liberty policies, whenever issued. As also previously discussed, New York law spreads the loss evenly over the entire period of loss occurrence, while New Jersey law shifts more of the loss to periods when more coverage was purchased, i.e., the later years, when the unsettled policies were in force. Therefore, applying New York law to the settled policies underlying the unsettled policies, while applying New Jersey law to the unsettled policies, will result in simultaneously reaching the unsettled policies earlier (through smaller allocations to the lower-level policies) and allocating more of the loss to the unsettled policies.

We are not persuaded by the nonsettling insurers' contention that all of the settled policies (and the lost policies, assuming *30 their relevance) must be considered in determining which state's law governs the unsettled policies. Under our choice-of-law analysis, the settled primary and lower-level excess policies underlying the unsettled policies in force from 1970 to 1982 will also be deemed governed by New Jersey law, for the simple reason that all such underlying policies were, like the unsettled policies, issued while Foster Wheeler was based in New Jersey. The pre-1962 settled policies do not underlie the unsettled policies that cover the years 1970 to 1982, and are therefore irrelevant to determining when the layer of coverage afforded by each unsettled policy is reached in the vertical allocation for the year that policy was **11 in force. [FN12] Thus, the problem posited by the nonsettling insurers, while it might actually be presented in some future case, is illusory here. [FN13]

*31 The nonsettling insurers further argue that, even if the foregoing analysis is correct as applied to settled and lost policies in general, certain settled policies--many of which were **12 issued prior to 1962--continue to be at issue insofar as Foster Wheeler, as assignee of the carriers that issued those policies, asserts those carriers' contribution claims (if any) against the nonsettling insurers in this action. [FN14] The theory of the contribution claims is that the original holders of the claims (Liberty and the London Insurers) each paid "more than its allocable share" of Foster Wheeler's loss. Therefore, the pleadings in support of the contribution claims assert, the nonsettling insurers are liable to Foster Wheeler, as the assignee of Liberty and the London Insurers, for the amounts "properly allocable" to the nonsettling insurers that have been paid by Liberty and the London Insurers.

In our view, the contribution claims only theoretically place the coverage obligations of Liberty and the London Insurers at issue, and therefore do not affect our conclusion that the settled policies are irrelevant to the choice-of-law determination. Obviously, the nonsettling insurers' liability cannot exceed their own actual coverage obligations. Thus, as a practical matter, Foster Wheeler's assertion of the assigned contribution claims merely forecloses the nonsettling insurers from arguing that their liability should be reduced because Liberty and the London Insurers, in their respective settlements, paid Foster Wheeler more than they actually owed. [FN15] Moreover, it is undisputed that Liberty and the London Insurers are the only carriers that sold Foster Wheeler relevant coverage prior to the 1962 move to New Jersey. Accordingly, it is also irrelevant to the choice-of-law determination that the nonsettling insurers might ultimately argue for reducing their liability on the ground that other settling carriers, which did not assign their potential contribution *32 claims, paid Foster Wheeler more than they actually owed under their respective policies.

In closing, we note that the nonsettling insurers fail to articulate any justification under choice-of-law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

principles for their argument that we should render a blanket choice-of-law determination for hundreds of different insurance policies issued by dozens of different insurers **13 over several decades. Each policy constitutes a separate contractual transaction, and to treat insurance policies issued at various widely separated points in time, over a span of decades, as one undifferentiated aggregate for the purpose of choosing one state's law to govern them all, would do considerable violence to the principle (relied on by the nonsettling insurers themselves at certain points in their argument) that the contacts on which the choice-of-law determination depends should have been known to the parties at the time of contracting (*see* Restatement § 188, Comment *e*, at 580 [a contact "can bear little weight in the choice of the applicable law when . . . at the time of contracting it is either uncertain or unknown"]). [FN16] While there may nonetheless be sound practical reasons to adopt the practice suggested by the nonsettling insurers where the issue cannot be avoided, we find that the settlement of all pre-1962 policies in the case before us obviates any need for us to consider doing so here.

Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered January 10, 2005, which denied defendant-appellant Foster Wheeler Corporation's motion for partial summary judgment declaring that New Jersey substantive law governs all disputed issues in this action, and granted the motions by defendants-respondents for partial summary judgment declaring that New York substantive law governs all disputed issues in this action, should be reversed, on the law, without costs, the motion by Foster Wheeler Corporation granted to the extent of declaring that the liability insurance policies issued by defendants-respondents, and the underlying settled policies providing primary and lower-level excess coverage for the same years, are governed by New Jersey substantive law, and the motions by defendants-respondents denied.

**33** Sullivan, Nardelli, Williams and Sweeny, JJ.,

concur.

Order, Supreme Court, New York County, entered January 10, 2005, reversed, on the law, without costs, defendant Foster Wheeler Corporation's motion for partial summary judgment granted to the extent of declaring that the liability insurance policies issued by defendants-respondents, and the underlying settled policies providing primary and lower-level excess coverage for the same years, are governed by New Jersey substantive law, and defendants-respondents' motions for partial summary judgment denied.

