# EXHIBIT 4

NON-CALIFORNIA AUTHORITIES SUPPORTING THE CONTINENTAL INSURANCE COMPANY'S
AND CENTURY INDEMNITY COMPANY'S JOINT MOTION TO DISMISS OR STAY THE ACTION
BASED ON *FORUM NON CONVENIENS*

*CYPRUS AMAX MINERALS CO., ET AL., V. CONTINENTAL CASUALTY CO., ET AL.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

CASE NO. BC 391068

452 F.Supp.2d 290                                                                    Page 1
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**


**H**

Hughes v. BCI Intern. Holdings, Inc.
S.D.N.Y.,2006.

United States District Court,S.D. New York.
Patricia G. HUGHES, et al., Plaintiffs,
v.
BCI INTERNATIONAL HOLDINGS, INC., et al.,
Defendants.
No. 05 Civ. 9085(HB).

Sept. 14, 2006.

**Background:** Investor brought action against
founders, officers, and directors of privately held
start-up company for, inter alia, fraud in connection
with her investment. Defendants moved to dismiss
the complaint.

**Holdings:** The District Court, Baer, J., held that:
(1) nonresident founder's contacts with New York
were sufficient to constitute a transaction of busi-
ness in New York within meaning of New York's
long-arm statute;
(2) doctrine of forum non conveniens did not war-
rant dismissal of investor's action;
(3) investor's allegations of misrepresentations in
private placement memo were sufficient to plead
fraud against company founder individually as well
as against the other defendants for whom he acted;
(4) investor sufficiently alleged that founder had
duty to provide investor with accurate information
relative to her decision to invest;
(5) investor adequately alleged a claim for viola-
tions of the Colorado Securities Act (CSA);
(6) investor sufficiently alleged claims for promis-
sory and equitable estoppel; and
(7) investor stated claims for constructive trust and
for an accounting.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Courts 170B 🔑76.15**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents;
"Long-Arm" Jurisdiction in General
                170Bk76.15 k. Transacting or Doing
Business. Most Cited Cases
Generally, telephone calls and other communica-
tions sent into New York by an out of state defend-
ant, taken alone, are insufficient to establish a
transaction of business in New York for purposes
of New York's long-arm statute. N.Y.McKinney's
CPLR 302(a)(1).

**[2] Federal Courts 170B 🔑76.25**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents;
"Long-Arm" Jurisdiction in General
                170Bk76.25 k. Tort Cases. Most Cited
Cases
Nonresident founder's contacts with New York,
which included attendance at several meetings in
New York concerning the formation of start-up
company and the solicitation of capital for it, were
sufficient to constitute a transaction of business in
New York within meaning of New York's long-arm
statute and there was a substantial nexus between
the transaction (i.e., the formation of start-up com-
pany and the solicitation of capital for it) and in-
vestor's fraud claims so as to give rise to personal
jurisdiction over founder personally and entities
that he represented. N.Y.McKinney's CPLR
302(a)(1).

**[3] Corporations 101 🔑665(1)**

101 Corporations
    101XVI Foreign Corporations
        101k663 Actions by or Against
            101k665 Jurisdiction
                101k665(1) k. Facts and Circum-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

stances Conferring Jurisdiction. Most Cited Cases
Acts of predecessor corporations could be attributed to successor corporation for the purpose of establishing jurisdiction under New York's long-arm statute where successor acquired all of the assets of predecessors, was managed by the same team that previously managed predecessor, and operates from the same address as predecessor. N.Y.McKinney's CPLR 302(a)(1).

**[4] Federal Courts 170B ⟜74**

170B Federal Courts
  170BII Venue
    170BII(A) In General
      170Bk74 k. Particular Actions. Most Cited Cases
Venue was proper in Southern District of New York for investor's claims against founders, officers, and directors of privately held start-up company for fraud in connection with her investment in the company; company conducted numerous meetings regarding its financing strategy in New York, and private placement memo was prepared there. 28 U.S.C.A. § 1391(a)(2).

**[5] Federal Courts 170B ⟜45**

170B Federal Courts
  170BI Jurisdiction and Powers in General
    170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
      170Bk45 k. Forum Non Conveniens. Most Cited Cases
A forum non conveniens analysis turns on: 1) the availability of an adequate alternative forum; 2) the level of deference that must be accorded plaintiffs' choice of forum; and 3) the balance of the public and private interest factors that determine which forum is most convenient and will best serve the ends of justice.

**[6] Federal Courts 170B ⟜45**

170B Federal Courts
  170BI Jurisdiction and Powers in General

    170BI(B) Right to Decline Jurisdiction; Abstention Doctrine
      170Bk45 k. Forum Non Conveniens. Most Cited Cases
Nonresident defendants failed to demonstrate that the doctrine of forum non conveniens warranted dismissal of investor's action against founders, officers, and directors of privately held start-up company for fraud in connection with her investment in the company; various defendants were domiciled in the United Kingdom (UK), California, Utah and Switzerland so that any single forum would necessitate witness travel and the transfer of documents, and investor's breach of contract claim against company was subject to a New York forum selection clause.

**[7] Fraud 184 ⟜3**

184 Fraud
  184I Deception Constituting Fraud, and Liability Therefor
    184k2 Elements of Actual Fraud
      184k3 k. In General. Most Cited Cases

**Fraud 184 ⟜16**

184 Fraud
  184I Deception Constituting Fraud, and Liability Therefor
    184k15 Fraudulent Concealment
      184k16 k. In General. Most Cited Cases
Under New York law, to plead fraud, plaintiffs must allege: 1) a material false representation or omission of an existing fact; 2) made with knowledge of its falsity; 3) with an intent to defraud; 4) reasonable reliance; 5) and resulting damage to the plaintiff.

**[8] Fraud 184 ⟜28**

184 Fraud
  184I Deception Constituting Fraud, and Liability Therefor
    184k28 k. Fraud in Particular Transactions or for Particular Purposes. Most Cited Cases

452 F.Supp.2d 290

452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

Investor's allegations of misrepresentations in private placement memo were sufficient to plead fraud against company founder individually as well as against the other defendants for whom he acted; investor alleged that founder knew that company was in dire financial shape and that certain assets in Spain and South Africa had not been properly conveyed to it.

**[9] Fraud 184 ⚖13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

To plead negligent misrepresentation under New York law, a plaintiff must allege that: (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information; (2) the defendant negligently provided incorrect information; and (3) the plaintiff reasonably relied upon the information given.

**[10] Fraud 184 ⚖17**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to Disclose Facts. Most Cited Cases

A duty to disclose is imposed under New York law only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.

**[11] Fraud 184 ⚖17**

184 Fraud
    184I Deception Constituting Fraud, and Liabil-

ity Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to Disclose Facts. Most Cited Cases

In negligent misrepresentation claims based on omissions, New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

**[12] Fraud 184 ⚖16**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k16 k. In General. Most Cited Cases

**Fraud 184 ⚖17**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to Disclose Facts. Most Cited Cases

A claim under New York law for fraudulent concealment requires a duty to disclose based on either a fiduciary relationship or that defendant possesses superior knowledge, not readily available to the plaintiff, and that defendant knows that plaintiff is acting under a mistaken belief with respect to a material fact.

**[13] Fraud 184 ⚖43**

184 Fraud
    184II Actions
        184II(C) Pleading

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

184k43 k. Statements, Acts, or Conduct Constituting Fraud. Most Cited Cases
Investor, who brought negligent misrepresentation claim against founder of privately held start-up company and related entities, sufficiently alleged that founder had duty under New York law to provide investor with accurate information relative to her decision to invest where she alleged that founder met personally with her to solicit her investment, and that he possessed "unique and specialized expertise" with respect to the relevant industry in general and the company's project in particular; furthermore, since founder represented three entities in soliciting investor's investment, his statements and omissions were attributable to those entities as well.

**[14] Implied and Constructive Contracts 205H ⊗═⇒55**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. Most Cited Cases
If founder and related defendants, who solicited plaintiff's investment in start-up company, wrongfully obtained assets plaintiff intended for company, thereby depriving plaintiff of the value of her investment, plaintiff's binding agreement with company did not preclude plaintiff under New York law from proceeding on an unjust enrichment theory against founder and related defendants.

**[15] Conspiracy 91 ⊗═⇒1.1**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k1 Nature and Elements in General
                91k1.1 k. In General. Most Cited Cases

**Conspiracy 91 ⊗═⇒13**

91 Conspiracy

911 Civil Liability
    91I(A) Acts Constituting Conspiracy and Liability Therefor
        91k12 Persons Liable
            91k13 k. In General. Most Cited Cases
There is no independent cause of action for conspiracy under New York law; however, a conspiracy may be alleged, for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others.

**[16] Fraud 184 ⊗═⇒1.5**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k1.5 k. What Law Governs. Most Cited Cases
Under New York law, fraud claims are outside the scope of contractual choice-of-law provisions that specify what law governs.

**[17] Securities Regulation 349B ⊗═⇒242**

349B Securities Regulation
    349BII State Regulation
        349BII(A) In General
            349Bk242 k. What Law Governs. Most Cited Cases
Colorado Securities Act (CSA) applied to company founder's activities in traveling to Colorado to solicit plaintiff's investment. West's C.R.S.A. § 11-51-102(1).

**[18] Securities Regulation 349B ⊗═⇒278**

349B Securities Regulation
    349BII State Regulation
        349BII(A) In General
            349Bk278 k. Fraudulent or Other Prohibited Practices. Most Cited Cases
Investor adequately alleged a claim for violations of the Colorado Securities Act (CSA) against company founder where investor alleged that investor recklessly made several material misrepresentations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290

452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

in soliciting her investment. West's C.R.S.A. §§ 11-15-501, 11-15-604.

**[19] Corporations 101 ⟳445.1**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(C) Property and Conveyances
         101k441 Conveyances by Corporations
            101k445.1 k. Assumption of Transferor's Liabilities. Most Cited Cases
Successor liability will generally lie in New York when (1) there is an express or implied agreement to assume the other company's debts and obligations, (2) the transaction was fraudulent, (3) there was a de facto merger or consolidation of the companies, or (4) the purchasing company was a mere continuation of the selling company.

**[20] Corporations 101 ⟳445.1**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(C) Property and Conveyances
         101k441 Conveyances by Corporations
            101k445.1 k. Assumption of Transferor's Liabilities. Most Cited Cases
To find that a de facto merger has occurred, for purposes of finding successor liability in New York, there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location, a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock, a dissolution of the selling corporation, and the assumption of liabilities by the purchaser.

**[21] Corporations 101 ⟳445.1**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(C) Property and Conveyances
         101k441 Conveyances by Corporations
            101k445.1 k. Assumption of Transferor's Liabilities. Most Cited Cases
For purposes of successor liability under New York

law, de facto merger was sufficiently alleged where successor corporation was allegedly owned and controlled by chairman and sole officer of predecessor, and acquired all of the assets of related companies from predecessor.

**[22] Estoppel 156 ⟳85**

156 Estoppel
   156III Equitable Estoppel
      156III(B) Grounds of Estoppel
         156k82 Representations
            156k85 k. Future Events; Promissory Estoppel. Most Cited Cases
To plead promissory estoppel in New York, a plaintiff must allege: (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance.

**[23] Estoppel 156 ⟳52.15**

156 Estoppel
   156III Equitable Estoppel
      156III(A) Nature and Essentials in General
         156k52.15 k. Essential Elements. Most Cited Cases
To succeed on a claim for equitable estoppel in New York, plaintiff must show that defendant: (1) engaged in conduct which amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts.

**[24] Estoppel 156 ⟳85**

156 Estoppel
   156III Equitable Estoppel
      156III(B) Grounds of Estoppel
         156k82 Representations
            156k85 k. Future Events; Promissory Estoppel. Most Cited Cases
Investor sufficiently alleged claims for promissory and equitable estoppel under New York law where she alleged that, in reliance on certain unfulfilled promises by start-up company's founder, she re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

frained from filing suit for fraud or taking other action to recoup her investment and that her investment had never been repaid.

