IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CENTURY INDEMNITY COMPANY, ET AL.** | **ELECTRONICALLY FILED** |
| Plaintiffs, | CIVIL ACTION NO.: 08 CV 02012 |
| Versus | PKL/DCF |
| **FREEPORT-MCMORAN COPPER & GOLD INC., ETC.** | |
| Defendant. | |

### AFFIDAVIT OF VANCE A. WOODWARD SUBMITTING NEWLY DISCOVERED EVIDENCE IN SUPPORT OF THE CONTINENTAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO FREEPORT-MCMORAN COPPER AND GOLD INC.'S MOTION TO DISMISS OR STAY THIS ACTION

I, Vance A. Woodward, swear that the following is true, upon personal knowledge, under penalties of perjury.

1. I am an associate at the Carroll, Burdick & McDonough, LLP law firm in San Francisco, California.

2. I am a member in good standing of the bars of California and New York.

3. I submit this affidavit to present newly discovered evidence in support of The Continental Insurance Company's Memorandum of Law in Opposition to Freeport-McMoRan Copper and Gold Inc.'s Motion to Dismiss or Stay This Action.

4. Attached hereto as **Exhibit A** is a true and correct copy of the motion to dismiss and supporting documents filed by The Continental Insurance Company and Century Indemnity Company in *Cyprus Amax Minerals Co v. Cont'l Cas. Co.*, No. BC391068 (Cal. Super. Ct., Los Angeles County, complaint filed May 16, 2008). Specifically, **Exhibit A** includes the following:

CBM-IPG\SF409232.1

- ➢ Notice of Motion and The Continental Insurance Company's and Century Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Memorandum of Points and Authorities in Support of The Continental Insurance Company's and Century Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Request for Judicial Notice in Connection with The Continental Insurance Company's and Century Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Non-California Authorities Supporting The Continental Insurance Company's and Century Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Declaration of Vance Woodward in Support of The Continental Insurance Company's and Century Indemnity Company's Joint Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Declaration of Robert Galardi in Support of The Continental Insurance Company's Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

- ➢ Declaration of David Lehman in support of The Continental Insurance Company's Motion To Dismiss or Stay the Action Based On *Forum Non Conveniens*

- ➢ Declaration of Margo Dedeyan in Support of The Continental Insurance Company's and Century Indemnity Company's Motion to Dismiss or Stay the Action Based on *Forum Non Conveniens*

5.   Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the "Realtime Rough Draft" deposition transcript of the deposition of Mr. Bobby Medlin, taken on June 23 and June 24, 2008.

6.   Mr. Medlin currently works at Enviro-Tox Loss Services ("ETLS") and has worked at ETLS since August 2003. Ex. B, Medlin Dep. Tr., 11:20 – 13:18.

7. During his employment with ETLS, defendant Freeport-McMoRan has been a client of ETLS and Mr. Medlin has worked on the Freeport-McMoRan account. Ex. B, Medlin Dep. Tr., 11:19 – 12:15; 18:14 – 20; 20:9 – 21:12.

_____
Vance A. Woodward, affiant


STATE OF CALIFORNIA        )
                           )  ss
COUNTY OF SAN FRANCISCO    )

Subscribed and sworn to before me on this 1st day of July 2008, by Vance A. Woodward, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_____
Notary Public

JANINE OLIKER
Commission # 1578466
Notary Public - California
San Francisco County
My Comm. Expires Jun 10, 2009

# EXHIBIT B

ROUGH DRAFT - NOT A FINAL

Page 1

1  REALTIME ROUGH DRAFT

2  BOBBY J. MEDLIN

3  JUNE 23, 2008

4  CONFIDENTIAL

5

6  The stenographic notes taken in the within
7  proceeding have been translated instantaneously into
8  their English equivalents through a computerized process
9  called realtime translation
10  A realtime rough draft, in ASCII format, is
11  available to all counsel on a diskette.  The realtime
12  text as seen on the computer monitor at the site of
13  these proceedings, as well as the rough draft ASCII
14  transferred onto a diskette, is unedited and uncertified
15  and may contain untranslated stenotype, misspelled
16  proper names and technical words, occasional reporter's
17  notes, and/or nonsensical English word combinations.
18  These will be corrected on the final certified
19  transcript upon its delivery to you in accordance with
20  our standard delivery terms, or on an expedited basis,
21  as requested.
22  The realtime rough draft is intended only for
23  the purpose of augmenting counsel's notes and is not
24  intended to be used or cited in any court proceeding as
25  representing a final edited and proofread transcript.