FOOTNOTES

FN1. Although the Court of Appeals stated that its approval of the time-on-the-risk method in *Consolidated Edison* was "not the last word on proration" (98 NY2d at 225), for purposes of this appeal, we accept the parties' shared premise that *Consolidated Edison* adopted time-on-the-risk as New York's allocation method.

FN2. The nonsettling insurers, citing *Stolarz* (81 NY2d at 226), argue that New York, as the center of the worldwide insurance industry, has an interest in the issues in dispute, given that the insurance brokers that procured the unsettled policies were located in New York, as more fully discussed below. We acknowledge, of course, that the Court of Appeals has recognized New York's interest in "maintain[ing] its position as a financial capital of the world" (*id.*). While this interest might well warrant applying New York law to determine the authority of the New York-based brokers that procured the policies, we are not persuaded that the involvement of New York brokers gives New York a greater interest than the state of the insured's domicile in the construction of the policies themselves.

FN3. We also noted in our discussion of the choice-of-law issue in *Steadfast* that the insured's domicile in that case was also the place "from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made)" (283

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17                                                                 Page 10
36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

AD2d at 50). While these factors provided additional support for the choice-of-law ruling in *Steadfast*, for the reasons discussed below, they were not essential to that ruling.

FN4. As more fully discussed below, *Munzer*'s holding that the law of the state of the insured's principal place of business should be applied if that state is different from the insured's state of incorporation (203 AD2d at 771, 772) is also of significance to this appeal.

FN5. As previously noted, throughout the period in which the unsettled policies were issued (1970-1981), the principal place of business of Foster Wheeler (meaning both FW Corp. and FW Energy) was in New Jersey, while FW Corp. and FW Energy were incorporated, respectively, in New York and Delaware.

FN6. The nonsettling insurers apparently use the term "performance" to refer only to the insured's payment of the premium. This ignores the fact that the insurer's payment of a claim (which has not yet occurred with regard to any of the unsettled policies) also constitutes the performance of a policy obligation.

FN7. Foster Wheeler apparently concedes that it generally remitted premium checks to, and received policies and premium invoices from, the brokers' New York offices. Foster Wheeler argues that this should not affect the choice-of-law analysis because (according to Foster Wheeler) the brokers, in transmitting such material between the parties, were acting as agents of the insurers. Not surprisingly, the nonsettling insurers argue that the brokers were acting as agents of Foster Wheeler. For the reasons discussed below, we find it unnecessary to determine which party the brokers were representing in performing these functions.

FN8. To the extent the nonsettling insurers rely on the fact that most premium checks were drawn on Foster Wheeler's New York bank account, we fail to see how the bank's location would give New York an interest in the construction of the insurance policies for which the checks constituted payment.

FN9. Foster Wheeler denies the relevance of the lost policies. We do not find it necessary to determine whether the lost policies are relevant in order to decide this appeal.

FN10. The parties disagree on how far back in time the relevant policies extend. Foster Wheeler contends that the relevant policies extend back to around 1952, while the nonsettling insurers contend that the relevant policies extend back at least to 1940. This dispute cannot be resolved on the present record; in any event, the instant appeal does not require us to resolve it. Assuming, however, that the nonsettling insurers are correct that the relevant years are from 1940 to 1982, Foster Wheeler points out that, during this 42- year period, it purchased 82.7% of its liability insurance policies, and 95% of its total liability coverage, while based in New Jersey, i.e., after 1962.

FN11. Contrary to the nonsettling insurers' claim that Foster Wheeler has attempted to manipulate the choice-of-law determination by selectively settling with certain insurers rather than others, the record establishes that Liberty, as well as Hartford Accident & Indemnity Company, the primary insurer during Liberty's three-year hiatus, both argued for application of New Jersey law before they settled with Foster Wheeler.

FN12. This point is demonstrated by a hypothetical the New Jersey Supreme Court posed to illustrate how vertical allocation within a policy year operates:

"Assume that primary coverage for one year was $100,000, first-level excess insurance totaled $200,000, and second-level excess coverage was $450,000. If the loss allocated to that specific year was $325,000, the primary insurer would pay $100,000, the first-level excess policy would be responsible for $200,000, and the second-level excess policy would pay $25,000" (*Carter-Wallace*, 154

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36 A.D.3d 17, 822 N.Y.S.2d 30, 2006 N.Y. Slip Op. 06937
**(Cite as: 36 A.D.3d 17, 2006 N.Y. Slip Op. 06937)**

NJ at 326-327, 712 A2d at 1124).

Given that the primary and lower-level excess insurers have settled with Foster Wheeler, New Jersey apparently requires (subject to the particular terms of each unsettled policy) that, in determining when the nonsettling insurers' layers of coverage are reached, each nonsettling insurer receive a credit for the full amount of the loss allocable to the underlying settled policies (*see Chemical Leaman Tank Lines, Inc. v Aetna Cas. & Sur. Co.*, 177 F3d 210, 227-228 [3d Cir 1999] [applying New Jersey law]; *UMC/Stamford, Inc. v Allianz Underwriters Ins. Co.*, 276 NJ Super 52, 68- 69, 647 A2d 182, 190-191 [Law Div 1994]; *see also Carpenter Tech. Corp. v Admiral Ins. Co.*, 172 NJ 504, 517-518, 522, 800 A2d 54, 61-62, 64 [2002] [discussing with apparent approval the *Chemical Leaman* and *UMC/Stamford* holdings on this issue]).