**[25] Corporations 101 ⟶542(4)**

101 Corporations
    101XII Insolvency and Receivers
        101k541 Conveyances When Insolvent or in Contemplation of Insolvency
            101k542 In General
                101k542(4) k. Transfer to Another Corporation Having Same Officers or Stockholders. Most Cited Cases
Investor adequately alleged fraudulent conveyance claim against founder of start-up company and related entities where she alleged that assets belonging to company, namely, her cash and company's purported interest in the Spanish and South African bio-composite projects, were conveyed to founder's entities without fair consideration. N.Y.McKinney's Debtor and Creditor Law § 276.

**[26] Corporations 101 ⟶1.7(1)**

101 Corporations
    101I Incorporation and Organization
        101k1.7 Pleading and Procedure in Determining Corporate Entity
            101k1.7(1) k. In General. Most Cited Cases
Allegations that company founder and related defendants abused the corporate form of company in such a way as to render them liable for the debts of the corporation and that investor suffered unjust injury as a result were sufficient to state veil piercing claim under New York law against founder and related defendants.

**[27] Corporations 101 ⟶349**

101 Corporations
    101X Officers and Agents
        101X(D) Liability for Corporate Debts and Acts
            101k349 k. Insolvency or Dissolution of Corporation. Most Cited Cases
Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors; while an officer or director does not owe a fiduciary duty to the creditors of a solvent corporation, the fact of insolvency causes such a duty to arise.

**[28] Trusts 390 ⟶102(1)**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k102 Breach of Duty by Person in Fiduciary Relation in General
                390k102(1) k. In General. Most Cited Cases
Investor in insolvent start-up company adequately stated a claim under New York law for constructive trust against director and related entities based on transfer of company's assets to related entities for insufficient consideration where investor adequately alleged a fiduciary duty on the part of director, who in all respects acted as agent for the various related entities.

**[29] Corporations 101 ⟶320(7)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k320 Actions Between Shareholders and Officers or Agents
                101k320(7) k. Bill, Petition, or Complaint in General. Most Cited Cases
Investor in start-up company adequately pleaded a claim under New York law for an accounting as to company's director and related entities where investor alleged that various company assets, including her own investment funds, wound up in the related entities' coffers.

**[30] Fraud 184 ⟶4**

184 Fraud

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290                                                                                                    Page 7
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

184I Deception Constituting Fraud, and Liability Therefor
   184k2 Elements of Actual Fraud
      184k4 k. Intent. Most Cited Cases

**Fraud 184 ⚷13(2)**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k13 Falsity and Knowledge Thereof
            184k13(2) k. Knowledge of Defendant. Most Cited Cases

Allegations of investor in start-up company were sufficient to state a claim for fraud against company founder and company; investor alleged that founder personally approved private placement memo and authorized its distribution to investor with knowledge that it contained misrepresentations, and allegation that omission of co-founder-controlled placement agent from the Securities and Exchange Commission (SEC) filing and loan agreements with investor was sufficient to allege an intent to defraud by founder.

**[31] Fraud 184 ⚷13(3)**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k13 Falsity and Knowledge Thereof
            184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

Although founder of start-up company never met investor or communicated with her directly prior to her investment in company, allegations that he sent investor a handwritten thank you note after the first installment of her investment was received and that private placement memo touted his 10 years of successful experience in the industry, were sufficient to allege that founder possessed "unique or specialized expertise" giving rise to a duty under New York law to convey accurate information for pur-

poses of negligent misrepresentation, negligent nondisclosure and fraudulent concealment claims.

**[32] Fraud 184 ⚷30**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k30 k. Persons Liable. Most Cited Cases

Investor in privately held start-up company failed to allege that shareholders and placement agent were liable under New York law for directors' fraudulent statements in private placement memo by virtue of their status as "co-venturers;" there were no allegations that shareholders functioned as "partners" in start-up venture and shareholders could not be found to have acted as agents for placement agent simply because placement agent owned shares in start-up company.

**[33] Fraud 184 ⚷17**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k15 Fraudulent Concealment
         184k17 k. Duty to Disclose Facts. Most Cited Cases

In the context of a negligent nondisclosure claim under New York law, a duty to speak may exist where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

**[34] Corporations 101 ⚷215**

101 Corporations
   101IX Members and Stockholders
      101IX(D) Liability for Corporate Debts and Acts
         101k215 k. Nature and Grounds in General. Most Cited Cases

Shareholders in privately held start-up company, who had no reason to believe that founder's role in the venture would be material to investor, could not be held liable to investor under New York law for

452 F.Supp.2d 290
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

negligent nondisclosure of founder's role in the venture.

**[35] Fraud 184 ⟷41**

184 Fraud
   184II Actions
      184II(C) Pleading
         184k41 k. Allegations of Fraud in General. Most Cited Cases
Under New York law, fraud allegations may be alleged upon information and belief as to facts peculiarly within the opposing party's knowledge when those allegations are accompanied by a statement of the facts upon which the belief is based.

**[36] Fraud 184 ⟷30**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k30 k. Persons Liable. Most Cited Cases
Investor in privately held start-up company sufficiently alleged fraudulent concealment claim under New York law against founder based on co-founder's concealment of founder's role in the company where investor alleged that founder's "advice" to co-founder based on founder's knowledge that investor would not invest if she knew the full extent of founder's involvement led directly to co-founder's concealment of the information from the investor.

**[37] Torts 379 ⟷114**

379 Torts
   379I In General
      379k110 Contracts in Relation to Torts
         379k114 k. Duty, Breach, or Wrong Independent of Contract. Most Cited Cases
Under New York law, a contracting party may be charged with separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract.

**[38] Federal Civil Procedure 170A ⟷636**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and Particularity
         170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

**Fraudulent Conveyances 186 ⟷259(1)**

186 Fraudulent Conveyances
   186III Remedies of Creditors and Purchasers
      186III(H) Pleading
         186k258 Bill, Complaint, or Petition
         186k259 Form and Requisites in General
            186k259(1) k. In General. Most Cited Cases
Allegations of constructive fraudulent transfer need not meet the heightened pleading requirements of rule governing pleading of fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[39] Corporations 101 ⟷349**

101 Corporations
   101X Officers and Agents
      101X(D) Liability for Corporate Debts and Acts
         101k349 k. Insolvency or Dissolution of Corporation. Most Cited Cases
Under Delaware law, directors of an insolvent corporation owe a fiduciary duty to the holders of convertible debentures.

**\*295** David Samuel Fein, Robert Daniel Scheid, Lewis Scheid LLC, Denver, CO, Elizabeth J. Sher, Pitney Hardin, LLP, New York, NY, for Plaintiffs. Andre K. Cizmarik, Edwards Angell Palmer & Dodge, LLP, Debra Joy Guzov, Guzov Ofsink Flink LLC, John Richard Supple, Jr., Ian Chesir Teran, Hinshaw & Culbertson LLP, Daniel L. Brown, Sheppard, Mullin, Richter & Hampton, LLP, John F. Cambria, Alston & Bird, LLP, New York, NY, Dana J. Dunwoody, Sheppard Mullin Richter and Hampton, LLP, San Diego, CA, for De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290                                                                              Page 9
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

fendants.

## OPINION & ORDER

BAER, District Judge.
Plaintiff Patricia Hughes ("Hughes"), on behalf of herself and her three minor children, brought this action for, *inter alia,* fraud in connection with her investment in a privately held start-up company. Defendants are, primarily, the founders, officers, and directors of that venture. All defendants have moved to dismiss plaintiffs' first amended complaint.[FN1] Oral argument *296 on defendants' motions was held on August 21, 2006. For the reasons that follow, defendants' motion are GRANTED in part and DENIED in part.

> FN1. Defendants previously moved to dismiss plaintiffs' original complaint. However, after that motion was fully briefed but before it was decided, plaintiffs filed an amended pleading. Thereafter, I directed the defendants to re-file their motions against the new complaint. It is unlikely that any further amended pleading will be accepted.

## FACTUAL BACKGROUND

The facts set forth below are taken from plaintiffs' first amended complaint. In 2002 and 2003, defendants Michael Cunningham ("Cunningham"), Marc Bruner ("Bruner") and David Saltman ("Saltman") negotiated the formation of a business venture that would "develop, produce[ ] and sell natural fiber composites." (Comp.[FN2] ¶¶ 30, 33-34). Cunningham is the chairman and sole officer of The Coach House Group (UK) Ltd. ("CHG"). The Sustainable Projects Development Group, Ltd. ("Sustainable Projects") is a wholly owned subsidiary of CHG. Sustainable Projects, in turn, owned SPDG Fibre International ("SPDG Fibre").

> FN2. Citations to "Comp." refer to plaintiffs' First Amended Complaint dated May 5, 2006.

Bruner, "a wealthy individual in the oil and gas industry," (comp.¶ 15), is the sole officer of Resource Venture Management AG ("RVM"). Plaintiffs allege that RVM was retained as placement agent to raise money for the new venture. Bruner is also affiliated with Equistar Capital, LLP ("Equistar"), a merchant banking firm. Defendants Carmen Lotito ("Lotito") and Kelly Nelson ("Nelson") are, respectively, a partner and "managing member" of Equistar. Saltman is president and CEO of Bio-Composites International, Inc. ("Bio-Comp").

On November 24, 2003, defendants incorporated BCI International Holdings, Inc. ("BCI") in Delaware. (Comp.¶ 37). Saltman became president and CEO of BCI, as well as a director. Saltman also received 23.35% of BCI's stock. (Comp.¶ 43). In addition, Sustainable Projects received 50.04% of BCI's stock, Equistar received 13.34%, and RVM received 6.63%. (Comp.¶¶ 42, 44-45). Defendant Garry Lavold ("Lavold") received 6.63% of BCI's stock, and became its chief operating officer. (Comp.¶¶ 41, 46).[FN3] Nelson was named CFO of BCI, and both Nelson and Lotito became directors. (Comp.¶¶ 18-19). Defendant D. Roger Glenn ("Glenn"), an attorney and partner at Edwards, Angell, Palmer & Dodge, LLP ("EAPD"), was named corporate secretary, chief legal counsel, and a director of BCI. (Comp.¶¶ 21, 41). Plaintiffs also allege that, on January 15, 2004, Cunningham was named chairman of BCI's board.[FN4] (Comp.¶ 12, 77-78).

> FN3. Lavold also became a BCI director in August 2004. (Comp.¶ 20).

> FN4. However, Cunningham contends that he was never "formally appointed" to BCI's board of directors. (Comp.¶ 163).

On November 24, 2003, BCI's board of directors approved a Private Placement Memo ("PPM") intended to raise investment dollars for BCI. (Comp.¶ 50). The PPM was approved by unanimous written consent of the board, and that resolution was signed by Saltman. (*Id.*) Plaintiffs allege that the PPM was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290

452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

prepared by Glenn and EAPD, "with the know-ledge, consent, authority and/or assistance" of each of the defendants. (Comp.¶ 51). Plaintiffs also al-lege that the PPM contained various material mis-representations. Plaintiffs contend that the PPM: 1) misrepresented the ownership status and value of BCI's assets; 2) failed to disclose BCI's dire finan-cial condition; 3) misrepresented the qualifications and expertise of **\*297** BCI's management team; 4) failed to disclose the "excessiveness of ... fees, ex-penses, and other deductions" to be paid from in-vested funds; and 5) failed to disclose "other inten-ded uses of investor funds" that would not benefit BCI. (Comp.¶¶ 58-59).