ROUGH DRAFT - NOT A FINAL

Page 11

1  employment history.  You mentioned you've worked long
2  enough in the insurance industry that you're excempte
3  from continuing legal -- continuing education?
4      A.    Education.
5      Q.    Rather.  How many years have you worked in the
6  insurance industry total?
7      A.    It hurts to say that, but 38.
8      Q.    38 years?
9      A.    Yeah.  I started in March of 1970.
10     Q.    And please name some of the companies that
11 you've worked for in those 38 years.
12     A.    I've worked for -- I started out with safeco
13 insurance /(.  I had my own company for right at 14
14 years, was Frontier Adjusters.  I worked with Trinity
15 for a while.  I worked for Houston General for about
16 three, four years, until they -- until Tokyo Marine sold
17 the company.  And then I went to work for Cunningham
18 Lindsey /(.
19         After that, I went into temporary work for a
20 while, and then in August of '03 I went to work for ETLS
21 as temp.  They had taken an a project with Phelps Dodge
22 Industries and they had approximately 250/60 boxes of
23 materials that they wanted reviewed and I went to work
24 to do that.  They needed someone with pretty good
25 insurance experience to take a look at those documents.

ROUGH DRAFT - NOT A FINAL

Page 12

1  It was not a reel detailed inspection as far as looking
2  at each and every page and cataloging those.  It was --
3  we were looking for company histories dating back into
4  the late 1800s/early 1900s with several different
5  companies that come under the Phelps damage mantle.  We
6  were looking for insurance policies that would apply to
7  a lot of their complex litigation, their long tail
8  claims (crkt) that we could put together document
9  programs of insurance for each one of the subsidiary
10 companies and basically archaeology work for a long
11 time.
12        And then I went to work for them
13 permanently -- once we sold the project was -- would be
14 semipermanent I went to work for ETLS in December of 03
15 as a permanent employee.
16     Q.   And ETLS is -- stands for what?
17     A.   Enviro-Tox Loss Services.
18     Q.   And you said you started temping in summer
19 2003, correct?
20     A.   I'm sorry, what?
21     Q.   You started as a temporary employee in the
22 summer of 2003?
23     A.   Right.  I -- if I'm not mistaken Phelps
24 Dodge -- or the time period when Enviro-Tox first got
25 the assignment to do work for them was in May or June of

ROUGH DRAFT - NOT A FINAL

Page 13

1   '03 which I'm not certain of that because I wasn't
2   there.  And -- but yes, in August of '03 I went to work
3   as a temporary.
4       Q.   And why were you temping at that time?
5       A.   At that time I was between jobs.  The work at
6   Cunningham was getting to a point where it was a little
7   bit uncontrollable as far as when I went to work there I
8   was supposed to work Houston general claims only and by
9   the time I left I was working five or six other
10  companies as well.
11      Q.   And then you mentioned that you were hired as
12  a permanent employee at ETLS later in 2003.  Do you
13  recall --
14      A.   December.
15      Q.   December 2003?
16      A.   Right, uh-huh (Affirmative.)
17      Q.   And are you currently employed at ETLS?
18      A.   Yes, I am.
19      Q.   What is your current title?
20      A.   Well, we really don't have titles at ETLS.
21  I'm an adjuster, insurance adjuster.
22      Q.   What type of clients does ETLS serve?
23      A.   We serve both insurance carrier clients as
24  well as corporate clients.
25      Q.   And briefly describe the kind of services that