FN13. It is also irrelevant to the determination of the nonsettling insurers' coverage obligations that the putative allocation of the loss to years prior to 1962 that will result from using New Jersey's time-plus-limits method will be different from the allocation that would have resulted under New York's time-on-the-risk method, which presumably would have applied to the settled and lost policies that were in force during those years. To reiterate, since all pre-1962 policies have been settled, this appeal simply does not require us to consider how a loss should be allocated when there must be a determination of the respective coverage obligations of various implicated policies that are governed by the laws of different states mandating the use of conflicting allocation methods. That difficult problem will have to be addressed in a case that actually presents it.

FN14. The carriers that assigned their contribution claims to Foster Wheeler as part of their respective settlements are Liberty and plaintiffs Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies (collectively, the London Insurers). Liberty assigned Foster Wheeler any contribution claims Liberty had based on pay-

ments made pursuant to the primary policies Liberty sold Foster Wheeler from 1951 to 1971 and from 1975 to 1981. The London Insurers assigned Foster Wheeler any contribution claims they had based on payments made pursuant to the excess policies the London Insurers sold Foster Wheeler from 1951 to 1981.

FN15. Of course, Liberty and the London Insurers presumably did not intend to pay Foster Wheeler more than they owed, but it is possible that they did so, given that many issues (including the choice-of-law issue) were unresolved at the time the settlements were made.

FN16. In this case, at the various times the unsettled policies were issued between 1970 and 1981, the parties presumably could not have known with any degree of certainty that the unsettled policies would be implicated by claims originating as far back as 1940, or that, by virtue of such claims, the policies issued in those remote times would be relevant to determining the law governing the unsettled policies.

Copr. (c) 2008, Secretary of State, State of New York.

NY,2006.

CERTAIN v FOSTER WHEELER

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 3

**NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION BASED ON *FORUM NON CONVENIENS***

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

**CASE NO. BC 391068**

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22118989 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22118989 (S.D.N.Y.))

Page 1

**H**
Cyprus Amax Minerals Co. v. Asarco Inc.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CYPRUS AMAX MINERALS COMPANY, a
Delaware corporation, Plaintiff,
v.
ASARCO INCORPORATED, a New Jersey cor-
poration, Defendants.
No. 99 Civ. 11198(LMM).

Sept. 11, 2003.

*MEMORANDUM AND ORDER*

MCKENNA, J.
*1 The Court has considered the parties' corres-
pondence regarding a motion by plaintiff for leave
to amend its complaint. Following the practice of
Judge Martin, to whom this case was previously as-
signed, the Court will, as suggested by the parties,
decide the motion on the correspondence.[FN1]

> FN1. The correspondence consists of
> plaintiff's counsels' letter to Judge Martin
> of July 11, 2003, defendant's counsels' let-
> ter to the undersigned of July 29, 2003,
> plaintiff's counsel's letter to the under-
> signed of August 5, 2003, defendant's
> counsel's letter to the undersigned of Au-
> gust 8, 2003, and plaintiff's counsel's letter
> to the undersigned of August 13, 2003, the
> first two letters being accompanied by ex-
> hibit booklets.

"Leave to file an amended complaint 'shall be
freely given when justice so requires,' and should
not be denied unless there is evidence of undue
delay, bad faith, undue prejudice to the non-
movant, or futility."*Milanese v. Rust-Oleum Corp.,*
244 F.3d 104, 110 (2d Cir.2001) (quoting
Fed.R.Civ.P. 15(a), and citing *Foman v. Davis,* 371
U.S. 178, 182 (1962)). The Court is not persuaded

that any of those impediments to amendment has
been demonstrated.[FN2]

> FN2. The Court has applied the
> Fed.R.Civ.P. 12(b)(6) standard in consider-
> ing whether the amendment would be fu-
> tile, rather than the *id.* 56 standard, be-
> cause the parties have not "fully briefed
> the issue whether the proposed amended
> complaint could raise a genuine issue of
> fact and have [not] presented all relevant
> evidence in support of their positions."*Mil-
> anese,* 244 F.3d at 110.

Plaintiff may serve and file its proposed amended
complaint.

SO ORDERED.

S.D.N.Y.,2003.
Cyprus Amax Minerals Co. v. Asarco Inc.
Not Reported in F.Supp.2d, 2003 WL 22118989
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Delivery Summary Report for WALSH,MICHAEL 3518983**

| | |
|---|---|
| Date/Time of Request: | Monday, June 16, 2008 13:23 Central |
| Client Identifier: | 034877 |
| Database: | FSFIND |
| Citation Text: | 452 F.Supp.2d 290 |
| Lines: | 1799 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.