More specifically, plaintiffs allege, *inter alia,* that the PPM: 1) misrepresented that BCI had acquired SPDG Fibre from Sustainable Projects; 2) misrep-resented that BCI, through SPDG Fibre, either owned or intended to acquire interests in valuable assets in Spain and South Africa; 3) misrepresented Bio-Comp's "managerial [and] technical capability" to develop bio-composite projects; 4) failed to dis-close that BCI "never intended to use [ ] investor proceeds for BCI corporate purposes ... [r]ather, the funds were immediately distributed to ... CHG, SP-DG [Fibre] and Equistar to pay monthly overhead and administrative expenses ..."; 5) falsely repres-ented that certain individuals with relevant expert-ise had associated themselves with BCI; and 6) failed to disclose that BCI's acquisition of assets held by CHG, Sustainable Projects and SPDG Fibre was contingent on both BCI's fulfillment of finan-cing obligations to CHG and Equistar's fulfillment of financing obligations to BCI. (Comp.¶¶ 60-65).

On December 30, 2003, after the PPM was ap-proved but before it was provided to the plaintiffs, Cunningham sent an email to Saltman, Lotito and Nelson in which he stated that CHG was experien-cing a severe cash shortfall in connection with SP-DG Fibre's Spanish venture. (Comp.¶¶ 54-56). Cun-ningham advised that "this has been kept from the attention of the Authorities and our partner Bank."(Comp.¶ 54). Cunningham further stated

that, "[i]f we are obliged to sell the land to meet commitments ... [then] the Spanish project will no longer be viable in its present form." (*Id.*) Cunning-ham concluded that "BCI has until the end of Janu-ary to prove to my satisfaction that it can meet its commitments. After that I will ... follow an alternat-ive strategy. This will entail SPDG [FN5] proceeding alone or with other partners.... [T]he BCI project in its present format will no longer exist." (Comp.¶ 56).

> FN5. It is unclear whether Cunningham was referring to Sustainable Projects or to SPDG Fibre.

On January 16, 2004, Saltman formally engaged RVM to act as placement agent for BCI. (Comp.¶ 79). In return, RVM was to receive 2 shares of BCI stock for each dollar raised up to $10 million, and 1.4 shares per dollar raised thereafter. (*Id.*) [FN6] Plaintiffs allege that Bruner suggested to the other defendants that they approach Hughes to solicit an investment in BCI. (Comp.¶ 81). According to plaintiffs, there already existed a "lengthy history of failed and/or troubled investments" involving Bruner, Hughes, and Hughes' husband, Brian Hughes. (Comp.¶ 82). On January 17, 2004 Cun-ningham met with Hughes in Denver to solicit her investment in BCI. (Comp.¶ 86). At the meeting, Cunningham provided Hughes with a copy of the PPM and told Hughes that he expected BCI to be "in revenue" by April 2004. (Comp.¶ 87). In addi-tion, in response to a direct question from Hughes, Cunningham stated that Bruner was not involved in the BCI project. (Comp.¶ 87, **\*298** 90). [FN7]

> FN6. Plaintiffs allege that this arrangement rendered false BCI's SEC "Form D," filed on January 14, 2004, which stated that Spencer Clarke LLC was the sole entity re-tained to solicit purchasers in connection with BCI's stock offering. (Comp.¶ 70).

> FN7. At oral argument, defendants cited certain testimony given by Hughes during her deposition in which, in defendants'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290

452 F.Supp.2d 290

**(Cite as: 452 F.Supp.2d 290)**

view, Hughes' account of her meeting with Cunningham changed in certain respects. In addition, both plaintiffs and the Cunningham Defendants have submitted copies of Hughes' deposition. However, as I made clear during the argument, such evidence is not properly before me on this motion to dismiss.

Shortly after this meeting, Hughes agreed to invest $2 million in BCI. On January 20, 2004, Hughes executed the first in a series of "Bridge Loan Agreements" by which she received promissory notes payable to her from BCI as well as warrants to purchase BCI stock. (Comp.¶¶ 95-97). Each Bridge Loan Agreement contained a provision stating that BCI had retained "no finder or broker in connection with the transaction" except Spencer Clarke LLC. (Comp.¶ 110). However, on January 26, 2004, Saltman sent a letter to RVM on behalf of BCI acknowledging that RVM had been responsible for soliciting Hughes' investment and confirming that BCI's agreement with RVM remained in effect. (Comp.¶ 112, Ex. I). On that same day, plaintiffs wired their first $1 million installment to defendants. Plaintiffs wired $200,000 directly to Sustainable Projects, and $800,000 to an EAPD trust account. (Comp.¶¶ 113). The next day, $700,000 from the trust account was transferred to "CHG, Sustainable Projects and/or SPDG [Fibre,]" and $100,000 was transferred to "Bio-Comp and/or Saltman[.]" (Comp.¶ 114). According to plaintiffs, none of the money was transferred to BCI.

On February 24, 2006, Hughes and BCI executed another series of notes, and Hughes wired another $1 million to the EAPD trust account. (Comp.¶¶ 116-128). On February 26, 2004, EAPD distributed $800,000 to "CHG, Sustainable Projects and/or SPDG." (Comp.¶ 129). Plaintiffs allege that the remaining $200,000 "or a substantial portion thereof" was retained by EAPD as payment for legal and other services. (Id.) Plaintiffs also allege that at least $50,000 from plaintiffs' investment was transferred by "one or more" of the other defendants to

Equistar. (Id.) Once again, plaintiffs contend that none of their money went to BCI. On February 26, 2004, Cunningham sent an email to Saltman, Lotito and Nelson complaining that $200,000 had been "taken out" of Hughes' second million dollar payment. (Comp.¶ 131). Cunningham calculated that, of the first $2.4 million raised for the BCI venture, "24% .... ha[d] gone to overhead in the U.S."(Id.)Cunningham stated that he considered this amount "excessive." (Id.)

BCI defaulted on its obligations under the notes. On January 17, 2005, after plaintiff demanded payment, Saltman and Nelson wrote to Hughes on behalf of BCI and reassured her that SPDG Fibre and its assets had been properly conveyed to BCI. (Comp.¶¶ 164-165). Cunningham, Lavold and Glenn were copied on that letter. (Comp.¶ 167). On January 24, 2005, a CHG agent, Philip Cook ("Cook"), [FN8] wrote to Hughes and outlined a proposal to recoup plaintiffs' investment that, he claimed, had been agreed to by Cunningham, Saltman and Nelson. The proposal contained the following provisions: a CHG subsidiary would "subsume" plaintiffs' investment; title to SPDG Fibre's ventures in Spain and South Africa would "revert" to that CHG subsidiary; CHG would receive a 15% equity interest in a new North American venture to be developed by the BCI participants; and plaintiffs would receive a stake in a new CHG entity in **299** proportion to their original investment. (Comp.¶ 170). Cook also confirmed that $1.65 million of plaintiffs' funds had been utilized in connection with SPDG Fibre's Spanish and South African ventures. (Id.) Plaintiffs contend that, in reliance on these representations (which continued through July 2005), they refrained from filing suit.

> FN8. The Cunningham Defendants argue that Cook was never authorized to act as their agent.

On June 6, 2005, Glenn sent an email to Cunningham claiming that BCI held title to SPDG Fibre's Spanish venture, and threatening to commence an action to quiet title unless Cunningham assumed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

BCI's obligation to plaintiffs. (Comp.¶ 175). On August 1, 2005, Cunningham wrote plaintiffs to solicit another $1 million to pay creditors in South Africa in connection with SPDG Fibre's venture there. (Comp.¶ 176). On September 14, 2005, a new CHG entity, SPDG Technologies, acquired Sustainable Projects, SPDG Fibre and the Spanish and South African ventures. (Comp.¶ 184). That entity is currently listed on a British stock exchange. To date, plaintiffs have not received any of the principal or interest due on the promissory notes, nor have they acquired an interest in any "substitute" venture.

### DISCUSSION

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe all factual allegations in the complaint in favor of the non-moving party. *See Krimstock v. Kelly*, 306 F.3d 40, 47-48 (2d Cir.2002). The Court's consideration is normally limited to facts alleged in the complaint, documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir.2004) (*quoting Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). When a complaint alleges fraud, "Rule 9(b) requires that allegations of fraud be pleaded with particularity." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996). This means that the complaint "must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent". *Id.*

### A. Cunningham, CHG, Sustainable Projects, SP-DG Fibre and SPDG Technologies (the "Cunningham Defendants")

Plaintiffs allege claims against the Cunningham Defendants for: fraud; negligence; negligent misrepresentation; "intentional concealment/ negligent nondisclosure;" unjust enrichment; civil conspiracy; violations of the Colorado Securities Act ("CSA") (against all Cunningham Defendants except SPDG Technologies); successor liability (against all Cunningham Defendants except Cunningham individually); "respondeat superior"[FN9] (same); promissory estoppel and equitable estoppel (same); fraudulent conveyance[FN10] (same); "lack *300 of separate corporate existence/ alter ego" (against all Cunningham Defendants except SPDG Technologies); constructive trust;[FN11] breach of fiduciary duty (against Cunningham individually); and for an accounting. Before addressing the sufficiency of plaintiffs' substantive allegations, I will turn to the Cunningham Defendants' contention that this Court lacks personal jurisdiction over them and that venue is improper.

> FN9. This claim is captioned: "respondeat superior, principal/agent, employer/employee, and joint venture liability."

> FN10. Plaintiffs allege separate claims for "avoidance of fraudulent transfers" under Delaware and Colorado law, (comp.¶¶ 318-329), and "avoidance of fraudulent conveyance" under New York law. (Comp.¶¶ 330-341).

> FN11. This cause of action is captioned: "constructive trust/ equitable lien/ specific performance/ injunction." (Comp.¶¶ 354-367).

### 1. Personal Jurisdiction

The Cunningham Defendants, all UK domiciliaries, argue that plaintiffs have failed to show that they are subject to jurisdiction in New York.[FN12] When

subject matter jurisdiction is predicated on diversity, state law governs a federal court's exercise of personal jurisdiction. *See Jacobs v. Felix Bloch,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2001). New York's "long arm" statute provides for personal jurisdiction over a non-resident defendant "where the cause of action arises from the defendant's transaction of business in New York."*Id.* at 739; *see also*N.Y. CPLR § 302(a)(1). "A claim arises out of a party's transaction of business when there is a substantial nexus between the transaction of business and the cause of action sued upon." *Anderson v. Indiana Black Expo, Inc.,* 81 F.Supp.2d 494, 501 (S.D.N.Y.2000) (internal quotation omitted).

> FN12. Prior to the submission of this motion, I permitted plaintiffs to engage in limited discovery with regard to the Cunningham Defendants' contacts within this jurisdiction.

[1] "A non-domiciliary transacts business under section 302(a)(1) when [it] 'purposefully avails [itself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of [New York's] laws.' "*Beatie and Osborn LLP v. Patriot Scientific Corp.,* 431 F.Supp.2d 367, 387 (S.D.N.Y.2006) (quoting *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986)). Generally, telephone calls and other communications sent into New York by an out of state defendant, taken alone, are insufficient to establish a transaction of business in New York. *See Beatie,* 431 F.Supp.2d at 388. *But cf. National Telephone Directory Consultants, Inc. v. Bellsouth Advertising,* 25 F.Supp.2d 192, 196 (S.D.N.Y.1998) ("Telephone calls and mailings, however, can confer personal jurisdiction only if the defendants conducted these activities in such a manner as to project themselves into New York in order to purposely avail themselves of the benefits of doing business in New York.") (internal quotation omitted). When faced with a motion to dismiss predicated on lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction ex-

ists. *See DiStefano v. Carozzi North America, Inc.,* 286 F.3d 81, 84 (2d Cir.2001).

[2] Here, plaintiff has adduced evidence that: 1) Cunningham attended several meetings in New York relating to BCI business; 2) these meetings included BCI board and shareholder meetings at which the solicitation of capital for BCI and the financing of the Spanish and South African ventures was discussed; 3) Cunningham also participated in several BCI conference calls which were initiated from New York; 4) Cunningham's son John, who was an officer and director of each of the Cunningham entities, attended BCI meetings in New York both in person and via telephone; 5) both Cunninghams attended these meetings on behalf of the various Cunningham entities; 6) in January 2004, Michael Cunningham met with Hughes' *301 husband, Brian Hughes, in New York to discuss a potential investment by the Hughes family in BCI; 7) Cunningham also met with other potential investors in New York; and 8) Cunningham met with Spencer Clarke LLC, an investment banking firm that BCI retained in connection with the offering, in New York to brief the bankers on Sustainable Project's business.