ROUGH DRAFT - NOT A FINAL

Page 18

1  of boxes --
2      A.   Uh-huh (Affirmative.)
3      Q.   -- of insurance documents. Do you know where
4  the boxes came from? Were you told where the boxes came
5  from?
6      A.   Yes, I do. Those boxes, I believe -- and I
7  think I'm? ? On this came from the Zevnik Horton law
8  firm /( who had been coverage counsel for Phelps Dodge
9  in the Cyprus AMAX companies for quite some time.
10     Q.   Did you work for any other client when you
11 were a temporary employee at ETLS?
12     A.   Not as a temporary, no. As a temporary my
13 sole duties were inspection of documents.
14     Q.   During your time as a permanent employee at
15 ETLS, have you worked for any other clients?
16     A.   A few. My biggest job at ETLS is the Phelps
17 Dodge program, but I have assisted on a few other
18 things, just on a necessary time when somebody might be
19 out or they had a little bit more than what they could
20 do, that we helped -- helped out on that.
21     Q.   And you've been referring to the company
22 client in -- at issue as Phelps Dodge. What are some of
23 the affiliated companies of Phelps Dodge that you
24 provide services for?
25     A.   Oh, gosh. Well, you could track the line with

ROUGH DRAFT - NOT A FINAL

Page 19

1  Cyprus, originally Cyprus Mines (crkt), they took Sierra
2  Talc, United Clay, a bunch of companies along.  I think
3  they started somewhere around the turn of the Century.
4  AMAX? ?  That had other facilities that -- we tracked
5  back through all of those.  AMAX and Cyprus came
6  together in '93 as Cyprus AMAX and they were absorbed by
7  Phelps Dodge in 1999.  Phelps Dodge itself I think they
8  were in business in the mid to late 1800s.  And they've
9  had several subsidiary companies along the way taking
10 over other companies along the way, so we have actually
11 worked for each and every one of those companies at some
12 time period if some specific thing pops up that we need
13 to know about.  Cyprus Foote// Chemicals (ck) which at
14 one time -- that was taken over by Cyprus Mines and
15 they're actually a separate entity for a while.  They
16 have coal companies.  Each of the three major companies,
17 Cyprus, AMAX and Phelps Dodge all dealt in basically
18 anything that came out of the ground, mostly copper,
19 though, but yes, we probably -- I don't know how many
20 different entities there is but there's a bunch of them.
21      Q.   And have you studied the relationships between
22 these different corporate entities during your time at
23 ETLS?
24      A.   Yes.
25      Q.   For what purpose?

ROUGH DRAFT - NOT A FINAL

Page 20

1  A. Well, to determine what policies and what
2  claims go with each entity you have to know the time
3  periods that they were in business, when they came into
4  being, when they merged with, say, Cyprus or able /( or
5  Phelps Dodge. You have to know what policies apply to
6  the period of time that the suits that we get pertain
7  to, so yeah, we -- we do kind of a time line on -- on
8  everybody that we deal with.
9  Q. Please describe your current job duties at
10  ETLS.
11  A. Current job right now is not a whole lot
12  different than what it has been. We are still charged
13  with reviewing all new suits that come in, trying to
14  determine what program they go under, if there's any
15  insurance coverage that might apply to them. If there
16  is insurance coverage, we report it to those carriers.
17  We set up the claims on a database that we could keep
18  pretty much rolling inventory of everything we're
19  working on, and that Phelps Dodge or Freeport can also
20  see the same thing we're seeing.
21  We handle any questions that the carriers may
22  have. We report something if they either don't quite
23  agree with what we've got or have some questions, we
24  supply information to help answer those questions. We
25  deal with Phelps Dodge coverage counsel -- actually,

ROUGH DRAFT - NOT A FINAL

Page 21

1  Freeport coverage counsel now -- on any new situations
2  that we run into that we might not have in the past that
3  needs some type of review as to coverage, as to possibly
4  what entity they actually fit under. We do that type of
5  thing.
6       We -- we monitor bills. We're setting up
7  methods that help us to be more alert to be able to
8  monitor -- methods to monitor bills that aren't being
9  paid properly. We send out arrearage letters. That's
10 something that's a little bit new now. I particularly
11 don't send those out. We have somebody else that does
12 that. Mostly just the same thing we've been doing.
13      Q.   As part of your job, do you perform a
14 historical review of insurance policies?
15      A.   Yes.
16      Q.   And can you speak briefly about the difference
17 between primary and excess insurers with respect to the
18 duty to defend?
19      A.   Primary and excess -- all the primary policies
20 that apply to this program have defense in them//. Some
21 of the excess policies do, some of them don't. It's
22 just according to how to policy is worded.
23      The primary policies all have a duty to defend
24 on claims that there is any likelihood that there might
25 be a payment on any claim involved in the future. That