These contacts are sufficient to constitute a transaction of business in New York both by Michael Cunningham personally and by the entities that he represented, namely, CHG, Sustainable Projects, and SPDG Fibre. Furthermore, there is a "substantial nexus" between this transaction (i.e., the formation of BCI and the solicitation of capital for it) and plaintiffs' claims in this action. Plaintiffs allege that Cunningham and his co-venturers defrauded them in the course of soliciting their investment in BCI, the formation of which necessitated Cunningham's travel to this state.

[3] In addition, plaintiffs have established that jurisdiction exists over SPDG Technologies as a successor in interest to Sustainable Projects and SPDG Fibre. *See Linzer v. EMI Blackwood Music, Inc.,* 904 F.Supp. 207, 213 (S.D.N.Y.1995). *See also Abbacor, Inc. v. Miller,* No. 01 Civ. 803, 2001 WL

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290

Page 14

452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

1006051, *4 (S.D.N.Y. Aug. 31, 2001) ("acts of a predecessor corporation can be attributed to a successor corporation for the purpose of establishing long arm jurisdiction where the predecessor and the successor are one and the same") (internal quotation omitted). Here, according to the testimony of John and Michael Cunningham, SPDG Technologies has acquired all of the assets of CHG, Sustainable Projects and SPDG Fibre. In addition, SPDG Technologies is managed by the same team that previously managed CHG, and operates from the same address as CHG. This is sufficient to establish a "*de facto* merger" between Sustainable Projects, SPDG Fibre and SPDG Technologies. *See International Private Satellite Partners, LP v. Lucky Cat, Ltd.,* 975 F.Supp. 483, 486-87 (W.D.N.Y.1997) (listing factors for *de facto* merger). Thus, plaintiffs have established that personal jurisdiction exists over SPDG Technologies by virtue of its relationship with its predecessor entities.

**2. Venue and *Forum Non Conveniens***

[4] The Cunningham defendants argue that venue is improper in this District and that the doctrine of *forum non conveniens* dictates dismissal of this action. Venue lies wherever "a substantial part of the events or omissions giving rise to [a] claim occurred ..."28 U.S.C. § 1391(a)(2). BCI conducted numerous meetings regarding its financing strategy in New York, and the PPM was prepared here. Furthermore, the Bridge Loan Agreements executed by plaintiffs and BCI contained a New York forum selection clause. (Comp.¶ 24). Therefore, venue is proper.

[5][6] A *forum non conveniens* analysis turns on: 1) the availability of an "adequate alternative forum[;]" 2) the "level of deference" that must be accorded plaintiffs' choice of forum; and 3) the balance of the public and private interest factors that determine which forum is "most convenient and will best serve the ends of justice." *USHA (India) Ltd. v. Honeywell Int'l, Inc.,* 421 F.3d 129, 134 (2d Cir.2005) (internal quotations omitted). Even as-

suming that there is an alternative forum in which all of the defendants would be subject to jurisdiction, defendants have not demonstrated that any other forum would be more convenient than this one. The various defendants are domiciled in, *inter alia,* the UK, California, Utah and Switzerland. Any single forum would necessitate witness travel and the transfer of *302 documents. Furthermore, plaintiffs' breach of contract claim against BCI is subject to the New York forum selection clause. It would be inefficient and inequitable to require plaintiffs to divvy up their claims against the various defendants in different locales. Therefore, the Cunningham defendants have failed to demonstrate that the doctrine of *forum non conveniens* warrants dismissal of this action.

**3. Fraud**

[7] Under New York law,[FN13] to plead fraud, plaintiffs must allege: 1) a material false representation or omission of an existing fact; 2) made with knowledge of its falsity; 3) with an intent to defraud; 4) reasonable reliance; 5) and resulting damage to the plaintiff. *See JHW Greentree Capital v. Whittier Trust Co.,* No. 05 Civ. 2985, 2005 WL 3008452, *9 (S.D.N.Y. Nov. 10, 2005) (Baer, J.). The Cunningham Defendants argue that plaintiffs have failed to allege fraud with adequate particularity, that any alleged misrepresentations were not "material," and that at least some of their statements constituted mere promises to perform future acts.

> FN13. Since it appears that no actual conflict exists between New York law and the law of Colorado (plaintiffs' domicile) or Delaware (BCI's state of incorporation), I will apply New York law to plaintiffs' substantive common law claims. *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998). In addition, while the Cunningham defendants have asserted that UK, Spanish and/or South African law may apply, they perform no choice of law analysis to support

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

this conclusion nor do they provide any citation to relevant foreign authorities.

[8] Plaintiffs allege that Cunningham provided the PPM to Hughes during their meeting in Colorado and is therefore responsible for the misrepresentations contained therein. (Comp.¶¶ 60-65). Plaintiffs further allege that, during that meeting, Cunningham misrepresented Bruner's role in BCI. (Comp.¶¶ 90-92). In addition, plaintiffs allege that Cunningham told Hughes at that meeting that BCI would be "in revenue" by April 2004.[FN14] Cunningham made these representations on behalf of CHG, Sustainable Projects, and SPDG Fibre, each of which had a significant interest in BCI's efforts.[FN15] Plaintiffs contend that Cunningham knew these representations were false because, prior to his meeting with Hughes in Colorado, he had written to Saltman and others detailing his concerns as to the viability of the BCI venture. (See Comp. ¶¶ 54-56 (warning that, unless financing was secured quickly "the BCI project in its present format will no longer exist").

> FN14. Plaintiffs also allege that, after BCI defaulted on the notes, Cunningham falsely represented to Hughes that CHG would assume BCI's debt to her, and even solicited an additional investment from Hughes. Plaintiffs contend that these representations also constituted fraud because the Cunningham Defendants either never intended to assume BCI's obligations, or did in fact assume the debt and have failed to make payment. (Comp.¶ 190).

> FN15. Although SPDG Technologies did not yet exist when Cunningham initially met Hughes to solicit her investment, as is set forth more fully below, plaintiffs have adequately alleged that SPDG Technologies succeeded to the liabilities of the other Cunningham entities.

These allegations are sufficient to plead fraud against Cunningham individually as well as against

the other Cunningham Defendants for whom he acted. Plaintiffs have alleged that Cunningham knew that BCI was in dire financial shape and that SPDG Fibre and its assets in Spain and South Africa had not been properly conveyed to BCI. These facts were contradicted by Cunningham's statements to Hughes and by the representations contained in the PPM. (See, e.g., Comp. ¶ 60(c) (reciting *303 PPM's representation that BCI "own[ed] interests in companies in Spain and South Africa that own or intend to acquire land, manufacturing facilities and joint venture interests in those countries ..."). Furthermore, plaintiffs have alleged that Cunningham knew of the "bad blood" between Bruner and Hughes, but nonetheless misrepresented Bruner's role in the BCI project. Therefore, plaintiffs have adequately alleged fraud against the Cunningham Defendants.

**4. Negligence/ Negligent Misrepresentation/ Negligent Nondisclosure/ Fraudulent Concealment**

[9][10][11][12] To plead negligent misrepresentation,[FN16] plaintiffs must allege that: "(1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information[;] (2) the defendant negligently provided incorrect information [;] and (3) the plaintiff reasonably relied upon the information given." Tomoka Re Holdings, Inc. v. Loughlin, No. 03 Civ. 4904, 2004 WL 1118178, *6 (S.D.N.Y. May 19, 2004) (internal quotation omitted). See also Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 187 (2d Cir.2004) (plaintiffs' reliance on the misrepresentation must be foreseeable). A duty to disclose is " 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.' "Id. (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996)). Similarly,

> FN16. Although plaintiffs, in this over-

452 F.Supp.2d 290

Page 16

452 F.Supp.2d 290

(Cite as: 452 F.Supp.2d 290)

broad complaint, plead separate claims for "negligence," "negligent misrepresentation," and "negligent nondisclosure," the factual allegations underlying plaintiffs' claim for "negligence" center on defendants' alleged misrepresentations and failure to disclose material facts. Thus, for purposes of this analysis, plaintiffs' "negligence" claim may be collapsed into plaintiffs' negligence-based misrepresentation and non-disclosure claims.

in negligent misrepresentation claims based on omissions, 'New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' *Creative Waste Mgmt., Inc. v. Capitol Environmental Servs., Inc.,* 429 F.Supp.2d 582, 609 (S.D.N.Y.2006) (quoting *Brass v. Am. Film Techs, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). A claim for fraudulent concealment requires an additional element, namely, a duty to disclose based on either a fiduciary relationship "or [that] defendant possesses superior knowledge, not readily available to the plaintiff, and [that defendant] knows that plaintiff is acting under a mistaken belief with respect to a material fact." *Heineman v. S & S Machinery Corp.,* 750 F.Supp. 1179, 1186 (E.D.N.Y.1990) (internal quotation omitted).

[13] The Cunningham Defendants argue that plaintiffs have failed to allege that Cunningham (or the entities that he represented) had a duty to provide plaintiffs with accurate information. I disagree. Plaintiffs have alleged that Cunningham met personally with Hughes to solicit her investment, and that he possessed "unique *304 [and] special-

ized expertise," *Eternity Global,* 375 F.3d at 187, with respect to the bio-composite industry in general and the BCI project in particular. Thus, it was reasonable for Hughes to repose trust in Cunningham, and foreseeable to Cunningham that Hughes would rely on his statements. Since, in soliciting Hughes' investment, Cunningham represented CHG, Sustainable Projects, and SPDG Fibre, his statements and omissions are attributable to those entities.

### 5. Unjust Enrichment

"[A] party may recover under an unjust enrichment theory if that party establishes: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Diversified Carting, Inc. v. City of New York,* No. 04 Civ. 9507, 2006 WL 147584, *7 (S.D.N.Y. Jan. 20, 2006) (internal quotations omitted). The Cunningham Defendants argue that plaintiffs' written loan agreements with BCI bar any claim for unjust enrichment. "Generally, the existence of an express agreement bars a quasi contract claim concerning the subject matter covered by that express agreement." *Id.* at *9 In some circumstances, a valid written agreement may preclude a claim for unjust enrichment even against a non-party to that agreement. *Id.* (citing *Bellino Schwartz Padob Advertising, Inc. v. Solaris Marketing Group, Inc.,* 635 N.Y.S.2d 587, 588 (1st Dep't 1995)); *But see Seiden Assocs., Inc. v. ANC Holdings,* Inc., 754 F.Supp. 37, 41 (S.D.N.Y.1991) ("the mere existence of a written contract governing the same subject matter does not preclude such recovery from non parties so long as the other requirements for quasi contracts are met").

[14] The Bridge Loan Agreements and promissory notes governed plaintiffs' investment in BCI. However, those agreements do not set forth plaintiffs' rights and obligations with respect to the Cunningham Defendants. If in fact the Cunningham Defendants wrongfully obtained assets plaintiffs intended for BCI, thereby depriving plaintiffs of the

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

value of their investment, plaintiffs' binding agreement with BCI should not preclude plaintiffs from proceeding in equity against the Cunningham entities. To hold otherwise would subvert the "logic of [this] equitable doctrine ... which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from [the culpable] parties." *Seiden,* 754 F.Supp. at 41. Thus, this claim too survives the motion to dismiss.

### 6. Civil Conspiracy

[15] There is no independent cause of action for conspiracy under New York law. *See Briarpatch Ltd., L.P. v. Pate,* 81 F.Supp.2d 509, 516 (S.D.N.Y.2000). "[H]owever, a conspiracy may be alleged, for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others." *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 591 (2d Cir.2005) (internal quotation omitted). Nonetheless, this doctrine "does not allow a plaintiff to reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." *Id.* Thus, while plaintiffs may allege facts to demonstrate that a conspiracy existed in support of their various substantive claims, they may not allege "conspiracy" as a separate basis for liability. Therefore, plaintiffs' cause of action for "civil conspiracy" must be dismissed.

### 7. Colorado Securities Act

Plaintiffs also assert a claim against each of the Cunningham Defendants (except**305 SPDG Technologies) for violations of the Colorado Securities Act ("CSA"). *See*Colo.Rev.Stat. §§ 11-15-501, 11-15-604.[FN17] The Cunningham Defendants argue that: 1) the New York choice of law provision in the Bride Loan Agreements precludes plaintiffs from asserting any claims under the CSA; and 2) plaintiffs have failed to adequately allege that the Cunningham defendants made any material misrepresentations with the requisite scienter.

> FN17. Section 11-15-501(1) provides that "[i]t is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly: (a) [t]o employ any device, scheme, or artifice to defraud; (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person". Colo.Rev.Stat. § 11-15-501(1). Section 11-15-604(3) provides that "[a]ny person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1) ... is liable to the person buying or selling such security ... for such legal or equitable relief that the court deems appropriate ..."Colo.Rev.Stat. § 604(3).

[16][17] The Cunningham Defendants rely on the Bridge Loan Agreements' choice of law provision, which states: "[t]his Agreement shall be construed and enforced in accordance with and governed by the laws of the State of New York ..." (Comp., Ex. A § 11.1). However, "[f]raud claims 'are outside the scope of contractual choice-of-law provisions that specify what law governs ...' "*JHW Greentree Capital, L.P. v. Whittier Trust Co.,* No. 05 Civ. 2985, 2006 WL 1080395, *6 (S.D.N.Y. April 24, 2006) ("*Greentree II*") (quoting *Finance One Public Co. Ltd. v. Lehman Brothers Spec. Fin., Inc.,* 414 F.3d 325, 335 (2d Cir.2005)). Thus, in this instance the choice of law clause does not bar plaintiffs' CSA claims. By its terms, the CSA applies to, *inter alia,*"persons who sell or offer to sell [securities] when an offer to sell is made in" Colorado. Colo.Rev.Stat. § 11-51-102(1). Here, Cunning-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

ham traveled to Colorado to solicit plaintiffs' investment. Thus, the CSA applies to the Cunningham Defendants' activities.

[18] In addition, as set forth above, plaintiffs have adequately alleged that Cunningham made several material misrepresentations. Furthermore, at the very least, plaintiffs have alleged that Cunningham made these statements recklessly. Therefore, plaintiffs have adequately alleged a claim for violations of the CSA against the Cunningham Defendants.

**8. Successor Liability**

[19][20] Plaintiffs assert a claim for successor liability against CHG, Sustainable Projects, SPDG Fibre and SPDG Technologies in order to render those entities liable for BCI's debt to the plaintiffs. "In general, successor liability will lie when: (1) there is an express or implied agreement to assume the other company's debts and obligations; (2) the transaction was fraudulent; (3) there was a de facto merger or consolidation of the companies; or (4) the purchasing company was a mere continuation of the selling company." *American Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.,* 944 F.Supp. 240, 249 (S.D.N.Y.1996). " '[T]o find that a *de facto* merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation, and the assumption of liabilities by the purchaser.' "**\*306***Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,* 775 F.2d 38, 42 (2d Cir.1985) (quoting *Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 839 (S.D.N.Y.1977)).

[21] Plaintiffs allege that SPDG Technologies, which is owned and controlled, at least in part, by Michael Cunningham, has acquired all of the assets of Sustainable Projects and SPDG Fibre from CHG.

Furthermore, plaintiffs allege that SPDG Technologies is developing Spanish and South African projects in BCI's stead. (Comp.¶¶ 181-187).[FN18] This is sufficient to allege a *de facto* merger at the pleading state. *See Cargo Partner AG v. Albatrans, Inc.,* 207 F.Supp.2d 86, 89 n. 1 (S.D.N.Y.2002) ("when determining whether the existence of a de facto merger has been plead sufficiently it is appropriate to apply a flexible rather than formulaic approach").

> FN18. Indeed, as set forth above, the jurisdictional discovery taken thus far has confirmed these allegations.

In response, the Cunningham defendants argue that plaintiffs' successor liability theory is merely an attempt to "boostrap" plaintiffs' claims against entities who would otherwise not be liable for plaintiffs' injuries. Be that as it may, such "bootstrapping" is permitted in certain circumstances. Indeed, that is the purpose of the successor liability doctrine. Therefore, plaintiffs have adequately plead "successor liability" against the Cunningham entities.

**9. Vicarious Liability**

Plaintiffs allege claims for "respondeat superior, principal/agent, employer/employee and joint venture liability" against CHG, Sustainable Projects, SPDG Fibre and SPDG Technologies. The Cunningham entities move to dismiss these "vicarious liability" claims on the basis that: 1) plaintiffs have failed to allege any substantive tort against any of the Cunningham Defendants; and 2) these "claims" are merely theories of liability applicable to other causes of action rather than independent bases for liability. First, as set forth above, plaintiffs have adequately alleged substantive torts against the Cunningham entities. In addition, while I agree that this is generally an evidentiary issue rather than an independent cause of action, there is authority to support the pleading of vicarious liability as a separate claim. *See New York Islanders Hockey Club, Inc v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290    Page 19
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

*Comerica Bank-Texas,* 71 F.Supp.2d 108, 119-20 (E.D.N.Y.1999) (denying motion to dismiss respondeat superior "cause of action"). Therefore, although the derivative nature of these "claims" render the format of their pleading an inconsequential question, the Cunningham Defendants' motion to dismiss these "claims" is denied.

### 10. Promissory Estoppel/ Equitable Estoppel

[22][23] Plaintiffs plead causes of action for promissory estoppel and equitable estoppel against CHG, Sustainable Projects, SPDG Fibre and SPD Technologies. To plead promissory estoppel, a plaintiff must allege: "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance." *Readco, R.D.P. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996).[FN19] To succeed on a claim for *307 equitable estoppel, plaintiff must show that defendant: "(1) engaged in conduct which amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts." *Id.* (internal quotation omitted). In addition, the party alleging this claim must ..."show with respect to [itself]: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in [its] position." *Id.* at 302.(internal quotation omitted).

> FN19. The Cunningham Defendants, relying on *Angelo, Gordon & Co., L.P. v. Dycom Indus., Inc.,* 2006 WL 870453, *11 (S.D.N.Y. March 31, 2006), argue that plaintiffs must also allege the existence of a binding agreement to succeed on a claim for promissory estoppel. However, there is nothing in *Dycom* to suggest such a requirement exists. *Id.* Furthermore, if plaintiffs were required to plead the existence of an enforceable agreement, promissory estoppel would be indistinguishable from a garden variety breach of contract

claim.

[24] Here, plaintiffs allege, *inter alia,* that Cunningham promised plaintiffs that they would receive a lien on CHG's Spanish venture to secure repayment of their investment in BCI. (Comp.¶ 162). In addition, plaintiffs allege that Cook, acting on behalf of CHG, sent plaintiffs a "proposal" that had been agreed to by Cunningham and the other defendants. That proposal stated that a CHG subsidiary would take title to the Spanish and South African projects and that plaintiffs would receive equity in that new entity in proportion to their original investment in BCI. (Comp.¶ 170). Plaintiffs allege that, in reliance on these promises, they refrained from filing suit or taking other action to recoup their investment. Furthermore, while the "new entity" (SPDG Technologies) has been formed and has allegedly assumed certain of BCI's assets, plaintiffs' investment has never been repaid. These facts are sufficient to allege claims for promissory and equitable estoppel.

### 11. Fraudulent Conveyance

Plaintiffs allege claims for constructive and intentional fraudulent conveyance against CHG, Sustainable Projects, SPDG Fibre and SDG Technologies. Under New York Debtor and Creditor Law ("DCL") Section 273, "[e]very conveyance made and every obligation incurred by a person who is or will ... thereby [be] rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." In addition, any conveyance made "with actual intent ... to hinder, delay, or defraud ... present or future creditors, is fraudulent as to both present and future creditors." N.Y. DCL § 276.

[25] Plaintiffs allege that assets belonging to BCI, namely, plaintiffs' cash and BCI's purported interest in the Spanish and South African bio-composite projects, were conveyed to the Cunningham entities without fair consideration.[FN20] The Cunningham

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

Defendants argue that these allegations are, in essence, shareholder derivative claims based on corporate mismanagement. Therefore, according to the defendants, plaintiffs, as mere creditors, lack standing to assert them. Perhaps if the Cunningham Defendants were given an opportunity to draft plaintiffs' complaint, they would have chosen different causes of action. However, fraudulent transfer laws provide a cause of action to creditors of insolvent entities based on the transfer of the debtor's assets without *308 meaningful return. Plaintiffs have adequately alleged just that.

> FN20. The Cunningham Defendants argue that, since plaintiffs allege that BCI never obtained an interest in the Spanish or South African ventures, it could not have fraudulently conveyed any such interest. However, plaintiffs are permitted to plead in the alternative. BCI's interest in these assets and the sequence of conveyances will (hopefully) be revealed through discovery. When more is known about what actually occurred, plaintiffs may be restricted to claims based on fraud, rather than fraudulent conveyance, or vice versa.

**12. Piercing the Corporate Veil**

Plaintiffs plead a claim for "lack of separate corporate existence/ alter ego" against Cunningham, CHG, Sustainable Projects, and SPDG Fibre.[FN21] Plaintiffs seek to render these entities liable for BCI's contractual debt to the plaintiffs. "Under Delaware law, 'a court [may] ... pierce the corporate veil ... where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.' "*Jet Star Enterprises, Ltd. v. Soros*, No. 05 Civ. 6585, 2006 WL 2270375, *6 (S.D.N.Y. Aug. 9, 2006) (Baer, J.) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir.1995)).[FN22] " 'To prevail under an alter ego [theory] ... a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness ... [is] present.' " *Id.* (quoting *Fletcher*, 68 F.3d at 1457).

> FN21. Plaintiffs also plead an identical claim against BCI.

> FN22. Since BCI, the entity whose "veil" plaintiffs' seek to pierce, is incorporated in Delaware, Delaware law applies to plaintiffs' veil piercing claims. *See Fletcher*, 68 F.3d at 1456.

[26] The Cunningham Defendants argue that "veil-piercing" is not an independent basis for liability. Indeed, the essence of a veil-piercing claim is that a corporation's owners abused the corporate form in such a way as to render them liable for the debts of the corporation. Such claims are, necessarily, fact bound inquiries. Since plaintiffs have alleged that the Cunningham Defendants used BCI in this manner, and that plaintiffs suffered unjust injury as a result, plaintiffs' veil piercing claim must stand.

**13. Breach of Fiduciary Duty**

[27] Plaintiffs plead a claim for breach of fiduciary duty against Cunningham individually, as director of BCI. Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors. *See Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir.1981) (citing *New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 7, 110 N.E.2d 397 (1953)). Once again, the Cunningham Defendants argue that this claim is akin to a shareholder derivative cause of action and that therefore plaintiffs, as non-shareholders, lack standing to assert it. While "[a]n officer or director does not owe a fiduciary duty to the creditors of a solvent corporation"*C3 Media & Marketing Grp. LLC v. Firstgate Internet, Inc.*, 419 F.Supp.2d 419, 431 (S.D.N.Y.2005) (internal quotation omitted), the fact of insolvency causes such a duty to arise. *Id.* Thus, plaintiffs, as creditors, have standing to assert this claim against BCI's directors.

In addition, defendants argue that, to the extent plaintiffs' breach of fiduciary duty claim is predic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ated on the "trust fund doctrine," that right of action is restricted to court appointed receivers, trustees in bankruptcy or judgment creditors. For this proposition, defendants rely on *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank,* 94 N.Y.2d 541, 550, 708 N.Y.S.2d 26, 729 N.E.2d 683 (2000). However, there the Court of Appeals held that under the trust fund doctrine "officers and directors of an insolvent corporation ... hold ... corporate assets in trust for the benefit of its general creditors." *Id.* at 549, 708 N.Y.S.2d 26, 729 N.E.2d 683. Thus, plaintiffs have adequately alleged a claim for breach of fiduciary duty against Cunningham*309 as a director of BCI.[FN23]

> FN23. The Cunningham Defendants also argue that plaintiffs cannot sustain a claim for breach of fiduciary duty under the "trust fund doctrine" because plaintiffs have failed to allege that the directors preferred one creditor over another. In fact, plaintiffs allege that Cunningham preferred himself over plaintiffs in divvying up BCI's assets.

## 14. Constructive Trust

Plaintiffs allege a claim for constructive trust against each of the Cunningham Defendants. "To sustain a claim for a constructive trust, plaintiffs must establish '(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment.' "*Diversified Carting,* 2006 WL 147584, *5 (quoting *In re First Central Financial Corp.,* 377 F.3d 209, 212 (2d Cir.2004)). Defendants argue that the written loan agreements between plaintiffs and BCI bar any claim for imposition of a constructive trust, and that plaintiffs have failed to allege the existence of a fiduciary relationship.

[28] As set forth above, since plaintiffs had no enforceable agreement with any of the Cunningham Defendants, and since plaintiffs' claims against the Cunningham Defendants are not wholly contingent on plaintiffs' claims against BCI, plaintiffs' constructive trust claim is not barred. Furthermore, plaintiffs have adequately alleged a fiduciary duty on the part of Cunningham, who in all respects acted as agent for the various Cunningham entities. Therefore, plaintiffs have adequately plead a claim for constructive trust.

## 15. Accounting

"A party seeking an accounting must first establish four conditions: '(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.' "*Pressman v. Estate of Steinvorth,* 860 F.Supp. 171, 179 (S.D.N.Y.1994) (quoting *300 Broadway Realty Corp. v. Kommit,* 37 Misc.2d 325, 235 N.Y.S.2d 205, 206 (Sup.Ct.1962)). Plaintiffs seek a full accounting of BCI's assets from its formation to the present.

[29] The Cunningham Defendants argue that this claim should be dismissed because it "requests no affirmative relief against them." (Cunningham Defendants' Memorandum in Support of Motion to Dismiss, dated June 2, 2006 at 16). However, plaintiffs have alleged that various BCI assets, including their own investment funds, wound up in the Cunningham Defendants' coffers. Therefore, plaintiffs have adequately plead a claim for an accounting as to the Cunningham Defendants.

## B. Saltman, BCI and Bio-Comp

Plaintiffs plead claims against Saltman, BCI and Bio-Comp for: breach of contract[FN24] (BCI); fraud; negligence; negligent misrepresentation; "intentional concealment/ negligent nondisclosure;" unjust enrichment; civil conspiracy; "respondeat superior" (BCI and Bio-Comp); violations of the Colorado Securities Act; successor liability (Bio-Comp); fraudulent conveyance (BCI and Bio-Comp); "lack of separate corporate existence/ alter

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

ego" (BCI); constructive trust (BCI); breach of fiduciary duty (Saltman); and an accounting.[FN25] *310 Each will be addressed in turn.[FN26]

FN24. BCI does not move to dismiss plaintiffs' breach of contract claim.

FN25. Since the applicable standards for each of these claims has been set forth above, I will not repeat them below. In addition, to the extent that Saltman, BCI, Bio-Comp (or any of the other defendants) raise arguments identical to those raised by the Cunningham Defendants, I will not address them a second time.

FN26. BCI and Bio-Comp join in Saltman's arguments (as well as the arguments of the other defendants) but put forth no additional arguments of their own in support of dismissal.

**1. Fraud**

Saltman argues that plaintiffs have failed to allege fraud with adequate particularity and that plaintiffs have failed to allege scienter. Plaintiffs have alleged that Saltman, on behalf of himself, BCI and Bio-Comp: 1) authorized and approved the PPM (indeed he signed the unanimous written consent by which it was adopted); 2) signed the "Form D" filed with the SEC on January 14, 2004 which stated that Spencer Clarke LLC was the sole entity retained as placement agent for BCI;[FN27] and 3) wrote to plaintiffs on January 17, 2005 and assured them that SPDG Fibre had been properly conveyed to BCI.

FN27. In their brief, plaintiffs contend that Saltman also signed the Bridge Loan Agreements which contained a similar misrepresentation. (*See* Pltfs.' Memorandum in Opposition dated June 23, 2006, at 12). However, the complaint merely alleges that the Bridge Loan Agreements were executed by "BCI." (*See, e.g.,* Comp. ¶ 97).

The sample Bridge Loan Agreement appended to plaintiffs' complaint lists Saltman's name in the signature block, but is unsigned. (Comp., Ex. A).

Plaintiffs contend that Saltman knew the above representations to be false because, after the PPM was approved but before it was provided to plaintiffs, Saltman received Cunningham's email attesting to SPDG Fibre's tenuous financial circumstances and threatening to withdraw from the BCI venture. In addition, two days after filing the Form D, Saltman formally engaged RVM (Bruner's entity) to help raise capital for BCI.

[30] These allegations are sufficient to state a claim for fraud against Saltman, BCI and Bio-Comp. Plaintiffs have alleged that Saltman personally approved the PPM and authorized its distribution to plaintiffs with knowledge that it contained misrepresentations. In addition, plaintiffs have alleged that, by signing the Form D (and either signing or approving the Bridge Loan Agreements), Saltman misrepresented RVM's role in the offering. Saltman argues that plaintiffs have not alleged that Saltman was aware of any prior dealings between Bruner and Hughes, and therefore could not have known that Bruner's involvement in the offering was material. However, plaintiffs do allege that Bruner initially suggested to Saltman (as well as to the other defendants) that they approach plaintiffs as potential investors. This should have put Saltman on notice that Bruner and Hughes had some sort of prior relationship. Plaintiffs also allege that Bruner knowingly omitted RVM from the SEC filing and the Bridge Loan Agreements. This omission, viewed in conjunction with Bruner's suggestion to Saltman that they solicit plaintiffs, is sufficient to allege an intent to defraud by Saltman. Thus, Saltman, BCI and Bio-Comp's motion to dismiss the fraud claim must be denied.

**2. Negligence/ Negligent Misrepresentation/ Negligent Nondisclosure/ Fraudulent Concealment**

452 F.Supp.2d 290

452 F.Supp.2d 290

(Cite as: 452 F.Supp.2d 290)

Saltman argues that plaintiffs' claims sounding in negligence (as well as their concealment claim) should be dismissed because: 1) Saltman never agreed to personally assume the liabilities of BCI or Bio-Comp; and 2) plaintiffs have failed to *311 allege a duty by Saltman to render complete or accurate information.

[31] Saltman's first argument fails for the simple reason that plaintiffs have not alleged that Saltman is liable for acts committed by BCI or Bio-Comp, but rather that Saltman is liable for his own tortious conduct, taken on behalf of BCI and Bio-Comp. With respect to the existence of a duty, it appears that Saltman never met plaintiffs or communicated with them directly prior to their investment in BCI.FN28However, plaintiffs have alleged that Saltman was aware of defendants' solicitation of plaintiffs. In fact, he sent Hughes a handwritten thank you note after the first installment of her investment was received. (Comp.¶ 96). In addition, the PPM touted Saltman's 10 years of successful experience in the "environmental materials industry." (Sher Aff., Ex. B at 30). This is sufficient to allege that Saltman possessed "unique or specialized expertise" giving rise to a duty to convey accurate information. *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263-64, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996) ("Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact.") Therefore, for now plaintiffs have sufficiently alleged that Saltman had a duty to disclose accurate information to plaintiffs. Since Saltman acted on behalf of BCI and Bio-Comp, this duty extends to those entities as well. Thus, plaintiffs have adequately alleged claims for negligent misrepresentation, negligent nondisclosure and fraudulent concealment against Saltman, BCI and Bio-Comp.

> FN28. He did, however, write to Hughes after BCI had defaulted on the notes.

**3. Unjust Enrichment**

Saltman argues that plaintiffs' claim for unjust enrichment must fail because plaintiffs have failed to allege that he retained a benefit at plaintiffs' expense. However, plaintiffs have alleged that $100,000 of their initial investment was transferred to Bio-Comp "and/or" Saltman. (Comp.¶ 114). This is sufficient to allege that Saltman and Bio-Comp received a benefit from plaintiffs. In addition, while it would appear that plaintiffs' unjust enrichment claim against BCI will be barred by the Bridge Loan Agreements that plaintiffs executed with BCI, plaintiffs correctly assert that they may plead alternate theories of liability. *See Berk v. Tradewell, Inc.,* No. 01 Civ. 9035, 2003 WL 21664679, *8 (S.D.N.Y. July 16, 2003). In the event that BCI asserts a valid contractual defense to the promissory notes, plaintiffs may proceed on an unjust enrichment theory. Thus, for the moment, plaintiffs have adequately plead claims for unjust enrichment against BCI, as well as against Saltman and Bio-Comp.

**4. Civil Conspiracy**

For the reasons set forth above, *see* section A(6), *supra,* plaintiffs' claim for civil conspiracy must be dismissed.

**5. Colorado Securities Act**

Saltman argues that plaintiffs' CSA claim fails because plaintiffs have failed to allege fraud with adequate particularity. *See Teacher's Retirement System of Louisiana v. Qwest Communications Int'l, Inc.,* No. 04 Civ. 0782, 2005 WL 2359311, * 13-14 (D.Colo. Sept. 23, 2005) (reciting elements of CSA securities fraud). However, as set forth above, plaintiffs have alleged, *inter alia,* that Saltman approved the PPM and authorized its distribution to plaintiffs with knowledge of the misrepresentations contained therein. That is sufficient to plead fraud. Therefore, plaintiffs *312 have adequately alleged a CSA claim against Saltman, BCI and Bio-Comp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

**6. Vicarious Liability/ Successor Liability/ Fraudulent Transfer/ Veil-Piercing/ Constructive Trust**

Plaintiffs allege each of these claims (except successor liability) against BCI. Plaintiffs also allege successor liability, fraudulent transfer, and vicarious liability claims against Bio-Comp.[FN29] While Bio-Comp and BCI have joined in the other defendants' motions to dismiss, they have provided no argument as to why any of these claims are deficient against them. Thus, for the reasons set forth above, plaintiffs have adequately alleged these claims against BCI and Bio-Comp.

> FN29. None of these claims are plead against Saltman.

**7. Breach of Fiduciary Duty**

As set forth above, directors of an insolvent corporation owe a fiduciary duty to safeguard corporate assets for the benefit of general creditors. See Clarkson, 660 F.2d at 512. Plaintiffs have adequately alleged that Saltman breached this duty. Therefore, Saltman's motion to dismiss this claim is denied.

**8. Accounting**

Saltman argues that this equitable remedy is unavailable because plaintiffs have an adequate remedy at law. See Berk, 2003 WL 21664679, *7. Specifically, the Bridge Loan Agreements provide plaintiffs with the right to inspect BCI's records. Saltman contends that plaintiffs have requested BCI's relevant records in discovery and that defendants have complied with those requests. While it may prove that normal discovery procedures are adequate to trace BCI's assets, I decline to dismiss this claim now without the benefit of full discovery.

**C. Bruner, Equistar, RVM, Lotito, Nelson & Lavold (the "Bruner Defendants")**

Plaintiffs allege claims against the Bruner Defendants for: fraud; negligence; negligent misrepresentation; "intentional concealment/ negligent nondisclosure;" unjust enrichment; civil conspiracy; "respondeat superior" (RVM and Equistar); violations of the Colorado Securities Act; fraudulent transfer (Equistar); breach of fiduciary duty (Lotito, Nelson and Lavold); and an accounting.

**1. Fraud**

Plaintiffs allege that the PPM was prepared with the "knowledge, consent, authority, and/or assistance" of each of the Bruner Defendants. (Comp.¶ 51).FN30 However, only Lotito and Nelson (not Bruner or Lavold) received Cunningham's December 30, 2003 email threatening to pull out of the project. Receipt of this communication provides a sufficient basis to allege that Lotito and Nelson knew that the representations contained in the PPM were false.[FN31] The Bruner Defendants argue that *313 receipt of the December 30th email is inapposite, since it was received after the PPM was adopted by BCI's board. However, plaintiffs have alleged that, after Cunningham sent the December 30th email, Lotito and Nelson discovered that the defendants planned to approach Hughes to solicit her investment. (Comp.¶ 81). Thus, Lotito and Nelson knew that the PPM would be disseminated to Hughes. Therefore, plaintiffs have adequately alleged that Lotito and Nelson authorized the distribution of the PPM to Hughes with knowledge of its falsity. This is sufficient to state a claim for fraud against Lotito and Nelson. In addition, since Lotito and Nelson served as Equistar's representatives on BCI's board, plaintiffs have sufficiently alleged fraud against Equistar as well.

> FN30. While Lotito and Nelson were BCI board members when the PPM was approved, and thus formally ratified its contents in their capacity as directors, Bruner was never a BCI board member. Lavold did not become a BCI board member until August 2004, long after the PPM was ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
**(Cite as: 452 F.Supp.2d 290)**

proved.

FN31. At oral argument and in a sub-
sequent letter brief, the Bruner Defendants
argue that the "Risk Factors" disclosed in
the PPM defeat any misrepresentations
contained therein. The PPM did disclose
that BCI was a high-risk investment with
no guarantee of profitability. However, the
PPM did not disclose, *inter alia,* that BCI
did not own various assets that it purported
to own, or that key participants had already
threatened to abandon the project. In short,
the PPM's risk disclosures do not, as a mat-
ter of law, preclude plaintiffs' reliance on
alleged misrepresentations contained
therein.

However, assuming plaintiffs' allegation connecting
Bruner and Lavold to the PPM suffices to allege a
misrepresentation, (*see* comp. ¶ 51), plaintiffs have
not alleged with any particularity how Bruner and
Lavold knew that the PPM contained any affirmat-
ive misrepresentations at the time it was distributed
to plaintiffs.[FN32] Therefore, plaintiffs have failed
to plead fraud based on any affirmative misrepres-
entations against Bruner, Lavold or RVM.[FN33]

FN32. Plaintiffs claims relating to the non-
disclosure of Bruner's role in BCI will be
addressed below in connection with
plaintiffs' fraudulent concealment and oth-
er non-disclosure claims.

FN33. In addition, plaintiffs cite a January
17, 2005 email from Saltman and Nelson
to Hughes representing that SPDG Fibre
had been properly conveyed to BCI.
(Comp.¶ 164). This email was cc'd to La-
vold. (*Id.*) However, once again, plaintiffs'
have not alleged any facts showing that
Lavold knew that this assertion was false.

[32] In addition, plaintiffs argue that, as joint ven-
turers, each defendant may be liable for fraud com-
mitted by any other defendant acting in the ordinary

course of BCI's business. *See Gramercy Equities
Corp. v. Dumont,* 72 N.Y.2d 560, 565, 534
N.Y.S.2d 908, 531 N.E.2d 629 (1988) ("As agents
for each other, partners and joint venturers are
jointly and severally liable to third parties for any
wrongful act or omission of any partner acting in
the ordinary course of the business of the partner-
ship.") (internal quotation omitted). However, here
Bruner, RVM and Lavold were shareholders in a
corporation (BCI) of which Lotitio and Nelson
were directors. While Bruner, Lotito and Nelson
were each also affiliated with Equistar, plaintiffs
have not alleged any facts showing that Bruner,
Lotito and Nelson functioned as "partners" in the
BCI venture. Nor may plaintiffs allege that Lotito
and Nelson acted as agents for RVM, simply be-
cause RVM owned shares in BCI. Thus, plaintiffs
have failed to allege that Bruner, Lavold or RVM
are liable for Lotito and Nelson's (or any other de-
fendant's) fraudulent statements by virtue of their
status as "co-venturers."

**2. Negligence/ Negligent Misrepresentation/ Neg-
ligent Nondisclosure/ Fraudulent Concealment**

In addition to the misrepresentations contained in
the PPM, plaintiffs allege that the Bruner Defend-
ants failed to disclose Bruner's role in the BCI ven-
ture. In response, the Bruner Defendants argue,
*inter alia,* that: 1) they had no duty to disclose Bru-
ner's role (or any other material facts); 2) any mis-
representation or omission regarding Bruner's role
was made by Cunningham alone; and 3) plaintiffs'
tort claims are barred by the "economic loss" rule.

**\*314** [33] As set forth above, a duty to convey ac-
curate information may arise when, *inter alia,* a
person "posses[es] unique or specialized expertise."
*Eternity Global,* 375 F.3d at 187 (internal disclos-
omitted). Similarly, in the context of a nondisclos-
ure claim, a duty to speak may exist "where one
party possesses superior knowledge, not readily
available to the other, and knows that the other is
acting on the basis of mistaken knowledge." *Creat-
ive Waste,* 429 F.Supp.2d at 609 (internal quotation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

omitted). *See also Heineman,* 750 F.Supp. at 1186 (reciting substantially identical standard for duty to disclose in context of fraudulent concealment claim).

With respect to affirmative misrepresentations, plaintiffs have alleged that each of the Bruner Defendants consented to the issuance of the PPM with knowledge of its contents. (Comp.¶ 51).[FN34] In addition, each of the Bruner Defendants was aware that the PPM would be distributed to Hughes. (Comp.¶ 81). Furthermore, the PPM touted the "specialized expertise" of Nelson, Lotito and Lavold. (Sher Aff. Ex. B at 30-32). Bruner also had specialized knowledge with respect to the venture based on his key role in forming BCI and assembling its management team. (Comp.¶¶ 30-34). Therefore, each of the Bruner Defendants had a duty to convey accurate information and each is responsible for any misrepresentations contained in the PPM.

> FN34. As set forth above, Nelson and Lotito, as BCI directors, formally approved the PPM. Although Lavold was not a director when the PPM was approved, he was an officer and founding shareholder. In addition, Bruner owned a founding stake in BCI through his interests in RVM and Equistar. Thus, plaintiffs' "group pleading" regarding Bruner and Lavold's knowledge of the PPM's contents and approval of its adoption is reasonable in light of these background facts.

[34] With respect to the non-disclosure of Bruner's role in the project, plaintiffs have alleged that each defendant (including Nelson, Lotito and Lavold) knew that that Bruner had identified plaintiffs as potential investors. Thus, Nelson, Lotito and Lavold had reason to believe that Bruner's role in the venture would be material to the plaintiffs. However, Nelson, Lotito and Lavold had no reason to believe that plaintiffs were acting under any mistaken belief as to Bruner's role. Therefore, plaintiffs have failed to state a claim for negligent nondis-

closure against Nelson, Lotito or Lavold.

Plaintiffs have alleged that Bruner knew that Hughes would be loathe to invest in any venture in which Bruner played a key role. (Comp. ¶ 83 ("Hughes had made very clear to [Bruner] the significant ... animosity and distrust ..." that Hughes felt for Bruner)). While these conclusory allegations of mistrust, taken alone, are not sufficient to sustain a nondisclosure claim even at the pleading stage, plaintiffs also allege that Bruner told Cunningham not to disclose his role in the venture to Hughes. (Comp.¶ 84). Thus, plaintiffs have adequately alleged that Bruner knew that plaintiffs were acting on the basis of inaccurate (or incomplete) information. Therefore, plaintiffs have adequately plead a claim for negligent nondisclosure against Bruner. Since plaintiffs have alleged that Bruner was a principal of both RVM and Equistar, and acted on behalf of both entities with respect to the BCI project, those entities are liable for Bruner's omission as well.

[35][36] To plead fraudulent concealment, plaintiffs must allege an intent to defraud in addition to a duty to disclose. Plaintiffs allege, "upon information and belief[,]" that Bruner "specifically advised" Cunningham not to disclose Bruner's true role in the BCI venture to Hughes. (Comp.¶ 84). Bruner argues that fraud *315 allegations may not be alleged upon information and belief. While this is correct as a general matter, "fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge" when those allegations are "accompanied by a statement of the facts upon which the belief is based." *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Here, communications between Bruner and Cunningham are solely within the defendants' knowledge. Furthermore, plaintiffs have alleged facts supporting this belief, namely, that Bruner had a long history of troubled investments with Hughes; that Bruner knew Hughes would not invest if she knew the full extent of his involvement in BCI; and that Cunningham in fact did not dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

close Bruner's true role in BCI. Therefore, plaintiffs have adequately alleged fraudulent concealment against Bruner, RVM and Equistar.[FN35]

> FN35. Plaintiffs fraudulent concealment claims against Nelson, Lotito and Lavold fail because, as set forth above, plaintiffs have failed to allege that they knew plaintiffs were acting under a mistaken belief as to any material fact. *See Heineman,* 750 F.Supp. at 1186.

Bruner also argues that Cunningham alone should be liable for any failure to disclose Bruner's role, because plaintiffs relied exclusively on Cunningham's concealment of Bruner's involvement, rather than on any statements by Bruner to Cunningham. *See Securities Investor Protection Co. v. BDO Seidman, LLP,* 95 N.Y.2d 702, 709-11, 723 N.Y.S.2d 750, 746 N.E.2d 1042 (2001) (no fraud where plaintiff relied on independent actions of third party rather than defendant's misrepresentations to third party). However, if in fact Bruner advised Cunningham not to disclose Bruner's involvement, then Cunningham's actions cannot be viewed as independent. Plaintiffs have alleged that Bruner's "advice" to Cunningham lead directly to the concealment of this information from the plaintiffs.

[37] Finally, the Bruner Defendants contend that plaintiffs' tort claims are barred by the "economic loss" rule. *See Carmania Corp. N.V. v. Hambrecht Terrell Int'l,* 705 F.Supp. 936, 938 (S.D.N.Y.1989) ("plaintiffs who have suffered 'economic loss,' but not personal or property injury" are restricted to contract action). However, "a contracting party may be charged with ... separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract." *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 551, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992). Here, there was no binding agreement between plaintiffs and the Bruner Defendants. Even if there were such an agreement, it is well established that fraud-based claims may exist alongside a claim for breach of contract. *See EED Holdings v. Palmer Johnson Acquisition*

*Corp.,* 387 F.Supp.2d 265, 277-79 (S.D.N.Y.2004).

Thus, plaintiffs have adequately alleged negligent misrepresentation against each of the Bruner Defendants, and have adequately alleged negligent nondisclosure and fraudulent concealment against Bruner, Equistar and RVM.

### 3. Unjust Enrichment

As set forth above, plaintiffs' written agreement with BCI does not, as a matter of law, bar a claim for unjust enrichment against non-parties to that agreement whose alleged conduct falls outside of the subject matter of the agreement. Thus, plaintiffs have adequately alleged a claim for unjust enrichment against the Bruner Defendants.

### 4. Civil Conspiracy

For the reasons set forth above, plaintiffs claim for "civil conspiracy" must be dismissed *in toto.*

### *316 5. Vicarious Liability

For the reasons set forth above, plaintiffs may plead "vicarious liability" as a separate cause of action. Therefore, the Bruner Defendants' motion to dismiss these claims is denied.

### 6. Colorado Securities Act

Since a CSA claim may be predicated on an affirmative fraudulent misrepresentation or a fraudulent omission, *see* Colo.Rev.Stat. § 11-15-501(1)(b), plaintiffs have adequately alleged violations of the CSA against Nelson, Lotito and Equistar (for affirmative misrepresentations) and Bruner, Equistar and RVM (for fraudulent concealment).

### 6. Fraudulent Transfer[FN36]

> FN36. As noted, plaintiff pleads separate claims for fraudulent conveyance under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

New York law and fraudulent transfer under Delaware and/or Colorado law. Equistar is named in the fraudulent transfer count plead under Delaware and Colorado law. However, even if Delaware or Colorado law would be applicable to plaintiffs' fraudulent transfer claim against Equistar, Delaware and Colorado's relevant standards appear to be substantively identical to those of New York.

[38] Plaintiffs allege that $50,000 from the second $1 million that plaintiffs invested in BCI was transferred by "one or more" of the other defendants to Equistar for less than fair consideration. (Comp.¶¶ 129, 325). Plaintiffs also allege that BCI was either insolvent at the time of this transfer, or became insolvent as a result of this and other fraudulent transfers to the various defendants. (Comp.¶ 323). Equistar argues that plaintiffs fraudulent transfer allegations are "conclusory," and that plaintiffs fail to plead any facts showing an intent to defraud. However, allegations of constructive fraudulent transfer need not meet the heightened pleading requirements of Rule 9(b). *Sullivan v. Kodsi,* 373 F.Supp.2d 302, 307 (S.D.N.Y.2005). Plaintiffs need not plead an intent to defraud with respect to each fraudulent conveyance. Therefore, plaintiffs' have sufficiently alleged a claim for fraudulent transfer against Equistar.

**7. Breach of Fiduciary Duty**

As set forth above, directors of an insolvent corporation owe a fiduciary duty to general creditors of the corporation to preserve corporate assets *See Clarkson,* 660 F.2d at 512. Therefore, plaintiffs have a viable claim for breach of fiduciary duty against Nelson, Lotito and Lavold as directors of BCI.

**8. Accounting**

For the reasons set forth above, plaintiffs have adequately alleged a claim against the Bruner Defendants for an accounting of all of BCI's assets from its inception to the present.

**C. Glenn and EAPD**

Plaintiffs allege claims against Glenn and EAPD for: fraud; negligence; negligent misrepresentation; "intentional concealment/ negligent nondisclosure;" unjust enrichment; civil conspiracy; "respondeat superior" (EAPD); violations of the Colorado Securities Act; fraudulent conveyance (EAPD); breach of fiduciary duty (Glenn); and an accounting.

**1. Fraud**

Plaintiffs allege that Glenn and EAPD prepared the PPM. (Comp.¶ 51). Thus, plaintiffs allege that Glenn and EAPD are responsible for the misrepresentations contained therein. Glenn and EAPD argue, *inter alia,* that as attorneys for BCI, they cannot be liable for misrepresentations made to third parties on behalf of *317 their clients. *See Prudential-Bache Metal Co., Inc. v. Binder.* 121 A.D.2d 923, 504 N.Y.S.2d 646, 649 (1st Dep't 1986) (attorneys not liable for misrepresentations contained in letter agreement written on behalf of corporate client). However, here plaintiffs have alleged that Glenn was a director and "chief legal counsel" of BCI in addition to serving as its outside counsel. (Comp.¶ 21). Thus, as a director, Glenn may be personally liable for misrepresentations that he made on behalf of the company. Nonetheless, the representations in the PPM were not made on behalf of EAPD. Even if EAPD participated in the drafting process, it did so as outside counsel to BCI. Thus, EAPD may not be liable for any misrepresentations contained in the PPM.[FN37]

> FN37. Nor may EAPD be liable for BCI's misrepresentations under an agency or "joint venture" theory. Plaintiffs have not alleged facts showing that EAPD was a partner of BCI's in any venture. Rather, EAPD served as BCI's outside counsel and escrow agent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

While the statements in the PPM may be attributed to Glenn, plaintiffs have not alleged any specific facts showing that Glenn knew those statements to be false. In essence, plaintiffs allege that since Glenn was involved with BCI from its inception and was an experienced securities attorney he should have figured out that some of the representations contained in the PPM were untrue. This does not suffice to allege an intent to defraud. Therefore, plaintiffs have failed to plead fraud against both Glenn and EAPD.

### 2. Negligence/ Negligent Misrepresentation/ Negligent Nondisclosure/ Fraudulent Concealment

Glenn and EAPD argue that plaintiffs negligence based claims fail because attorneys have no duty to exercise reasonable care for the benefit of non-clients such as the plaintiffs. *See National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626, 628 (1st Dep't 1987) ("an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity"). However, as set forth above, plaintiffs have alleged that Glenn wore two hats. He served as BCI's outside counsel, and as a director. Therefore, Glenn had the same duty to convey accurate information as the other director defendants.[FN38]

> FN38. Like Nelson, Lotito and Lavold, plaintiffs have alleged that Glenn knew the PPM would be issued to Hughes. In addition, the PPM advertised Glenn's "specialized expertise" with respect to corporate finance.

With respect to Glenn's role as BCI's outside counsel, a duty of care with respect to non-clients may arise when: 1) the attorney is aware that his statement "is to be used for a particular purpose;" 2) a "known" third party relies "on the statement in furtherance of that purpose;" and 3) there is "some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Prudential Ins. Co. of America v. Dewey, Ballantine,* 80 N.Y.2d 377, 384, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992) (internal citation omitted). Here, plaintiffs have alleged that Glenn knew that the PPM would be given to Hughes. (Comp.¶ 81). After plaintiff invested in BCI, Glenn communicated directly with Hughes. (Comp.¶¶ 137, 167). Therefore, there was a relationship "approach[ing] ... privity" sufficient to create a duty of care between Glenn and the plaintiffs. *Prudential,* 80 N.Y.2d at 382, 590 N.Y.S.2d 831, 605 N.E.2d 318. However, plaintiffs have not alleged that Glenn breached any duty incumbent upon him as BCI's counsel. Glenn was not required to perform "due *318 diligence" on BCI before drafting the PPM. He was entitled to accept his clients' representations regarding BCI's assets. Therefore, while plaintiffs have adequately alleged a claim for negligent misrepresentation against Glenn in his capacity as a director, plaintiffs have failed to state a claim for negligent misrepresentation against Glenn or EAPD in their capacity as outside counsel to BCI.

However, with respect to plaintiff's nondisclosure claim, plaintiffs have alleged no facts that show Glenn was aware that plaintiffs' were acting on the basis of mistaken information regarding Bruner's involvement in the venture. Furthermore, plaintiffs' fraudulent concealment claim is deficient because, as set forth above, plaintiffs have failed to allege an intent to defraud. Therefore, plaintiffs' negligent nondisclosure and fraudulent concealment claims against Glenn and EAPD fail as a matter of law.

### 3. Unjust Enrichment

Glenn and EAPD contend that plaintiffs have failed to allege that plaintiffs conferred any benefit on Glenn or EAPD. However, plaintiffs have alleged that EAPD received approximately $200,000 from the funds plaintiffs' invested in BCI. (Comp.¶ 129). Plaintiffs also allege that any legal services Glenn and EAPD performed provided no benefit to BCI, but rather solely benefited the Cunningham Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

ants, Saltman and Equistar. (Comp.¶ 132). Glenn and EAPD argue that their acceptance of legal fees from BCI was perfectly reasonably and justified in light of the legal work they performed. However, this is a factual issue not ripe for adjudication. For now, plaintiffs have adequately plead unjust enrichment against Glenn and EAPD.

### 4. Civil Conspiracy

For the reasons set forth above, plaintiffs may not allege a claim for "civil conspiracy" against Glenn or EAPD.

### 5. Vicarious Liability

For the reasons, set forth above, plaintiffs may allege vicarious liability as a separate claim against EAPD.

### 6. Colorado Securities Act

Since plaintiffs have failed to allege that either Glenn or EAPD made an affirmative misrepresentation or omission with scienter, plaintiffs' CSA claim against Glenn and EAPD must be dismissed.

### 7. Fraudulent Conveyance

Glenn and EAPD argue that plaintiffs' fraudulent conveyance claim fails because plaintiffs have not alleged that Glenn or EAPD had knowledge of any fraudulent scheme perpetrated by BCI on its creditors. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 636 (2d Cir.1995) ("an appropriate creditor may void or disregard a fraudulent conveyance to any person 'except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase' ") (quoting N.Y. DCL § 278(1)). However, *HBE Leasing* involved a multilateral transfer of assets in which the transferee actually conveyed fair value to the debtor in exchange for the debtor's property. *Id.* at 635. Here, plaintiffs have alleged that EAPD received funds directly from BCI (or more precisely retained funds plaintiff intended to distribute to BCI) without conveying fair consideration to BCI in return. Under these circumstances, plaintiffs need not allege an intent to defraud by EAPD to allege a constructive fraudulent conveyance. Thus, plaintiffs have adequately alleged a claim for fraudulent conveyance against EAPD.

### *319 8. Breach of Fiduciary Duty

[39] Glenn argues that, under Delaware law, directors do not owe a fiduciary duty to the holders of convertible debentures. *See Benjamin v. Kim,* No. 95 Civ. 9597, 1999 WL 249706, *13 (S.D.N.Y. April 28, 1999) (applying Delaware law). However, in *Benjamin* the court explicitly noted that, in Delaware (as in New York), directors of an insolvent corporation do owe a fiduciary duty to creditors (including convertible debenture holders). *Id.* In addition, Glenn argues that, as BCI's attorney, he was bound to follow BCI's instructions in disbursing funds that EAPD held in escrow for BCI. However, Glenn was also a director of BCI, and his fiduciary duty to BCI's creditors flows from his status as a director. Thus, plaintiffs have sufficiently plead a claim for breach of fiduciary duty against Glenn.

### 9. Accounting

Glenn and EAPD argue that plaintiffs may not seek an accounting from them because plaintiffs have failed to allege that they enjoyed "relations of a mutual and confidential nature" with either Glenn or EAPD. *Pressman,* 860 F.Supp. at 179. In addition, Glenn and EAPD argue that plaintiffs have failed to allege that plaintiffs entrusted any assets to them. As set forth above, plaintiffs have alleged the existence of a fiduciary relationship with Glenn. In addition, EAPD received all of the funds plaintiffs' invested in BCI (and allegedly distributed most of those funds to the other defendants). Thus, it is equitable to impose an obligation on Glenn and EAPD to account for plaintiffs' investment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

452 F.Supp.2d 290
452 F.Supp.2d 290
(Cite as: 452 F.Supp.2d 290)

### CONCLUSION

For the reasons set forth above, the Cunningham Defendants, Saltman, BCI and Bio-Comp's motions to dismiss are GRANTED with respect plaintiffs' civil conspiracy claim and DENIED in all other respects. Lotito and Nelson's motions to dismiss are GRANTED with respect to plaintiffs' claims for negligent nondisclosure, fraudulent concealment and civil conspiracy and DENIED in all other respects. Lavold's motion to dismiss is GRANTED with respect to plaintiffs' claims for fraud, negligent nondisclosure, fraudulent concealment, civil conspiracy and violations of the Colorado Securities Act, and DENIED in all other respects. Equistar's motion to dismiss is GRANTED with respect to plaintiffs' claim for civil conspiracy and DENIED in all other respects. Bruner and RVM's motions to dismiss are GRANTED with respect to plaintiffs' claims for fraud and civil conspiracy and DENIED in all other respects. Glenn's motion to dismiss is GRANTED with respect to plaintiffs' claims for fraud, negligent nondisclosure, fraudulent concealment, civil conspiracy and violations of the Colorado Securities Act, and DENIED in all other respects. EAPD's motion to dismiss is GRANTED with respect to plaintiffs' claims for fraud, negligent misrepresentation, negligent nondisclosure, fraudulent concealment, civil conspiracy and violations of the Colorado Securities Act, and DENIED in all other respects. The Clerk of the Court is directed to close these motions and remove them from my docket.

**SO ORDERED.**

S.D.N.Y.,2006.
Hughes v. BCI Intern. Holdings, Inc.
452 F.Supp.2d 290

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.